**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>Hawks Landing Owner LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31122 (LTB) |
| In re:<br><br>Merchant's Sub 1 LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31123 (LTB) |

**MOTION TO DISMISS DEBTORS' CHAPTER 11 CASES**
**FOR LACK OF REQUISITE CORPORATE AUTHORIZATION**

MaxMez NC, LLC ("MaxMez"), by and through undersigned counsel, hereby moves (this "Motion") pursuant to sections 105(a) and 1112(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), for entry of an order dismissing the above-captioned bankruptcy cases (together, the "Chapter 11 Cases") on the basis that each was filed without valid and requisite corporate authorization. In support of this Motion, MaxMez relies on the *Declaration of David L. Johnson* filed concurrently herewith (the "Johnson Declaration") and respectfully states as follows:

## I. Introduction

1. The above-captioned debtors (together, the "Debtors") commenced these Chapter 11 Cases without the requisite corporate authorization from their indirect and controlling member, MaxMez. The purported "Action of the Authorized Signatory" filed with each of the Debtors' petitions, *see* Case No. 26-31122 at Docket No. 2, Case No. 26-31123 at Docket No. 2, is not sufficient to validly authorize either Debtor to petition this Court for relief, nor to proceed in

bankruptcy. Instead, the Debtors require MaxMez's prior written consent and approval before they file any petition for relief under the Bankruptcy Code. MaxMez did not (and does not) consent or approve of the Debtors' bankruptcy filings. For this reason alone, the Chapter 11 Cases must be dismissed.

2. In addition to being unauthorized, the Chapter 11 Cases were commenced for the singular purpose of attempting to delay action by the North Carolina state court with respect to the release of approximately $20 million in attached funds that the Debtors had failed to bond by the state court's August 17, 2025 deadline. Beyond attempting to use the automatic stay to shield the Debtors from the inevitable result of their own conduct in that litigation, these Chapter 11 Cases serve no valid bankruptcy purpose: the Debtors are special-purpose entities that have sold their sole real property asset; they have no ongoing business or other operations to restructure; they have no material or tangible assets requiring protection from creditors; and they have no credible ability to confirm a plan that treats their various liabilities in any meaningful way. While MaxMez does not, through this Motion, seek dismissal of the Chapter 11 Cases on these or other bad faith grounds, it reserves the right to do so.

## II. Factual Background

### A. Overview of the Parties[1]

3. These Chapter 11 Cases arise in the context of a failed real estate investment partnership between affiliates of the Valor Residential Group (generally, "Valor") and Maxus Realty Trust, Inc. ("Maxus"). In 2022, Valor purchased two multi-family apartment complexes in North Carolina, one in Leland known as the Park at Village Oaks (the "PVO Property") and one

[1] The relevant history underlying these Chapter 11 Cases is detailed, complex, and wide-ranging. This summary is intended to provide context for the specific relief sought in this Motion. It is not exhaustive, nor does it reflect the full extent of the misconduct committed by the Debtors and their operating affiliates. Likewise, it does not belabor the sweeping damages and other relief awarded in MaxMez's favor.

in Hickory known as Hawks Landing (the "Hawks Property"). Valor was responsible for operating the properties, while Maxus provided mezzanine debt and mezzanine equity investments through its affiliate, MaxMez.

4. Due to Valor's mismanagement, the senior mortgage loans on each property suffered maturity defaults in June 2024. Numerous disputes arose between Valor and Maxus, including the commencement of arbitration proceedings in August 2024 (as detailed more fully below, the "Arbitration"). Despite MaxMez's objections and efforts to take control of the properties in accordance with its rights under the various governing documents, Valor caused the sale of PVO Property in October 2024 and the sale of the Hawks Property in April 2025. Subsequent merits and appellate panel decisions in the Arbitration have ruled, amongst other significant relief, that MaxMez had a right to control both sales and that the wrongful conduct of Valor and its affiliates in connection therewith triggered individual recourse liability on guarantees given by Valor's principals Eliezer Meisels ("Meisels") and Moshe Weingarten ("Weingarten"). A true and correct copy of the *Appellate Opinion and Final Award* dated June 8 and issued June 12, 2026 (the "Final Arbitration Award") is attached to the Johnson Declaration as **Exhibit A**.[2]

### B. The Hawks Property and Its Ownership Structure

5. The Debtors in these Chapter 11 Cases – Merchant's Sub 1 LLC ("Merchant's Debtor") and Hawks Landing Owner LLC ("Hawks Landing Debtor") – were formed as special-purpose entities (SPEs) to own the Hawks Property. In particular, the Debtors owned the Hawks Property as tenants-in-common along with two other non-debtor entities, Dover Sub 1 LLC

[2] MaxMez has filed a *Motion to Confirm Arbitration* in North Carolina Superior Court, Mecklenburg County, in the case styled as *MaxMez v. Hawks PVO, et al.*, Case No. 26CV033762-590 (the "Confirmation Action"), which remains pending. Notably, the Debtors in this case are not Respondents in the Arbitration, nor parties to the Confirmation Action. The Debtors are thus not entitled to, nor have they sought, a stay of the Confirmation Action as a result of these Chapter 11 Cases.

("Dover Sub Owner"), and RRAIT Sub 1 LLC ("RRAIT Sub Owner" and collectively with the Debtors, the "TIC Owners").[3] A true and correct copy of the organizational structure chart showing the corporate ownership of the Hawks Property and the TIC Owners is attached to the Johnson Declaration as **Exhibit B** (the "Structure Chart").

6. As shown in the Structure Chart, each of the TIC Owners is a single-member Delaware limited liability company. As is relevant to these proceedings:

- Merchant's Holding 1 LLC ("Merchant's Holding") is the sole member and manager of Merchant's Debtor; and
- Hawks PVO Holding LLC ("Hawks Holding" and together with Merchant's Holding, the "HoldCos") is the sole member of Hawks Landing Debtor.

True and correct copies of the limited liability operating agreements for each of Merchant's Debtor and Hawks Landing Debtor (together the "Debtor LLC Agreements") are attached to the Johnson Declaration as **Exhibit C** (Merchant's Debtor LLC Agreement) and **Exhibit D** (Hawks Landing Debtor LLC Agreement).

7. Under the Debtor LLC Agreements, each of Merchant's Debtor and Hawks Landing Debtor are exclusively managed by their respective sole member, *i.e.*, the HoldCos. *See* Exhs. C and D, each at § 5.

8. Although the HoldCos may appoint an "Authorized Signatory" to "execute and deliver any and all specific agreements, certificate or any other documents" on behalf of Merchant's Debtor and Hawks Landing Debtor, the overall "business and affairs of the Company," including all decision powers under Delaware's Limited Liability Company Act, are vested in the HoldCos. *See* Exhs. C and D, each at § 6.

[3] The TIC Owners' respective ownership interests were divided as follows: Merchant's Debtor – 47.5%; Hawks Landing Debtor – 42.2%; Dover Sub Owner – 4.7%; and RRAIT Sub Owner – 5.6%.

9. In turn, each of the HoldCos is a Delaware limited liability company having a "Capital Member" and an "Operating Member":

- MaxMez is the Capital Member and holds one hundred percent (100%) of the preferred equity in each of the HoldCos; and
- Merchant's Walk Apartments LLC ("Merchant's Operating Member") is the Operating Member of Merchant's Holding, and Hawks PVO LLC ("Hawks Operating Member" and together with Merchant's Operating Member, the "Operating Members") is the Operating Member of Hawks Holding.

**C. The HoldCo Operating Agreements**

10. MaxMez's mezzanine equity investment in the Hawks Property is evidenced by the limited liability company operating agreements for each of the HoldCos (collectively, the "HoldCo LLC Agreements"). True and accurate copies of the HoldCo LLC Agreements are attached to the Johnson Declaration as **Exhibit E** (Merchant's Holding LLC Agreement) and **Exhibit F** (Hawks Holding LLC Agreement).[4]

11. Importantly, to protect MaxMez's investments in Hawks Property, the HoldCo LLC Agreements grant MaxMez various rights to control both the HoldCos and their respective SPEs (*i.e.*, the Debtors). In particular, the HoldCo LLC Agreements expressly prohibit the HoldCos – in their capacity as the sole member of the SPE – to authorize the SPE to file bankruptcy without MaxMez's prior consent. *See* Exhs. E and F, each at Section 4.1(e). That same provision also prohibits any member of the HoldCos to authorize the HoldCos or the SPE to commence bankruptcy proceedings without MaxMez's prior consent. *Id.* Moreover, a separate provision of

[4] The HoldCo LLC Agreements are materially the same except with reference to the particular HoldCo member and its respective SPE and Operating Member.

the HoldCo LLC Agreements requires that MaxMez consent and approve any "Major Decision" with respect to the HoldCos, the SPE, and the property, including a bankruptcy filing. *See* Exhs. E and F, each at Section 4.1(a)(xi) and (xvii).

**1. Terms Defined in the HoldCo LLC Agreements**

12. The HoldCo LLC Agreements define various terms, including with respect to the Debtors, the HoldCos and the Hawks Property:

> "***Company***" means the respective HoldCo Member, *i.e.*, Merchant's Holding 1 LLC or Hawks PVO Holding LLC. Exhs. E and F, each at 3 (definition of "Company").
>
> "***SPE***" means the respective Debtor, *i.e.*, Merchant's Sub 1, LLC or Hawks Landing Owner LLC. Exhs. E and F, each at 3 (definition of "SPE").
>
> "***Capital Member***" means MaxMez. Exhs. E and F, each at 3 (definition of "Capital Member(s)").
>
> "***Operating Member***" means the respective Valor-affiliated Operating Member, *i.e.*, Merchant's Walk Apartments LLC or Hawks PVO LLC. Exhs. E and F, each at 7 (definition of "Operating Member").
>
> "***Members***" mean the Capital Member, the Operating Member and any subsequently admitted member. Exhs. E and F, each at 7 (definition of "Member").
>
> "***Manager***" means the Operating Member unless or until the Operating Member is removed or replaced. Exhs. E and F, each at 6 (definition of "Manager").
>
> "***Changeover Event***" means "the occurrence of one or more events described in Section 8.1" of the HoldCo LLC Agreements which, with were deemed to occur during the course of the Arbitration. Exhs. E and F, each at 3 (definition of "Changeover Event"); *see also* Ex. A at 15 (recognizing that MaxMez has "obtained changeover declarations on both properties.")

13. Within the definitional sections, the HoldCo LLC Agreements also establish and detail the function of the HoldCo's "Board of Managers":

> "***Board of Managers***" means (i) prior to a Changeover Event, a board of two members consisting of one member appointed by the Operating Member, which must be an Operating Member or an affiliate of an Operating Member (the "***Operating Member Appointee***") and one member appointed by the Capital Members,

> which must be a Capital Member or an affiliate of the Capital Members (the "***Capital Members Appointee***"), each member of the Board of Managers shall have a 50% vote, and (ii) after a Changeover Event, solely the Capital Members Appointee who shall have the ability, acting alone, to grant any consent or approval of the Board of Managers. Whenever the "approval" or "consent" of the Board of Managers is described herein, such action shall be deemed to require a unanimous vote of the Board of Managers prior to a Changeover Event and the sole vote of the Capital Members Appointee after a Changeover Event. . . .

Exhs. E and F, each at 2 (definition of "Board of Managers") (emphasis added). As noted above, the Appellate Arbitration Panel recognized that a Changeover Event had occurred as to both the PVO Property and the Hawks Property. *See* Ex. A at 15. Accordingly, at the time these Chapter 11 Cases were commenced MaxMez, as the Capital Member acting alone, had the sole ability to grant any consent or approval of the Board of Managers.[5]

**2. Section 4.1(e)**

14. Section 4.1(e) of the HoldCo LLC Agreements require MaxMez's prior written consent to authorize the HoldCo Member (the Company) or the Debtors (the SPEs) to file bankruptcy:

> Without the prior consent of all Members, neither the Manager nor any Member shall have any authority to do any of the following acts: . . . (vi) the filing on behalf of the Company or SPE (where the Company or SPE is the debtor) of any petition, or consent to the appointment of a trustee or receiver or any judgment or order, under state or federal bankruptcy laws[.]

Exhs. E and F, each at Section 4.1(e) (emphasis added). Stated plainly, Section 4.1(e) bars any single Member or the Manager of the Company from authorizing the HoldCos or the SPEs to file for bankruptcy without the unanimous and prior written consent of all other Members. *Id.*

[5] Again, there is no dispute that a Changeover Event has occurred. *See* Ex. A at 15. Yet even if a Changeover Event had not occurred (or whether that occurrence was still disputed), MaxMez's consent to any Board of Manager action would still be required because, in that circumstance, the unanimous vote of both members of the Board of Managers would be required.

### 3. Section 4.1(a)(xi) and (xvii)

15. Section 4.1(a) of the HoldCo LLC Agreements imposes a similar requirement of Board of Manager consent before the HoldCos may authorize the SPEs (*i.e.*, the Debtors) to file bankruptcy. Specifically, Section 4.1(a) prescribes the approvals required before any Manager, Member, the Company or the SPE take any "Major Decisions":

> No action shall be taken, sum expended, or obligation incurred by the Manager or any Member, the Company or SPE regarding the matters described below (the "***Major Decisions***") without the written approval of the Board of Managers (except to the extent the same is otherwise expressly authorized by the terms of this Agreement . . .

Exhs. E and F, each at Section 4.1(a) (emphasis added).

16. The subsection thereafter enumerates eighteen "Major Decisions" requiring Board of Manager approval, including:

> (xi) filing of any petition or consenting to the filing of any petition that would subject the Company to a Bankruptcy
>
> [and]
>
> (xvii) causing the SPE to take any action that, if taken by the Company, would have required the approval of the Capital Members;

Exhs. E and F, each at Section 4.1(a) (xi) and (xvii) (emphasis added).

17. The subsection concludes by affirming that upon the occurrence of a Changeover Event, the Capital Member shall have sole authority to make or affect Major Decisions in its sole discretion:

> Notwithstanding the foregoing provisions of this Section 4.1(a) or anything in this Agreement to the contrary, except as provided in Section 4.1(e), upon the occurrence of a Changeover Event, the Capital Members shall have the authority to make and/or affect Major Decisions acting without the consent or joinder of the Operating Member and in Capital Members' sole discretion.

*Id.* (emphasis added).

**D. Prior Review of MaxMez's Management Rights**

18. The Debtors and each of the other TIC Owners are plaintiffs and counterclaim defendants in a pre-petition action pending in the North Carolina Business Court, *Dover Sub 1, LLC et al. v Hawks Note Purchase LLC*, Case No. 25-955-170 (the "HNP Action"). The defendant and counterclaim plaintiff in the HNP Action is Hawks Note Purchase, LLC ("HNP") which is an affiliate of Maxus. Prior to the Hawks Property sale, HNP purchased the senior mortgage note on the Hawks Property. HNP was not paid upon the sale of the Hawks Property; instead, proceeds in excess of $21 million were deposited with the Clerk of Court for Catawba County in connection with the HNP Action (generally, the "Attached Proceeds").

19. Following the issuance of the merits decision in the Arbitration in October 2025 (which found overwhelmingly in MaxMez's favor), MaxMez sought to intervene in the HNP Action to, amongst other things, direct the dismissal of the HNP Action by the TIC Owners. In particular, MaxMez asserted that it had taken valid corporate action (i) to remove the Operating Managers as managers of the HoldCos, (ii) remove the HoldCos as manager of the Debtors, and (iii) appoint MaxMez as the manager for each of the those entities (generally, the "Replacement Manager Grounds"). In addition, MaxMez asserted that a separate provision of the HoldCo LLC Agreement – Section 4.1(a)(x) (the "Litigation Consent Grounds") – required the TIC Owners get MaxMez's consent before they could undertake the "Major Decision" of "instituting any legal action for damages in excess of $50,000[.]" *See* Exhs. E and F, each at Section 4.1(a)(x).

20. The TIC Owners (including the Debtors) opposed MaxMez's intervention and asserted that MaxMez had previously sought in the Arbitration to be deemed the "manager" of the HoldCo or Debtor entities, and that relief was denied. As a result, the Debtors asserted that MaxMez's attempt to intervene in the HNP Action on the Replacement Manager Grounds was

barred by *res judicata*. TIC Owners also asserted that *any* dispute as to MaxMez's right to control the TIC Owners was subject to arbitration pursuant to Section 15.19 of the HoldCo LLC Agreements.

21. On May 12, 2026, the North Carolina Business Court entered an order denying MaxMez's request to intervene in the HNP Action. *See Order Denying Emergency Motion to Intervene and Staying the Litigation*, a true and correct copy of which is attached hereto as **Exhibit G** (the "Intervenor Order"). The Intervenor Order stayed the HNP Action to allow MaxMez to file an arbitration demand to address the issues highlighted by the Business Court. *Id.* at 8. In the interest of allowing the HNP Action to proceed, MaxMez advised the Business Court that it did not intend to pursue additional relief in arbitration at that time.

22. In parallel to the intervenor briefing, HNP sought the release of the Attached Proceeds unless the plaintiff TIC Owners posted a bond to maintain the attachment under North Carolina state law. Following multiple orders from the Business Court, the TIC Owners eventually posted one bond sufficient to attach approximately $1.9 million of the Attached Proceeds; the deadline to post the bond for the balance, approximately $20 million, was August 17, 2026 at 5:00 p.m. (the "Bond Deadline").

**E. The Debtor's Unauthorized Bankruptcy Filing**

23. Unable to meet the bond deadline, each of the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on August 17, 2026 (the "Petition Date").[6] *See* Case No. 26-31122 at Docket No. 1, Case No. 26-31123 at Docket No. 1 (collectively, the "Petitions"). Each of the Petitions purports to be authorized by an "Action of the Authorized Signatory" for each of the Debtors. *See* Case No. 26-

[6] The Bond Deadline expired at 5:00 p.m. Eastern. Based on the EC/ECF filing stamp, each of the Petitions appears to have been filed after 5:00 p.m.

31122 at Docket No. 2, Case No. 26-31123 at Docket No. 2 (collectively, the "Purported Authorizations"). The Purported Authorizations are signed by Weingarten in his capacity as "Authorized Signatory" for each of the Debtors, which are defined in each Purported Authorization as the "Company." *Id.*

24. By the Purported Authorizations, Mr. Weingarten supposedly "adopt[s] the following resolution by signing its written consent":

> **RESOLVED**, that the Company be, and hereby is, authorized to proceed with the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Western District of North Carolina.
>
> **FURTHER RESOLVED,** that Moshe Weingarten as authorized representative is authorized and directed to sign and verify the voluntary petition under Chapter 11 of the Bankruptcy Code on behalf of the Company and to execute such other documents, including without limitation, pleadings, schedules, statement of affairs, applications, motions, plan of reorganization, disclosure statement, and amendments or modifications thereto, in furtherance of the Company's Chapter 11 filing and reorganization effort.

*Id.*

25. On its face, each Purported Authorization appears merely to be "the consent of the Authorized Signatory" of each of the Debtors. *Id.* It is not a "written consent" of any member-manager of the Debtors, *i.e.*, the HoldCos, nor does it even claim that the HoldCos acted by written consent (or any other mechanism) to authorize or approve the bankruptcy filings. Likewise, the Purported Authorizations make no mention as to the required consent or authorization up the Debtors' corporate structure. And indeed they cannot, if only for the simple fact that MaxMez has not provided that requisite consent.

## III. Basis for Relief

26. MaxMez, in its capacity as Capital Member of each of the HoldCos and the sole member of the Board of Managers for each of the HoldCos, which are in turn the current acting managers and sole members of the respective Debtors, respectfully seeks dismissal of these Chapter 11 Cases pursuant to Sections 105 and 1112(b) the Bankruptcy Code, Rule 1017 of the Federal Rules of Bankruptcy Procedure, and this Court's Local Rule 1002-2(d).

## IV. Argument

### A. A Debtor's Lack of Valid Corporate Authorization to File Bankruptcy Requires Dismissal of Its Chapter 11 Case

27. Section 1112(b) of the Bankruptcy Code provides that a bankruptcy court "shall" either convert a chapter 11 case to a case under chapter 7 or dismiss the case, "whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment … of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1) (emphasis added).

28. Section 1112(b)(4) provides a non-exhaustive list of sixteen examples of what constitutes "cause" for dismissal or conversion. Though not included within this list, Courts have long held that a lack of corporate authority to file a bankruptcy petition constitutes cause for dismissal under Section 1112(b). *See Price v. Gurney*, 324 U.S. 100, 106 (1945) (upholding dismissal of petition for relief under Bankruptcy Act for lack of corporate authority); *In re NNN 123 N. Wacker, LLC*, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014) ("In addition to 'cause' under § 1112(b), lack of corporate authority to file is an independent ground for dismissal of a bankruptcy case filed by a corporation.").

29. While Section 1112(b) by its terms provides some optionality between dismissing the case, converting it to a Chapter 7 proceeding, or appointing a trustee, a lack of corporate

authority mandates dismissal as it implicates the bankruptcy court's jurisdiction. *See Price*, 324 U.S. at 106 (1945) ("If the District Court finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition."); *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997) ("where a voluntary petition for bankruptcy is filed in behalf of a corporation, the bankruptcy court does not acquire jurisdiction unless those purporting to act for the corporation have authority under local law to institute the proceedings") (cleaned up).

30. Thus, where a limited liability company is placed into bankruptcy proceedings without its members' consent, or in contradiction to the entities' operating agreement, bankruptcy courts have routinely dismissed these proceedings for lack of corporate authority. *See NNN 123 N. Wacker, LLC*, 510 B.R. 854 (dismissing Delaware LLC bankruptcy proceeding where members did not authorize filing); *In re 301 W N. Ave., LLC*, 666 B.R. 583 (Bankr. N.D. Ill. 2025) (similar).

**B. The Debtors Were Not Authorized to File Bankruptcy**

31. The law of the state of incorporation governs whether the bankruptcy proceeding was authorized. *Price*, 324 U.S. at 106 (analyzing Virginia law for bankruptcy proceeding commenced by Virginia entity); *In re Elgin's Paint & Body Shop, Inc.*, 249 B.R. 110, 112 (Bankr. D.S.C. 2000) ("[T]he initiation of the [bankruptcy] proceedings, like the run of the corporate activities, is left to the corporation itself, *i.e.* to those who have the power of management. The determination of who has the power of management is governed by state law.") (cleaned up); *In re Audubon Quartet, Inc.*, 275 B.R. 783, 786 (Bankr. W.D. Va. 2002) ("Accordingly, this court must look to the substantive law of the state of incorporation to evaluate the propriety of corporate action.").

32. Here, each of the Debtors and the HoldCos are Delaware limited liability companies. Under Delaware law, a limited liability company is managed by its members, unless otherwise provided in the governing operating agreement. *See* Del. Code Ann. tit. 6, § 18-402; *Gurney-Goldman v. Goldman*, 321 A.3d 559, 571 (Del. Ch. 2024), *aff'd*, No. 166, 2025, 2026 WL 237221 (Del. Jan. 29, 2026) ("By default under the Delaware Limited Liability Company Act [] an LLC is member managed.").

33. For each of the relevant entities, the governing operating agreements designate the "Manager":

- *Merchant's Debtor* → *Merchant's Holding* → *Merchant's Operating Member*
- *Hawks Debtor* → *Hawks Holding's* → *Hawks Operating Member*

Yet with respect to each of Merchant's Holding and Hawks Holding, the ability of their respective Operating Member/Manager to authorize a bankruptcy filing (at either the HoldCo or SPE level) is constrained by the "Major Decisions" provision of the HoldCo LLC Agreements – and, in any event, requires unanimous member consent. Thus, no matter the circumstances, MaxMez's consent is necessary.

34. As described above, two separate provisions of the HoldCo LLC Agreements prevent the Debtors from unilaterally commencing bankruptcy proceedings without obtaining the requisite corporate authority.

35. First, Section 4.1(e) of the HoldCo LLC Agreements require the "prior consent of *all Members*" before the HoldCos, or the SPEs (*i.e.*, the Debtors) can commence bankruptcy proceedings. *See* Exhs. E and F, each at § 4.1(e) (emphasis added). As a Member, MaxMez's prior written consent was necessary before the Debtors could file voluntary petitions. MaxMez has not provided that consent.

36. Second, upon the occurrence of a "Changeover Event," Section 4.1(a) of the HoldCo Agreements grants MaxMez the exclusive authority to approve the making of any "Major Decisions," which includes causing either of the Debtors to file a bankruptcy petition. *See* Exhs. E and F, each at § 4.1(a)(xi) and (xvii). As evidenced by the Final Arbitration Award, a Changeover Event has occurred, automatically vesting MaxMez with exclusive right and ability to authorize the Debtors' bankruptcy filing. MaxMez has not provided that authorization.

### C. The Purported Authorizations Are Not Sufficient to Authorize the Debtors to File Bankruptcy

37. Beyond the fact that MaxMez has not consented to the Debtors' bankruptcy filings – either in its capacity as a Member of the HoldCo or as the sole member of the HoldCo's Board of Managers – the Purported Authorization does not even attempt to provide evidence that the Debtors' respective Managers (the HoldCos) have validly authorized the Debtors to file their petitions. This failure is fatal to the Debtors' ability to proceed in Chapter 11 under both Delaware law and this Court's Local Rules.

38. This Court expressly recognizes the necessity that a corporate debtor seeking bankruptcy relief provide evidence that the debtor has received valid authorization from its controlling parties. Indeed Local Rule 1002-2(d) expressly requires this evidence be filed with the debtor's petition:

> **Petition Filed by a Corporation, Partnership, Limited Liability Company, Limited Partnership, or Limited Liability Partnership.** When a corporation, partnership, limited liability company, limited partnership or limited liability partnership files a voluntary bankruptcy petition, an executed copy of the resolution of the debtor's board of directors, members, or general partners authorizing the filing of the bankruptcy petition shall be filed with the petition.

W.D.N.C. Bankr. L.R. 1002-2(d) (emphasis added).

39. Neither of the Debtors has provided a resolution from its board, members, or even its manager authorizing the filing of its bankruptcy petition (nor can they). Instead, alongside the Petitions, the Debtors filed the Purported Authorizations, through which Weingarten appears to adopt a "resolution" permitting the Debtors to commence the Bankruptcy Cases in his capacity as an "Authorized Signatory" for the Debtors. *See* ECF Nos. 2. But these Purported Authorizations have no operative effect under any of the relevant operating agreements or Delaware law.

40. As described above, the Debtor LLC Agreements permit Merchant's Debtor and Hawks Landing Debtor to appoint certain "Authorized Signatories" "to execute and deliver any and all *specified* agreements, certificates or any other documents." *See* Exhs. C and D, each at § 6 (emphasis added). Although Weingarten is an "Authorized Signatory" under the Debtor LLC Agreements, this status confers no management power on Weingarten, let alone the ability to "resolve" to commence bankruptcy proceedings in derivation – and complete disregard – of protections imposed in the HoldCo LLC Agreements. *See* Del. Code Ann. tit. 6, § 18-302(d) ("on any matter that is to be voted on, consented to or approved by members, *the members* may take such action . . . if consented to or approved, in writing") (emphasis added).

41. In fact, the Debtor LLC Agreements expressly provide that the management of Merchant's Debtor and Hawks Landing Debtor are vested in the HoldCos (as the member-managers). *See id.* An "Authorized Signatory" holds no management rights. Consequently, Weingarten has no power to "resolve" to take any action with respect to the Debtors.

42. Furthermore, under the terms of the Debtor LLC Agreements, "Authorized Signatories" are only permitted to sign any *specified* documents. Thus, Weingarten's signatory rights are inherently constrained by the HoldCos' management rights. And at no point did the

HoldCos, their Board of Managers, or the required Capital Member (MaxMez) authorize or direct Weingarten to sign the Petitions.

**D. MaxMez's Rights to Consent and Approve the Debtors' Bankruptcy Filings Are Not Subject to Arbitration and Have Not Been Previously Decided.**

43. Notwithstanding the plain facial deficiencies of the Purported Authorizations, the Debtors may object to this Motion on the basis that the Business Court's Intervenor Order requires MaxMez to bring *any* issue relating to its control of the Debtors in arbitration. If raised, the Court should reject this argument for three separate reasons.

44. First, this Court has the independent and inherent ability to determine whether a corporate entity is validly authorized to seek relief in bankruptcy. *See, e.g.*, *In re Mount Acadia Senior Props. LLC,* 679 B.R. 38, 44 (Bankr. S.D. Cal. 2026) (holding that the bankruptcy court "is entitled on its own volition to examine whether the bankruptcy petition was valid at the time filed, which bears directly on whether the bankruptcy case is properly before the Court"); *In re Cinch Wireline Servs.*, LLC, No. 23-51742-CAG, 2025 WL 848199, at *9 (Bankr. W.D. Tex. Mar. 18, 2025) (recognizing that the bankruptcy court can raises issues of subject-matter jurisdiction and corporate authorization *sua sponte*). This is particularly the case given that this Court's jurisdiction over a debtor in bankruptcy is predicated on the debtor's ability to file bankruptcy in the first place. As the Fourth Circuit explained in *Hager*:

> [W]here a voluntary petition for bankruptcy is filed in behalf of a corporation, <u>the bankruptcy court does not acquire jurisdiction unless those purporting to act for the corporation have authority</u> under local law to institute the proceedings. And, for the corollary that <u>where authority under local law is found lacking, the court has no alternative but to dismiss the petition</u>.

*Hager*, 108 F.3d at 39 (emphasis added, internal quotations omitted).

45. Furthermore, the Debtors in these cases have failed to comply with the Court's Local Rule 1002-2(d) which requires the Debtors to submit proof that they are validly authorized

to file bankruptcy with their petition. *See* L.R. 1002-2(d). Nothing in the Intervenor Order excuses the Debtors from complying with this requirement.

46. Second, the Intervenor Order did not decide – and thus does not preclude – MaxMex's right to consent or approve any bankruptcy filing by the Debtors or any action by the HoldCos to authorize the same. Instead, the Intervenor Order denied MaxMez's request to intervene in the HNP Action on the basis that the specific relief MaxMez sought via intervention – the affirmative right to control the TIC Owners' conduct of the HNP Action – needed first to be exhausted in the Arbitration. *See* Exh. G at 8-9. In particular, the Business Court ruled on three narrow issues: (i) that any dispute as to MaxMez's ability to replace the Managers of certain TIC Owners (including the Debtors) as a result of the occurrence of a Changeover Event needed to be exhausted in arbitration; (ii) that any dispute as to MaxMez's ability to control the TIC Owners through the TIC Owner's Tenant-in-Common Agreement (the "TIC Agreement") needed to be settled in arbitration; and (iii) that any dispute as to MaxMez's right to control the HNP Action as a "Major Decision" must likewise be exhausted in arbitration. *See* Ex. G at 4-8.

47. The instant Motion seeks different and distinct relief, and does not implicate or rely upon any of the matters ruled upon by the Business Court in the Intervenor Order. Here, MaxMez is not seeking leave to enforce rights in this Court that the Debtors might argue needs to be vindicated in another forum; instead, the Motion raises the direct question as to whether these Debtors obtained valid authorization under their own operating agreements and Delaware law to commence these Chapter 11 Case. Because this is a jurisdictional question, it can (and must) be answered by this Court in the first instance.

48. Third, even if the Court had the option of deferring this issue to arbitration, there is no actual dispute as to what is required for these Debtors to validly authorize bankruptcy

proceeding. The Debtor LLC Agreements and the HoldCo LLC Agreements are clear on their face and plainly govern the management rights of the various parties in accordance with Delaware law. The Debtors have never disputed the terms of these provisions, nor can they do so now. And even if they could, the *Debtors* in this case have no basis to rely upon the arbitration provisions in the *HoldCo* LLC Agreements, which are operating agreements between MaxMez (the Capital Member) and the Operating Member, not the Debtors. And then even if it were the case that the Debtors could rely on the HoldCo LLC Agreement arbitration provisions, this Court is not required to give effect to such provisions and may decide "core" matters in this discretion. *See, e.g.*, *Moses v. CashCall, Inc.*, 781 F.3d 63, 73 (4th Cir. 2015) (discussing the framework for considering enforceability of arbitration agreements in bankruptcy).

49. For this and each of the reasons set forth above, these Chapter 11 Case must be dismissed.

WHEREFORE, MaxMez respectfully requests this Court enter an order dismissing each of the Chapter 11 Cases, together with such additional relief as is just and proper.

Dated: August 26, 2026

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Jarret P. Hitchings*

Jarret P. Hitchings (NC Bar No. 60085)
301 S. College Street, Suite 2150
Charlotte, North Carolina 28202
Telephone: (704) 749-8999
Facsimile: (704) 749-8990
Email: jarret.hitchings@bclplaw.com

*Counsel to MaxMez NC, LLC*

## CERTIFICATE OF SERVICE

This is to certify that on August 26, 2026, I electronically filed MaxMez NC, LLC's *Motion to Dismiss Debtors' Chapter 11 Cases for Lack of Requisite Corporate Authorization* using the Court's CM/ECF filing system, which generated an email notice of the filing, linked to this document, to those parties who receive electronic notices in this case.

Moreover, I further certify that true and correct copies of the same were served via United States First Class mail with sufficient postage affixed thereon to ensure delivery to the parties listed below.

Brooks Pierce
Attn: Managing Agent
230 N. Elm Street, Suite 2000
Greensboro, NC 27401

Catawba County Tax Office
Attn: Managing Agent
P.O. Box 368
Newton, NC 28658

Eliezer Meisels
209 Benjamin Street
Toms River, NJ 08755

Glankler Brown, PLLC
Attn: Managing Agent
6000 Poplar Avenue, Suite 400
Memphis, TN 38119

Hawks Note Purchase, LLC
c/o Elizabeth Hedrick, Esq.
301 Hillsborough Street, Suite 1120
Raleigh, NC 27603

Internal Revenue Service Centralized
Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

Lubin Law Group, LLC
Attn: Managing Agent
9 Belvedere Lane, Suite 101
Lakewood, NJ 08701

NC Department of Revenue
Attn: Bankruptcy Unit
P.O. Box 1168
Raleigh, NC 27602-1168

Patrick, Harper & Dixon, LLP
Attn: Managing Agent
PNC Bank Building, 4th Floor
34 2nd Street, Suite 400
Hickory, NC 28601

Valor Residential Group
Attn: Managing Agent
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977

Hawks PVO Holding LLC
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977

Bradley S. Anderson
Stinson LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106

Dover SUB 1 LLC
Attn: Managing Agent
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977

Merchant’s SUB 1 LLC
Attn: Managing Agent
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977

RRAIT SUB 1 LLC
Attn: Managing Agent
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977

U.S. Attorney, WDNC
Attn: Civil Process Clerk
227 West Trade Street, Suite 1650
Charlotte, NC 28202

Brian R. Anderson
Fox Rothchild LLP
230 N. Elm Street, Suite 1200
Greensboro, NC 27401

Hawks Landing Owner LLC
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977

Merchant's Holding 1 LLC
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977

Dated: August 26, 2026

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Jarret P. Hitchings*

Jarret P. Hitchings (NC Bar No. 60085)
301 S. College Street, Suite 2150
Charlotte, North Carolina 28202
Telephone: (704) 749-8999
Facsimile: (704) 749-8990
Email: jarret.hitchings@bclplaw.com

*Counsel to MaxMez NC, LLC*