**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>Hawks Landing Owner LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31122 (LTB) |
| In re:<br><br>Merchant's Sub 1 LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31123 (LTB) |

**DECLARATION OF DAVID L. JOHNSON**

I, David L. Johnson, hereby declare, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct, to the best of my knowledge and belief:

1. I am the Chief Executive Officer of Maxus Properties LLC and principal of its affiliates including Maxus Realty Trust, Inc. (collectively "Maxus").

2. This *Declaration* is made in support of the *Motion to Dismiss Debtors' Chapter 11 Cases for Lack of Requisite Corporate Authorization* (the "Motion"). Capitalized terms not otherwise defined herein are intended to have the meaning given in the Motion.

3. Maxus provided mezzanine debt and mezzanine equity investments in the Hawks Property through its affiliate, MaxMez NC, LLC ("MaxMex").

4. MaxMez, in its capacity as sole member of the Board of Managers of each of the HoldCos, as the Capital Member of each of the HoldCos, for itself, and in any other capacity, has not consented, approved, or authorized the Debtors to file for bankruptcy, nor has MaxMez

consented, approved, directed or authorized the HoldCos or any other person or entity to consent, approve, cause or authorize the Debtors to file for bankruptcy.

5. True and correct copies of the following documents are attached hereto:

| | |
|---|---|
| **Exhibit A** | *Appellate Opinion and Final Award* dated June 8 and issued June 12, 2026 |
| **Exhibit B** | Hawks Property Structure Chart |
| **Exhibit C** | LLC Agreement of Merchant's Holding 1 LLC |
| **Exhibit D** | LLC Agreement of Hawks Landing Owner LLC |
| **Exhibit E** | LLC Agreement of Merchant's Holding 1 LLC |
| **Exhibit F** | LLC Agreement of Hawks PVO Holding LLC |
| **Exhibit G** | *Order Denying Emergency Motion to Intervene and Staying the Litigation* |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 24st day of August, 2026.

David L. Johnson

# EXHIBIT A

Final Arbitration Award

**AMERICAN ARBITRATION ASSOCIATION**
**APPELLATE ARBITRATION PANEL**

AAA Case No. 02-24-0006-4870

---

MAXMEZ NC, LLC,
Claimant-Appellee,
v.
HAWKS PVO HOLDING, LLC; MERCHANT'S HOLDING 1, LLC;
PVO HOLDING, LLC; MERCHANT'S HOLDING 2, LLC;
PVO JV, LLC; HAWKS PVO, LLC;
MERCHANT'S WALK APARTMENTS, LLC;
ELI MEISELS; and MOSHE WEINGARTEN,
Respondents-Appellants.

---

# APPELLATE OPINION AND FINAL AWARD

---

*Appellate Panel: Hon. Rebecca L. Kourlis (Ret.) Presiding Arbitrator; Hon. Michael Fitzpatrick (Ret.), Arbitrator; and Hon. Jeff Rose (Ret.), Arbitrator*

*Underlying Award: Interim Award of Arbitrator Hon. Gregory P. McGuire (Ret.), dated October 20, 2025*

## I. INTRODUCTION

This appeal arises from a real estate joint venture in which Claimant-Appellee MAXMEZ NC, LLC ("MAXMEZ" or "Claimant") made preferred equity investments in two multifamily apartment complexes in North Carolina — the Parks at Village Oaks in Brunswick County (the "PVO Property") and the Hawks Landing Apartments in Catawba County (the "Hawks Property") — structured through four limited liability companies governed by substantially identical Operating Agreements (the "LLC Agreements"). Respondents-Appellants HAWKS PVO Holding, LLC; MERCHANT'S Holding 1, LLC; PVO Holding, LLC; MERCHANT'S Holding 2, LLC; PVO JV, LLC; HAWKS PVO, LLC; MERCHANT'S Walk Apartments, LLC; Eli Meisels; and Moshe Weingarten (collectively, "Respondents") appeal from the Interim Award issued on October 20, 2025, by Arbitrator Hon. Gregory P. McGuire (the "Award"), following a four-day evidentiary hearing.

After review of the record submitted to us, the briefs submitted by the parties[1], the Award, and the applicable standard of review, this Panel affirms the Award in its entirety.

## II. STANDARD OF REVIEW

The parties agree that this appeal is governed by the AAA Appellate Arbitration Rules (the "Appellate Rules"). Pursuant to Appellate Rule A-10, a party may appeal on the grounds that the underlying award is based upon: (1) an error of law that is material and prejudicial; or (2) determinations of fact that are clearly erroneous. This Panel confirmed the applicable standard of review by order dated January 19, 2026.

[1] The Panel has considered the Reply Brief, albeit untimely filed, in its deliberations. Accordingly, the MaxMez Motion to Strike Respondents' Reply Brief is denied.

This is a highly deferential standard. The AAA Rule requirement that the error of law be 'material and prejudicial' has not been interpreted by North Carolina, but tracks the North Carolina Revised Uniform Arbitration Act pursuant to which vacatur is available only if an error substantially prejudiced the rights of a party. *N.C. Gen. Stat*. Section 1-569.23(a)(3).

Again, the AAA requirement has not been interpreted in North Carolina, but the settled law is that findings of fact are conclusive on appeal if supported by competent evidence, even if there is evidence to the contrary. *Henderson County v. Osteen* 297 N.C. 113, 254 S.E. 2d 160 (1979).

As explained below, the Arbitrator's findings on each of the four issues presented are well-grounded in the evidence and consistent with the plain language of the LLC Agreements. Respondents have not met their burden to demonstrate material prejudicial legal error or clear error on any issue.

## III. BACKGROUND

The Panel has reviewed both parties' Statements of Facts and, for purposes of this Opinion, summarizes the undisputed or Arbitrator-found facts as follows:

### *A. The Joint Venture and the LLC Agreements*

On or about June 16, 2022, MaxMez and entities controlled by Eli Meisels and Moshe Weingarten consummated a joint venture to purchase and operate the PVO Property and the Hawks Property through four limited liability companies: Hawks PVO Holding, LLC and Merchant's Holding 1, LLC (regarding the Hawks Property); PVO Holding, LLC and Merchant's Holding 2, LLC (regarding the PVO Property). Under each LLC Agreement, MaxMez is identified as the "Capital Member" and the Respondent entities as the "Operating Member," with Meisels and Weingarten

as "Sponsors." MaxMez contributed 100% of the capital to the LLCs; Respondents contributed no capital to the LLCs but were responsible for operations and property management.

MaxMez made initial capital contributions of approximately $4,889,770 for the PVO Property and $4,977,230 for the Hawks Property. The venture was funded in part by purchase money loans from Regions Bank — a $20.4 million loan for the PVO Property and a $19.7 million loan for the Hawks Property (collectively, the "Regions Loans") — each maturing on June 16, 2024. Meisels and Weingarten were named as limited personal guarantors on both Regions Loans. MaxMez had no guaranty obligation on either loan.

The LLC Agreements provided that on or before the June 16, 2024 maturity date, each property would either be (1) sold, with proceeds used to pay off the Regions Loans and return to each member the amounts as required under the LLC Agreements or (2) refinanced, with proceeds used to pay MaxMez its "Required Redemption Amount" — a contractually defined sum representing the unpaid balance of MaxMez's capital contribution multiplied by a specified return multiple (1.22x, 1.35x, or 1.45x depending on the redemption date), less monthly payments previously made.

The LLC Agreements also contained important protective provisions for MaxMez, including: (a) "Changeover" provisions permitting MaxMez to assume control of the LLCs upon specified triggering events; (b) "Drag to Market" ("DTM") provisions allowing MaxMez to compel a sale of the properties under certain circumstances set forth in the LLC Agreements; and (c) "Full Recourse" provisions under Section 13.2 rendering Meisels and Weingarten jointly and severally personally liable for the Required Redemption Amount upon the occurrence of any one of six specified triggering events.

### *B. Events Giving Rise to the Dispute*

In late 2023, the PVO Property experienced significant financial strain from low occupancy and market conditions. Respondents stopped providing MaxMez with required financial reporting and, in early 2024, ceased making monthly return payments to MaxMez on the PVO Property. Meanwhile, Respondents continued transferring funds from the PVO Property accounts to themselves via Valor Residential — a property management company owned 50% each by Meisels and Weingarten — including in months when funds existed that could have been used to pay MaxMez.

The Hawks Property performed better through the same period, with MaxMez receiving its monthly return payments through June 2024.

As the June 16, 2024, maturity date approached, Respondents were unable to reach a forbearance or extension agreement with Regions Bank. Regions advised that any extension would require Respondents to make a material paydown of the Regions Loans — a condition Respondents could not or would not meet. On June 18, 2024, Regions confirmed in writing that both loans had matured and that default interest was now in effect. Neither loan was paid by the June 16, 2024, maturity date.

On June 17, 2024, MaxMez issued DTM Notices to Respondents with respect to both properties. Respondents served neither a DTM Sale Notice nor a DTM Purchase Notice within the contractually required 30-day period. Respondents instead proceeded to market and sell both properties themselves without MaxMez's consent.

Respondents sold the PVO Property on October 1, 2024, for $21,205,000 — sufficient to pay the Regions Loan and closing costs, but not enough to repay MaxMez's Required Redemption

Amount. Respondents sold the Hawks Property on April 8, 2025, for $27,375,000. Respondents did not remit additional proceeds to MaxMez from either sale; instead, the Hawks Property sale proceeds were distributed to Meisels based on a Deed of Trust that Meisels and Weingarten executed against the Hawks Property on January 31, 2025 — without MaxMez's required written approval, and while multiple Changeover Events, as defined in section 8.1(a-m) of the LLC Agreements, were in effect.

MaxMez initiated this arbitration on July 16, 2024. Following a four-day evidentiary hearing in September 2025, Arbitrator McGuire issued the Award on October 20, 2025.

### *C. The Award*

The Arbitrator awarded MaxMez the Required Redemption Amount as calculated by MaxMez's expert, Kristopher R. Zeid, CPA/CFF: $6,042,628 on the PVO Property (applying a 1.35x multiplier) and $1,539,843 on the Hawks Property (applying a 1.45x multiplier). The Arbitrator awarded prejudgment interest at 8% per annum pursuant to N.C. Gen. Stat. § 24-5 — on the PVO Property amount from October 1, 2024, through September 8, 2025, and on the Hawks Property amount from April 8, 2025, through September 8, 2025. The Arbitrator found Meisels and Weingarten personally liable in full for the Required Redemption Amount under Section 13.2(iii) of the LLC Agreements, having previously stipulated to full recourse liability on the Hawks Property. The Arbitrator awarded MaxMez its attorneys' fees and costs for the entire arbitration proceeding under Section 15.19 of the LLC Agreements. The Arbitrator denied MaxMez's claims for an accounting, for declaratory relief designating MaxMez as managing member of the LLCs, and for a declaration of fraudulent transfer.

## IV. ANALYSIS

### *A. Issue One: Full Recourse Liability of Meisels and Weingarten as to the PVO Property*

Respondents contend that the Arbitrator erred in finding that Meisels and Weingarten are personally liable for the full Required Redemption Amount on the PVO Property. For the reasons set forth below, we affirm the Arbitrator's finding on this issue.

Section 13.2(iii) of the LLC Agreements provides that Meisels and Weingarten shall become jointly and severally, fully liable for the Required Redemption Amount if "Borrower . . . commits a material default under the Senior Mortgage [Regions] Loan Documents which default remains uncured beyond the applicable cure period and which, if left uncured, could cause the Senior Mortgage [Regions] Loan to be accelerated."

The Arbitrator found that Respondents' affiliates failed to pay the PVO Regions Loan when it matured on June 16, 2024, and that this failure constituted an "Event of Default" under the plain, unambiguous language of the Regions Loan agreement. Section 9.1 of the Regions Loan agreement identifies as an Event of Default the failure to make any scheduled payment of principal or interest "or if the entire Debt is not paid on or before the Maturity Date." Section 9.2 gives Regions the immediate right — expressly "without notice or demand" — to accelerate the entire outstanding debt upon any Event of Default. This finding is compelled by the contractual text and the facts as found by the Arbitrator, and thus not clearly erroneous under our standard of review. Respondents themselves admitted at the final hearing that after maturity, they owed the entire loan balance, and Regions confirmed in writing on June 18, 2024, that the loans had matured and that default interest was in effect.

Respondents argue that, because Regions never formally declared a default, never issued a Notice of Default, and never commenced foreclosure proceedings on the PVO Property, no material default occurred for purposes of Section 13.2(iii). This argument conflates Regions' decision to forbear from exercising its remedies with the threshold question of whether a default occurred. The Full Recourse trigger in Section 13.2(iii) is not conditioned on a lender's affirmative exercise of remedies; it requires only a material default under the loan documents that remains uncured and "could cause" acceleration. That standard was plainly satisfied here: Regions had both the right and the contractual ability to accelerate immediately upon the June 16, 2024, maturity default, without notice or demand. The fact that Regions elected not to foreclose — and instead worked to facilitate a sale — does not mean no default occurred or that the loan was current. Indeed, Regions expressly confirmed the loans were in default and assessed default interest.

Respondents further rely on a payoff letter issued by Regions to argue that the maturity date was effectively extended. The Arbitrator correctly found that the payoff letter – issued September 24, 2024, merely provided Respondents a final opportunity to pay the loan without Regions initiating foreclosure. As the Award states, the letter "did not constitute a forbearance agreement" and did not cure the default. Regions' loan required any modification, amendment, extension, or waiver to be in writing signed by the lender. No such written forbearance agreement exists; Respondents conceded as much at the final hearing.

Respondents also invoke Section 4.1(e)(vii) and Section 13.3 of the LLC Agreements, arguing that MaxMez's conduct caused the default and should exculpate Meisels and Weingarten. Section 4.1(e)(vii) prohibits any LLC member from taking any willful action "that has the purpose of creating a recourse event." Section 13.3 provides that Meisels and Weingarten shall not have recourse liability if the triggering event "was the result of the act or omission of" MaxMez.

In their Reply Brief, Respondents cite two additional cases – *CL Howard Investments I, LLC v. Wilmington Savings Fund Society*, 297 N.C. App. 234, 911 S.E.2d 384 (2024) and *Ussery v. Brank Banking & Trust Co*., 368 N.C. 325, 777 S.E. 2d 272 (2015) – for the proposition that the right to declare or waive a default belongs exclusively to the lender, arguing that Regions' post-maturity conduct demonstrates that it exercised that right by waiving any default. These authorities do not alter the Panel's analysis. *CL Howard* is inapposite in that it deals with lien priorities, and *Ussery* is inapposite because it affirms the proposition that a borrower who knowingly reaffirms a loan and waives offsets and defenses cannot later assert lender liability claims. The general proposition that a lender may waive a default is not in dispute. What is disputed is whether Regions actually did so here, and the Arbitrator's finding that Regions did not is not clearly erroneous. As we discuss above, the payoff letter was not a written forbearance or a loan modification as required by Section 11.4 of the Regions Loan; Regions expressly confirmed in writing on June 8, 2024, that the loans had matured and that default interest was in effect; and the Full Recourse trigger in Section 13.2(iii) requires only that the default 'could cause' acceleration – not that Regions actually declared a default or initiated foreclosure. The question under the LLC Agreements is not whether Regions ultimately chose to exercise its acceleration rights, but whether a default occurred that gave rise to that right. It plainly did.

In declining to apply these provisions to eliminate recourse liability, the Arbitrator's Award does not approach our review standard of clearly erroneous. Respondents failed to present competent evidence that MaxMez caused Respondents to default on the Regions Loan. The record demonstrates that the default arose from Respondents' own inability or unwillingness to make the paydown that Regions required for any extension — a condition that predated and was independent of any material conduct by MaxMez. The sole evidence Respondents identified — a June 27, 2024,

email from MaxMez to Regions stating that MaxMez would consent to a forbearance "so long as it does not cure the default for nonpayment" — postdated the June 16, 2024, maturity default by nearly two weeks. Respondents had already defaulted before that communication. MaxMez's effort to preserve its contractual rights in the context of a pre-existing default is not the "act or omission" that caused the default within the meaning of Section 13.3, and it is not the kind of willful act by MaxMez to create a recourse event within the meaning of Section 4.1(e)(vii). To hold otherwise would effectively read MaxMez's protective covenant rights out of the LLC Agreements entirely.

Moreover, the Panel notes the existence of additional, alternative grounds for full recourse liability under Section 13.2 that the record supports and that the Arbitrator did not need to reach, having found the loan default sufficient. The record supports findings that: (1) Respondents failed to cause distributions to MaxMez from available funds in violation of Section 13.2(v) given the evidence that PVO Property bank accounts held funds during periods when MaxMez was not paid; (2) Respondents committed gross negligence or willful misconduct within the meaning of Section 13.2(iv) by, among other things, wiring PVO Property funds to Valor and failing to maintain separate tenant security deposit accounts as required by North Carolina law and the LLC Agreements; and (3) Respondents willfully and intentionally failed to cooperate with MaxMez's DTM rights under Section 13.2(vi) by ignoring MaxMez's DTM Notices and selling the properties themselves without authority. Any one of these alternative grounds independently supports the full recourse finding. The existence of these alternative bases further confirms that the Arbitrator's ultimate conclusion — personal liability for Meisels and Weingarten — is amply supported.

The Panel affirms the Arbitrator's finding of full recourse liability of Meisels and Weingarten with respect to the PVO Property.

***B. Issue Two: Calculation of the Required Redemption Amounts***

Respondents contend the Arbitrator erroneously adopted MaxMez's expert's calculation of the Required Redemption Amounts for both the Hawks Property and the PVO Property. The Panel disagrees and affirms the Award on this issue.

The LLC Agreements define the "Required Redemption Amount" by a specific formula set forth in the agreements. Claimant's expert, Kristopher R. Zeid, applied that formula by multiplying MaxMez's "Initial Capital Contribution" (i.e., the actual dollar amount contributed by MaxMez at inception, as set forth in Schedule I to each LLC Agreement) by the applicable return multiple, and then subtracting the current return payments received. The Arbitrator carefully reviewed Mr. Zeid's methodology and calculations and found them to be thorough, thoughtful, compelling, and consistent with the provisions of the LLC Agreements and the evidence of MaxMez's initial contributions and subsequent payments.

Respondents argue that the calculation should use a different starting figure — specifically, the "Initial Capital Contribution Balance" (which Respondents define as the initial contribution reduced by "Initial Capital Contribution Current Return" payments previously made) rather than the "Initial Capital Contribution" as defined and used in the formula. This argument was presented at the hearing and rejected by the Arbitrator. The rejection was not clearly erroneous.

As Claimant correctly notes, the LLC Agreements define "Initial Capital Contributions" as the capital contributions initially contributed by the Capital Members, set forth in Schedule I. That is the dollar amount Mr. Zeid used. The term "Initial Capital Contribution Balance" does not appear in the Required Redemption Amount formula in the LLC Agreements. Respondents' approach would require the Panel to substitute a different defined term into a contractual formula that does

not call for it — an approach inconsistent with the plain language of the LLC Agreements and the canon of construction that courts give effect to all terms as written. *Gaston County Dyeing Machine Co., v. Northfield Ins. Co*., 351 N.C. 293, 299-3000, 524 S.E. 2d 558, 564 (2000). The Arbitrator's adoption of Mr. Zeid's formula-faithful calculation was correct.

Respondents' additional argument — that Mr. Zeid (and the Arbitrator) erred in allocating a proportionate share of Respondents' monthly payments to the parallel mezzanine loans rather than crediting 100% of those payments to the preferred equity obligations — also fails to meet the standard of review. Critically, Respondents presented no expert report or other evidence at the final hearing regarding payment allocation. The Arbitrator noted this absence explicitly. Claimant presented evidence that payments were applied pro-rata across Respondents' preferred equity and mezzanine loan obligations — a reasonable and documented methodology. Respondents' counsel offered competing calculations during closing argument, but without evidentiary support. The Arbitrator was justified in crediting the supported calculations over unsupported argument, and this Panel finds no clear error in that determination.

The Panel is also mindful that Respondents' proposed Required Redemption Amount calculations have shifted repeatedly throughout these proceedings — from asserting full payment in January 2025, to acknowledging a shortfall in interrogatory responses, to claiming a refund in closing argument, to advancing yet another figure on appeal. Notably, in their Reply Brief, Respondents clarify that their lowest figures ($335,724.57 for the Hawks Property and $5,257,729.04 for the PVO Property) were premised on a mezzanine loan payment allocation argument that Respondents are no longer pressing, because Claimant has since applied those payments to reduce the amounts sought in the parallel Missouri litigation. Respondents' final appellate figures are therefore $537,221.32 for Hawks Property and $5,411,970.39 for PVO Property. Even accepting this

clarification, the shifting nature of Respondents' calculations throughout these proceedings underscores the fact that the Arbitrator was in the best position to determine the facts, and he chose to credit Mr. Zaid's consistent, document-based analysis.

The Panel affirms the Arbitrator's calculation of the Required Redemption Amounts: $6,042,628 for the PVO Property and $1,539,843 for the Hawks Property.

***C. Issue Three: Prejudgment Interest***

Respondents contend the Arbitrator had no authority to award prejudgment interest because MaxMez never requested it in its arbitration demands, and that deprived Respondents of notice and an opportunity to defend. The Panel disagrees and affirms the award of prejudgment interest.

AAA Commercial Arbitration Rule R-49, incorporated into these proceedings through the parties' agreement in Section 15.19 of the LLC Agreements, expressly authorizes an arbitrator to award interest "at such rate and from such date as the arbitrator may deem appropriate." This rule grants broad discretionary authority to the arbitrator to award interest and contains no requirement that a party specifically plead prejudgment interest as a separate claim. By agreeing to arbitrate under the AAA Commercial Rules, Respondents agreed to be bound by Rule R-49 and cannot now complain that the Arbitrator exercised the power the rules expressly confer.

Moreover, the record does not support Respondents' assertion that MaxMez never sought prejudgment interest. MaxMez's Pre-Hearing Brief expressly referenced prejudgment interest: Claimant sought total recovery including "prejudgment interest based on the terms of the LLC Agreements." Additionally, Mr. Zeid's expert report — provided to Respondents on July 11, 2025, well in advance of the September 2025 hearing — expressly calculated prejudgment interest

amounts. Respondents thus had actual notice of the interest claim and full opportunity to address it.

The Arbitrator awarded prejudgment interest at 8% per annum under N.C. Gen. Stat. § 24-5 — the applicable North Carolina statutory rate for breach of contract actions. The application of that statute, in the context of a dispute governed by North Carolina law, falls well within the Arbitrator's broad remedial discretion under Rule R-49 and constitutes no material error of law.

The Panel affirms the award of prejudgment interest at 8% per annum - on both the PVO Required Redemption Amount from October 1, 2024, through September 8, 2025, and on the Hawks Required Redemption Amount from April 8, 2025, through September 8, 2025.

***D. Issue Four: Attorneys' Fees and Costs***

Respondents contend the Arbitrator erred by: (1) awarding MaxMez all of its attorneys' fees and costs for the entire arbitration, including for claims and issues on which MaxMez did not prevail; and (2) denying Respondents any fees or costs for proceedings in which Respondents prevailed. The Panel affirms the Award on this issue.

Section 15.19 of the LLC Agreements provides in relevant part: "The prevailing party in any arbitration proceeding shall be entitled to an award of all reasonable out-of-pocket costs and expenses (including attorneys' and arbitrators' fees) related to the entire arbitration proceeding (including review if applicable)." (Emphasis added.) This language is both mandatory ("shall be entitled") and comprehensive ("the entire arbitration proceeding"). The parties negotiated and agreed to this provision, and the Arbitrator faithfully applied it.

The threshold question is whether MaxMez was the "prevailing party." The Panel has little difficulty concluding that it was, and that the Arbitrator's finding to that effect is not clearly erroneous. MaxMez obtained a substantial monetary judgment of $7,582,471 plus prejudgment interest, representing the full Required Redemption Amount on both properties. MaxMez obtained full recourse personal liability against Meisels and Weingarten — the maximum relief available under the LLC Agreements. MaxMez obtained changeover declarations on both properties. By any reasonable measure, MaxMez achieved the primary relief it sought in this arbitration.

The matters on which Claimant did not prevail were, by comparison, ancillary and secondary. The denial of accounting relief was grounded in practical considerations — the Arbitrator found that an accounting would be difficult and expensive given Respondents' inadequate recordkeeping and likely non-cooperation, not on any determination that MaxMez lacked a contractual right to an accounting. The denial of certain declaratory relief regarding MaxMez's designation as managing member was rendered largely moot by the fact that both properties had already been sold by the time of the hearing. These outcomes do not diminish MaxMez's status as the prevailing party in any meaningful sense.

Respondents, by contrast, obtained no affirmative relief. They abandoned their counterclaims on the first day of the final hearing.

Respondents' Reply Brief clarifies that they do not seek to eliminate Claimant's fee award entirely. They seek only a partial award of their own fees for the specific proceedings on which they prevailed, including the emergency hearings and the corporate governance claims. This reframing does not alter the analysis. Section 15.29's 'entire arbitration proceeding' language does not invite issue-by-issue or phase-by-phase parsing of the fee award. In their Agreement, the parties agreed

that a prevailing party would recover fees for the 'entire' proceeding, and MaxMez was clearly the prevailing party on the significant merits issues. Moreover, as the Arbitrator correctly noted, AAA Commercial Rule R-49(b) authorizes fee awards on partial rulings only if requested at the time the Arbitrator is ruling on such a motion. Respondents did not seek fees and costs at the time the emergency motions were ruled upon, nor did they seek fees in response to the orders once issued. This independent procedural basis – entirely separate from the prevailing party analysis – separately supports denial of Respondents' fee request.

Respondents place particular emphasis on their success in opposing MaxMez's Applications for Emergency Measures of Protection — proceedings in which two different arbitrators denied MaxMez's applications. Respondents argue they should at a minimum recover fees for those proceedings. This argument fails for two independent reasons.

First, Section 15.19 awards fees to the prevailing party for "the entire arbitration proceeding" without parsing the proceeding by phase or sub-proceeding. The agreed-upon fee-shifting provision does not permit the reconstruction of separate prevailing-party determinations for each interim hearing. Respondents ask the Panel to read the phrase "entire arbitration proceeding" as if it were written "each discrete phase of the arbitration" — an interpretation that does violence to the plain language of the contract and ignores the unambiguous modifier "entire."

Second, and in any event, Respondents' success at the emergency hearings must be understood in context. At the PVO Property emergency hearing, Respondents successfully opposed MaxMez's application in significant part by contesting that any Changeover Events had occurred — a position Respondents later stipulated was wrong on the first day of the final hearing. At the Hawks Property emergency hearing, Respondents prevailed by representing that MaxMez would be "paid in full"

upon the Hawks Property sale — a representation that Respondents now concede was not accurate. Emergency relief was denied based, at least in part, on assurances Respondents later acknowledged were incorrect. The Arbitrator reasonably declined to award fees based on such interim "success," particularly when Respondents ultimately lost on the merits of every significant issue.

The Panel affirms the Arbitrator's award of attorneys' fees and costs to MaxMez for the entire arbitration proceeding and the denial of fees to Respondents.

## V. APPELLATE ATTORNEYS' FEES AND COSTS

MaxMez requests an award of its attorneys' fees and costs incurred in defending this appeal, relying on Section 15.19's express inclusion of "review" proceedings within the scope of the fee-shifting provision. The Panel agrees that the plain language of Section 15.19 encompasses appellate review. Because MaxMez has prevailed on this appeal in its entirety, MaxMez is entitled to reasonable attorneys' fees and cost.

Hence, the Panel orders:

Respondents Hawks PVO Holding, LLC; Merchant's Holding 1, LLC, PVO Holding, LLC; Merchant's Holding 2, LLC; PVO JV, LLC; Hawks PVO, LLC and Merchant's Walk Apartments, LLC shall pay reasonable attorneys' fees to MaxMez in the amount of $102,045.15.

The Panel has reviewed the Request for Attorneys' Fees and Costs and submissions associated with that Request, and the Response filed by MaxMez and is satisfied that the fees requested are reasonable and that the filings meet the requirements of North Carolina law concerning (1) the time and labor expended; (2) the skill required to perform the legal services properly; (3) the customary fee for like work; (4) the experience and ability of the attorney; (5) the novelty and

difficulty of the questions of law; (6) the adequacy of the representation; (7) the difficulty of the problems faced, including any unusual difficulties; (8) the type of case; and (9) the results obtained. This was a case in which significant dollar amounts were at issue and the time expended appears reasonably proportionate to the issues and amount in controversy.

The Panel is not persuaded to reduce the requested amount based upon the argument that there were too many redactions in the itemized billings: it does not fall to the Panel to inquire into determinations of privilege at this point and, again, the total amount is within the range of reasonableness. Further, the Panel agrees that the award of attorney fees is entered only against the entity Respondents and not the individual Respondents, but the Panel does not believe that limitation on collection of the award circumscribes or requires fractionalization of the attorney fee request.

The administrative fees and expenses of the American Arbitration Association, in the amount of $6,000.00, and the compensation of the Arbitrators totaling $35,280.75, shall be borne as incurred.

This Award is in full and final disposition of all claims, counterclaims, defenses, motions, and matters submitted in this appeal, including attorneys' fees and costs.

**VI. CONCLUSION AND ORDER**

For the foregoing reasons, the Panel ORDERS as follows:

1. The Interim Award of Arbitrator Gregory P. McGuire, dated October 20, 2025, is AFFIRMED in its entirety.

2. Respondents Eli Meisels and Moshe Weingarten are jointly and severally, fully personally liable for the Required Redemption Amount on the PVO Property in the amount of

$6,042,628, plus prejudgment interest at 8% per annum from October 1, 2024, through September 8, 2025.

3. Respondents are liable for the Required Redemption Amount on the Hawks Property in the amount of $1,539,843 plus prejudgment interest at 8% per annum from April 8, 2025, through September 8, 2025, with Meisels and Weingarten jointly and severally, personally liable as previously ordered.

4. The award of attorneys' fees and costs to MaxMez for the entire arbitration proceeding is affirmed. MaxMez is further entitled to recover its reasonable attorneys' fees and costs against the Respondent entities incurred in defending this appeal pursuant to Section 15.19 of the LLC Agreements in the amount of $102,045.15.

5. Respondents' appeal is DENIED in its entirety.

This Opinion and Final Award shall become effective upon issuance.

**SO ORDERED.**

Dated: June 8, 2026

Rebecca L Kourlis
_________________________________
*Hon. Rebecca L Kourlis (Ret.), Presiding Arbitrator*

Michael Fitzpatrick
_________________________________
*Hon. Michael Fitzpatrick (Ret.), Arbitrator*

Jeff Rose
_________________________________
*Hon. Jeff Rose (Ret.), Arbitrator*

# EXHIBIT B

Structure Chart

*Dover Holding 1 LLC and RRAIT Holding 1 LLC will each be borrowers under separate loan agreements. The members of each LLC will pledge their LLC interests as collateral to Maxus.




6/2/22

# EXHIBIT C

Merchant's Debtor LLC Agreement

# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# MERCHANT'S SUB 1 LLC

This Limited Liability Company Agreement ("**Agreement**") of **MERCHANT'S SUB 1 LLC** is entered into as of the 16th day of June, 2022 by **Merchant's Holding 1 LLC**, a Delaware limited liability company (the "**Member**").

1. **Name.** The name of the limited liability company formed hereby is **MERCHANT'S SUB 1 LLC** (the "**Company**").

2. **Purpose.** The LLC is formed for the purpose of engaging in any lawful act or activity for which limited liability companies may beformed under the Limited Liability Company Act of the State of Delaware (the "**LLCA**") and engaging in any and all activities necessary or incidental to the foregoing.

3. **Members.** The name and address of the Member of the Company is:

   Merchant's Holding 1 LLC
   c/o Valor Residential Group
   3 Alpine Court, Suite 200
   Chestnut Ridge, NY 10977

4. **Membership Percentage Interests.** The Membership Interests of the Member is as follows:
   Merchant's Holding 1 LLC – 100%

5. **Management.** The business and affairs of the Company shall be managed by the Member. The Member shall have the power to do any and all acts necessary and convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Member or Managing Member under the LLCA.

6. **Powers.** The Member shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members under the LLCA. The Member may, from time to time as it deems advisable, appoint authorized signatories of the Company (each an "**Authorized Signatory**" and collectively, the "**Authorized Signatories**") by unanimous consent. Any Authorized Signatory shall be empowered and directed in the name and on behalf of the Company to execute and deliver any and all specified agreements, certificates or any other documents on behalf of the Company. The Member hereby appoints Moshe Weingarten and Eliezer Meisels as

the initial Authorized Signatories.

7. **Books and Records.** The books and records of the Company shall be kept at the principal office of the Company, or such other address as authorized by the Member.

8. **Admission of Additional Members.** One (1) or more additional members of the Company may be admitted to the Company with the consent of the Member.

9. **Liability of Members.** The Member shall not have any liability for the obligation or liabilities of the Company except to the extent provided in the LLCA or as provided herein.

10. **Governing Law.** This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

11. **SPE Provisions.**

(a) Notwithstanding anything to the contrary contained herein, for so long as that certain loan in the maximum principal amount of up to $19,700,000 (the "**Loan**") made by REGIONS BANK ("**Lender**"), to the Company, RRAIT SUB 1 LLC, DOVER SUB 1 LLC and Hawks Landing Owner LLC, as tenants in common ("**Tenants**") in accordance with that certain Promissory Note among Tenants and Lender and other documents evidencing the Loan (the "**Loan Documents**"), and secured by, among other things, the grant of security title to the Premises pursuant to a deed of trust, remains outstanding, (i) Lender shall be deemed a third-party beneficiary with respect to all rights, interests and remedies of each Tenant created by this Agreement, and (ii) the "**SPE Provisions**" attached as Schedule A to this Agreement are hereby incorporated into this Agreement by this reference as if the same were fully set forth in this Agreement.

(b) Upon the full satisfaction of the Loan, this Agreement shall be automatically deemed to be amended to delete this Section 11 hereof and Schedule A in their entirety. Failure of the Company or any Member on behalf of the Company to comply with any of the covenants contained in this Section 11 or Schedule A shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

(c) Notwithstanding anything to the contrary contained hereinabove,

nothing in this Section shall be deemed to require any Member to contribute funds to the Company. By execution hereof, the Member ratifies and consents to the Loan from Lender to the Company.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, do duly execute this Limited Liability Company Agreement as of the day and year written above.

**MEMBER:**

**MERCHANT'S HOLDING 1 LLC,**
a Delaware limited liability company

By: Merchant's Walk Apartments LLC,
a Delaware limited liability company
its sole member

By: Maxeli Merchants Walk LLC,
a Delaware limited liability company
its manager

By: ______________________________
Name: Moshe Weingarten
Title: Managing Member

# SCHEDULE A

SPE COVENANTS

Borrower has at all times been a Single-Purpose Entity and has at all times acted in a manner which complies with the SPE Covenants since the date of its formation.

As used in this Agreement, the term "**SPE Covenants**" means that, so long as any of the Debt is outstanding, Borrower has not and will not, without the prior written consent of Lender:

(a) fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, or otherwise amend its organizational documentation;
(b) engage in any business or activity other than the development, construction, ownership, leasing and operation of the Property and activities incidental thereto;
(c) acquire or own any material asset other than the Property;
(d) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal form;
(e) own any subsidiary or make any investment in or acquire the obligations or securities of any other Person;
(f) commingle its assets with the assets of any of its partners, members, shareholders, other Affiliates, or of any other Person;
(g) allow any Person to pay its debts and liabilities or fail to pay its debts and liabilities solely from its own assets;
(h) enter into any contract or agreement with any shareholder, partner, member, principal or other Affiliate of Borrower or any Guarantor, or any shareholder, partner, member, principal or Affiliate thereof, except as shall be on terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any shareholder, partner, member, principal or affiliate of Borrower or any Guarantor or any shareholder, partner, member, principal or Affiliate thereof;
(i) seek dissolution or winding up, in whole or in part;
(j) fail to correct any known misunderstandings regarding the separate identity of Borrower;
(k) hold itself out to be responsible or pledge its assets or credit worthiness for the debts of another Person or allow any Person to hold itself out to be responsible or pledge its assets or credit worthiness for the debts of Borrower (except pursuant to the Loan Documents);
(l) make any loans or advances to any third party, including any shareholder, partner, member, principal or other Affiliate of Borrower, or any shareholder, partner, member, principal or other Affiliate thereof;
(m) fail to file its own tax returns, if required by applicable Law;
(n) fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name in order not (i) to mislead others as to the entity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any shareholder, partner, member, principal or other Affiliate of Borrower, or any shareholder, partner, member, principal or other Affiliate thereof);
(o) fail to allocate fairly and reasonably among Borrower and any third party (including, without limitation, any Guarantor) any overhead for common employees, shared office space or other

overhead and administrative expenses; or
(p) modify the operating agreement or partnership agreement of Borrower.

Capitalized terms used and not otherwise defined in this Schedule A have the respective meanings set forth on the Loan Documents.

# EXHIBIT D

Hawks Landing Debtor LLC Agreement

# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# HAWKS LANDING OWNER LLC

This Limited Liability Company Agreement ("**Agreement**") of **HAWKS LANDING OWNER LLC** is entered into as of the 16th day of June, 2022 by **Hawks PVO Holding LLC**, a Delaware limited liability company (the **"Member**").

1. **Name.** The name of the limited liability company formed hereby is **HAWKS LANDING OWNER LLC** (the "**Company**").

2. **Purpose.** The LLC is formed for the purpose of engaging in any lawful act or activity for which limited liability companies may beformed under the Limited Liability Company Act of the State of Delaware (the "**LLCA**") and engaging in any and all activities necessary or incidental to the foregoing.

3. **Members.** The name and address of the Member of the Company is:

   Hawks PVO Holding LLC
   c/o Valor Residential Group
   3 Alpine Court, Suite 200
   Chestnut Ridge, NY 10977

4. **Membership Percentage Interests.** The Membership Interests of the Member is as follows:
   Hawks PVO Holding LLC – 100%

5. **Management.** The business and affairs of the Company shall be managed by the Member. The Member shall have the power to do any and all acts necessary and convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Member or Managing Member under the LLCA.

6. **Powers.** The Member shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members under the LLCA. The Member may, from time to time as it deems advisable, appoint authorized signatories of the Company (each an "**Authorized Signatory**" and collectively, the "**Authorized Signatories**") by unanimous consent. Any Authorized Signatory shall be empowered and directed in the name and on behalf of the Company to execute and deliver any and all specified agreements, certificates or any other documents on behalf of the Company. The Member hereby appoints Moshe Weingarten and Eliezer Meisels as

the initial Authorized Signatories.

7. **Books and Records.** The books and records of the Company shall be kept at the principal office of the Company, or such other address as authorized by the Member.

8. **Admission of Additional Members.** One (1) or more additional members of the Company may be admitted to the Company with the consent of the Member.

9. **Liability of Members.** The Member shall not have any liability for the obligation or liabilities of the Company except to the extent provided in the LLCA or as provided herein.

10. **Governing Law.** This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

11. **SPE Provisions.**

(a) Notwithstanding anything to the contrary contained herein, for so long as that certain loan in the maximum principal amount of up to $19,700,000 (the "**Loan**") made by REGIONS BANK ("**Lender**"), to the Company, RRAIT SUB 1 LLC, MERCHANT'S SUB 1 LLC and DOVER SUB 1 LLC, as tenants in common ("**Tenants**") in accordance with that certain Promissory Note among Tenants and Lender and other documents evidencing the Loan (the "**Loan Documents**"), and secured by, among other things, the grant of security title to the Premises pursuant to a deed of trust, remains outstanding, (i) Lender shall be deemed a third-party beneficiary with respect to all rights, interests and remedies of each Tenant created by this Agreement, and (ii) the "**SPE Provisions**" attached as Schedule A to this Agreement are hereby incorporated into this Agreement by this reference as if the same were fully set forth in this Agreement.

(b) Upon the full satisfaction of the Loan, this Agreement shall be automatically deemed to be amended to delete this Section 11 hereof and Schedule A in their entirety. Failure of the Company or any Member on behalf of the Company to comply with any of the covenants contained in this Section 11 or Schedule A shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

(c) Notwithstanding anything to the contrary contained hereinabove,

nothing in this Section shall be deemed to require any Member to contribute funds to the Company. By execution hereof, the Member ratifies and consents to the Loan from Lender to the Company.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, do duly execute this Limited Liability Company Agreement as of the day and year written above.

**MEMBER:**

**HAWKS PVO HOLDING LLC,**
a Delaware limited liability company

By: Hawks PVO LLC,
a Delaware limited liability company
its sole member

By: Maxeli Merchants Walk LLC,
a Delaware limited liability company
its manager

By: ______________________
Name: Moshe Weingarten
Title: Managing Member

# SCHEDULE A

SPE COVENANTS

Borrower has at all times been a Single-Purpose Entity and has at all times acted in a manner which complies with the SPE Covenants since the date of its formation.

As used in this Agreement, the term "**SPE Covenants**" means that, so long as any of the Debt is outstanding, Borrower has not and will not, without the prior written consent of Lender:

(a) fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, or otherwise amend its organizational documentation;
(b) engage in any business or activity other than the development, construction, ownership, leasing and operation of the Property and activities incidental thereto;
(c) acquire or own any material asset other than the Property;
(d) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal form;
(e) own any subsidiary or make any investment in or acquire the obligations or securities of any other Person;
(f) commingle its assets with the assets of any of its partners, members, shareholders, other Affiliates, or of any other Person;
(g) allow any Person to pay its debts and liabilities or fail to pay its debts and liabilities solely from its own assets;
(h) enter into any contract or agreement with any shareholder, partner, member, principal or other Affiliate of Borrower or any Guarantor, or any shareholder, partner, member, principal or Affiliate thereof, except as shall be on terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any shareholder, partner, member, principal or affiliate of Borrower or any Guarantor or any shareholder, partner, member, principal or Affiliate thereof;
(i) seek dissolution or winding up, in whole or in part;
(j) fail to correct any known misunderstandings regarding the separate identity of Borrower;
(k) hold itself out to be responsible or pledge its assets or credit worthiness for the debts of another Person or allow any Person to hold itself out to be responsible or pledge its assets or credit worthiness for the debts of Borrower (except pursuant to the Loan Documents);
(l) make any loans or advances to any third party, including any shareholder, partner, member, principal or other Affiliate of Borrower, or any shareholder, partner, member, principal or other Affiliate thereof;
(m) fail to file its own tax returns, if required by applicable Law;
(n) fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name in order not (i) to mislead others as to the entity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any shareholder, partner, member, principal or other Affiliate of Borrower, or any shareholder, partner, member, principal or other Affiliate thereof);
(o) fail to allocate fairly and reasonably among Borrower and any third party (including, without limitation, any Guarantor) any overhead for common employees, shared office space or other

overhead and administrative expenses; or
(p) modify the operating agreement or partnership agreement of Borrower.

Capitalized terms used and not otherwise defined in this Schedule A have the respective meanings set forth on the Loan Documents.

# EXHIBIT E

Merchant's Holding LLC Agreement

# LIMITED LIABILITY COMPANY AGREEMENT OF MERCHANT'S HOLDING 1 LLC

**as of June 16, 2022**

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF CERTAIN STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED OR RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE SUBSEQUENT TRANSFER OF THE MEMBERSHIP INTERESTS WILL BE SEVERELY RESTRICTED BY THE TERMS OF THE OPERATING AGREEMENT. IN ADDITION, PURCHASERS SHOULD BE AWARE THAT THE PROVISIONS OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WILL NOT BE AVAILABLE AT SUCH TIME AS A PURCHASER DESIRES TO DISPOSE OF THE SECURITIES BEING OFFERED HEREBY**

**TABLE OF CONTENTS**

**Page**

ARTICLE I - DEFINITIONS ..... 1
Section 1.1 Definitions ..... 1
Section 1.2 Additional Clarification ..... 10
ARTICLE II - ORGANIZATIONAL MATTERS; PURPOSE; TERM ..... 10
Section 2.1 Formation of Company ..... 10
Section 2.2 Name ..... 10
Section 2.3 Principal Office ..... 10
Section 2.4 Registered Office and Registered Agent ..... 10
Section 2.5 Purpose and Scope ..... 11
Section 2.6 Term ..... 11
Section 2.7 No State Law Partnership ..... 11
Section 2.8 Foreign Qualification ..... 11
ARTICLE III - MEMBERSHIP; DISPOSITIONS OF INTERESTS ..... 11
Section 3.1 Members ..... 11
Section 3.2 Dispositions of Membership Interests ..... 11
Section 3.3 Resignation ..... 12
Section 3.4 Information ..... 12
Section 3.5 Liability to Third Parties ..... 13
Section 3.6 Representations and Warranties of Operating Member ..... 13
Section 3.7 Covenants of the Manager ..... 17
Section 3.8 Representations and Warranties of Capital Members ..... 18
ARTICLE IV - MANAGEMENT OF COMPANY ..... 19
Section 4.1 Management ..... 19
Section 4.2 Capital Budgets and Expenditures ..... 23
Section 4.3 Operating Budgets and Expenditures ..... 24
Section 4.4 Meetings of Members ..... 25
Section 4.5 Waiver of Notice ..... 25
Section 4.7 Reimbursement of Expenses ..... 25
Section 4.8 Compensation of Members ..... 26
Section 4.9 Transactions with Affiliates ..... 26

**TABLE OF CONTENTS**
(continued)

**Page**


Section 4.10 Exculpation, Indemnification; Reimbursement of Expenses; Insurance ........ 27

Section 4.11 Conflicts of Interest ........ 29

Section 4.12 Confidentiality ........ 29

Section 4.13 Upfront Fee, Expense Reimbursement ........ 30

ARTICLE V - ACCOUNTING AND REPORTING ........ 30

Section 5.1 Fiscal Year, Accounts, Reports ........ 30

Section 5.2 Bank Accounts ........ 31

Section 5.3 Capital Members Designee ........ 31

ARTICLE VI - CAPITAL CONTRIBUTIONS ........ 31

Section 6.1 Initial Capital Contributions ........ 31

Section 6.2 Additional Capital Contributions ........ 32

Section 6.3 Intentionally Omitted ........ 32

Section 6.4 Failure to Make Additional Capital Contributions ........ 32

Section 6.5 Return of Contributions ........ 32

Section 6.6 Balances ........ 32

ARTICLE VII - DISTRIBUTIONS ........ 32

Section 7.1 Distribution Policy ........ 32

Section 7.2 Distribution Priority ........ 32

Section 7.3 Distributions In Kind ........ 33

Section 7.4 Senior Mortgage Loans ........ 33

Section 7.5 Distributions Under the Act ........ 34

ARTICLE VIII - CHANGEOVER EVENTS; REMEDIES ........ 34

Section 8.1 Changeover Events ........ 34

Section 8.2 Acts or Failures of Manager ........ 35

Section 8.3 Remedies ........ 35

ARTICLE IX - CAPITAL ACCOUNTS; ALLOCATIONS; TAX MATTERS ........ 36

Section 9.1 Capital Accounts ........ 36

Section 9.2 Allocation of Profit and Loss ........ 36

Section 9.3 Tax Returns ........ 36

Section 9.4 Tax Elections ........ 36

**TABLE OF CONTENTS**
(continued)

**Page**


Section 9.5 Tax Representative ........ 36

ARTICLE X - WITHDRAWAL; DISSOLUTION; LIQUIDATION; TERMINATION ........ 37

Section 10.1 Dissolution, Liquidation, and Termination Generally ........ 37

Section 10.2 Liquidation and Termination ........ 37

Section 10.3 Deficit Capital Accounts ........ 38

Section 10.4 Cancellation of Certificate ........ 38

Section 10.5 Dissolution Generally ........ 38

ARTICLE XI - PURCHASE OF MEMBERSHIP INTEREST ........ 39

Section 11.1 General ........ 39

Section 11.2 Assignment of Membership Interest ........ 39

Section 11.3 Transfer of Management ........ 39

Section 11.4 Release and Indemnity ........ 39

Section 11.5 Transfer Tax ........ 40

Section 11.6 Assignment by Acquiring Member ........ 40

ARTICLE XII - PREFERENCES; REQUIRED PAYMENTS; REDEMPTION DATE; RESERVES; CASH MANAGEMENT ........ 40

Section 12.1 Voluntary Redemption ........ 40

Section 12.2 Redemption ........ 40

Section 12.3 Capital Expenditure Reserve ........ 40

Section 12.4 Extension Option ........ 41

Section 12.5 Tax Reserve ........ 41

ARTICLE XIII - RECOURSE LIABILITIES ........ 41

Section 13.1 Recourse Limited to Damage ........ 41

Section 13.2 Full Recourse ........ 42

Section 13.3 No Recourse ........ 43

ARTICLE XIV - REIT COVENANTS ........ 43

ARTICLE XV - MISCELLANEOUS PROVISIONS ........ 44

Section 15.1 Notices ........ 44

Section 15.2 Approvals ........ 44

Section 15.3 Governing Law ........ 44

**TABLE OF CONTENTS**
(continued)

**Page**

Section 15.4 Entireties; Amendments ... 44
Section 15.5 Waiver ... 44
Section 15.6 Severability ... 44
Section 15.7 Ownership of Property and Right of Partition ... 45
Section 15.8 Captions, References and Construction ... 45
Section 15.9 Involvement of Members in Certain Proceedings ... 45
Section 15.10 Interest ... 45
Section 15.11 Counterparts ... 45
Section 15.12 General Indemnification ... 45
Section 15.14 Time of the Essence; Business Day ... 46
Section 15.15 Estoppel Certificate ... 46
Section 15.16 Right of Offset ... 46
Section 15.17 Waiver of Certain Defenses ... 46
Section 15.18 Waiver of Jury Trial ... 47
Section 15.19 Alternate Dispute Resolution ... 47
Section 15.20 SPE Provisions ... 48
Section 15.21 Third Parties ... 48
Section 15.22 Casualty and Condemnation ... 48
Section 15.23 Expenses ... 48
Section 15.24 Material Adverse Change ... 48
ARTICLE XVI - DRAG TO MARKET ... 49
Section 16.1 Capital Members' Right to Market ... 49
Section 16.2 Operating Member's Rights upon service of DTM Notice ... 49
Section 16.3 DTM Purchase ... 49
Section 16.4 No DTM Purchase ... 49

# LIMITED LIABILITY COMPANY AGREEMENT OF MERCHANT'S HOLDING 1 LLC

This Limited Liability Company Agreement (this "***Agreement***") is entered into as of June 16, 2022 (the "***Effective Date***"), by and among the members listed in Schedule I attached hereto (in their capacities as members of the Company, the "***Members***") and the Manager listed on the signature page attached hereto (in its capacity as the Manager of the Company). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.

## ARTICLE I - DEFINITIONS

Section 1.1 Definitions. As used in this Agreement, the following terms shall have the following meanings:

"***Acquiring Member***" shall have the meaning set forth in Section 11.1.

"***Acquisition Date***" shall have the meaning set forth in Section 11.1.

"***Act***" means the Delaware Limited Liability Company Act (6 Del.C. §18-101 et seq.), as it may be amended from time to time.

"***Additional Capital Contributions***" means the amount of Capital Contributions made by a Member, in excess of such Member's Initial Capital Contribution.

"***Affiliate***" means, as to any Member, (a) any corporation in which such Member or any partner, shareholder, director, officer, member (whether direct or indirect), or manager of such Member, directly or indirectly, owns or controls more than ten percent (10%) of the beneficial interest, (b) any partnership, joint venture or limited liability company in which such Member or any partner, shareholder, director, officer, member (whether direct or indirect), or manager of such Member is a partner, joint venturer or member, (c) any trust in which such Member or any partner, shareholder, director, officer, member (whether direct or indirect), or manager of such Member is a trustee or beneficiary, (d) any entity of any type which is directly or indirectly owned or controlled by such Member or any partner, shareholder, director, officer, member(whether direct or indirect), or manager of such Member, (e) any partner, shareholder, director, officer, member, manager or employee of such Member, or (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager or employee of such Member or such Member's Affiliate applying (a) through (e) above.

"***Anniversary Date***" means the anniversary of the Closing Date in the applicable year.

"***Authorized Representative***" shall have the meaning set forth in Section 4.12(a).

"***Balances***" shall mean, collectively, the total unreturned Capital Contributions for each Member.

"***Bankruptcy***" means, with respect to a Person, the occurrence of (1) an assignment by a Person for the benefit of creditors; (2) the filing by a Person of a voluntary petition in bankruptcy;

(3) the entry of a judgment by any court that a Person is bankrupt or insolvent, or the entry against a Person of an order for relief in any bankruptcy or insolvency proceeding; (4) the filing of a petition or answer by a Person seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (5) the filing by a Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (6) the consent or acquiescence of a Person to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; or (7) any other event which would cause a Person to cease to be a member of a limited liability company under Section 18-304 of the Act. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"***Blended Tax Rate***" means, as determined by the Company's accountants or the Manager, in his reasonable discretion, and approved by the Capital Members, for each Fiscal Year, the overall effective combined federal, state and local tax rate applicable to the Members' allocable share of the Company's net income and gain. For purposes of determining the Blended Tax Rate, the maximum federal income tax rate applicable to each item of net income or gain under Section 1 of the Code shall be applied and all potential credits, losses, deductions allocated to Members shall be deemed fully utilized and taken into account.

"***Board of Managers***" means (i) prior to a Changeover Event, a board of two members consisting of one member appointed by the Operating Member, which must be an Operating Member or an affiliate of an Operating Member (the ***"Operating Member Appointee"***) and one member appointed by the Capital Members, which must be a Capital Member or an affiliate of the Capital Members (the ***"Capital Members Appointee"***), each member of the Board of Managers shall have a 50% vote, and (ii) after a Changeover Event, solely the Capital Members Appointee who shall have the ability, acting alone, to grant any consent or approval of the Board of Managers. Whenever the "approval" or "consent" of the Board of Managers is described herein, such action shall be deemed to require a unanimous vote of the Board of Managers prior to a Changeover Event and the sole vote of the Capital Members Appointee after a Changeover Event. The members of the Board of Managers can be removed and replaced, with or without cause, by the Member(s) who appointed such member. Any action by the Capital Members to appoint, remove, or replace the Capital Members Appointee shall require the vote of the Capital Members who own at least a majority of the Capital Member Percentage Interest. The initial Operating Member Appointee is Maxeli Merchants Walk LLC. The initial Capital Members Appointee is MaxMez NC, LLC, a Missouri limited liability company. Each Member shall promptly notify each other Member of any change to its appointed member of the Board of Managers.

"***Capital Account***" shall have the meaning set forth in Section 9.1.

"***Capital Budget***" means the capital budget, prepared by the Manager and approved by the Board of Managers, and setting forth the estimated capital expenses of the Company and SPE for the property, which may be revised in accordance with Section 4.2. Attached hereto as "Exhibit E" is a copy of the initial Capital Budget as approved by all Members.

"***Capital Contribution***" means, with respect to each Member, the amount of cash and the fair market value of property other than cash (net of liabilities which the Company assumes or takes the property subject to) contributed to the capital of the Company by that Member.

***"Capital Expenditure Reserve"*** shall have the meaning set forth in Section 12.3.

"***Capital Member(s)***" shall be MaxMez NC, LLC, a Missouri limited liability company.

**"*Capital Members' Initial Capital Contribution*"** means the Capital Contributions to be initially contributed by the Capital Members to the Company as set forth in Schedule I.

***"Capital Members Current Preferred Return Rate"*** equals six and one-half percent (6.5%) per annum, compounded monthly on an actual/360 basis.

"***Capital Member Percentage Interest***" of each Capital Member at any time shall equal the fraction the numerator of which is each Capital Member's Initial Capital Contributions to the Company and the denominator of which shall be the sum of the aggregate Initial Capital Contributions to the Company of all Capital Members. The Capital Member Percentage Interests are set forth on Schedule I.

"***Capital Members Preferred Return Rate***" equals eleven percent (11.00%) per annum, compounded monthly on an actual/360 basis for all periods beginning on the Closing Date and continuing to and through the Redemption Date or a Changeover Event. Upon a Changeover Event the rate will increase pursuant to Section 8.3(c) hereof.

"***Capital Proceeds***" means the proceeds received by the Company arising from a Capital Transaction after payment of all reasonable costs and expenses incurred by the Company and/or the SPE in connection with such Capital Transaction.

**"*Capital Transaction*"** means the sale, financing (other than any financing occurring as of the date of this Agreement), refinancing, defeasance or similar transaction of or involving the Property (including condemnation, payment of title insurance proceeds or casualty loss insurance proceeds, other than business interruption or rental loss insurance proceeds, to the extent not applied to mortgage indebtedness of the Company and not used to repair damage caused by a casualty or taking or in alleviation of any title defect).

"***Cash Flow***" shall mean, for the period in question, the amount by which the aggregate cash receipts of the Company from any source (including loans and Capital Contributions) exceed the sum of the cash expenditures of the Company plus a cash reserve in the amount determined by the Manager and approved by the Board of Managers to be sufficient to meet the working capital requirements of the Company.

"***Changeover Event***" means the occurrence of one or more events described in Section 8.1 of this Agreement.

"***Closing Date***" means June 16, 2022.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of succeeding law.

"***Company***" means Merchant's Holding 1 LLC, a Delaware limited liability company.

"***Control***" means of any entity the ownership, directly or indirectly, of at least 51% of the equity interests in, and the right to at least 51% of the distributions from, such entity or the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ability to exercise voting power, by contract or otherwise ("***Controlled***" and "***Controlling***" each have the meanings correlative thereto).

"***Covered Person***" shall have the meaning set forth in Section 4.10(a)(v).

"***CPI***" shall mean "The Consumer Price Index (New Series) (Base Period 1982-84=100) (all items for all urban consumers)" issued by the Bureau of Labor Statistics of the United States Department of Labor (the "***Bureau***"). If the CPI ceases to use the 1982-84 average equaling 100 as the basis of calculation, or if a change is made in the term, components or number of items contained in said index, or if the index is altered, modified, converted or revised in any other way, then the index shall be adjusted to the figure that would have been arrived at had the change in the manner of computing the index in effect at the date of this Agreement not been made. If at any time during the term of the Investment the CPI shall no longer be published by the Bureau, then any comparable index issued by the Bureau or similar agency of the United States issuing similar indices shall be used in lieu of the CPI.

"***Creditor Member***" shall have the meaning set forth in Section 15.16.

**"*Debt Service*"** means the aggregate of interest, principal, and other payments due on the Senior Mortgage Loan under the terms of the Senior Mortgage Loan Documents, for the period of time for which calculated.

"***Debtor Member***" shall have the meaning set forth in Section 15.16.

"***DTM Notice***" shall have the meaning set forth in Section 16.1.

"***DTM Purchase Notice***" shall have the meaning set forth in Section 16.2.

"***DTM Sale Notice***" shall have the meaning set forth in Section 16.2.

"***Dispute***" shall have the meaning set forth in Section 15.19.

"***Effective Date***" means the date set forth in the initial paragraph of this Agreement as the effective date of this Agreement.

"***Emergency Expenses***" means an expense that is reasonably necessary to prevent imminent damage to structural support of any portion of the Property, imminent bodily injury to persons in the immediate vicinity of the Property or material physical damage to any portion of the Property or substantial, imminent economic loss to the Property (including, without limitation, any expense necessary to prevent any tenant's right to offset rent arising pursuant to any lease at the Property), including, without limitation, any civil and/or criminal penalties that have been imposed in connection with the foregoing events.

"***Encumbrance***" shall have the meaning set forth in Section 3.2(a).

***"Environmental Matter"*** means: (i) the direct or indirect violation or exposure to any liability under any local, state or federal law, rule, regulation, or other legal requirement, including common law duty pertaining to human health, safety, natural resources or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq. as it may be amended (***"CERCLA"***), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), the Clean Air Act (42 U.S.C. §7401 et seq.), the Emergency Planning and Community Right-To-Know Act (42 U.S.C. §1101 et seq.), The Endangered Species Act (16 U.S.C. §1531 et seq.), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.), the Occupational Safety and Health Act (29 U.S.C. §651 et seq.), and the Hazardous Material Transportation Act (49 U.S.C. §1801 et seq.), and the regulations promulgated pursuant to said laws, all as amended from time to time and similar state counterparts or equivalents (collectively, the ***"Environmental Law"*** or ***"Environmental Laws"***), or otherwise exposed to any liability under any Environmental Law relating to or affecting the Property and (ii) any microbial matter maintenance plan, the presence, release or threat of release of any hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos or asbestos-containing materials, lead based paint, polychlorinated biphenyls, petroleum or petroleum products or byproducts, flammable explosives, radioactive materials, paint containing more than 0.5% lead by dry weight, infectious substances, radon gas or raw materials which include hazardous constituents) or microbial matter or any other substances or materials which are included under or regulated by Environmental Laws which are, in each case, on, in, under or affecting all or any portion of the Property or any surrounding areas.

"***Exiting Member***" shall have the meaning set forth in Section 11.1.

"***Expense Reimbursement***" shall mean an amount of $75,000.00 which shall be paid by the Company to the Capital Member on the Closing Date to reimburse the Capital Member for underwriting and legal expenses.

"***Extension***" shall have the meaning set forth in Section 12.4.

"***Full Casualty Event***" shall have the meaning set forth in 15.22.

***"Hawks Landing Apartments"*** shall mean the property located at 2778 2nd Street NE, Hickory NC 28601.

**"*Initial Capital Contributions*"** means (a) with respect to the Capital Members the Capital Contributions to be initially contributed by the Capital Members, and (b) with respect to each Operating Member the Capital Contributions to be initially contributed by such Operating Member. The Initial Capital Contributions are set forth in Schedule I.

**"*Initial Capital Contribution Balance*"** means, for the Capital Members, the Initial Capital Contribution of the Capital Members less that portion of the Initial Capital Contribution that has been returned to the Capital Members pursuant to Section 7.2.

***"Initial Capital Contribution Current Return"*** means a preferential distribution to the Capital Members calculated on the Capital Members' Initial Capital Contribution Balance at the Capital Members Current Preferred Return Rate.

"***Initial Capital Contribution Preferred Return***" means a preferential distribution to the Capital Members calculated on the Capital Members' Initial Capital Contribution Balance and Initial Capital Contribution Preferred Return Balance at the Capital Members Preferred Return Rate, which Initial Capital Contribution Preferred Return is inclusive of the Initial Capital Contribution Current Return.

***"Initial Capital Contribution Preferred Return Balance***" means, for the Capital Members, at any time, the cumulative accrued Initial Capital Contribution Preferred Return less the sum of all amounts distributed by the Company to that Member in payment thereof pursuant to Section 7.2.

"***Investment"*** shall mean Capital Members' total Initial Capital Contributions combined with the Initial Capital Contribution Preferred Return Balance, the Protective Capital Contributions, and Protective Capital Contribution Preferred Return Balance.

"***Knowledge" or "knowledge"*** means, with respect to the Operating Member, the knowledge of Eli Meisels, Aron Mendelovitz, or Moshe (a/k/a Max) Weingarten as of the date of this Agreement and, with respect to the Capital Members, the actual knowledge of Adam Fletcher or Chase Watson as of the date of this Agreement.

"***Land***" means that certain real property generally situated at 2778 2nd Street NE, Hickory NC 28601, as more fully described on Exhibit A attached hereto.

***"Lender"*** means the Senior Mortgage Lender, whichever then holds or administers the Senior Mortgage Loan encumbering the Property.

"***Manager***" means the Operating Member, so long as such Person shall continue as the Manager hereunder, and each Person hereafter designated as a Manager in accordance with this Agreement until such Person ceases to be a Manager of the Company. Only the Board of Managers may remove or replace the Manager of the Company.

***"Material Adverse Effect*** means a material adverse effect on (i) the Property, (ii) the business, profits, operations, or condition (financial or otherwise) of the Company or the SPE, or (ii) the ability of the Company, the Sponsors, or the Manager to perform its obligations as they become due under this Agreement or under the Senior Mortgage Loan Documents to which it is a party.

***"Material Property Contract***" means (a) any management agreements; or (b) any agreement with respect to the Property that (i) has a term longer than one year and is not cancellable by the Company on 30 days' notice or less with no penalty or similar payment, (ii) requires payment or performance by the Company of a value exceeding $50,000 annually, or (iii) is not in the ordinary course of business, but this definition shall not include any contract specifically itemized in an approved Operating Budget or Capital Budget.

"***Members***" means the Capital Members, the Operating Member, and each Person hereafter admitted as a Member in accordance with this Agreement, until such Person ceases to be a Member of the Company.

"***Membership Interests***" means all of the rights and interests of whatsoever nature of the Members in the Company, including without limitation, the right to participate in management to the extent herein expressly provided, to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit, and shall also include indirect interests in the Company held by or through the Members, the Manager or their constituent upstream entities. The Membership Interests of the Members are set forth on Schedule I.

"***Necessary Expenses***" means expenses not set forth in an Operating Budget or Capital Budget that is required (a) to be incurred and paid in order to cure or prevent an event of default under the Senior Mortgage Loan Documents, (b) to pay Emergency Expenses, (c) to pay debt service and reserve payments under the Senior Mortgage Loan Documents, and (d) to pay Uncontrollable Expenses, including, without limitation, real estate taxes and assessments, utility expenses and insurance premiums with respect to the Property.

"***Operating Budget***" means the annual budget, prepared by the Manager and approved by the Board of Managers, and setting forth the estimated capital and operating expenses of the Company and SPE for the then current or immediately succeeding calendar year and for each month of said calendar year, in such detail as the Board of Managers and the Manager may agree from time to time. Attached hereto as "Exhibit D" is a copy of the Operating Budget for the first year of this Agreement as approved by all Members.

"***Operating Expenses***" means, for any period, the current obligations and expenditures of the Company or SPE for such period, determined in accordance with sound accounting principles approved by the Board of Managers and applicable to commercial real estate, consistently applied and in accordance with Section 5.1(b), for operating expenses of the Property, including such commercially reasonable additional expenditures that a party engaged in the operation and/or management of similar properties would deem necessary or customary to operate the Property. Operating Expenses shall not include Debt Service or any non-cash expenses such as depreciation or amortization.

"***Operating Member***" shall be Merchant's Walk Apartments LLC, a Delaware limited liability company.

"***Operating Revenues***" means, for any period, the gross revenues of the Company or the SPE arising from the ownership and operation of the Property during such period, determined in accordance with GAAP (as defined herein) with such deviations as may be approved by the Board of Managers and applicable to commercial real estate, consistently applied and in accord with Section 5.1(b), including proceeds of any business interruption insurance maintained by the Company from time to time and amounts funded from Company reserves, but specifically excluding Capital Proceeds and Capital Contributions of the Members.

"***Person***" means an individual or entity.

"***Property***" means the Land together with the improvements located thereon.

"***Property Management Agreement***" means the property management agreement, satisfactory in form and content to the Capital Members, to be entered into by the SPE and the Property Manager with respect to the day to day operation of the Property.

"***Property Manager***" means the manager appointed pursuant to the Property Management Agreement.

"***Property Proceeds***" shall have the meaning set forth in Section 7.2.

**"*Protective Capital Contributions*"** means any Additional Capital Contributions made by the Capital Members.

**"*Protective Capital Contribution Balance*"** means, for the Capital Members, the cumulative Protective Capital Contributions of that Member less the cumulative distributions to that Member specifically described as being a return thereof pursuant to Section 7.2.

**"*Protective Capital Contribution Preferred Return*"** means a preferential distribution to the Capital Members calculated on the Capital Members' Protective Capital Contribution Balance and Protective Capital Contribution Preferred Return Balance at the lesser of 15% per annum, or the highest per annum interest rate permitted under the laws of the state in which the Property is located (in either case, compounded monthly).

***"Protective Capital Contribution Preferred Return Balance*"** means, for the Capital Members, the cumulative accrued Protective Capital Contribution Preferred Return less all amounts distributed by the Company to that Member specifically described as being in payment thereof pursuant to Section 7.2.

***"Purchase Agreement"*** means that certain Purchase and Sale Agreement by and between the Hawks Landing Luxury Apartments, LLC, a Florida limited liability company, as "seller", and Hawks Landing Owner LLC, as "purchaser", effective January 27, 2022.

"***Redemption Date***" means the earlier to occur of: (a) one day following the maturation of the Senior Mortgage Loan; and (b) the second (2nd) anniversary of the Closing Date, unless extended by an Extension, in which case until the expiration of the applicable Extension.

"***Regulations***" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Regulations shall include any corresponding provisions of succeeding, similar, substitute proposed or final Regulations.

"***REIT Covenants"*** refers to the covenants set forth in Article 14 hereof.

"***Replacement Guaranty Requirements***" means the compliance with all conditions and requirements under the Senior Mortgage Loan Documents and the Capital Members causing the Sponsor to be promptly released from all guaranties, recourse or non-recourse carve-out guarantees, environmental indemnities and any other similar agreements in respect of the

obligations of the Company or the SPE, to the extent first arising after the effective date of such removal.

"***Required Redemption Amount***" means, with respect to the Capital Members, an amount equal to (i) the unpaid portion of the Investment; plus (ii) any additional amount (the *"**Redemption Premium**"*) required to assure that the Capital Members receives a return on the Capital Members' Initial Capital Contribution, over the term of the Capital Members' Initial Capital Contribution (through the date of redemption) equal to (X) at least 122% of such portion of the Capital Members' Initial Capital Contribution (a minimum 1.22x return multiple) if the redemption occurs within twenty four months after the Closing Date, (Y) at least 135% of such portion of the Capital Members' Initial Capital Contribution (a minimum 1.35x return multiple) if the redemption occurs after the first twenty four months after the Closing Date but within thirty months of the Closing Date, and (Z) at least 145% of such portion of the Capital Members' Initial Capital Contribution (a minimum 1.45x return multiple) if the redemption occurs after the first thirty months after the Closing Date; plus (iii) any other amounts then owing to the Capital Members hereunder. In calculating the Redemption Premium, the Upfront Fee and Expense Reimbursement shall not be included as part of the Capital Members' return on the Capital Members' Initial Capital Contribution.

"***Required Redemption Date***" means the date that is the earlier of: (a) one business day after the date upon which the Senior Mortgage Loan is fully repaid or defeased, (b) the date on which all or any portion of the Property is sold, or (c) the Redemption Date.

"***Requisite Consent***" means approval or consent of the Board of Managers.

"***Reserve Accounts***" means any reserve accounts provided for under the Senior Mortgage Loan Documents, and any other reserves established pursuant to Article XII of this Agreement.

**"*Senior Mortgage Lender*"** means the financial institution which from time to time provides any Senior Mortgage Loan to the SPE.

**"*Senior Mortgage Loan*"** means the existing or future loans secured by the Property and any loan which refinances such Senior Mortgage Loan from a Senior Mortgage Lender selected by the Manager and approved by all the Board of Managers.

**"*Senior Mortgage Loan Documents*"** mean the documents evidencing or securing any Senior Mortgage Loan.

"***SPE"*** mean MERCHANT'S SUB 1, LLC, a single-member LLC wholly owned by the Company, organized in Delaware and foreign registered in North Carolina.

"***Sponsor***" means Eli Meisels and Moshe (a/k/a Max) Weingarten.

"***Tax Amount***" means, for any Fiscal Year, (a) the Members' estimated aggregate allocable share of the Company's items of net income and gain for such tax year (after first applying all net loss carryovers, as determined and calculated by the Company or its accountants, from a prior tax year), multiplied by (b) the Blended Tax Rate for such Fiscal Year. The Tax Amount shall be determined by the Company's accountants or the Manager in his reasonable discretion subject to the approval of the Capital Members.

"***Transfer***" shall have the meaning set forth in Section 3.2(a).

**"*Uncontrollable Expenses*"** means expenses not set forth in an Operating Budget, Capital Budget or other budget approved by the Board of Managers for the payment of (i) real estate taxes and assessments,, (ii) utility expenses, (iii) insurance premiums, (iv) expenses necessary to (A) avoid or remediate any condition constituting a real and present hazard to health or human safety at, or presenting risk of material loss or damage to, the Property or any portion thereof, (B) enable the Company or SPE to comply with or avoid violating in any material respect the laws or regulations or any governmental authority or (C) avoid or mitigate in any material respect the Company's or SPE's exposure to potential liability as a result of any environmental matter, and (v) snow and ice removal expenses.

***"Upfront Fee"*** shall mean a fee equal to 2% of the Capital Members' Initial Capital Contribution which shall be payable to the Capital Member by the Company on the Closing Date.

"***Voluntary Redemption***" shall have the meaning set forth in Section 12.1.

Section 1.2 Additional Clarification. Notwithstanding anything contained herein to the contrary, when the word "material" is used in this Agreement, it shall be used as reference to something that is important or essential, as determined by Capital Members in a commercially reasonable manner.

## ARTICLE II - ORGANIZATIONAL MATTERS; PURPOSE; TERM

Section 2.1 Formation of Company. The Company was formed effective as of May 18, 2022 as a limited liability company pursuant to and in accordance with Delaware law as of the filing of its Certificate of Formation with the Secretary of State of the State of Delaware.

Section 2.2 Name. The name of the Company is Merchant's Holding 1 LLC, and all Company business shall be conducted in that name or such other name as the Manager and the Board of Managers approve. ________________ is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware. Upon the filing of the Certificate of Formation with the Secretary of State, her powers as an "authorized person" ceased, and the Manager thereupon became designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act.

Section 2.3 Principal Office. The Company will maintain an office and principal place of business (i) prior to a Changeover Event, at ________________________________________ or at such place or places as the Operating Member may from time to time designate with prior written notice of such designation given to the other Members prior and (ii) following a Changeover Event, at 104 Armour Rd., N Kansas City, Missouri 64116 or at such place or places as the Capital Members may from time to time designate with prior written notice of such designation given to the Manager and other Members.

Section 2.4 Registered Office and Registered Agent. The Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware.

Section 2.5 Purpose and Scope. The purposes and scope of the Company's activities are strictly limited to acquiring, developing, financing, constructing and/or renovating, improving, maintaining, owning, leasing, and selling the Property, either directly or through the SPE; financing the foregoing activities; and performing all other activities reasonably necessary or incidental to the furtherance of such purposes, including, but not limited to, causing the Company and/or the SPE to enter into and perform its obligations under the Senior Mortgage Loan Documents.

Section 2.6 Term. The term of the Company commenced upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware in accordance with Delaware law and shall be perpetual, unless sooner dissolved as herein provided.

Section 2.7 No State Law Partnership. The Company shall not be a partnership or joint venture under any state or federal law, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager for any purposes, other than under the Code and other applicable tax laws, and this Agreement may not be construed otherwise.

Section 2.8 Foreign Qualification. Before the Company conducts business in any jurisdiction other than Delaware, the Manager shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Manager, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business.

## ARTICLE III - MEMBERSHIP; DISPOSITIONS OF INTERESTS

Section 3.1 Members. The initial Members of the Company are set forth in Schedule I to this Agreement, each of which is admitted to the Company as a Member as of the date hereof.

Section 3.2 Dispositions of Membership Interests.

(a) Except as otherwise authorized pursuant to this Agreement, neither the Operating Member nor the Sponsor may make an assignment, transfer, or other disposition (voluntarily, involuntarily or by operation of law) (a "***Transfer***") of all or any portion of its Membership Interest, nor pledge, mortgage, hypothecate, grant a security interest in, or otherwise encumber (an "***Encumbrance***") all or any portion of its Membership Interest, except with Requisite Consent if:

(i) Such Transfer reduces Sponsor's legal or equitable interest in Operating Member in an amount in excess of 49% of the legal or equitable interest owned by Sponsor on the date hereof;

(ii) Such Transfer or series of Transfers of any legal or equitable interest in any entity or entities that results in a change of Control of Operating Member in a manner that neither Sponsor continues to, directly or indirectly, have the power, directly or indirectly to direct or cause the direction of the management and policies of the Operating Member, whether through the ability to exercise voting power, by contract or otherwise;

(iii) Such Transfer or series of Transfers of any legal or equitable interest that results in any party that was not a Significant Owner before such Transfer (or series of Transfers) becoming a Significant Owner thereafter (such consent not to be unreasonably withheld, conditioned or delayed). For purposes of this provision, a "Significant Owner" is an individual or entity that owns, directly or indirectly, 25% or more of the collective equity interests in Operating Member;

(iv) It is a Transfer of any interests in the Company by Operating Member;

(v) Such Transfer or Encumbrance would violate the terms of the Senior Mortgage Loan Documents.

(b) Any attempted Transfer of, or granting of an Encumbrance on, all or any portion of a Membership Interest, other than in strict accordance with this Section 3.2, shall be void. A Person to whom a Membership Interest is transferred in violation of the above restrictions may be admitted to the Company as a member only with Requisite Consent, which may be given or withheld in the non-transferring Member's sole and absolute discretion. In connection with any Transfer of a Membership Interest or any portion thereof, and any admission of an assignee as a Member, the Member making such Transfer and the assignee shall furnish the other Member with such documents regarding the Transfer as the other Member may reasonably request (in form and substance reasonably satisfactory to the other Member), including a copy of the Transfer instrument, a ratification by the assignee of this Agreement (if the assignee is to be admitted as a Member) and a legal opinion that the Transfer complies with applicable federal and state securities laws. In addition to obtaining Requisite Consent, any Person initiating a Transfer shall be obligated to (a) obtain the approval of the Senior Mortgage Lender for any such Transfer (or demonstrate that such consent is not required pursuant to the Senior Mortgage Loan Documents) and to pay any Senior Mortgage Lender costs associated with Senior Mortgage Lender's review and approval, if any, and (b) pay all costs incurred by the Company or the other Members in connection with their legal and other fees associated with reviewing such Transfer.

(c) Manager shall have no right to Transfer its rights, title, interest or obligations as Manager herein except with Requisite Consent.

(d) Capital Members may not make any Transfer or Encumbrance that would violate the terms of the Senior Mortgage Loan Documents.

Section 3.3 Resignation. A Member may not resign or withdraw from the Company without the consent of the other Members.

Section 3.4 Information. In addition to the other rights specifically set forth in this Agreement, each Member and each permitted assignee is entitled to (a) true and full information regarding the status of the business and financial condition of the Company; (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year; (c) a current list of the name and last known business, residence or mailing address of each Member and Manager; (d) a copy of this Agreement, the Company's certificate of formation, and all amendments to such documents; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; and (f) other information regarding the affairs of the Company to

which that Member or permitted assignee is entitled pursuant to Section 18-305 of the Act (including all Company books and records). Under no circumstances shall any information regarding the Company or its business be kept confidential from the Manager or a Member.

Section 3.5 Liability to Third Parties. Except as expressly set forth in this Agreement, no Member or Manager shall be liable for the debts, obligations or liabilities of the Company.

Section 3.6 Representations and Warranties of Operating Member.

(a) As a material inducement for the Capital Members to contribute its Initial Capital Contribution to the Company, the Operating Member hereby represents and warrants to the Capital Members that:

(i) Both the Company and the SPE are limited liability companies duly organized, validly existing, and in good standing under the laws of the State of Delaware, and have and have had since their inception all necessary power and authority to carry on their business, to own and lease the assets which they owned and leased, and to perform all their obligations under each agreement and instrument by which they are bound;

(ii) The SPE is registered to do business in North Carolina;

(iii) Except in connection with the Company's ownership of the SPE, neither the Company nor the SPE owns, directly or indirectly, any equity interest in any other corporation, association, partnership, joint venture, business organization or limited liability company or other entity, nor has the Company or the SPE entered into any agreement, arrangement or understanding to make any such investment;

(iv) The Company has not engaged, in any material respect, in any trade or business other than owning the SPE (the "Business"). Neither the Company nor the SPE has ever conducted business under any other name other than the name of the Hawks Landing Apartments (i.e., "trading" or "doing business as").

(v) No bankruptcy or insolvency proceedings are pending or contemplated by the SPE, the Company, the Operating Member, or Manager or against the SPE, the Company, the Operating Member or Manager;

(vi) There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or, to the best of the Operating Member's knowledge, threatened against or affecting the Company, the SPE or the Property which, if adversely determined, would materially impair the Property or the Company's, SPE's or Operating Member's ability to perform the covenants or obligations required to be performed under this Agreement;

(vii) Neither the Company nor the SPE has (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by its creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of its assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of its assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension, or composition to its creditors generally.

(viii) The Company and the SPE have duly filed with the appropriate government agencies all material tax returns required to be filed. No waiver of any statute of limitations relating to taxes has been executed or given by the Company, Operating Member, Manager or the SPE that is currently in effect. All taxes required to be paid or withheld and remitted by the Company, Operating Member, Manager or the SPE (whether or not reflected on any tax return) have been fully and timely paid or withheld and remitted, and there are no levies, liens or other encumbrances relating to taxes existing, threatened or pending with respect to any asset of the Company;

(ix) The Company is not (nor has ever been) a party to any tax sharing agreement or tax indemnity agreement and the Company has not assumed the tax liability of any other person under contract. Neither the SPE nor the Company has agreed, nor is the Company or SPE required to make, any adjustment under Code Section 481(a) by reason of a change in accounting method or otherwise.

(x) Other than in connection with the Senior Mortgage Loan Documents, on the Closing Date there will be no security agreements or financing statements affecting all or any portion of the Property other than as disclosed in writing by the Operating Member to the Capital Members;

(xi) Neither the Operating Member nor the SPE is a "foreign person" within the meaning of Section 1445(f)(3) of the Code and the related Treasury Department regulations, including temporary regulations;

(xii) As of the Effective Date, Operating Member and Capital Members are the only members of the Company and the Company is the only member of the SPE;

(xiii) Since the date of the Company's formation, it has owned no material assets other than cash and the SPE;

(xiv) Since the date of the Company's formation, the Company has had no employees and no employee benefit plans of any kind or nature;

(xv) Reserved;

(xvi) There exists no presently pending litigation, arbitration, governmental investigation, or administrative proceeding, and no litigation, arbitration or administrative proceeding has been threatened in writing against the Company or SPE;

(xvii)The SPE has no material assets or liabilities, whether accrued, absolute or contingent, in each case, other than those related to the Property;

(xviii) All material reports, certificates, affidavits, financial statements and other data furnished in writing by or on behalf of the Operating Member or Manager and expressly delivered to the Capital Members, as from the Operating Member or Manager, and not from a third party, if any, in connection with the Property or this Agreement are true and correct in all material respects and do not omit to state any fact or circumstance necessary to make the statements contained therein not materially misleading;

(xix) The execution, delivery and performance of this Agreement is binding and enforceable against the Operating Member and Manager in accordance with the respective terms thereof and do not violate, result in a breach of or constitute a default (nor upon the giving of notice or the passage of time or both will constitute a default) under any contract or agreement of any nature to which the Operating Member or Manager is a party or by which the Operating Member or Manager or any of its property may be bound and do not violate any law, order, decree, rule or regulation to which the Operating Member or Manager is subject;

(xx) To the best of the Operating Member's knowledge, on the Closing Date, the Property and the current intended use thereof by the Company and SPE shall comply in all material respects with all applicable restrictive covenants, zoning ordinances, subdivision and building codes, flood disaster laws, health and environmental laws and regulations and all other ordinances, orders or requirements issued by any state, federal or municipal authorities having or claiming jurisdiction over the Property. On the Closing Date, the Property will constitute one or more separate tax parcels for purposes of ad valorem taxation. On the Closing Date, the Property shall not require any rights over, or restrictions against, other property in order to comply with any of the aforesaid governmental ordinances, orders or requirements except those that are in place;

(xxi) To the best of the Operating Member's knowledge, there are no conditions on, about, beneath or arising from the Property caused by the Company or SPE or to the Operating Member's knowledge, any other Person which would reasonably be expected to, now or any time in the future under any environmental law, (A) give rise to a liability, a restriction on use or activity or the imposition of a statutory lien, or (B) require any action to report, investigate, remediate, monitor or undertake other actions in response to the presence or release of hazardous substances or a violation of environmental laws;

(xxii)To the best of the Operating Member's knowledge, there is not now, nor, to Operating Member's knowledge, has there ever been, any above or underground storage tanks, asbestos containing materials, or transformers containing or contaminated with PCB's on, about or beneath the Property;

(xxiii) The utility services necessary and sufficient for the full use, occupancy, operation and disposition of the Property for its intended purposes shall be available to the Property through public rights-of-way or perpetual private easements;

(xxiv) The Property will be free from delinquent water charges, sewer rents, taxes and assessments and related liens;

(xxv)The Property will be free from material unrepaired damage caused by fire, flood, accident or other casualty;

(xxvi) No part of the Property or the improvements thereon has been taken in condemnation, eminent domain or like proceeding nor, to the best of the Operating Member's knowledge, is any such proceeding pending or threatened or contemplated;

(xxvii) Operating Member has delivered to Capital Members true, correct and complete copies of all service, management contracts, and other agreements in its possession or

under its control then currently relating to the Property, including any and all amendments thereto or modifications thereof (collectively, the "***Contracts***");

(xxviii) On the Closing Date, each Contract will constitute the legal, valid and binding obligation of the other party thereto and is enforceable against any other party thereto. No default exists, or with the passing of time or the giving of notice or both would exist, under any Contract which would, in the aggregate, have a material adverse effect on the Company or the Property;

(xxix) No Contract, other than the Senior Mortgage Loan Documents, shall provide any party with the right to obtain a lien or encumbrance upon the Property, and there are no liens, which are prior to or of equal priority with the lien of the Senior Mortgage Loan Documents against the Property other than as disclosed in writing by the Operating Member to the Capital Members prior to the Closing Date;

(xxx) The easements, covenants, conditions, restrictions and other encumbrances to title to the Property will not materially and adversely affect (A) the ability of the SPE to pay in full the Senior Mortgage Loan in a timely manner (B) the ability of the Company to pay in full all amounts due to the Capital Members hereunder, or (C) the use of the Property for the use currently being made thereof on the Closing Date, the operation of the Property as currently being operated or the value of the Property on the Closing Date;

(xxxi) Any right of any Affiliate of the Operating Member or Manager to receive any compensation, reimbursement of costs and expenses or other payments in consideration for its management services for the Property or its asset management services for the Company, other than the property management fees and expenses set forth in the Property Management Agreement, except to the extent approved by the Board of Managers or included in this Agreement or the annual Operating Budget for the Company and paid in the ordinary course of business and in accordance with the provisions of Section 7.2 hereof, shall be and remain subordinate in all respects to the Capital Members' rights under this Agreement;

(xxxii) Other than Meridian and Marc Belsky, neither the Company nor the Manager has entered into any agreement with any financial advisors, brokers, underwriters, placement agents, agents or finder in connection with the subject matter of this Agreement. The total amount owed to Meridian is $______________ and the total amount owed to Marc Belsky is $________________;

(xxxiii) The Company and SPE are and at all times during the prior five (5) year period have been, in material compliance with all applicable laws, and during such period there has not been, any notice, order or other communication from any governmental agency or instrumentality of any alleged, actual or potential violation of or failure to comply with any law by the SPE, the Company, the Operating Member or the Manager or in connection with the Business or the Company's assets, except for notices, orders or communications citing or referring to violations or failures that have been cured or alleging violations or failures that were determined not to exist.

(xxxiv) All federal, foreign, state, local, and other governmental consents, licenses, permits, franchises, approvals, notifications, numbers, and identifiers issued by governmental

authorities, grants and other authorizations (including without limitation environmental authorizations) required for the operation of the Business as currently conducted and as conducted during the prior five (5) year period have been obtained by the Company or SPE and are (to the extent currently required to be so) in full force and effect without any default or violation thereunder.

Section 3.7 Covenants of the Manager.

(a) So long as there are funds available, the Manager shall cause (i) the SPE to pay when due its portion of the principal of and the interest on the Senior Mortgage Loan in accordance with the terms of the Senior Mortgage Loan Documents, (ii) the SPE to pay its portion of all charges, fees and other sums required to be paid by the SPE as provided in the Senior Mortgage Loan Documents, in accordance with the terms of the Senior Mortgage Loan Documents, and (iii) cause the Company to pay all amounts payable to the Capital Members hereunder. So long as there are funds available, the Manager shall also cause the Company and SPE to observe, perform and discharge all obligations, covenants and agreements to be observed, performed or discharged by the Company or SPE set forth in the Senior Mortgage Loan Documents in accordance with their terms. Further, the Manager shall use good faith and commercially reasonable efforts to cause the Company and SPE to promptly and substantially perform and comply with all covenants, conditions, obligations and prohibitions required of the Company or SPE in connection with any other document or instrument affecting title to the Property, or any part thereof.

(b) Manager shall cause the SPE to comply with all insurance requirements of the Senior Mortgage Loan Documents. In the event that the Senior Mortgage Loan is satisfied and Capital Members remains a Member of the Company, the Manager shall comply with the insurance covenants that were contained in the most recently effective Senior Mortgage Loan Documents. No less than three (3) business days prior to the Closing Date, the Manager will deliver to the Capital Members certificates of insurance evidencing the required insurance.

(c) Subject to requesting and obtaining the required consent required from the Board of Managers to the extent required pursuant to Article IV below, and so long as there are funds available, the Manager shall cause the SPE to pay (or shall require that the Senior Mortgage Loan Documents require the Senior Mortgage Lender to pay), its portion of all taxes and assessments which are or may become a lien on the Property or which are assessed against or imposed upon the Property. Upon request, the Manager shall furnish a Member with evidence reasonably acceptable to such Member showing payment of such taxes and assessments no less than five (5) days prior to the applicable delinquency date therefor. Notwithstanding the foregoing, the Company and SPE may, in good faith, by appropriate proceedings and upon notice to the Capital Members, contest the validity, applicability or amount of any asserted tax or current or proposed assessment so long as (a) such contest is diligently pursued and (b) the Capital Members does not determine, based on the opinion of its counsel, that such contest would fail to suspend the obligation to pay the tax and that nonpayment of such tax or assessment may result in the sale, loss, forfeiture or diminution of the Property or any part thereof or any interest of the Capital Members therein; provided, however, that the Manager shall promptly cause the Company to pay any amount adjudged by a court of competent jurisdiction to be due, with all interest, costs and penalties thereon, promptly after such judgment becomes final; and provided further that in any event each such contest shall be concluded and the taxes, assessments, interest, costs and penalties

shall be paid prior to the date any writ or order is issued under which the Property may be sold, lost or forfeited.

(d) Subject to requesting and obtaining the required consent from the Board of Managers to the extent required pursuant to Article IV below, and so long as there are funds available, the Manager shall cause the Company or SPE to pay when due its portion of all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Property or the improvements thereon; provided, however, that, the Company or SPE shall have the right to contest in good faith any such claim or demand, so long as same is permitted under the terms of the Senior Mortgage Loan Documents, it does so diligently, by appropriate proceedings and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest. In the event the Company or SPE shall contest any such claim or demand, the Manager shall promptly notify the Members of such contest and thereafter shall, upon a Member's request, promptly cause the Company or SPE to provide a bond, cash deposit or other security reasonably satisfactory to such Member to protect the Company's and SPE's interests in the Property should the contest be unsuccessful.

Section 3.8 Representations and Warranties of Capital Members.

(a) As a material inducement for the Operating Member to contribute its Initial Capital Contribution to the Company, the Capital Members hereby represents and warrants to the Operating Member that:

(i) Each Capital Member is an "Accredited Investor" as defined by Regulation D under the Securities Act of 1933, as amended;

(ii) Each Capital Member's net worth and income are adequate to support the obligations incurred by its admission to the Company;

(iii) Each Capital Member acquired its Membership Interest in the Company for investment solely for its own account with the intention of holding such Membership Interest for investment, without any intention of participating directly or indirectly in any distribution of any portion of such Membership Interest, including an economic interest, and without the financial participation of any other Person in acquiring such Membership Interest in the Company;

(iv) None of (1) the Capital Members, (2) their Affiliates, (3) any Person with a collective direct or indirect equity interest in a Capital Member equal to or greater than 25%, (4) managers, managing members, general partners, trustees, or other Person who has the power to direct or cause the direction of the management or policies of a Capital Member, or, (5) to its knowledge, any Person that owns a beneficial interest in such Capital Member, is (i) a Person with whom U.S. Persons are restricted from doing business under regulations of Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List or Consolidated Sanctions List) or under the Executive order or a Person on the list of individuals and entities prohibited from doing business with the Department of Housing and Urban Development (each a "Prohibited Person"); (ii) no such Person is included in, owned by, controlled by, knowingly acting for or on behalf of, knowingly providing assistance, support, sponsorship or services of any kind to, or otherwise

knowingly associated with any of the Persons referred to or described in the Executive Order, or banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by OFAC; (iii) conducting any business or engaging in any transaction or dealing with any Prohibited Person; (iv) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (v) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (vi) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (vii) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes, or (F) any regulations promulgated under the foregoing statutes;

(v) No bankruptcy or insolvency proceedings are pending or contemplated by or against either Capital Member;

(vi) Each Capital Member is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code and the related Treasury Department regulations, including temporary regulations;

(vii) The execution, delivery and performance of this Agreement is binding and enforceable against the Capital Members in accordance with the respective terms thereof and, to the Capital Members' knowledge, do not violate, result in a breach of or constitute a default (nor upon the giving of notice or the passage of time or both will same constitute a default) under any contract or agreement of any nature to which the Capital Members are a party or by which the Capital Members or any of their property may be bound and, to the Capital Members' knowledge, do not violate any law, order, decree, rule or regulation to which the Capital Members are subject.

## ARTICLE IV - MANAGEMENT OF COMPANY

Section 4.1 Management. The Manager shall manage the affairs of the Company and SPE and make all decisions with regard thereto, except where the Board of Manager's approval is required under this Agreement. Without limiting the foregoing, the Manager is expressly authorized to cause the Company and/or the SPE to execute, deliver, and perform, and the Manager, on behalf of the Company and/or the SPE, is hereby authorized to (i) execute and deliver the Senior Mortgage Loan Documents to be executed in connection with the acquisition of the Property, (ii) the Property Management Agreement with Valor Residential Group LLC for the management of the Property, and (iii) carry out all matters referenced in an approved Operating Budget, Capital Budget or in any other budget approved in writing by the Board of Managers. The foregoing authorization shall not be deemed a restriction on the powers of the Manager to enter into other agreements on behalf of the Company and/or the SPE as otherwise permitted herein. Notwithstanding the foregoing, the Capital Members shall have sole authority to enforce the Property Management Agreement following a Changeover Event, including the ability to direct or replace the Property Manager, and any Property Management Agreement shall include

a provision requiring the Property Manager to accept the direction or enforcement of the Property Management Agreement by the Capital Members following a Changeover Event.

(a) No action shall be taken, sum expended, or obligation incurred by the Manager or any Member, the Company or SPE regarding the matters described below (the "***Major Decisions***") without the written approval of the Board of Managers (except to the extent the same is otherwise expressly authorized by the terms of this Agreement or expressly provided for (and not in excess of any amount set forth) in any Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers (subject to the Variance Threshold):

(i) encumbering, transferring (other than routing transfers of fixtures or personalty that is obsolete or no longer used in the operation of the Property) or granting a security interest of any nature whatsoever in all or a portion of the Company, Property or its assets, except to the extent (1) provided in an Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers, (2) the net proceeds of such transaction would satisfy in full the Required Redemption Amount, (3) such sale, lease, exchange or disposal involves (x) the sale of any personal property to the extent replaced by personal property of equal or greater value or is obsolete or (y) any easements granted to utility providers as may be necessary for the proper operation of the Property, (4) that a lease is a standard residential lease to be executed in the normal course of business, or (5) created pursuant to the Senior Mortgage Loan Documents executed in conjunction with the acquisition of the Property;

(ii) incurring indebtedness on behalf of the Company, except for (i) trade payables in an outstanding amount no greater than 2.0% of the original Senior Mortgage Loan balance, (ii) taxes and assessments, (iii) matters authorized by the terms of this Agreement, (iv) matters referenced in an approved Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers, or (v) the Senior Mortgage Loan;

(iii) making any of the following with respect to the Property not referenced in an approved Operating Budget: (A) capital or other material improvement, renovation or refurbishment, (B) removal, demolition or material alteration of the improvements or the equipment (other than routine replacement of such equipment), (C) material increase in the square footage or gross leasable area of the improvements;

(iv) making loans to, or guaranteeing the indebtedness of, any third party;

(v) binding the Company or the Property to Material Property Contracts;

(vi) entering into, modifying, or terminating any arrangement for property or asset management;

(vii) changing the zoning of the Property;

(viii) reducing or terminating (without replacing with comparable coverage) any insurance required hereunder or under the Senior Mortgage Loan Documents;

(ix) using or referencing in any way the name of, or any affiliation with, the Capital Members or any of its Affiliates in any business representation or advertising;

(x) settling any litigation, arbitration or administrative proceedings, or confessing judgment, in each case requiring payment in excess of $50,000 (unless any excess above $50,000 is funded by insurance proceeds, subject to applicable deductibles) or instituting any legal action for damages in excess of $50,000, except for counterclaims and crossclaims in matters in which the defense of the claim is funded by insurance proceeds;

(xi) filing of any petition or consenting to the filing of any petition that would subject the Company to a Bankruptcy;

(xii) entering into any transaction involving the Company on one hand and the Operating Member, Sponsor, or any Affiliate of the Operating Member on the other hand, except as specifically set out in the approved Operating Budget;

(xiii) making any material change in the method of conducting the business of the Company or making any modification to any organizational documents of the Company;

(xiv) issuing any equity in the Company or subsidiary of the Company, acquiring or creating of any subsidiary of the Company, or merging or consolidating the Company with another entity;

(xv) causing the Company to acquire any direct or indirect interest in land or other real property or interest therein other than the Property;

(xvi) amending, modifying or otherwise altering the terms or conditions of the Senior Mortgage Loan or Senior Mortgage Loan Documents;

(xvii)causing the SPE to take any action that, if taken by the Company, would have required the approval of the Capital Members;

(xviii) appointing a new Manager in replacement of the original Manager identified herein.

Notwithstanding the foregoing provisions of this Section 4.1(a) or anything in this Agreement to the contrary, except as provided in Section 4.1(e), upon the occurrence of a Changeover Event, the Capital Members shall have the authority to make and/or affect Major Decisions acting without the consent or joinder of the Operating Member and in Capital Members' sole discretion. Any termination of the Property Management Agreement, failure to renew the Property Management Agreement, or replacement property management agreement shall comply with the requirements of Section 8.3(a).

(b) Except as otherwise expressly provided in this Section 4.1, the Manager shall have the authority to execute a contract on behalf of the Company or the SPE provided that (i) such contract is a normal and customary contract in the operation of the Property and is with an unaffiliated third party; (ii) the expenditures to be made pursuant to such contract are consistent with the Operating Budget as implemented in accordance with Section 4.3 hereof; and (iii) such contract may be terminated without penalty by the Company or the SPE without cause on not more than thirty (30) days' prior written notice.

(c) If the Manager desires to take any Major Decision or take any action in respect of any matter requiring the approval of the Board of Managers as provided elsewhere in this Agreement, the Board of Managers shall be deemed to have approved such action if the Board of Mangers fail to respond to a written request for its approval given in accordance with the notice provisions set forth in Section 15.1 of this Agreement (the "***Approval Request***") within ten (10) business days after receipt by the Board of Managers of the Approval Request. The Approval Request shall include all material information known to the Manager which would be reasonably relevant to the Board of Managers' making the determination of whether to approve such action. In the case of an Approval Request sent by email, if the Capital Members Appointee does not respond to such request within five (5) business days, the Manager shall call the Capital Members Appointee (and leave a voicemail if no answer) to confirm that the Capital Members Appointee received the email Approval Request.

(d) Notwithstanding any restrictions set forth in the foregoing clauses, the Manager shall have the right to take any action as it, in its reasonable judgment, deems necessary for preservation of the life or health of any individual affected by the operation of the Company or the SPE, or preservation of the Company's or the SPE's assets if, under the circumstances, in the good faith estimation of the Manager, there is insufficient time to obtain the approval of the Board of Managers to the action and any delay materially increases the risks to life or health or the preservation of assets. The Manager shall notify the Board of Managers of each such action contemporaneously therewith or as soon as reasonably practicable thereafter.

(e) Without the prior consent of all Members, neither the Manager nor any Member shall have any authority to do any of the following acts: (i) do any act in material violation of this Agreement; (ii) possess any Company assets or SPE asset or assign the rights of the Company or the SPE in specific Company or SPE assets for other than Company or SPE purposes, or take any other action contrary to the Company's or SPE's stated purpose; (iii) permit the Company or the SPE to merge or consolidate with any other entity; or (iv) amend, modify or otherwise alter the terms or conditions of this Agreement or any other organizational document of the Company or the SPE (except to reflect the addition of another Member or redemption of a Member); (v) dispose of the Property or Company or SPE assets on terms other than commercially reasonable terms; (vi) the filing on behalf of the Company or SPE (where the Company or SPE is the debtor) of any petition, or consent to the appointment of a trustee or receiver or any judgment or order, under state or federal bankruptcy laws; (vii) the taking of any willful action by the Company or SPE that has the purpose of creating a recourse event identified in any guaranty or indemnity (including, without limitation, the guaranty agreement and the environmental indemnity agreement) issued in favor of Lender or Capital Member (which, as used herein, means any recourse event, including, without limitation, fraud or misappropriation by the Company or SPE); or (viii) contract on behalf of the Company or the SPE to make any payments to any Member or its Affiliates for any services rendered that is not a normal and customary contract in the operation of the Property and on arm's length terms consistent with an agreement with an unaffiliated third party

(f) Without the consent of the Board of Managers, neither the Manager nor any Member shall have any authority to do any of the following acts: (i) admit a person or entity as a Member except as provided in this Agreement, (ii) amend, modify or otherwise alter the terms or conditions of the Senior Mortgage Loan or Senior Mortgage Loan Document; (iii) refinance or defease the Senior Mortgage Loan or encumber all or any portion of the Property; (iv) make any

payments to any Affiliates of any Member for any services rendered that is not otherwise provided for in the Operating Budget or the Property Management Agreement, or use the name of any Member in the operation of the Property without that Member's prior written consent; or (v) incur any additional liabilities under the Senior Mortgage Loan, including under any existing draw rights of the Company or the SPE under the terms of such Senior Mortgage Loan or otherwise.

(g) The Manager shall discharge its duties in a commercially prudent manner as provided for in this Agreement. The Manager, on behalf of the Company, shall in good faith use all commercially reasonable efforts to implement all Major Decisions approved by the Board of Managers, enforce agreements entered into by the Company, and conduct the ordinary business and affairs of the Company in accordance with good industry practice and this Agreement. The Manager shall not be required to devote a particular amount of time to the Company's business, but shall devote sufficient time to perform its duties hereunder. Subject to the SPE's engagement of a Property Manager to manage the Property, engagement of various professionals and service providers (e.g., accountants and attorneys) and engagement of any third parties described in an approved Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers, the Manager shall not delegate any of its rights or powers to manage and control the business and affairs of the Company to any person without the prior written consent of the Board of Managers, except to a third party manager to undertake some or all the duties of the Manager, and any management fee due to the Manager may be paid to such third party manager by Manager.

(h) Notwithstanding anything contained in this Agreement to the contrary, the Board of Manager's vote, consent or approval shall no longer be required for any action taken by Manager, Operating Member, the Company or SPE from and after the receipt by Capital Members of the entire Required Redemption Amount. From and after such time as the vote, consent or approval of Capital Members and the Capital Members Appointee shall no longer be required, all references to vote, consent or approval by Capital Members or Capital Members Appointee or words of similar import shall refer to approval of Operating Member only.

Section 4.2 Capital Budgets and Expenditures.

(a) Implementation of Capital Budget. The Manager shall prepare and deliver to the Board of Managers for its approval a project budget for the Property prior to the Closing Date that reflects the capital expenditures associated with the Capital Expenditure Reserve. The Manager may resubmit for approval an amended Capital Budget to the Board of Managers from time to time as changes in the nature of the Property require, but in no event more than four (4) times per annum.

(b) Deviation from Operating Budget and Capital Budget. In implementing any Operating Budget and Capital Budget, and unless the consent of the Board of Managers is first obtained, the Manager shall not cause or permit the Company or the SPE to deviate from the Operating Budget or Capital Budget more than five percent (5%) in any single budgeted category (the "**Variance Threshold**"). In the event there shall be a variance in excess of the Variance Threshold between the actual or forecasted capital expenditures for a given month and the estimated results as set forth in the Operating Budget or the Capital Budget (as applicable), Manager shall also furnish to Capital Members, within ten (10) days after the expiration of such month, a written explanation concerning the variances and the steps being taken by Manager to

rectify the variances. If after a Capital Budget has been approved and substantial variations have occurred, or are anticipated by Manager, Manager shall promptly notify Capital Members and, upon Capital Members' request, shall prepare and submit to Capital Members a revised forecast of capital expenditures. Such forecast shall not constitute a replacement Capital Budget.

(c) Use of Capital Expenditure Reserve. The Manager shall prepare and deliver to the Board of Managers a written request to withdraw funds from the Capital Expenditure Reserve account. The reimbursement request shall include a line item breakout of expenses that have accrued from the previous reimbursement. Upon written consent from the Board of Managers, the Manager may withdraw the associated amount of the reimbursement. Notwithstanding the foregoing, no consent from the Board of Managers shall be required for any such expenditure that is required under the Senior Mortgage Loan Documents.

Section 4.3 Operating Budgets and Expenditures.

(a) Implementation of Operating Budgets. The Manager shall prepare and deliver to the Board of Managers for its approval budgets for the operation of the Property, prepared on an accrual basis, which budgets shall be delivered not later than thirty (30) days prior to the commencement of a particular Fiscal Year (except that the budget for the Fiscal Year in which the Closing Date occurs shall be delivered prior to the Closing Date and attached as Exhibit D). The Manager shall not implement any budget unless the same has been approved by the Senior Mortgage Lender to the extent approval by the Senior Mortgage Lender is required, and by the Board of Managers, which budget shall be approved or denied within fifteen (15) business days after the Board of Managers receives the applicable budget. If the Board or Managers denies the budget, the Board of Managers shall promptly notify the Manager in writing of its good faith reasons for denying such budget. The Manager shall implement each Operating Budget and the Manager shall be authorized, without the need for further approval by the Board of Managers, to make the specified expenditures and incur the specified obligations provided for in such Operating Budget and this Agreement (but only if the Manager acts in strict conformance with such Operating Budget in all respects with regard to, among other matters, the nature and amount of each such expenditure or obligation (subject to the to the Variance Threshold and any Necessary Expenses, each of which is permitted hereunder). The Manager may resubmit for approval an amended Operating Budget to the Board of Managers from time to time as changes in the nature of the Property require, but in no event more than four (4) times per annum.

(b) Deviation from Operating Budgets. In implementing any Operating Budget, and unless the consent of the Board of Managers is first obtained, the Manager shall not deviate from the Operating Budget more than the Variance Threshold. The foregoing notwithstanding, in the event that Necessary Expenses exceed the above referenced allowable variations, the consent of the Board of Managers shall not be required, provided that in the event there shall be substantial variances (expenses that exceed the Variance Threshold, Necessary Expense, or Operating Revenues less than ninety-five percent (95%) of projection) between the actual results of operations for any month and the estimated results of operations for such month as set forth in the Operating Budget, Manager shall also furnish to Capital Members, within ten (10) days after the expiration of such month, a written explanation concerning the variances and the steps being taken by Manager to rectify the variances. If after an Operating Budget has been approved and substantial variations have occurred, or are anticipated by Manager during the course of the Fiscal Year, Manager shall promptly notify Capital Members and, upon Capital Members 's request,

shall prepare and submit to Capital Members a revised forecast of annual revenues and expenses for the remainder of the Fiscal Year based on actual year-to-date income and expenses and Manager's forecast of revenues and expenses for the remainder of the Fiscal Year. Such forecast shall not constitute a replacement Operating Budget.

(c) Failure to Approve Operating Budgets. If any proposed Operating Budget for any calendar year has not been approved by January 1 of that year, the prior year's Operating Budget, subject to CPI increases for all expenses, shall be used by the Manager until an Operating Budget is approved by the Board of Managers for the subsequent period.

Section 4.4 Meetings of Members.

(a) Meetings. If required by the Act, an annual meeting of the Members shall be held on such date as the Manager, the Operating Member or the Capital Members shall reasonably determine. Regular monthly, quarterly or other periodic meetings may be held upon the determination of the Manager, the Operating Member or the Capital Members at any time by delivering at least five (5) business days' prior notice thereof to the other Members to discuss such matters regarding Company business as the Members may elect; provided that no Member may call a meeting more frequently than once annually without the consent of the other Members.

(b) Procedure. Each Company meeting shall be held at the principal place of business of the Company, unless the Members otherwise agree to a different location. A Member may also participate in and hold a meeting by means of a conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Attendance of a Person at a meeting (either in person or by conference telephone) shall constitute a waiver of notice of such meeting, unless such Person attends the meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 4.5 Waiver of Notice. When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member, whether before, at, or after the time stated therein, or any attendance of the Member at the meeting (other than at the beginning of the meeting to object to the holding of the meeting), shall be equivalent to the giving of such notice.

Section 4.6 Action Without Meeting. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, with notice sent to all the Members at least 30 days prior to the date on which the action is to take effect, shall be signed by the holder or holders of Membership Interests having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted. Notwithstanding the foregoing, if the consent or consents in writing is obtained from all Members, the notice of at least 30 days shall not be required.

Section 4.7 Reimbursement of Expenses. The Manager shall be reimbursed for all reasonable out-of-pocket expenses actually incurred by it directly in connection with the business and affairs of the Company (including travel expenses and the like, but not overhead expenses), except to the extent such reimbursement would be inconsistent with the Operating Budget

implemented as set forth in Section 4.3 hereof or as otherwise expressly approved by the Board of Managers. Additionally, the Capital Members shall be reimbursed for their reasonable out-of-pocket expenditures incurred for reasonable routine site inspection of the Property and, after a Changeover Event, their reasonable out-of-pocket expenses actually incurred by them directly in connection with the business and affairs of the Company (including travel expenses and the like, but not overhead expenses). Upon request, a Member shall provide reasonable supporting verification to the other Members for all expenditures for which any reimbursement is requested.

Section 4.8 Compensation of Members.

(a) Prior to a Changeover Event, except as set forth in this Agreement or in the Property Management Agreement, no compensatory payment shall be made by the Company to any Member, Sponsor, or an Affiliate of such Member for the services to the Company of such Member, an Affiliate of a Member, a Sponsor, or any member or employee of such Member without the approval of all Members. For purposes of this Agreement, any compensatory payment included in an approved Operating Budget shall be deemed an approved compensatory payment.

(b) On the Closing Date, the Operating Member or its designee shall be entitled to receive an acquisition fee equal to the product of two percent (2%) of the purchase price of the Property under the Purchase Agreement multiplied by the tenancy in common percentage that the SPE owns in the Property on the Closing Date.

(c) The Operating Member or its designee shall be entitled to receive an asset management fee equal to the product of two percent (2%) of the gross monthly income generated by the Property multiplied by the tenancy in common percentage that the SPE owns in the Property on the Closing Date (the "***Asset Management Fee***"). The Asset Management Fee shall accrue and shall be subordinate to the payment of the Initial Capital Contribution Current Return then due hereunder. Further, the payment of the Asset Management Fee shall be fully subordinate to the payment of all amounts then due under the Senior Mortgage Loan. Upon the occurrence of a Changeover Event, payment of the Asset Management Fee shall cease.

Section 4.9 Transactions with Affiliates.

(a) General. When any service or activity to be performed on behalf of the Company is performed by an Affiliate of a Member, a written contract shall be entered into and the fee payable for such service or activity shall not exceed the fee which would be payable by the Company to an unaffiliated third party of comparable standing providing the same services. In addition, the non-Affiliate Member shall have full power and authority to approve all terms and conditions of the written contract and enforce the provisions thereof for the benefit of the Company, including terminating the contract if a default occurs thereunder and otherwise pursuing all other available remedies. The conditions and restrictions contained in this Section 4.9(a) shall have no application or effect with respect to any service or activity to be performed on behalf of the Company by an Affiliate of the Capital Members following a Changeover Event. Any contract approved by the Board of Managers shall be deemed to comply with the first sentence of this Section.

(b) Termination of Agreements with Affiliates. Upon the occurrence of a Changeover Event, the Company may terminate all agreements with the Operating Member's Affiliates, and all such agreements shall contain a provision that allows for the exercise of the right of termination under this Section 4.9(b). The Capital Members may enforce this provision on behalf of the Company.

Section 4.10 Exculpation, Indemnification; Reimbursement of Expenses; Insurance.

(a) Exculpation.

(i) No Covered Person shall be liable to the Company or any Member for any loss suffered by the Company or any Member which arises out of any investment or any other action or omission of such Covered Person, unless a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has been engaged in conduct which constitutes willful or criminal malfeasance, gross negligence or fraud.

(ii) No Covered Person shall be liable for the negligence, whether of action or omission, dishonesty or bad faith of any employee selected and supervised by any Covered Person or of any broker or other agent of the Company, unless a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has committed gross negligence or willful misconduct in selecting and supervising such employee, broker or other agent.

(iii) No Person serving as liquidating trustee pursuant to Section 10.2 shall be liable to the Company or any Member for any loss suffered by the Company or any Member which arises out of any action or omission of such Person, unless a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has been engaged in conduct which constitutes willful or criminal malfeasance, gross negligence or fraud.

(iv) No Covered Person and no Person serving as liquidating trustee shall be liable to the Company or any Member with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice as to matters of law of legal counsel, or as to matters of accounting of accountants, or as to matters of valuation of investment bankers or appraisers.

(v) For purposes hereof, "***Covered Person***" shall mean the Manager, each Member, the Tax Representative, each Affiliate of the Manager or any Member, and a member, shareholder, officer, director, manager, employee, consultant or other agent of any of the foregoing.

(b) Indemnification.

(i) Each Covered Person shall be indemnified, subject to the other provisions of this Agreement, by the Company (only out of Company assets, including the proceeds of liability insurance) against any claim, demand, controversy, dispute, cost, loss, damage, expense (including reasonable attorneys' fees), judgment and/or liability incurred by or imposed upon such Covered Person in connection with any action, suit or proceeding (including any proceeding before any administrative or legislative body or agency), to which such Covered Person may be

made a party or otherwise involved or with which such Covered Person shall be threatened, by reason of such Covered Person's being at the time the cause of action arose or thereafter, the Manager, a Member or an Affiliate of the Manager or a Member, or a member, shareholder, officer, director, manager, employee, consultant or other agent thereof, or a member, shareholder, officer, director member, employee, consultant or other agent of any other organization in which the Company owns or has owned, directly or indirectly, an interest or of which the Company is or was a creditor, which other organization such Covered Person serves or has served as a member, shareholder, officer, director, manager, employee, consultant or other agent at the request of the Company (whether or not such Covered Person continues to serve in such capacity at the time such action, suit or proceeding is brought or threatened).

(ii) A Covered Person shall not be indemnified with respect to matters as to which a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has been engaged in conduct which constitutes willful or criminal malfeasance, gross negligence or fraud.

(iii) In the event of settlement of any action, suit or proceeding brought or threatened, such indemnification shall apply to all matters covered by the settlement except for matters as to which the Company is advised by counsel (who may be counsel regularly retained to represent the Company) that the Person seeking indemnification, in the opinion of counsel, did not act in good faith or acted with gross negligence or a willful disregard of such Person's duties, or in breach of such Person's fiduciary obligations, or, with respect to any criminal action or proceeding, with reasonable cause to believe such Person's conduct was unlawful.

(iv) The Company shall pay the expenses incurred by a Covered Person in defending a civil or criminal action, suit or proceeding, or in opposing any claim arising in connection with any potential or threatened civil or criminal action, suit or proceeding, in advance of the final disposition of such action, suit or proceeding, upon receipt of an enforceable undertaking by such Covered Person to repay such payment if such Covered Person shall be determined to be not entitled to indemnification for such expenses pursuant to this Section 4.10.

(v) At its election, the Manager, on behalf of the Company, may cause the Company to purchase and maintain insurance, at the expense of the Company and to the extent available, for the protection of any Covered Person against any liability incurred by such Covered Person in any such capacity or arising out of his status as such, whether or not the Company has the power to indemnify such Covered Person against such liability.

(vi) The foregoing right of indemnification shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Covered Person. The rights to indemnification and advancement of expenses conferred in this Section 4.10(b) shall not be exclusive of any other right to which any Covered Person may have or hereafter acquire under any law, statute, rule, regulation, charter document, operating agreement, by-law, contract or agreement.

(c) Limitation by Law. If any Covered Person or the Company itself is subject to any law, rule or regulation which restricts the extent to which such Covered Person may be exculpated or indemnified by the Company, then the exculpation provisions set forth in Section 4.10(a) and the indemnification provisions set forth in Section 4.10(b) shall be deemed to be amended,

automatically and without further action by the Manager or the Members, to the minimum extent necessary to conform to such restrictions.

(d) Effectuation of Section. The Manager is authorized on behalf of the Company to enter into such agreements with all and any Covered Persons indemnified under this Section 4.10 as it may consider appropriate to give effect to the foregoing provisions and make them binding and enforceable against the Company by such Covered Persons.

Section 4.11 Conflicts of Interest. Subject to the other express provisions of this Agreement, each Member, Manager or Affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member or Manager the right to participate therein or to account therefore. The Company may transact business with any Member, Manager or Affiliate thereof, provided the terms of those transactions are no less favorable to the Company than those the Company could obtain from unrelated third parties or on terms approved by the Board of Managers.

Section 4.12 Confidentiality.

(a) Except as provided in Section 4.12(c), each Member agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Membership Interest in the Company or for purposes of filing such Member's tax returns) or disclose to any Person, any information or matter relating to the Company and its affairs and any information or matter related to investment (other than disclosure to such Member's directors, managers, employees, agents, advisors, or representatives responsible for matters relating to the Company, to such Member's direct and indirect owners or potential owners and the owners' or potential owners' directors, managers, employees, agents, advisors, or representatives responsible for matters relating to the owner or potential owner, or to any other Person approved in writing by all the Members (each such Person being hereinafter referred to as an "***Authorized Representative***")); provided that (i) such Member and its Authorized Representatives may make such disclosure to the extent that (w) such disclosure is necessary or desirable in connection with an initial public offering ("IPO") connected with a Member or any Affiliate of a Member, any SEC filing related to a Member or its Affiliates, or in connection with a Member's or its Affiliates marketing associated with any potential IPO, securities offering or other recapitalization or sale, (x) the information to be disclosed is publicly known at the time of proposed disclosure by such Member or Authorized Representative, (y) the information otherwise is or becomes legally known to such Member other than through disclosure by the Manager or any Affiliate, or other party that is subject to (and the Member is aware is subject to) a confidentiality agreement with, any of the foregoing entities, or (z) such Member is required by law or in response to any governmental agency request or in connection with an examination by regulatory authorities, provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed, (ii) each Member will be permitted, after written notice to the Manager, to correct any false or misleading information which becomes public concerning such Member's relationship to the Company, (iii) each Member (and each employee, representative or other agent of each Member) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Company and all materials of any kind (including opinions or other tax analyses) that are provided to the Member relating to such tax treatment or tax structure, and (iv) any information required to be disclosed in accordance with the Senior

Mortgage Loan Documents. Prior to making any disclosure required by law, each Member must, to the extent permitted by applicable law, use its reasonable best efforts to notify the Company of such disclosure. Prior to any disclosure to any Authorized Representative, each Member must use its reasonable best efforts to advise such Authorized Representative of the obligations set forth in this Section 4.12(a).

(b) The Company must use reasonable efforts to keep confidential any information relating to a Member obtained by the Company in connection with or arising out of the Company that the Member requests in writing to the Company to be kept confidential (it being understood that the identity of any Member may be disclosed to any other Member).

(c) Notwithstanding anything herein to the contrary, the Operating Member, Manager, Capital Members and their Affiliates may disclose the fact that the Capital Members has invested in and is a Member of the Company, provided that the specific terms of the investment are not disclosed.

Section 4.13 Upfront Fee, Expense Reimbursement. The Upfront Fee and Expense Reimbursement, shall be payable to the Capital Members on the Closing Date.

## ARTICLE V - ACCOUNTING AND REPORTING

Section 5.1 Fiscal Year, Accounts, Reports.

(a) The fiscal year of the Company shall be the calendar year (the "***Fiscal Year***").

(b) The Manager, at the Company's expense, shall cause to be kept proper and complete records and books of account in which shall be entered fully and accurately all transactions and other matters relating to the Company's business as are usually entered into such records and books of account kept for businesses of a like character. Notwithstanding Section 18-305(c) of the Act, the Manager shall not have the right to keep confidential from any Member any information relating to the Company, the Property or a Member's interest in the Company.

(c) The Manager shall provide financial statements and information as described in "Exhibit B" attached hereto (or such other information with respect to the Property or Sponsor which may be reasonably requested from time to time by the Capital Members or under any of the other Senior Mortgage Loan Documents) to the Members**,** all of which shall be certified to the Members as being true and correct in all material respects by the Manager or the person or entity to which they pertain, as applicable, and be in form and substance reasonably acceptable to the Board of Managers.

(d) If any of the aforementioned materials are not furnished to the Capital Members within the applicable time periods or the Capital Members finds the contents of any of the foregoing to be materially inaccurate, fraudulent or not of commercially reasonable quality, and has notified the Manager in writing of its dissatisfaction or failure to provided, as the case may be, and the Manager has failed to cure such deficiencies or failures within thirty (30) business days following notification by the Capital Members, in addition to any other rights and remedies of the Capital Members contained herein, the Capital Members shall have the right, but not the obligation, to obtain the same by means of an audit by an independent certified public accountant selected by such Member and at such Member's expense. The Manager agrees to provide all

necessary information to said accountant and to otherwise cooperate in the making of such audit, and the Manager further agrees to pay, or to reimburse the Capital Members for, any expense of such audit if the results of the audit support the Capital Members' determination that the materials furnished by the Manager were materially inaccurate, fraudulent or not of commercially reasonable quality.

(e) Each Member, at its expense, may at all reasonable times during usual business hours, but in no event more than quarterly, audit, examine, and make copies of or extracts from the books of account records, files, and bank statements of the Company. In addition, each Member, at its expense, may at all reasonable times during usual business hours, but in no event more than annually, initiate an audit of the financial statements of the Company. Such right may be exercised by any Member, or by its designated agents or employees, subject to the imposition of commercially reasonable restrictions on such agents and employees with respect to confidential information.

Section 5.2 Bank Accounts. The Manager shall open and maintain (in the name of the Company) a special bank account or accounts in a bank or savings and loan association, the deposits of which are insured, up to the applicable limits, by an agency of the United States government, in which shall be deposited all funds of the Company. Withdrawals therefrom shall be made upon the signatures of such Persons as the Manager shall designate with the approval of the Members, including one Person designated by the Capital Members. The account signatories for each bank account of the Company are set forth opposite each such account as follows:

| Account | Account Signatories |
|---|---|
| Operating Account – Property | > Moshe Weingarten<br>> Eli Meisels<br>> Adam Fletcher |
| | |
| Security Deposit Account | > Moshe Weingarten<br>> Eli Meisels<br>> Adam Fletcher |
| | |
| Operating Account – Company | > Moshe Weingarten<br>> Eli Meisels<br>> Adam Fletcher |

Section 5.3 Capital Members Designee. As used herein, the "***Capital Members Designee***" means an individual designated by Capital Members in writing. The Capital Members Designee shall at all times be a manager, member or employee of a Capital Member or one of its Affiliates. Prior to a Changeover Event, the Capital Members Designee shall not take any action related to the bank accounts, including making withdrawals.

## ARTICLE VI - CAPITAL CONTRIBUTIONS

Section 6.1 Initial Capital Contributions. Subject to Section 15.24, the Members shall make their respective Initial Capital Contributions to the Company on the Effective Date, as set forth in Schedule I.

Section 6.2 Additional Capital Contributions. No Member shall have the obligation to make any Additional Capital Contribution to the Company. However, the Capital Members may request Additional Capital Contributions from time to time to (a) avoid a material decline in the value of the assets of the Company, as determined by the Capital Members in their reasonable good faith discretion, (b) pay Uncontrollable Expenses, and (c) avoid a default under the Senior Mortgage Loan.

Section 6.3 Intentionally Omitted.

Section 6.4 Failure to Make Additional Capital Contributions. In the event that the Capital Members requests Additional Capital from the Members, as permitted in Section 6.2, and the Operating Member does not make an Additional Capital Contribution of 100% of the required capital, then the Capital Members may make a Protective Capital Contribution in the amount of any deficiency. Such Protective Capital Contribution shall receive preference in the order of distributions from the Company, including a return on such investment, as set forth in this Agreement.

Section 6.5 Return of Contributions. Except as expressly provided in this Agreement, no Member shall be entitled to (a) the return of any part of its Capital Contributions, (b) any preferred return in respect of any Capital Contribution, or (c) the fair market value of its Membership Interest in connection with a withdrawal from the Company or otherwise. Except as expressly provided in this Agreement, unrepaid Capital Contributions shall not be a liability of the Company or of any Member. Except as expressly provided in this Agreement, no Member shall be required to contribute or lend any cash or property to the Company to enable the Company to return the Capital Contribution of any Member.

Section 6.6 Balances. The Company's books and records shall contain entries indicating the type and amount of Capital Contributions made to the Company, the type of return applicable to such Capital Contribution, and the Balances thereof.

## ARTICLE VII - DISTRIBUTIONS

Section 7.1 Distribution Policy. The Company may, subject to approval of the Manager, make distributions of cash or securities to the Members at any time and from time to time, in accordance with this Agreement.

Section 7.2 Distribution Priority. Notwithstanding the frequency or amount, the aggregate of Operating Revenues, Capital Proceeds, Capital Expenditure Reserve (if permitted), and Additional Capital Contributions ("**Property Proceeds**"), shall be used to pay, on a monthly basis the items described in (a) below and the Property Proceeds shall be used to pay on a monthly basis (except for special distributions required pursuant to paragraphs (d), (e) and (f) below, or in the event of a Capital Transaction in which case Capital Proceeds shall be paid simultaneous with closing of the Capital Transaction rather than monthly), the distributions described in paragraphs (b) through (i) in the following order:

(a) to fund (i) any tax or insurance payments (or escrows therefor required by the Senior Mortgage Loan Documents); (ii) Debt Service on the Senior Mortgage Loan; (iii) Operating Expenses of the Property; and (iv) any remaining reserves or escrows required under

the Senior Mortgage Loan Documents, all in the order set forth above unless a different order is required under the Senior Mortgage Loan Documents;

(b) to pay the Capital Members any Protective Capital Contribution Preferred Return;

(c) to return to the Capital Members any Protective Capital Contribution;

(d) to pay any other amounts then due and payable to the Capital Members and not otherwise specifically noted in this list of distributions (including without limitation the Required Redemption Amount on a Required Redemption Date);

(e) if there has been a Changeover Event, to pay the Capital Members until the Required Redemption Amount is paid in full;

(f) if there has been a Full Casualty Event, to pay the Capital Members until the Required Redemption Amount (exclusive of the Redemption Premium) is paid in full;

(g) to pay the Capital Members any Initial Capital Contribution Current Return; and

(h) all remaining Property Proceeds to the Operating Member.

All distributions to the Capital Members under this Section 7.2 shall be pari passu. Notwithstanding the foregoing or anything contained in this Agreement to the contrary, Manager may, in its sole discretion, (i) use Property Proceeds or accept capital contributions from Operating Member to pay the Capital Member an amount greater than the Initial Capital Contribution Current Return, to reduce Capital Member's Protective Capital Contribution Balance, the Initial Capital Contribution Balance, the Initial Capital Contribution Preferred Return Balance and/or to pay any other amount payable to Capital Members or payable with respect to the Property; (ii) enter into (or have SPE enter into) a refinancing or sale transaction with respect to the Property that will result in a payment to Capital Member of the entire Required Redemption Amount.

Section 7.3 Distributions In Kind. In general, the Company will use its commercially reasonable efforts to liquidate investments rather than making distributions in kind. Prior to a distribution of property (other than cash and other than in complete liquidation of the Company or a Member's Interest), the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property (that has not previously been reflected in the Capital Accounts), would be allocated among the Members if there were a taxable disposition of the property on the date of distribution. If the distribution of property (other than cash) is to a Member in complete liquidation of the Member's Interest or in liquidation of the Company, prior to such distribution, the Capital Accounts of all the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in all the Company's property (that has not previously been reflected in the Capital Accounts) would be allocated among the Members if there was a taxable disposition of all such property on the date of the liquidating distribution.

Section 7.4 Senior Mortgage Loans. Notwithstanding the repayment or defeasance of the Senior Mortgage Loan, and for so long as a Capital Member remains a member of the Company, the provisions of the Senior Mortgage Loan Documents will continue to apply and remain in full force and effect with respect to the representations, warranties, covenants and reserve account requirements contained therein.

Section 7.5 Distributions Under the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Members on account of their interests in the Company if such distribution would violate Section 18-607 of the Act or any other applicable law.

## ARTICLE VIII - CHANGEOVER EVENTS; REMEDIES

Section 8.1 Changeover Events. The occurrence of any of the following events or circumstances shall constitute a Changeover Event; provided however, that notwithstanding anything to the contrary contained herein, any event, omission or circumstance listed below for which a cure period is otherwise expressly provided in this Agreement shall not constitute a Changeover Event until the expiration of such cure period.

(a) Failure to pay the Required Redemption Amount on or before a Required Redemption Date;

(b) The Company's failure to maintain required insurance;

(c) The Operating Member's, Sponsors', or Manager's: (i) fraud, intentional misrepresentation to the Capital Members, or gross negligence in the management of the Property or (ii) liquidation or dissolution;

(d) Sponsor's or Operating Member's material breach of a material representation made in connection with Capital Members' making the Capital Members' Initial Capital Contribution;

(e) The claim by the Senior Mortgage Lender of the occurrence of an Event of Default under the Senior Mortgage Loan Documents, together with the Senior Mortgage Lender's commencement of remedial action as a result of such claimed default unless such claimed default is being diligently contested in good faith and provided that neither the Property nor any interest therein would be in any danger of sale, loss, or forfeiture as a result of such proceeding or contest;

(f) The Company (A) files a petition in bankruptcy or (B) is the subject of an involuntary petition in bankruptcy which involuntary petition (i) is not dismissed within sixty (60) days after the effective filing date thereof, and (ii) is not caused by a Capital Member;

(g) Failure to pay the Capital Members the Initial Capital Contributions Current Return by the first (1st) day of each month (regardless of whether there is sufficient available cash); provided, however, that if payment is made within 30 days of when such Initial Capital Contributions Current Return is due then such failure to pay shall not constitute a Changeover Event, but during such period the Capital Members Preferred Return Rate shall increase in accordance with Section 8.3(c).

(h) Failure to cause the Company to cease engaging in an activity, as requested by the Capital Members, in violation of Section 14.3, which fails the income and asset tests as described in the REIT Covenants;

(i) Any other breach by the Operating Member of its obligations under this Agreement or the Senior Mortgage Loan Documents that is not cured within 30 days after written notice from the Capital Members or Senior Mortgage Lender (or, if such breach cannot be cured within 30

days, Operating Member fails to commence such cure within such 30 day period and to diligently prosecute the same to completion);

(j) The death, long-term disability, or adjudication as incompetent of all Sponsors or the failure at any time of one or more Sponsors to Control the Operating Member (each or any a "Loss of Sponsor"). Operating Member acknowledges that the individual talents of Sponsors are basic and essential to the success of the development and operation of the Company. Notwithstanding the foregoing, if within thirty (30) days of the Loss of Sponsor, the Operating Member proposes a substitute person to assume Control of the Operating Member, and such person is approved by Capital Members in its sole discretion, then the Changeover Event shall not be deemed to have occurred;

(k) Sponsor's (A) conviction of a felony which, in the reasonable judgment of the Capital Members would result in a Material Adverse Effect or (B) intentional misapplication of any funds derived from the Property, including without limiting the generality of the foregoing, security deposits, insurance proceeds and condemnation awards;

(l) Operating Member's failure to complete a redemption of Capital Members' interests hereunder in a timely fashion after becoming obligated to do so pursuant to Section 16.3; or

(m) The occurrence of: (1) a material breach or default under the loan documents between Capital Member and RRAIT Holding 1 LLC or between Capital Member and Dover Holding 1 LLC beyond any applicable notice and/or cure periods; or (2) a "Changeover Event" under the terms of the operating agreement for RRAIT Holding 1 LLC, Hawks PVO Holding LLC, or Dover Holding 1 LLC (as such term is defined under said operating agreements).

Section 8.2 Acts or Failures of Manager. For so long as the Operating Member or any of its Affiliates is the Manager, the occurrence of any act by the Manager that would constitute a Changeover Event if such act was performed by the Operating Member (after giving effect to the applicable notice and cure period), shall constitute a Changeover Event.

Section 8.3 Remedies. Upon the occurrence of any Changeover Event, in addition to any other rights or remedies available to the Capital Members at law or in equity, the Capital Members shall be entitled to exercise any one or more of the following remedies:

(a) The Capital Members may require that the SPE replace the Property Manager with Maxus Properties, Inc. or a regionally recognized, reputable property management company (provided that in each case Capital Members shall be required to comply with the terms of the Senior Mortgage Loan Documents, including obtaining Lender consent, if required, and shall comply with the Replacement Guaranty Requirements as a condition to this remedy);

(b) The Capital Members may replace the Manager of the Company and the SPE with a person or entity selected by the Capital Members, provided that Capital Members shall be required to comply with the Replacement Guaranty Requirements as a condition to this remedy;

(c) The Capital Members Preferred Return Rate will be increased by 4.0%;

(d) Distributions shall be changed as set forth in paragraph 7.2(e);

(e) To exercise control of the Company, including without limitation the making of Major Decisions, without the joinder or consent of the Operating Member as set forth in Section 4.1 hereof (subject to Section 4.1(e)); and

(f) Reserved.

## ARTICLE IX - CAPITAL ACCOUNTS; ALLOCATIONS; TAX MATTERS

Section 9.1 Capital Accounts. The Company shall establish and maintain a capital account ("***Capital Account***") for each Member in accordance with Exhibit C.

Section 9.2 Allocation of Profit and Loss. Profit and loss for each Fiscal Year shall be allocated in accordance with Exhibit C.

Section 9.3 Tax Returns. The Manager shall cause to be prepared and filed all necessary federal and state (and any required local) income tax returns for the Company, including making the elections described in Section 9.4, and shall provide all of the Members with a copy of such returns promptly after filing. Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable such income tax returns to be prepared and filed. In the event of an audit of the Company's income tax returns, the Company shall retain accountants and other professionals to participate in such audit in order to contest assertions by the auditing agent that may be materially adverse to the Members.

Section 9.4 Tax Elections. The following elections shall be made on the appropriate returns of the Company:

(a) to adopt the calendar year as the Company's Fiscal Year;

(b) to adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

(c) if there is a distribution of Company property as described in Section 734 of the Code or if there is a transfer of a Company interest as described in Section 743 of the Code, upon written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties; and

(d) to elect to amortize the organizational expenses of the Company ratably over a period of 60 months as permitted by Section 709(b) of the Code.

No election shall be made by the Company or any Member to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state laws.

Section 9.5 Tax Representative. The Manager shall be the "partnership representative" of the Company pursuant to Section 6223(a) of the Code (each such roles, the "Tax Representative"). If any state or local tax law provides for a Tax Representative, partnership representative or person having similar rights, powers, authority or obligations, the Tax Representative shall also serve in such capacity. The Tax Representative shall inform the Board of Managers and each Member of all matters relating to taxes (including any tax audits or inquiries

and administrative and judicial proceedings) that may come to its attention in its capacity as Tax Representative by giving notice thereof within ten (10) days after becoming aware thereof and, within such time, shall forward to the Board of Managers and each Member copies of all significant written communications it may receive in such capacity. The Tax Representative shall not settle any tax matter or dispute without the prior written consent of the Board of Managers and the Operating Member. Notwithstanding anything to the contrary in this Agreement, each Member (including for purposes of this Section 9.5 any Person who is or becomes a Member but who for any reason ceases to be a Member) (i) hereby covenants to treat each item of income, gain, loss, deduction, or credit attributable to the Company in a manner consistent with the treatment of such income, gain, loss deduction, or credit on the tax return of the Company or as determined in a notice of final partnership adjustment pursuant to Section 6226 of the Code, (ii) hereby agrees to indemnify and hold harmless the Company from such Member's share of any tax and any penalties, interest and additions to tax attributable to any adjustment to the income, gain, loss, deduction, or credit of the Company pursuant to Section 6226 of the Code and (iii) hereby agrees to take all other actions as the Tax Representative may reasonably direct with respect to the Member's (or, in respect of the Member, the Company's) tax liabilities, including filing an amended return for any "reviewed year" to account for all adjustments under Section 6225(a) of the Code properly allocable to the Member as provided in and otherwise contemplated by Section 6225(c) of the Code and any Treasury Regulations that may be promulgated thereunder. The provisions of this Section 9.5 shall survive the termination or dissolution of the Company or the termination of any Member's interest in the Company, any transfer of a Member's interest in the Company or withdrawal as a Member and shall remain binding on the Member.

## ARTICLE X - WITHDRAWAL; DISSOLUTION; LIQUIDATION; TERMINATION

Section 10.1 Dissolution, Liquidation, and Termination Generally. The Company shall be dissolved upon the first to occur of any of the following:

(a) The sale or disposition of all of the assets of the Company and the receipt, in cash, of all consideration therefore;

(b) The determination of the Members to dissolve the Company; and

(c) The occurrence of any event which, as a matter of law, requires that the Company be dissolved.

Section 10.2 Liquidation and Termination. Upon dissolution of the Company, the Manager shall act as liquidating trustee or may appoint one or more other Persons as liquidating trustee, unless one or more other Persons are selected in writing by the Members to act as liquidating trustee. The liquidating trustee shall proceed diligently to wind up the affairs of the Company, sell its property and assets for cash at the highest price reasonably obtainable and make final distributions as provided herein. The costs of liquidation shall be a Company expense. Until final distribution, the liquidating trustee shall continue to operate the Company properties with all of the power and authority of the Manager hereunder. The steps to be accomplished by the liquidating trustee are as follows:

(a) as promptly as possible after dissolution and again after final liquidation, the liquidating trustee shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution shall occur or the final liquidation shall be completed, as applicable;

(b) the liquidating trustee shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidating trustee may reasonably determine); and

(c) after all Capital Account adjustments for the Company's taxable year in which the liquidation occurs (including without limitation adjustments required under Regulation Section 1.704-1(b)(2)(iv)(e), relating to distributions in kind), all remaining assets of the Company shall be distributed to the Members in accordance with Section 7.2.

In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs, and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act, subject to modifications provided in Section 7.2 of this Agreement.

Section 10.3 Deficit Capital Accounts. No Member shall be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

Section 10.4 Cancellation of Certificate. On completion of the liquidation and winding up of Company, the Manager (or such other person as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State for the State of Delaware, cancel any other filings made pursuant to Article IV, and take such other actions as may be necessary to terminate the existence of the Company.

Section 10.5 Dissolution Generally.

(a) Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to this Agreement, or (ii) the resignation of a Member and the admission of an additional Member of the Company pursuant to this Agreement), to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member of the Company.

(b) Notwithstanding any other provision of this Agreement, the Bankruptcy of a Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c) Notwithstanding any other provision of this Agreement, each Member and the Manager waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of a Member, or the occurrence of an event that causes a Member to cease to be a member of the Company.

## ARTICLE XI - PURCHASE OF MEMBERSHIP INTEREST

Section 11.1 General. This Article sets forth certain provisions that are applicable if a Member (the "***Acquiring Member***") or its assignee purchases all or a portion of the entire Membership Interest of the other Member in the Company (the "***Exiting Member***"). The date on which the Acquiring Member or its assignee acquires the Membership Interest of the Exiting Member is herein called the "***Acquisition Date***". For the avoidance of doubt, this Article is intended to govern a consensual acquisition of Membership Interests between the Members and does not constitute a buy/sell right or option.

Section 11.2 Assignment of Membership Interest. Concurrently with the payment of any purchase price agreed upon between the Acquiring Member and Exiting Member, the Exiting Member shall deliver or cause to be delivered to the Acquiring Member or its assignee (1) an assignment of its Membership Interest (or the portion thereof that is being transferred, as applicable), and (2) such evidence of the due authorization and execution of such assignment (including corporate resolutions, company authorizations or partner consents, as applicable) as the Acquiring Member or its assignee may reasonably request in connection therewith. Such assignment shall represent and warrant that the Exiting Member is the owner of such Membership Interest free and clear of any liens, encumbrances, claims and rights, and that it has the free and unrestricted right and power to sell and assign such interest to the Acquiring Member or its assignee. Except as set forth above, the Exiting Member shall not make any representations or warranties of any kind or nature, express, implied or otherwise, in connection with such sale.

Section 11.3 Transfer of Management. If the Manager is the Exiting Member or an Affiliate of the Existing Member, or if the Property Manager is an Affiliate of the Exiting Member, and if the Exiting Member is transferring all of its Membership Interest or is otherwise withdrawing from or being removed as the Manager, then the Exiting Member shall reasonably cooperate (and cause its Affiliates to reasonably cooperate) with the Acquiring Member in order to effect an orderly transition of management of the Property to the Acquiring Member or its designee and minimize any disruption to the ongoing operation of the Property.

Section 11.4 Release and Indemnity.

(a) Release. Where the sale of the Membership Interest of the Exiting Member is consummated and if such sale is of the entire Membership Interest of the Exiting Member, then the Exiting Member shall be released from any liability first arising under this Agreement after the consummation of such sale, except for any liabilities of such Exiting Member under Article X and Section 9.5 of this Agreement, which liabilities shall survive any transfer of such Interest or a liquidation of the Company.

(b) Indemnity. In addition, if the sale of the Membership Interest of the Exiting Member is consummated and if the sale is of the entire Membership Interest of the Exiting Member, and except for any liabilities of and related amounts owed to the Capital Members under

Article X of this Agreement, the Company shall and hereby does, to the greatest extent permitted by applicable law, indemnify, defend and hold harmless the Exiting Member for, from and against (i) any liability, damage, cost or expense (including reasonable attorneys' fees incurred in connection with the enforcement of the foregoing indemnity) arising out of or relating to any action or proceeding commenced by any third party relating to the Company, the Property or this Agreement, and which action is based on facts or circumstances first arising on or after the Acquisition Date, and (ii) any liability actually known to both Members prior to the date on which the price payable for the Membership Interest of the Exiting Member was determined in accordance with this Agreement to the extent such liability was taken into account in the determination of such price. Such indemnity shall survive the closing of the sale of the Membership Interest of the Exiting Member.

Section 11.5 Transfer Tax. Unless the Acquiring Member and the Exiting Member agree otherwise, any transfer tax or similar taxes arising out of or in connection with the sale and transfer of the Membership Interest (other than any tax based upon the net income of either Member) and all other closing costs of the sale and purchase of the Membership Interest (if any) shall be borne by the Exiting Member; provided, however, each of the Acquiring Member and the Exiting Member shall pay its own attorneys' fees and costs in connection with such sale.

Section 11.6 Assignment by Acquiring Member. The Acquiring Member shall have the right to assign its rights to acquire the Membership Interest of the Exiting Member to a third party, which may or may not be an Affiliate of the Acquiring Member.

## ARTICLE XII - PREFERENCES; REQUIRED PAYMENTS; REDEMPTION DATE; RESERVES; CASH MANAGEMENT

Section 12.1 Voluntary Redemption. If the Operating Member elects to (a) return the Capital Members' Initial Capital Contribution Balance as described in this Section 12.1 (whether prior to or following a Changeover Event, a "***Voluntary Redemption***", and which Voluntary Redemption must be accomplished in whole and not in part), or if (b) the Redemption Date occurs on or prior to Capital Members receiving total distributions under Section 7.2 equal to the Required Redemption Amount, then the Company shall distribute to the Capital Members, in addition to any other amounts then payable to the Capital Members pursuant to this Agreement, the Required Redemption Amount. The Operating Member may elect to do a Voluntary Redemption at any time, including after the occurrence of a Changeover Event.

Section 12.2 Redemption. Following the receipt by a Capital Member of the entire Required Redemption Amount, the Capital Member shall cease to be a member of the Company without any further act. Following such distribution, the Capital Member shall have no further rights, obligations or duties pursuant to this Agreement or otherwise with respect to the Company and agrees to execute an assignment and other documents reasonably requested by the Operating Member to memorialize the redemption.

Section 12.3 Capital Expenditure Reserve. A Capital Expenditure Reserve in the total amount shown in the Capital Budget shall be established on the Closing Date. The Capital Expenditure Reserve shall be held in a separate account for payment of capital improvements at the Property, as more particularly set forth in the Capital Budget, which such account shall provide that no withdrawal shall be permitted without Board of Managers approval. The

Members agree that as of the date of this Agreement, the current amount of the required Capital Expenditure Reserve is $500,000.

Section 12.4 Extension Option. The Operating Member may request up to two (2), six (6) month extensions from the Capital Member (each, an "Extension"), with notice given no later than 90 days before the second (2nd) anniversary of the Closing Date. Upon each granted extension, the capital member shall be entitled to and shall be paid a 1% fee payable by Company at the time the extension goes into effect. Capital Member shall be entitled to reject the request for an Extension unless Company has in place or will have in place at the time the applicable Extension will go into effect, a senior loan satisfactory to Capital Member, in its sole discretion. Without limiting the Capital Member's discretion, such senior loan shall carry a balance equal to or greater than the current Regions Bank senior loan with a debt service coverage ratio of at least 1.2x, using a denominator equal to the senior loan payments as well as the Capital Member's Initial Capital Contribution Current Return. Furthermore, such senior loan shall have preapproved Capital Member, and/or its Affiliates, as replacement property managers and replacement Manager.

Section 12.5 Tax Reserve. A Tax Reserve shall be established when deemed appropriate by the Manager and funded with deposits thereafter up to a maximum amount equal to Tax Amount. The Tax Reserve shall be held in an interest-bearing account for payment to Members. The Capital Members hereby consent to a disbursement in April of each year to each Member an amount equal to a pro-rata portion of the Tax Amount. Disbursements from the Tax Reserve for any cost not set forth in the Operating Budget shall be prohibited, unless consented to in writing by Capital Members. Funds from the Tax Reserve may also be used to fund the payments required under Sections 7.2(a) through 7.2(g). The Operating Member shall provide the Capital Members with written notice including supporting documentation with respect to any shortfall in net cash flow and the amount of funds to be withdrawn from the Tax Reserve. Any payment to the Capital Members pursuant to this Section shall be considered a payment to the Capital Members under Section 7.2 (i.e. payments to the Capital Members under this Section are not in addition to the payments required under Section 7.2).

## ARTICLE XIII - RECOURSE LIABILITIES

Section 13.1 Recourse Limited to Damage. The Sponsor, jointly and severally, shall indemnify the Capital Members for losses on the Capital Members' Investment and related damages actually incurred resulting from any of the following:

(a) If the Manager fails to comply with an approved budget, operating plan or other required protocol of this Agreement;

(b) Misappropriation or conversion by the Operating Member, Sponsor, or Manager (i.e., if the Operating Member or any of its Affiliates is the Manager) (or any affiliated asset manager or affiliated property manager) of rents, security deposits, insurance and condemnation awards or other proceeds;

(c) If the Manager fails to comply with the Major Decisions provisions of this Agreement or otherwise obtain Requisite Consent when required;

(d) If Capital Member reasonably determines any material representation or warranty made to the Capital Member by Operating Member, Sponsor, or Manager is materially false or misleading as of the date on which such representation or warranty was made;

(e) Environmental Matters;

(f) The Operating Member, Sponsor, or Manager is convicted of a felony; or

(g) A Sponsor dies, retires, is deemed incompetent or is replaced without the consent of the Capital Member.

Section 13.2 Full Recourse. In addition, upon the occurrence of any of the following the Sponsor, jointly and severally, shall become fully liable for the repayment of the Required Redemption Amount (and the Capital Members' Investment shall thereupon be redeemed):

(i) Fraud, or intentional misrepresentation with respect to a material matter, by the Operating Member, Sponsor, Manager (if Operating Member or any of its Affiliates is the Manager), or an Affiliate of any of the foregoing Persons;

(ii) The occurrence of a Bankruptcy Event. A "Bankruptcy Event" shall include any of the following that occurs without the consent or cooperation of the Capital Members: (i) The Company or Sponsor voluntarily files for bankruptcy under the Bankruptcy Code; (ii) Company or Sponsor voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights; (iii) The Property or any part of the Property becomes an asset in a voluntary bankruptcy or becomes subject to any voluntary reorganization, receivership, insolvency proceeding, or other similar voluntary proceeding pursuant to any other federal or state law affecting debtor and creditor rights; (iv) An order of relief is entered against Company or Sponsor pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by, or as a result of solicitation by, the Operating Member, Sponsor or any Affiliate thereof; (v) An involuntary bankruptcy or other involuntary insolvency proceeding is commenced against Company or Sponsor but only if Company or Sponsor has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in Company or Sponsor to contribute or cause the contribution of additional capital to Company or Sponsor;

(iii) Borrower (as such term is defined under the Senior Mortgage Loan Documents) commits a material default under the Senior Mortgage Loan Documents which default remains uncured beyond the applicable cure period and which, if left uncured, could cause the Senior Mortgage Loan to be accelerated;

(iv) The Manager commits gross negligence or willful misconduct;

(v) Manager fails to cause a distribution of amounts due and payable to Capital Member in accordance with this Agreement, provided there is available cash, after payment of debt service, reserves and all operating expenses, to make such distribution; or

(vi) Operating Member willfully or intentionally fails to cooperate with Capital

Members in connection with marketing of the Property pursuant to Article XVI, or Operating Member fails to perform any payment obligation under Article XVI after it serves a DTM Purchase Notice pursuant to Section 16.3; *provided, however*, that routine management and operational activities of the Operating Member (as opposed to actions taken or omitted to be taken specifically in connection with the marketing of the Property for sale) shall not be deemed any failure to cooperate with Capital Members under this subsection (vii) so long as such management and operational activities are consistent with the operation and management activities of prudent and diligent managers of multifamily properties similar to the Property and located in the same geographical area as the Property.

For so long as the Operating Member or any of its Affiliates is the Manager, the occurrence of any action or inaction by Manager, that if taken or not taken by Operating Member would have constituted a Sponsor indemnification obligation as described above, shall constitute an indemnification obligation of Sponsor pursuant to this Article.

Section 13.3 No Recourse. Notwithstanding anything in this Article XIII to the contrary, Sponsor shall have no liability if the event giving rise to the liability under this Article XIII was the result of the act or omission of a Capital Member, any member of the Board of Managers appointed by the Capital Members, any Manager or Property Manager appointed by the Capital Members following a Changeover Event, or any officer, director, employee, member, manager, owner, or representative of any of the foregoing.

## ARTICLE XIV - REIT COVENANTS

Section 14.1 The Capital Members will be provided with any information with respect to any investment, its operations, its income and its assets reasonably requested in writing by the Capital Members for the purposes of verifying whether the Investment’s income and assets are treated as qualifying for purposes of the income and asset tests applicable to real estate investment trusts in Section 856(c) of the Code.

Section 14.2 The Manager will provide the Capital Members with a completed property services questionnaire prior to the funding of the investment. Additionally, a completed property services questionnaire will also be required on an annual basis and delivered no later than January 31st of each year. If, after providing the completed property services questionnaire to the Capital Members, the Manager (or any of its affiliates) plans to provide any additional service at the Property that is not listed or described on the most recently completed property services questionnaire, the Manager will notify the Capital Members in writing at least 30 days prior to the commencement of the provision of such service and will not provide such service if the Capital Members notifies the Manager that such service could reasonably be expected to cause the Investment to derive income that would not be qualifying income for the income tests applicable to real estate investment trusts in Section 856 of the Code.

Section 14.3 If the Capital Members otherwise notifies the Manager that the Company has recognized any income or acquired any assets that would cause the Company to fail to satisfy the income and asset tests applicable to real estate investment trusts in Section 856(c) of the Code, the Manager shall cause the Company to cease engaging in the activity that generates such income or dispose of such asset within 15 days of the receipt of written notice from the Capital Members.

## ARTICLE XV - MISCELLANEOUS PROVISIONS

Section 15.1 Notices. All notices, demands, requests or other communications that may be or are required to be given, served or sent by any party to another party pursuant to this Agreement shall be in writing and shall be mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or transmitted by hand delivery, telegram, facsimile transmission or electronic transmission addressed as set forth on the signature pages hereof. Each party may designate by notice in writing a new address to which any notice, demand, request or communication may thereafter be so given, served or sent. Each notice, demand, request or communication that is mailed, delivered or transmitted in the manner described above shall be deemed sufficiently given, served, sent and received for all purposes at such time as it is delivered to the addressee with the return receipt, the delivery receipt, the affidavit of messenger or (with respect to a facsimile or electronic transmission) the answer back being deemed conclusive evidence of such delivery or at such time as delivery is refused by the addressee upon presentation. Any notice provided to a member of the Board of Managers shall be given to the address of the Member that appointed such member of the Board of Managers.

Section 15.2 Approvals. All consents, approvals and other matters of similar import required pursuant to the terms of this Agreement shall be in effect only if in writing signed or sent by electronic transmission (*e.g.*, via email) by the party sought to be bound. Whenever the consent or approval of the Capital Members is required, such consent or approval shall be effective and binding on the Capital Members if given by the Capital Members that own more than fifty percent (50%) of the Capital Member Percentage Interest.

Section 15.3 Governing Law. This Agreement and the obligations of the Members hereunder shall be construed and enforced in accordance with the laws of the State of North Carolina, excluding any conflicts of law rule or principle which might refer such construction to the laws of another state or country. Each Member submits to the jurisdiction of the state and federal courts located in Hickory, North Carolina, which courts shall be entitled to enforce all awards granted.

Section 15.4 Entireties; Amendments. This Agreement and its exhibits constitute the entire agreement between the Members relative to the formation of the Company. This Agreement shall be amended only upon the written consent of all Members. Notwithstanding the forgoing, for so long as the Senior Mortgage Loan Documents are in place, this Agreement shall not be amended or modified in any manner, without the written consent of the Senior Mortgage Lender if such amendment or modification would violate the Senior Mortgage Loan Documents.

Section 15.5 Waiver. No consent or waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation hereunder. Failure on the part of any Member to complain of any act or to declare any other Member in default, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

Section 15.6 Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, and such invalidity

or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

Section 15.7 Ownership of Property and Right of Partition. A Member's interest in the Company shall be personal property for all purposes. No Member shall have any right to partition the property owned by the Company. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member and the Manager hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. No Member shall have any interest in any specific assets of the Company, and no Member shall have the status of a creditor with respect to any distribution pursuant to Article VII hereof.

Section 15.8 Captions, References and Construction. Pronouns, wherever used herein, and of whatever gender, shall include natural persons and corporations and associations of every kind and character, and the singular shall include the plural wherever and as often as may be appropriate. Article and section headings are for convenience of reference and shall not affect the construction or interpretation of this Agreement. Whenever the terms "hereof", "hereby", "herein", or words of similar import are used in this Agreement, they shall be construed as referring to this Agreement in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary. Whenever the word "including" is used herein, it shall be construed to mean including without limitation. Any reference to a particular "Article," "Section," "Schedules" or "Exhibit" herein shall be construed as referring to the indicated article, section or exhibit of this Agreement unless the context indicates to the contrary. Each party hereto acknowledges participating in the drafting of this Agreement and agrees that this Agreement shall not be construed more stringently against one party than the other.

Section 15.9 Involvement of Members in Certain Proceedings. Should any Member become involved in legal proceedings unrelated to the Company's business in which the Company is required to provide books, records, an accounting, or other information, then such Member shall indemnify the Company from all expenses incurred in conjunction therewith.

Section 15.10 Interest. No amount charged as interest on loans hereunder shall exceed the maximum rate from time to time allowed by applicable law.

Section 15.11 Counterparts. This Agreement may be executed in multiple counterparts, with signature pages signed by each party affixed to constitute a fully executed instrument.

Section 15.12 General Indemnification. The Operating Member shall indemnify, defend and hold harmless the Company and the Capital Members from any loss, claim, damage or liability relating to any brokerage commissions or finder's fees claimed by any broker or other party in connection with the transactions which are the subject of this Agreement, and any claim

arising out of any conduct of the Operating Member accruing prior to the date of this Agreement (excluding, however, any of the foregoing to the extent caused solely by the Capital Members).

Section 15.13 Publicity. Upon the acquisition of the Property, the Capital Members may issue press releases, advertisements and other promotional materials describing in general terms or in detail as to its participation in such transaction. All references to the Capital Members or its Affiliates in any press release, advertisement or promotional material issued by the Operating Member must be approved in advance of issuance by the Capital Members.

Section 15.14 Time of the Essence; Business Day. Time shall be of the essence as to all deadlines and time permits set forth in this Agreement. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or national bank holiday. Any time period provided for in this Agreement that expires on a Saturday, Sunday or national bank holiday shall extend to the next full business day. The term "business day" used in this Agreement shall mean any day other than a Saturday, Sunday or national bank holiday. The term "day" used in this Agreement shall mean any calendar day including a Saturday, Sunday or national bank holiday unless otherwise specified.

Section 15.15 Estoppel Certificate. Each Member agrees to give the other member or any proposed permitted transferee of such Member, on not less than ten (10) days' written request, a certificate, binding upon the issuing Member and its successors and assigns, stating (1) whether or not, to its then current knowledge, the transferring Member is then in default under this Agreement and whether an event has occurred which, with the passage of time or giving of notice or both, would constitute such a default (and stating with particularity the nature of any claimed defaults or potential defaults), and (2) that this Agreement is in full force and effect and has not been amended, or if amended, the date of each amendment.

Section 15.16 Right of Offset. Notwithstanding any other provision of this Agreement, in the event that a Member ("***Debtor Member***") or one of its Affiliates owes the Company or any other Member (the "***Creditor Member***") any sums, arising out of or related directly or indirectly to the matters which are the subject of this Agreement or Property, the Company or the Creditor Member, as the case may be, shall be entitled to withhold the distributions and payments that would otherwise be paid to such Debtor Member pursuant to this Agreement or any contractual arrangement with the Company and use the amount so withheld to pay to the Company or the Creditor Member, as appropriate, the sums owed to it by the Debtor Member or such Affiliate of the Debtor Member. For all purposes of this Agreement, any such amounts that are so withheld from the distributions or payments to be made to the Debtor Member under this Agreement shall be deemed to have been distributed or paid to the Debtor Member and then paid by such Debtor Member or its Affiliate to the Company or the Creditor Member, as appropriate. To the extent applicable, each Member hereby waives any all defenses of a guarantor, surety and accommodation maker, to the fullest extent possible, to the extent such defenses pertain to the exercise by the Company or any other Member of the offset rights set forth in this Section 15.16.

Section 15.17 Waiver of Certain Defenses. THE PARTIES HERETO ACKNOWLEDGE THAT THEY WERE REPRESENTED BY COMPETENT COUNSEL IN

CONNECTION WITH THE NEGOTIATION, DRAFTING AND EXECUTION OF THIS AGREEMENT. THE CAPITAL MEMBERS SHALL NOT BE SUBJECT TO ANY LIMITATION WHATSOEVER IN THE EXERCISE OF ANY RIGHTS OR REMEDIES AVAILABLE TO IT UNDER THIS AGREEMENT OR UNDER ANY OTHER DOCUMENTS EVIDENCING OR RELATING TO THE EQUITY INVESTMENT DESCRIBED HEREIN BY VIRTUE OF THE EXTENSION OF A MORTGAGE LOAN SECURED BY THE PROPERTY BY IT, OR ANY PARENT, SUBSIDIARY, OR AFFILIATE OF THE CAPITAL MEMBERS, AND THE OPERATING MEMBER HEREBY IRREVOCABLY WAIVES THE RIGHT TO RAISE ANY DEFENSE OR TAKE ANY ACTION ON THE BASIS OF THE FOREGOING WITH RESPECT TO THE CAPITAL MEMBERS' EXERCISE OF ANY SUCH RIGHTS OR REMEDIES.

Section 15.18 Waiver of Jury Trial. SUBJECT TO SECTION 15.19, EACH PARTY HERETO, TO THE FULLEST EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE PROPERTY OR ANY CONDUCT, ACT OR OMISSION OF ANY PARTY HERETO, OR ANY RESPECTIVE DIRECTOR, OFFICER, PARTNER, MEMBER, EMPLOYEE, AGENT OR ATTORNEY, OR ANY OTHER PERSONS AFFILIATED WITH SUCH PARTY, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Section 15.19 Alternate Dispute Resolution. If a dispute, controversy or claim (whether based upon contract, tort, statute, common law or otherwise) (collectively a "***Dispute***") arises from or relates directly or indirectly to the subject matter hereof, and if the Dispute cannot be settled through direct discussions, the parties shall first endeavor to resolve the Dispute by participating in a mediation administered by the American Arbitration Association (the "***AAA***") under its Commercial Mediation Rules before resorting to arbitration. Thereafter, any unresolved Dispute shall be settled by binding arbitration administered by the AAA in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator, after the review rights set forth below have been exhausted, may be entered in any court having jurisdiction. The arbitration proceedings shall be conducted in Hickory, North Carolina on an expedited basis before a neutral arbitrator (or multiple arbitrators if called for by the Commercial Arbitration Rules). Each arbitrator shall be an attorney with excellent academic and professional credentials, who (i) is a member of the Bar of any state in the United States, (ii) has been actively engaged in the practice of law for at least ten (10) years, and (iii) specializes in commercial transactions, with substantial experience in the subject matter of this Agreement. Any attorney who serves as an arbitrator shall be compensated at a rate equal to his or her current regular hourly billing rate. Upon the request of either party, the arbitrator's award shall include findings of fact and conclusions of law provided that such findings may be in summary form. Either party may seek review of the arbitrator's award before an arbitration review panel comprised of three (3) arbitrators qualified in the same manner as the initial arbitrator(s) (as set forth above) by submitting a written request to the AAA. The right of review shall be deemed waived unless requested in writing within ten (10) days of the receipt of the initial arbitrator's award. The arbitration review panel shall be entitled to review all findings of fact and conclusions of law in whatever manner it deems appropriate and may modify the award of the initial arbitrator(s) in its

discretion. The prevailing party in any arbitration proceeding shall be entitled to an award of all reasonable out-of-pocket costs and expenses (including attorneys' and arbitrators' fees) related to the entire arbitration proceeding (including review if applicable). Upon request of either party, the arbitrator(s) may require that the subject arbitration proceedings be kept confidential and no party shall disclose or permit the disclosure of any information produced or disclosed in the arbitration proceedings until the award is final. A party shall not be prevented from seeking temporary injunctive relief before a court of competent jurisdiction in an emergency situation, but responsibility for resolution of the Dispute shall be appropriately transferred to the arbitrator(s) upon appointment in accordance with the provisions hereof.

Section 15.20 SPE Provisions. The Company and its Members (to the extent governed thereby) shall comply, and shall cause the SPE to comply, with the SPE requirements set forth in Section 5.22 of the Senior Mortgage Loan Documents. In the event that the Senior Mortgage Loan is satisfied, the Company and its Members shall continue to comply with such SPE requirements until Capital Members is no longer a Member of the Company. Any action taken by the Operating Member or any Affiliate thereof on behalf of the SPE, which if taken by the Operating Member or Manager hereunder would constitute a Changeover Event, recourse event under Sections 13.1 or 13.2 hereof, or otherwise constitute a breach hereunder shall also constitute a Changeover Event, recourse event, or breach hereunder, as the case may be, and shall entitle the Capital Members to exercise its remedies therefor.

Section 15.21 Third Parties. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member. Nothing in this Agreement shall be deemed to create any right in any Person not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person.

Section 15.22 Casualty and Condemnation. In a case where a Lender exercises its right to apply proceeds from a casualty or condemnation event (a "Full Casualty Event") to pay down principal of the Senior Mortgage Loan, any excess proceeds from that event will be used to pay to the Capital Members the Required Redemption Amount exclusive of the Redemption Premium. In cases where the Lender allows the Company to apply casualty insurance proceeds to restore the Property subject to an approval/draw (or similar) process, Operating Member will obtain Capital Members' approval (not to be unreasonably withheld or delayed) for any plans, specifications, construction contracts, and draw requests in a manner that does not unreasonably burden or impede Operating Member's actions to restore the Property.

Section 15.23 Expenses. Sponsor shall pay Capital Members and its Affiliates, upon demand and whether or not the Capital Members' Initial Capital Contribution occurs, all out-of-pocket expenses and fees (including reasonable attorneys' fees) incurred by Capital Members and/or its Affiliates in connection with the matters and transactions contemplated hereby to the extent such expenses and fees exceed any deposit previously paid by Operating Member.

Section 15.24 Material Adverse Change. In addition to any other conditions set forth herein, Capital Members' obligation to make the Capital Members' Initial Capital Contribution is dependent upon the absence of any of the following: (a) failure of SPE to acquire the Property; (b) any materially adverse change in the condition, financial or otherwise, of the

Property between the Effective Date and the Closing Date; (c) any spill or release of hazardous materials at the Property after the effective date of the Property's final Phase I environmental assessment shall have occurred that is material and has not been fully remediated in accordance with all applicable laws to the Capital Member's reasonable satisfaction; (d) any material violation of any laws, ordinances, orders, restrictions, regulations or requirements applicable with respect to the Property, or the use thereof and first arises after the Effective Date, unless such violation is corrected on or before the Closing Date; (e) any unresolved title objections regarding the Property; (d) any development occurring which could, in Capital Members' sole and absolute opinion, materially and adversely affect the transactions contemplated hereby, including, without limitation, any development in the financial condition or prospects of the Property, Operating Member, Sponsor, or in the economy or capital markets. Capital Members agrees to use best efforts to inform the Sponsor immediately upon its identification of the existence of any of the conditions identified in this Section 15.24. Sponsor agrees to use best efforts to inform the Capital Members immediately upon its identification of the existence of any of the conditions identified in this Section.

## ARTICLE XVI - DRAG TO MARKET

Section 16.1 Capital Members' Right to Market. At any time following the second anniversary of the Closing Date, the Capital Members may elect to cause the Company to sell all or substantially all of the Property. The Capital Members shall give written notice (the **"DTM Notice"**) to the Operating Member of the Capital Members' desire to pursue such a sale. The Capital Members' right to market the property shall be conditioned upon there not being in existence any offer or proposal to purchase the property from any third party at the time the DTM Notice is given.

Section 16.2 Operating Member's Rights upon service of DTM Notice. Capital Members shall not commence marketing of the Property (including that Capital Members shall not commit the Company to any listing agreement) until the earlier of (i) the thirtieth (30th) day after Capital Members' service of the DTM Notice, or (ii) the date upon which Operating Member advises Capital Members in writing that Operating Member permits the Company to proceed to a third party sale (the **"DTM Sale Notice"**). Within such thirty- (30-) day period, the Operating Member, at its option, may advise the Capital Members in writing that Operating Member agrees to pay the Capital Members its Required Redemption Amount (the **"DTM Purchase Notice"**).

Section 16.3 DTM Purchase. If the Operating Member serves its DTM Purchase Notice, then the Operating Member shall become obligated to pay the Capital Members its Required Redemption Amount in accordance with the procedures set out in Section 12.1, and shall complete such redemption within ninety (90) days. Operating Member's failure to timely complete any such redemption after serving a DTM Purchase Notice shall be a material default hereunder and shall constitute a Changeover Event. Capital Members and the Operating Member shall close the sale at a time, place and date mutually agreeable to the Capital Members and the Operating Member within the sixty (60) day period referred to above.

Section 16.4 No DTM Purchase. If the Operating Member serves a DTM Sale Notice within the thirty day period referred to in Section 16.2, or if Operating Member serves neither a DTM Purchase Notice nor a DTM Sale Notice within such thirty (30) day period, then

the Capital Members shall be entitled to and is hereby vested with all power and authority (including a power of attorney, coupled with an interest) to cause the Company to sell the Property for cash to any third party at commercially reasonable terms. In any such transaction, the proceeds will be paid first to the Capital Members up to its Required Redemption Amount plus any other amounts owed to Capital Member under this Agreement and the balance to the Operating Member in accordance with Section 7.2(h).

[The remainder of this page is intentionally left blank.]

## SIGNATURE PAGE TO LIMITED LIABILITY COMPANY AGREEMENT

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be signed as of the date first above written.

**MANAGER:**

By: Merchant's Walk Apartments LLC
a Delaware limited liability company

By:____________________________
Name: Moshe Weingarten
Title: Authorized Signatory

Notice Address:

c/o Valor Residential Group LLC
3 Alpine Court
Suite 200
Chestnut Ridge, NY 10977 Attention: Moshe Weingarten
Email: max@valorresidential.com

With a copy to:

Lubin Law Group LLC
9 Belvedere Lane, Suite 101
Lakewood, NJ 08701
Attention: Michael E. Lubin, Esq.
Email: mlubin@mlubinlaw.com

**OPERATING MEMBER:**

**MERCHANT'S WALK APARTMENTS LLC,**
a Delaware limited liability company

By:____________________________________
Name: Moshe Weingarten
Title: Authorized Signatory

Notice Address:

Merchant's Walk Apartments LLC
c/o Valor Residential Group LLC
3 Alpine Court
Suite 200
Chestnut Ridge, NY 10977 Attention: Moshe Weingarten
Email: max@valorresidential.com __________________

with a copy to:

Lubin Law Group LLC
9 Belvedere Lane, Suite 101
Lakewood, NJ 08701
Attention: Michael E. Lubin, Esq.
Email: mlubin@mlubinlaw.com

**CAPITAL MEMBERS:**

**MAXMEZ NC, LLC**

By:________________________________
Name: Adam Fletcher
Title: Manager

Notice Address:

MaxMez NC, LLC
104 Armour Rd
N Kansas City, Missouri 64116
Attention: Adam Fletcher
E-Mail: afletcher@maxusprop.com

**SPONSORS:**

Each of the following individuals, acting in their capacity as Sponsor, hereby acknowledges its agreement to be bound by the provisions set forth in Article XIII of this Agreement, as of the date first above written.

______________________________
Moshe (a/k/a Max) Weingarten

Notice Address of Sponsor:

____________________
____________________

______________________________
Eli Meisels

Notice Address of Sponsor:

____________________
____________________

**Schedule I**
**<u>Schedule of Members and Membership Interest</u>**

| *Members* | *Initial Capital Contribution* | *Operating Member Percentage Interests* | *Capital Member Percentage Interests* |
|---|---|---|---|
| ***Merchant's Walk Apartments LLC*** | ***$__________*** | ***100.000%*** | ***0.000%*** |
| ***MaxMez NC, LLC*** | ***$2,635,656.73*** | ***0.000%*** | ***100.000%*** |
| ***Total*** | ***$___________*** | ***100.000%*** | ***100.000%*** |

**EXHIBIT A**

Land Description

# EXHIBIT B

Reporting Requirements

## I. Monthly Reporting

Manager shall prepare and deliver to the Members within ten (10) days after the end of each month (in Excel format, wherever possible and applicable):

(i) Budget Comparison[1], monthly and YTD
(ii) Rent Roll, as of the last day of the month
(iii) Market Survey
(iv) Income Statements, including trailing 12 months and YTD
(v) Cash Flow Statements, monthly and YTD
(vi) Balance Sheet, including monthly comparison
(vii) Check Register
(viii) Security Deposit Activity
(ix) Bank Statements and Reconciliations
(x) Reserve Accounts Summary, including evidence of withdrawals from reserve accounts
(xi) Base Management Fee Calculation
(xii) Asset Management Fee Calculation
(xiii) Distribution Calculation

(1) Budget comparison shall include: (i) a comparison of monthly line item actual income and expenses with the monthly line item income and expenses projected in the Operating Budget; and (ii) a comparison of the actual line item capital expenditures with the line item capital expenditures projected in the Capital Budget.

## II. Quarterly Reporting

Manager shall prepare and deliver to the Members within ten (10) days after the end of each quarter (in Excel format, wherever possible and applicable):

(i) Trial Balance, including mapping of the accounts to the financial statements
(ii) General Ledger, with description and balance detail
(iii) Payable Aging Summary
(iv) Receivable Aging Summary
(v) Prepaids and Accruals (for partners using Cash Basis)
(vi) Fixed Asset Additions and Depreciation Schedule
(vii) Bank Statements and Reconciliations
(viii) Senior Mortgage Loan Statement

## III. Periodic Reporting

1. Insurance, pursuant to Section 3.7(b) hereof
2. Real Estate Tax Bills, pursuant to Section 3.7(c) hereof
3. Capital Budget, pursuant to Section 4.2 hereof
4. Operating Budget, pursuant to Section 4.3 hereof
5. Tax Returns, pursuant to Section 9.3 hereof
6. Annual Property Services Survey, pursuant to Section 14.2 hereof

## IV. Additional Requirements

Manager shall furnish such information as requested by the Capital Members with respect to the Property, Company or Sponsor, as is necessary for the Capital Members to determine its qualification as a REIT pursuant to Article XIV and its compliance with any other requirements for qualifying as a REIT. Manager shall cooperate in a reasonable manner at the request of the Capital Members to work in good faith with any designated accountants or auditors of the Capital Members or its Affiliates so that the Capital Members or its Affiliate is able to comply with its public reporting, attestation, certification and other requirements under the Securities Exchange Act of 1934, as amended, applicable to such entity, and to work in good faith with the designated accountants or auditors of the Capital Members or any of its Affiliates for purposes of testing internal controls and procedures of the Capital Members or its Affiliates.

# EXHIBIT C

## Capital Accounts and Tax Allocations

**I. Allocation Definitions.** Capitalized terms and phrases used in this Exhibit C have the following meanings:

"***Adjusted Capital Account Deficit***" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences in Regulations sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) debit to such Capital Account the items described in Regulations sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"***Company Minimum Gain***" has the meaning as the term "partnership minimum gain" set forth in Regulations section 1.704-2(b)(2) and 1.704-2(d).

"***Depreciation***" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"***Full Capital Event***" means the sale or similar transaction of or involving the Property (including a full condemnation or full casualty loss), liquidation of the Company, or redemption of the Capital Members.

"***Gross Asset Value***" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value (taking Code section 7701(g) into account) of such asset on the date of contribution, as determined by the Manager;

(ii) the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values as determined by the Manager as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution or in exchange for the performance of services to or for the benefit of the Company; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; and (C) the liquidation of the Company within the meaning of Regulations section 1.704-1(b)(2)(ii)(g), provided that an adjustment described in clauses (A) and (B) of this paragraph shall be made only if the Manager reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii) the Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code section 7701(g) into account) of such asset on the date of distribution as determined by the Manager; and

(iv) the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code section 734(b) or Code section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

*“**Member Nonrecourse Debt**”* has the same meaning as the term “partner nonrecourse debt” in Regulations section 1.704-2(b)(4).

*“**Member Nonrecourse Debt Minimum Gain**”* means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations section 1.704-2(i)(3).

*“**Member Nonrecourse Deductions**”* has the same meaning as the term “partner nonrecourse deductions” in Regulations sections 1.704-2(i)(1) and 1.704-2(i)(2).

*“**Nonrecourse Deductions**”* has the meaning set forth in Regulations section 1.704 2(b)(1).

*“**Nonrecourse Liability**”* has the meaning set forth in Regulations section 1.704-2(b)(3).

*“**Preferred Distributions**”* means the total distribution received by the Capital Members of Initial Capital Contribution Current Return, Initial Capital Contribution Preferred Return, Protective Capital Contribution Preferred Return, and/or Redemption Premium.

*“**Profits**”* and *“**Losses**”* means, for each Fiscal Year, an amount equal to the Company’s taxable income or loss for the Fiscal Year, determined in accordance with Code Section 703(a)

(for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition will be added to the taxable income or loss;

(ii) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition will be subtracted from the taxable income or loss;

(iii) In the event the Gross Asset Value of any Company asset is adjusted pursuant to (ii) or (iii) of the definition of Gross Asset Value, the amount of the adjustment will be treated as an item of gain (if the adjustment increases the Gross Asset Value of the Company asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the Company asset) from the disposition of the item and will be taken into account for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income purposes will be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation for the Fiscal Year, computed in accordance with the definition of Depreciation;

(vi) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of the adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) from the disposition of a Company asset and will be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provisions of this definition, any items that are specially allocated pursuant to Section IV hereof will not be taken into account in computing Profits or Losses. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section IV of this Exhibit C will be determined by applying rules analogous to those set forth in clauses (i) through (vi) above.

*"**Unallocated Preferred Distributions**"* means the Preferred Distributions less all amounts previously allocated under Section III(a)(iv).

**II.** **Capital Accounts.** The Company shall maintain a separate Capital Account for each Member. Each Member's Capital Account shall be maintained in accordance Section 704(b)

and Regulations Section 1.704-1(b)(2)(iv). The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including without limitation debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Members) are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations section 1.704-1(b).

**III.** **Profits and Losses.** After giving effect to the special allocations set forth in Sections IV and V of this Exhibit C, Profits and Losses for any Fiscal Year shall be allocated to the to the Members in accordance with the following:

(a) Profit shall be allocated to the Members in the following order of priority:

(i) To the extent Losses have been allocated pursuant to Section III(b)(iii) and not previously offset by allocations pursuant to this Section III(a)(i), to the Members to whom such Losses have been allocated in the same ratio, in reverse order, and to the extent of such allocations of Loss pursuant to Section III(b)(iii) until the allocations pursuant to this Section III(a)(i) fully offset such losses;

(ii) To the extent Losses have been allocated pursuant to Section III(b)(ii) and not previously offset by allocations pursuant to this Section III(a)(ii), to the Members to whom such Losses have been allocated in the same ratio, in reverse order, and to the extent of such allocations of loss pursuant to Section III(b)(ii) until the allocations pursuant to this Section III(a)(ii) fully offset such Losses;

(iii) To the extent Losses have been allocated pursuant to Section III(b)(i) and not previously offset by allocations pursuant to this Section III(a)(iii), to the Members to whom such Losses have been allocated in the same ratio, in reverse order, and to the extent of such allocations of Loss pursuant to Section III(b)(i) until the allocations pursuant to this Section III(a)(iii) fully offset such Losses;

(iv) To the Capital Members in an amount equal to the Unallocated Preferred Distributions; and

(v) To the Operating Member.

(b) Losses shall be allocated to the Members in the following order of priority:

(i) To the Operating Member, until the Operating Member's Capital Account has been reduced to zero;

(ii) To the Capital Members, prorata in accordance with their Capital Accounts, until the Capital Members' Capital Accounts have been reduced to zero; and

(iii) To the Operating Members.

**IV. Special Allocations.** The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Regulations section 1.704-2(f), notwithstanding any other provision of this Exhibit C, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations sections 1.704-2(f)(6) and 1.704-2(j)(2). This subparagraph (a) is intended to comply with the minimum gain chargeback requirement in Regulations section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Except as otherwise provided in Regulations section 1.704-2(i)(4), notwithstanding any other provision of this Exhibit C, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such allocation Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Regulations section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations sections 1.704-2(i)(4) and 1.704-2(j)(2). This subparagraph (b) is intended to comply with the minimum gain chargeback requirement in Regulations section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this subparagraph (c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Exhibit C have been tentatively made as if this subparagraph (c) were not in the Agreement.

(d) Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Member

is deemed obligated to restore pursuant to the penultimate sentences of Regulations sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this subparagraph (d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Exhibit C have been made as if subparagraph (c) above and this subparagraph (d) were not in the Agreement.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Operating Members.

(f) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations section 1.704-2(i)(1).

(g) Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code section 734(b) or Code section 743(b) is required, pursuant to Regulations section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations section 1.704-1(b)(2)(iv)(m)(4) applies.

**V. Curative Allocations.** The allocations set forth in Sections IV(a) through IV(g) of this Exhibit C (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section V. Therefore, notwithstanding any other provision of this Exhibit C (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections III, and IV(a) of this Exhibit C.

**VI. Other Allocation Rules.**

(a) Profits, Losses, and any other items of income, gain, loss, or deduction will be allocated to the Members pursuant to this Exhibit C as of the last day of each taxable year; provided, that Profits, Losses, and such other items will also be allocated at such times as the Gross Asset Values of any Company assets are adjusted pursuant to clause (ii) of the definition of "Gross Asset Value."

(b) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any other items will be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(c) The Members are aware of the income tax consequences of the allocations made pursuant to the provisions of this Exhibit C and hereby agree to be bound by the provisions of this Exhibit C in reporting their shares of Company income and loss for income tax purposes.

(d) The "excess nonrecourse liabilities" of the Company (within the meaning of Regulations Section 1.752-3(a)(3)) shall be allocated among the Members in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated.

(e) As between a Member who has transferred all or part of his or her Membership Interest and his or her transferee, all items of income, gain, deduction and loss, for any year shall be apportioned on the basis of the number of days in each such year that each was the holder of such interest (making any adjustments necessary to comply with the provisions of Section 706(d)(2) of the Code), without regard to the results of the Company's operations during the period before and after the date of such transfer, provided that if both the transferor and transferee consent thereto a special closing of the books shall be had as of the effective date of such transfer and the apportionment of items of income and gain, and deduction and loss, shall be made on the basis of actual operating results.

**VII. Tax Allocations: Code Section 704(c).** In accordance with Code section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) of the definition of Gross Asset Value). In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Manager. Allocations pursuant to this Section VII are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

# EXHIBIT D

Operating Budget

# EXHIBIT E

Capital Budget

# EXHIBIT F

Hawks Holding LLC Agreement

**LIMITED LIABILITY COMPANY AGREEMENT OF
HAWKS PVO HOLDING LLC**

**as of June 16, 2022**

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF CERTAIN STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED OR RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE SUBSEQUENT TRANSFER OF THE MEMBERSHIP INTERESTS WILL BE SEVERELY RESTRICTED BY THE TERMS OF THE OPERATING AGREEMENT. IN ADDITION, PURCHASERS SHOULD BE AWARE THAT THE PROVISIONS OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WILL NOT BE AVAILABLE AT SUCH TIME AS A PURCHASER DESIRES TO DISPOSE OF THE SECURITIES BEING OFFERED HEREBY**

# TABLE OF CONTENTS

**Page**

ARTICLE I - DEFINITIONS ..... 1
Section 1.1 Definitions ..... 1
Section 1.2 Additional Clarification ..... 10
ARTICLE II - ORGANIZATIONAL MATTERS; PURPOSE; TERM ..... 10
Section 2.1 Formation of Company ..... 10
Section 2.2 Name ..... 10
Section 2.3 Principal Office ..... 10
Section 2.4 Registered Office and Registered Agent ..... 10
Section 2.5 Purpose and Scope ..... 10
Section 2.6 Term ..... 11
Section 2.7 No State Law Partnership ..... 11
Section 2.8 Foreign Qualification ..... 11
ARTICLE III - MEMBERSHIP; DISPOSITIONS OF INTERESTS ..... 11
Section 3.1 Members ..... 11
Section 3.2 Dispositions of Membership Interests ..... 11
Section 3.3 Resignation ..... 12
Section 3.4 Information ..... 12
Section 3.5 Liability to Third Parties ..... 13
Section 3.6 Representations and Warranties of Operating Member ..... 13
Section 3.7 Covenants of the Manager ..... 17
Section 3.8 Representations and Warranties of Capital Members ..... 18
ARTICLE IV - MANAGEMENT OF COMPANY ..... 19
Section 4.1 Management ..... 19
Section 4.2 Capital Budgets and Expenditures ..... 23
Section 4.3 Operating Budgets and Expenditures ..... 24
Section 4.4 Meetings of Members ..... 25
Section 4.5 Waiver of Notice ..... 25
Section 4.7 Reimbursement of Expenses ..... 25
Section 4.8 Compensation of Members ..... 26
Section 4.9 Transactions with Affiliates ..... 26

**TABLE OF CONTENTS**
(continued)

**Page**


Section 4.10 Exculpation, Indemnification; Reimbursement of Expenses; Insurance ... 27

Section 4.11 Conflicts of Interest ... 29

Section 4.12 Confidentiality ... 29

Section 4.13 Upfront Fee, Expense Reimbursement ... 30

ARTICLE V - ACCOUNTING AND REPORTING ... 30

Section 5.1 Fiscal Year, Accounts, Reports ... 30

Section 5.2 Bank Accounts ... 31

Section 5.3 Capital Members Designee ... 31

ARTICLE VI - CAPITAL CONTRIBUTIONS ... 31

Section 6.1 Initial Capital Contributions ... 31

Section 6.2 Additional Capital Contributions ... 32

Section 6.3 Intentionally Omitted ... 32

Section 6.4 Failure to Make Additional Capital Contributions ... 32

Section 6.5 Return of Contributions ... 32

Section 6.6 Balances ... 32

ARTICLE VII - DISTRIBUTIONS ... 32

Section 7.1 Distribution Policy ... 32

Section 7.2 Distribution Priority ... 32

Section 7.3 Distributions In Kind ... 33

Section 7.4 Senior Mortgage Loans ... 33

Section 7.5 Distributions Under the Act ... 34

ARTICLE VIII - CHANGEOVER EVENTS; REMEDIES ... 34

Section 8.1 Changeover Events ... 34

Section 8.2 Acts or Failures of Manager ... 35

Section 8.3 Remedies ... 35

ARTICLE IX - CAPITAL ACCOUNTS; ALLOCATIONS; TAX MATTERS ... 36

Section 9.1 Capital Accounts ... 36

Section 9.2 Allocation of Profit and Loss ... 36

Section 9.3 Tax Returns ... 36

Section 9.4 Tax Elections ... 36

**TABLE OF CONTENTS**
(continued)

**Page**


Section 9.5 Tax Representative .... 36

ARTICLE X - WITHDRAWAL; DISSOLUTION; LIQUIDATION; TERMINATION .... 37

Section 10.1 Dissolution, Liquidation, and Termination Generally .... 37

Section 10.2 Liquidation and Termination .... 37

Section 10.3 Deficit Capital Accounts .... 38

Section 10.4 Cancellation of Certificate .... 38

Section 10.5 Dissolution Generally .... 38

ARTICLE XI - PURCHASE OF MEMBERSHIP INTEREST .... 39

Section 11.1 General .... 39

Section 11.2 Assignment of Membership Interest .... 39

Section 11.3 Transfer of Management .... 39

Section 11.4 Release and Indemnity .... 39

Section 11.5 Transfer Tax .... 40

Section 11.6 Assignment by Acquiring Member .... 40

ARTICLE XII - PREFERENCES; REQUIRED PAYMENTS; REDEMPTION DATE; RESERVES; CASH MANAGEMENT .... 40

Section 12.1 Voluntary Redemption .... 40

Section 12.2 Redemption .... 40

Section 12.3 Capital Expenditure Reserve .... 40

Section 12.4 Extension Option .... 41

Section 12.5 Tax Reserve .... 41

ARTICLE XIII - RECOURSE LIABILITIES .... 41

Section 13.1 Recourse Limited to Damage .... 41

Section 13.2 Full Recourse .... 42

Section 13.3 No Recourse .... 43

ARTICLE XIV - REIT COVENANTS .... 43

ARTICLE XV - MISCELLANEOUS PROVISIONS .... 44

Section 15.1 Notices .... 44

Section 15.2 Approvals .... 44

Section 15.3 Governing Law .... 44

**TABLE OF CONTENTS**
(continued)

**Page**

Section 15.4 Entireties; Amendments ... 44
Section 15.5 Waiver ... 44
Section 15.6 Severability ... 44
Section 15.7 Ownership of Property and Right of Partition ... 45
Section 15.8 Captions, References and Construction ... 45
Section 15.9 Involvement of Members in Certain Proceedings ... 45
Section 15.10 Interest ... 45
Section 15.11 Counterparts ... 45
Section 15.12 General Indemnification ... 45
Section 15.14 Time of the Essence; Business Day ... 46
Section 15.15 Estoppel Certificate ... 46
Section 15.16 Right of Offset ... 46
Section 15.17 Waiver of Certain Defenses ... 46
Section 15.18 Waiver of Jury Trial ... 47
Section 15.19 Alternate Dispute Resolution ... 47
Section 15.20 SPE Provisions ... 48
Section 15.21 Third Parties ... 48
Section 15.22 Casualty and Condemnation ... 48
Section 15.23 Expenses ... 48
Section 15.24 Material Adverse Change ... 48
ARTICLE XVI - DRAG TO MARKET ... 49
Section 16.1 Capital Members' Right to Market ... 49
Section 16.2 Operating Member's Rights upon service of DTM Notice ... 49
Section 16.3 DTM Purchase ... 49
Section 16.4 No DTM Purchase ... 49

# LIMITED LIABILITY COMPANY AGREEMENT OF HAWKS PVO HOLDING LLC

This Limited Liability Company Agreement (this "***Agreement***") is entered into as of June 16, 2022 (the "***Effective Date***"), by and among the members listed in Schedule I attached hereto (in their capacities as members of the Company, the "***Members***") and the Manager listed on the signature page attached hereto (in its capacity as the Manager of the Company). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.

## ARTICLE I - DEFINITIONS

Section 1.1 Definitions. As used in this Agreement, the following terms shall have the following meanings:

"***Acquiring Member***" shall have the meaning set forth in Section 11.1.

"***Acquisition Date***" shall have the meaning set forth in Section 11.1.

"***Act***" means the Delaware Limited Liability Company Act (6 Del.C. §18-101 et seq.), as it may be amended from time to time.

"***Additional Capital Contributions***" means the amount of Capital Contributions made by a Member, in excess of such Member's Initial Capital Contribution.

"***Affiliate***" means, as to any Member, (a) any corporation in which such Member or any partner, shareholder, director, officer, member (whether direct or indirect), or manager of such Member, directly or indirectly, owns or controls more than ten percent (10%) of the beneficial interest, (b) any partnership, joint venture or limited liability company in which such Member or any partner, shareholder, director, officer, member (whether direct or indirect), or manager of such Member is a partner, joint venturer or member, (c) any trust in which such Member or any partner, shareholder, director, officer, member (whether direct or indirect), or manager of such Member is a trustee or beneficiary, (d) any entity of any type which is directly or indirectly owned or controlled by such Member or any partner, shareholder, director, officer, member(whether direct or indirect), or manager of such Member, (e) any partner, shareholder, director, officer, member, manager or employee of such Member, or (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager or employee of such Member or such Member's Affiliate applying (a) through (e) above.

"***Anniversary Date***" means the anniversary of the Closing Date in the applicable year.

"***Authorized Representative***" shall have the meaning set forth in Section 4.12(a).

"***Balances***" shall mean, collectively, the total unreturned Capital Contributions for each Member.

"***Bankruptcy***" means, with respect to a Person, the occurrence of (1) an assignment by a Person for the benefit of creditors; (2) the filing by a Person of a voluntary petition in bankruptcy;

(3) the entry of a judgment by any court that a Person is bankrupt or insolvent, or the entry against a Person of an order for relief in any bankruptcy or insolvency proceeding; (4) the filing of a petition or answer by a Person seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (5) the filing by a Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (6) the consent or acquiescence of a Person to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; or (7) any other event which would cause a Person to cease to be a member of a limited liability company under Section 18-304 of the Act. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"***Blended Tax Rate"*** means, as determined by the Company's accountants or the Manager, in his reasonable discretion, and approved by the Capital Members, for each Fiscal Year, the overall effective combined federal, state and local tax rate applicable to the Members' allocable share of the Company's net income and gain. For purposes of determining the Blended Tax Rate, the maximum federal income tax rate applicable to each item of net income or gain under Section 1 of the Code shall be applied and all potential credits, losses, deductions allocated to Members shall be deemed fully utilized and taken into account.

"***Board of Managers***" means (i) prior to a Changeover Event, a board of two members consisting of one member appointed by the Operating Member, which must be an Operating Member or an affiliate of an Operating Member (the ***"Operating Member Appointee"***) and one member appointed by the Capital Members, which must be a Capital Member or an affiliate of the Capital Members (the ***"Capital Members Appointee"***), each member of the Board of Managers shall have a 50% vote, and (ii) after a Changeover Event, solely the Capital Members Appointee who shall have the ability, acting alone, to grant any consent or approval of the Board of Managers. Whenever the "approval" or "consent" of the Board of Managers is described herein, such action shall be deemed to require a unanimous vote of the Board of Managers prior to a Changeover Event and the sole vote of the Capital Members Appointee after a Changeover Event. The members of the Board of Managers can be removed and replaced, with or without cause, by the Member(s) who appointed such member. Any action by the Capital Members to appoint, remove, or replace the Capital Members Appointee shall require the vote of the Capital Members who own at least a majority of the Capital Member Percentage Interest. The initial Operating Member Appointee is Maxeli Merchants Walk LLC. The initial Capital Members Appointee is MaxMez NC, LLC, a Missouri limited liability company. Each Member shall promptly notify each other Member of any change to its appointed member of the Board of Managers.

"***Capital Account***" shall have the meaning set forth in Section 9.1.

"***Capital Budget***" means the capital budget, prepared by the Manager and approved by the Board of Managers, and setting forth the estimated capital expenses of the Company and SPE for the property, which may be revised in accordance with Section 4.2. Attached hereto as "Exhibit E" is a copy of the initial Capital Budget as approved by all Members.

"***Capital Contribution***" means, with respect to each Member, the amount of cash and the fair market value of property other than cash (net of liabilities which the Company assumes or takes the property subject to) contributed to the capital of the Company by that Member.

***"Capital Expenditure Reserve"*** shall have the meaning set forth in Section 12.3.

"***Capital Member(s)***" shall be MaxMez NC, LLC, a Missouri limited liability company.

**"*Capital Members' Initial Capital Contribution*"** means the Capital Contributions to be initially contributed by the Capital Members to the Company as set forth in Schedule I.

***"Capital Members Current Preferred Return Rate"*** equals six and one-half percent (6.5%) per annum, compounded monthly on an actual/360 basis.

"***Capital Member Percentage Interest***" of each Capital Member at any time shall equal the fraction the numerator of which is each Capital Member's Initial Capital Contributions to the Company and the denominator of which shall be the sum of the aggregate Initial Capital Contributions to the Company of all Capital Members. The Capital Member Percentage Interests are set forth on Schedule I.

"***Capital Members Preferred Return Rate***" equals eleven percent (11.00%) per annum, compounded monthly on an actual/360 basis for all periods beginning on the Closing Date and continuing to and through the Redemption Date or a Changeover Event. Upon a Changeover Event the rate will increase pursuant to Section 8.3(c) hereof.

"***Capital Proceeds***" means the proceeds received by the Company arising from a Capital Transaction after payment of all reasonable costs and expenses incurred by the Company and/or the SPE in connection with such Capital Transaction.

**"*Capital Transaction*"** means the sale, financing (other than any financing occurring as of the date of this Agreement), refinancing, defeasance or similar transaction of or involving the Property (including condemnation, payment of title insurance proceeds or casualty loss insurance proceeds, other than business interruption or rental loss insurance proceeds, to the extent not applied to mortgage indebtedness of the Company and not used to repair damage caused by a casualty or taking or in alleviation of any title defect).

"***Cash Flow***" shall mean, for the period in question, the amount by which the aggregate cash receipts of the Company from any source (including loans and Capital Contributions) exceed the sum of the cash expenditures of the Company plus a cash reserve in the amount determined by the Manager and approved by the Board of Managers to be sufficient to meet the working capital requirements of the Company.

"***Changeover Event***" means the occurrence of one or more events described in Section 8.1 of this Agreement.

"***Closing Date***" means June 16, 2022.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of succeeding law.

"***Company***" means Hawks PVO Holding LLC, a Delaware limited liability company.

"***Control***" means of any entity the ownership, directly or indirectly, of at least 51% of the equity interests in, and the right to at least 51% of the distributions from, such entity or the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ability to exercise voting power, by contract or otherwise ("***Controlled***" and "***Controlling***" each have the meanings correlative thereto).

"***Covered Person***" shall have the meaning set forth in Section 4.10(a)(v).

"***CPI"*** shall mean "The Consumer Price Index (New Series) (Base Period 1982-84=100) (all items for all urban consumers)" issued by the Bureau of Labor Statistics of the United States Department of Labor (the ***"Bureau"***). If the CPI ceases to use the 1982-84 average equaling 100 as the basis of calculation, or if a change is made in the term, components or number of items contained in said index, or if the index is altered, modified, converted or revised in any other way, then the index shall be adjusted to the figure that would have been arrived at had the change in the manner of computing the index in effect at the date of this Agreement not been made. If at any time during the term of the Investment the CPI shall no longer be published by the Bureau, then any comparable index issued by the Bureau or similar agency of the United States issuing similar indices shall be used in lieu of the CPI.

"***Creditor Member***" shall have the meaning set forth in Section 15.16.

**"*Debt Service*"** means the aggregate of interest, principal, and other payments due on the Senior Mortgage Loan under the terms of the Senior Mortgage Loan Documents, for the period of time for which calculated.

"***Debtor Member***" shall have the meaning set forth in Section 15.16.

"***DTM Notice***" shall have the meaning set forth in Section 16.1.

"***DTM Purchase Notice***" shall have the meaning set forth in Section 16.2.

"***DTM Sale Notice***" shall have the meaning set forth in Section 16.2.

"***Dispute***" shall have the meaning set forth in Section 15.19.

"***Effective Date***" means the date set forth in the initial paragraph of this Agreement as the effective date of this Agreement.

"***Emergency Expenses***" means an expense that is reasonably necessary to prevent imminent damage to structural support of any portion of the Property, imminent bodily injury to persons in the immediate vicinity of the Property or material physical damage to any portion of the Property or substantial, imminent economic loss to the Property (including, without limitation, any expense necessary to prevent any tenant's right to offset rent arising pursuant to any lease at the Property), including, without limitation, any civil and/or criminal penalties that have been imposed in connection with the foregoing events.

"***Encumbrance***" shall have the meaning set forth in Section 3.2(a).

***"Environmental Matter"*** means: (i) the direct or indirect violation or exposure to any liability under any local, state or federal law, rule, regulation, or other legal requirement, including common law duty pertaining to human health, safety, natural resources or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq. as it may be amended (***"CERCLA"***), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), the Clean Air Act (42 U.S.C. §7401 et seq.), the Emergency Planning and Community Right-To-Know Act (42 U.S.C. §1101 et seq.), The Endangered Species Act (16 U.S.C. §1531 et seq.), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.), the Occupational Safety and Health Act (29 U.S.C. §651 et seq.), and the Hazardous Material Transportation Act (49 U.S.C. §1801 et seq.), and the regulations promulgated pursuant to said laws, all as amended from time to time and similar state counterparts or equivalents (collectively, the ***"Environmental Law"*** or ***"Environmental Laws"***), or otherwise exposed to any liability under any Environmental Law relating to or affecting the Property and (ii) any microbial matter maintenance plan, the presence, release or threat of release of any hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos or asbestos-containing materials, lead based paint, polychlorinated biphenyls, petroleum or petroleum products or byproducts, flammable explosives, radioactive materials, paint containing more than 0.5% lead by dry weight, infectious substances, radon gas or raw materials which include hazardous constituents) or microbial matter or any other substances or materials which are included under or regulated by Environmental Laws which are, in each case, on, in, under or affecting all or any portion of the Property or any surrounding areas.

"***Exiting Member***" shall have the meaning set forth in Section 11.1.

"***Expense Reimbursement***" shall mean an amount of $75,000.00 which shall be paid by the Company to the Capital Member on the Closing Date to reimburse the Capital Member for underwriting and legal expenses.

"***Extension***" shall have the meaning set forth in Section 12.4.

"***Full Casualty Event***" shall have the meaning set forth in 15.22.

***"Hawks Landing Apartments"*** shall mean the property located at 2778 2nd Street NE, Hickory NC 28601.

**"*Initial Capital Contributions*"** means (a) with respect to the Capital Members the Capital Contributions to be initially contributed by the Capital Members, and (b) with respect to each Operating Member the Capital Contributions to be initially contributed by such Operating Member. The Initial Capital Contributions are set forth in Schedule I.

**"*Initial Capital Contribution Balance*"** means, for the Capital Members, the Initial Capital Contribution of the Capital Members less that portion of the Initial Capital Contribution that has been returned to the Capital Members pursuant to Section 7.2.

***"Initial Capital Contribution Current Return"*** means a preferential distribution to the Capital Members calculated on the Capital Members' Initial Capital Contribution Balance at the Capital Members Current Preferred Return Rate.

"***Initial Capital Contribution Preferred Return***" means a preferential distribution to the Capital Members calculated on the Capital Members' Initial Capital Contribution Balance and Initial Capital Contribution Preferred Return Balance at the Capital Members Preferred Return Rate, which Initial Capital Contribution Preferred Return is inclusive of the Initial Capital Contribution Current Return.

***"Initial Capital Contribution Preferred Return Balance*"** means, for the Capital Members, at any time, the cumulative accrued Initial Capital Contribution Preferred Return less the sum of all amounts distributed by the Company to that Member in payment thereof pursuant to Section 7.2.

"***Investment"*** shall mean Capital Members' total Initial Capital Contributions combined with the Initial Capital Contribution Preferred Return Balance, the Protective Capital Contributions, and Protective Capital Contribution Preferred Return Balance.

"***Knowledge" or "knowledge"*** means, with respect to the Operating Member, the knowledge of Eli Meisels, Aron Mendelovitz, or Moshe (a/k/a Max) Weingarten as of the date of this Agreement and, with respect to the Capital Members, the actual knowledge of Adam Fletcher or Chase Watson as of the date of this Agreement.

"***Land***" means that certain real property generally situated at 2778 2nd Street NE, Hickory NC 28601, as more fully described on Exhibit A attached hereto.

***"Lender"*** means the Senior Mortgage Lender, whichever then holds or administers the Senior Mortgage Loan encumbering the Property.

"***Manager***" means the Operating Member, so long as such Person shall continue as the Manager hereunder, and each Person hereafter designated as a Manager in accordance with this Agreement until such Person ceases to be a Manager of the Company. Only the Board of Managers may remove or replace the Manager of the Company.

***"Material Adverse Effect*** means a material adverse effect on (i) the Property, (ii) the business, profits, operations, or condition (financial or otherwise) of the Company or the SPE, or (ii) the ability of the Company, the Sponsors, or the Manager to perform its obligations as they become due under this Agreement or under the Senior Mortgage Loan Documents to which it is a party.

***"Material Property Contract***" means (a) any management agreements; or (b) any agreement with respect to the Property that (i) has a term longer than one year and is not cancellable by the Company on 30 days' notice or less with no penalty or similar payment, (ii) requires payment or performance by the Company of a value exceeding $50,000 annually, or (iii) is not in the ordinary course of business, but this definition shall not include any contract specifically itemized in an approved Operating Budget or Capital Budget.

"***Members***" means the Capital Members, the Operating Member, and each Person hereafter admitted as a Member in accordance with this Agreement, until such Person ceases to be a Member of the Company.

"***Membership Interests***" means all of the rights and interests of whatsoever nature of the Members in the Company, including without limitation, the right to participate in management to the extent herein expressly provided, to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit, and shall also include indirect interests in the Company held by or through the Members, the Manager or their constituent upstream entities. The Membership Interests of the Members are set forth on Schedule I.

"***Necessary Expenses***" means expenses not set forth in an Operating Budget or Capital Budget that is required (a) to be incurred and paid in order to cure or prevent an event of default under the Senior Mortgage Loan Documents, (b) to pay Emergency Expenses, (c) to pay debt service and reserve payments under the Senior Mortgage Loan Documents, and (d) to pay Uncontrollable Expenses, including, without limitation, real estate taxes and assessments, utility expenses and insurance premiums with respect to the Property.

"***Operating Budget***" means the annual budget, prepared by the Manager and approved by the Board of Managers, and setting forth the estimated capital and operating expenses of the Company and SPE for the then current or immediately succeeding calendar year and for each month of said calendar year, in such detail as the Board of Managers and the Manager may agree from time to time. Attached hereto as "Exhibit D" is a copy of the Operating Budget for the first year of this Agreement as approved by all Members.

"***Operating Expenses***" means, for any period, the current obligations and expenditures of the Company or SPE for such period, determined in accordance with sound accounting principles approved by the Board of Managers and applicable to commercial real estate, consistently applied and in accordance with Section 5.1(b), for operating expenses of the Property, including such commercially reasonable additional expenditures that a party engaged in the operation and/or management of similar properties would deem necessary or customary to operate the Property. Operating Expenses shall not include Debt Service or any non-cash expenses such as depreciation or amortization.

"***Operating Member***" shall be Hawks PVO LLC, a Delaware limited liability company.

"***Operating Revenues***" means, for any period, the gross revenues of the Company or the SPE arising from the ownership and operation of the Property during such period, determined in accordance with GAAP (as defined herein) with such deviations as may be approved by the Board of Managers and applicable to commercial real estate, consistently applied and in accord with Section 5.1(b), including proceeds of any business interruption insurance maintained by the Company from time to time and amounts funded from Company reserves, but specifically excluding Capital Proceeds and Capital Contributions of the Members.

"***Person***" means an individual or entity.

"***Property***" means the Land together with the improvements located thereon.

"***Property Management Agreement***" means the property management agreement, satisfactory in form and content to the Capital Members, to be entered into by the SPE and the Property Manager with respect to the day to day operation of the Property.

"***Property Manager***" means the manager appointed pursuant to the Property Management Agreement.

"***Property Proceeds***" shall have the meaning set forth in Section 7.2.

**"*Protective Capital Contributions*"** means any Additional Capital Contributions made by the Capital Members.

**"*Protective Capital Contribution Balance*"** means, for the Capital Members, the cumulative Protective Capital Contributions of that Member less the cumulative distributions to that Member specifically described as being a return thereof pursuant to Section 7.2.

**"*Protective Capital Contribution Preferred Return*"** means a preferential distribution to the Capital Members calculated on the Capital Members' Protective Capital Contribution Balance and Protective Capital Contribution Preferred Return Balance at the lesser of 15% per annum, or the highest per annum interest rate permitted under the laws of the state in which the Property is located (in either case, compounded monthly).

***"Protective Capital Contribution Preferred Return Balance"*** means, for the Capital Members, the cumulative accrued Protective Capital Contribution Preferred Return less all amounts distributed by the Company to that Member specifically described as being in payment thereof pursuant to Section 7.2.

***"Purchase Agreement"*** means that certain Purchase and Sale Agreement by and between the Hawks Landing Luxury Apartments, LLC, a Florida limited liability company, as "seller", and SPE, as "purchaser", effective January 27, 2022.

"***Redemption Date***" means the earlier to occur of: (a) one day following the maturation of the Senior Mortgage Loan; and (b) the second (2nd) anniversary of the Closing Date, unless extended by an Extension, in which case until the expiration of the applicable Extension.

"***Regulations***" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Regulations shall include any corresponding provisions of succeeding, similar, substitute proposed or final Regulations.

"***REIT Covenants"*** refers to the covenants set forth in Article 14 hereof.

"***Replacement Guaranty Requirements***" means the compliance with all conditions and requirements under the Senior Mortgage Loan Documents and the Capital Members causing the Sponsor to be promptly released from all guaranties, recourse or non-recourse carve-out guarantees, environmental indemnities and any other similar agreements in respect of the obligations of the Company or the SPE, to the extent first arising after the effective date of such removal.

"***Required Redemption Amount***" means, with respect to the Capital Members, an amount equal to (i) the unpaid portion of the Investment; plus (ii) any additional amount (the *"**Redemption Premium**"*) required to assure that the Capital Members receives a return on the Capital Members' Initial Capital Contribution, over the term of the Capital Members' Initial Capital Contribution (through the date of redemption) equal to (X) at least 122% of such portion of the Capital Members' Initial Capital Contribution (a minimum 1.22x return multiple) if the redemption occurs within twenty four months after the Closing Date, (Y) at least 135% of such portion of the Capital Members' Initial Capital Contribution (a minimum 1.35x return multiple) if the redemption occurs after the first twenty four months after the Closing Date but within thirty months of the Closing Date, and (Z) at least 145% of such portion of the Capital Members' Initial Capital Contribution (a minimum 1.45x return multiple) if the redemption occurs after the first thirty months after the Closing Date; plus (iii) any other amounts then owing to the Capital Members hereunder. In calculating the Redemption Premium, the Upfront Fee and Expense Reimbursement shall not be included as part of the Capital Members' return on the Capital Members' Initial Capital Contribution.

"***Required Redemption Date***" means the date that is the earlier of: (a) one business day after the date upon which the Senior Mortgage Loan is fully repaid or defeased, (b) the date on which all or any portion of the Property is sold, or (c) the Redemption Date.

"***Requisite Consent***" means approval or consent of the Board of Managers.

"***Reserve Accounts***" means any reserve accounts provided for under the Senior Mortgage Loan Documents, and any other reserves established pursuant to Article XII of this Agreement.

**"*Senior Mortgage Lender*"** means the financial institution which from time to time provides any Senior Mortgage Loan to the SPE.

**"*Senior Mortgage Loan*"** means the existing or future loans secured by the Property and any loan which refinances such Senior Mortgage Loan from a Senior Mortgage Lender selected by the Manager and approved by all the Board of Managers.

**"*Senior Mortgage Loan Documents*"** mean the documents evidencing or securing any Senior Mortgage Loan.

"***SPE"*** mean Hawks Landing Owner LLC, a single-member LLC wholly owned by the Company, organized in Delaware and foreign registered in North Carolina.

"***Sponsor***" means Eli Meisels and Moshe (a/k/a Max) Weingarten.

"***Tax Amount***" means, for any Fiscal Year, (a) the Members' estimated aggregate allocable share of the Company's items of net income and gain for such tax year (after first applying all net loss carryovers, as determined and calculated by the Company or its accountants, from a prior tax year), multiplied by (b) the Blended Tax Rate for such Fiscal Year. The Tax Amount shall be determined by the Company's accountants or the Manager in his reasonable discretion subject to the approval of the Capital Members.

"***Transfer***" shall have the meaning set forth in Section 3.2(a).

"***Uncontrollable Expenses***" means expenses not set forth in an Operating Budget, Capital Budget or other budget approved by the Board of Managers for the payment of (i) real estate taxes and assessments,, (ii) utility expenses, (iii) insurance premiums, (iv) expenses necessary to (A) avoid or remediate any condition constituting a real and present hazard to health or human safety at, or presenting risk of material loss or damage to, the Property or any portion thereof, (B) enable the Company or SPE to comply with or avoid violating in any material respect the laws or regulations or any governmental authority or (C) avoid or mitigate in any material respect the Company's or SPE's exposure to potential liability as a result of any environmental matter, and (v) snow and ice removal expenses.

***"Upfront Fee"*** shall mean a fee equal to 2% of the Capital Members' Initial Capital Contribution which shall be payable to the Capital Member by the Company on the Closing Date.

"***Voluntary Redemption***" shall have the meaning set forth in Section 12.1.

Section 1.2 Additional Clarification. Notwithstanding anything contained herein to the contrary, when the word "material" is used in this Agreement, it shall be used as reference to something that is important or essential, as determined by Capital Members in a commercially reasonable manner.

## ARTICLE II - ORGANIZATIONAL MATTERS; PURPOSE; TERM

Section 2.1 Formation of Company. The Company was formed effective as of April 7, 2022 as a limited liability company pursuant to and in accordance with Delaware law as of the filing of its Certificate of Formation with the Secretary of State of the State of Delaware.

Section 2.2 Name. The name of the Company is Hawks PVO Holding LLC, and all Company business shall be conducted in that name or such other name as the Manager and the Board of Managers approve. Taylor Lolya is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware. Upon the filing of the Certificate of Formation with the Secretary of State, her powers as an "authorized person" ceased, and the Manager thereupon became designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act.

Section 2.3 Principal Office. The Company will maintain an office and principal place of business (i) prior to a Changeover Event, at ________________________________________ or at such place or places as the Operating Member may from time to time designate with prior written notice of such designation given to the other Members prior and (ii) following a Changeover Event, at 104 Armour Rd., N Kansas City, Missouri 64116 or at such place or places as the Capital Members may from time to time designate with prior written notice of such designation given to the Manager and other Members.

Section 2.4 Registered Office and Registered Agent. The Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware.

Section 2.5 Purpose and Scope. The purposes and scope of the Company's activities are strictly limited to acquiring, developing, financing, constructing and/or renovating,

improving, maintaining, owning, leasing, and selling the Property, either directly or through the SPE; financing the foregoing activities; and performing all other activities reasonably necessary or incidental to the furtherance of such purposes, including, but not limited to, causing the Company and/or the SPE to enter into and perform its obligations under the Senior Mortgage Loan Documents.

Section 2.6 Term. The term of the Company commenced upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware in accordance with Delaware law and shall be perpetual, unless sooner dissolved as herein provided.

Section 2.7 No State Law Partnership. The Company shall not be a partnership or joint venture under any state or federal law, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager for any purposes, other than under the Code and other applicable tax laws, and this Agreement may not be construed otherwise.

Section 2.8 Foreign Qualification. Before the Company conducts business in any jurisdiction other than Delaware, the Manager shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Manager, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business.

## ARTICLE III - MEMBERSHIP; DISPOSITIONS OF INTERESTS

Section 3.1 Members. The initial Members of the Company are set forth in Schedule I to this Agreement, each of which is admitted to the Company as a Member as of the date hereof.

Section 3.2 Dispositions of Membership Interests.

(a) Except as otherwise authorized pursuant to this Agreement, neither the Operating Member nor the Sponsor may make an assignment, transfer, or other disposition (voluntarily, involuntarily or by operation of law) (a "***Transfer***") of all or any portion of its Membership Interest, nor pledge, mortgage, hypothecate, grant a security interest in, or otherwise encumber (an "***Encumbrance***") all or any portion of its Membership Interest, except with Requisite Consent if:

(i) Such Transfer reduces Sponsor's legal or equitable interest in Operating Member in an amount in excess of 49% of the legal or equitable interest owned by Sponsor on the date hereof;

(ii) Such Transfer or series of Transfers of any legal or equitable interest in any entity or entities that results in a change of Control of Operating Member in a manner that neither Sponsor continues to, directly or indirectly, have the power, directly or indirectly to direct or cause the direction of the management and policies of the Operating Member, whether through the ability to exercise voting power, by contract or otherwise;

(iii) Such Transfer or series of Transfers of any legal or equitable interest that results in any party that was not a Significant Owner before such Transfer (or series of Transfers) becoming

a Significant Owner thereafter (such consent not to be unreasonably withheld, conditioned or delayed). For purposes of this provision, a "Significant Owner" is an individual or entity that owns, directly or indirectly, 25% or more of the collective equity interests in Operating Member;

(iv) It is a Transfer of any interests in the Company by Operating Member;

(v) Such Transfer or Encumbrance would violate the terms of the Senior Mortgage Loan Documents.

(b) Any attempted Transfer of, or granting of an Encumbrance on, all or any portion of a Membership Interest, other than in strict accordance with this Section 3.2, shall be void. A Person to whom a Membership Interest is transferred in violation of the above restrictions may be admitted to the Company as a member only with Requisite Consent, which may be given or withheld in the non-transferring Member's sole and absolute discretion. In connection with any Transfer of a Membership Interest or any portion thereof, and any admission of an assignee as a Member, the Member making such Transfer and the assignee shall furnish the other Member with such documents regarding the Transfer as the other Member may reasonably request (in form and substance reasonably satisfactory to the other Member), including a copy of the Transfer instrument, a ratification by the assignee of this Agreement (if the assignee is to be admitted as a Member) and a legal opinion that the Transfer complies with applicable federal and state securities laws. In addition to obtaining Requisite Consent, any Person initiating a Transfer shall be obligated to (a) obtain the approval of the Senior Mortgage Lender for any such Transfer (or demonstrate that such consent is not required pursuant to the Senior Mortgage Loan Documents) and to pay any Senior Mortgage Lender costs associated with Senior Mortgage Lender's review and approval, if any, and (b) pay all costs incurred by the Company or the other Members in connection with their legal and other fees associated with reviewing such Transfer.

(c) Manager shall have no right to Transfer its rights, title, interest or obligations as Manager herein except with Requisite Consent.

(d) Capital Members may not make any Transfer or Encumbrance that would violate the terms of the Senior Mortgage Loan Documents.

Section 3.3 Resignation. A Member may not resign or withdraw from the Company without the consent of the other Members.

Section 3.4 Information. In addition to the other rights specifically set forth in this Agreement, each Member and each permitted assignee is entitled to (a) true and full information regarding the status of the business and financial condition of the Company; (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year; (c) a current list of the name and last known business, residence or mailing address of each Member and Manager; (d) a copy of this Agreement, the Company's certificate of formation, and all amendments to such documents; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; and (f) other information regarding the affairs of the Company to which that Member or permitted assignee is entitled pursuant to Section 18-305 of the Act

(including all Company books and records). Under no circumstances shall any information regarding the Company or its business be kept confidential from the Manager or a Member.

Section 3.5 Liability to Third Parties. Except as expressly set forth in this Agreement, no Member or Manager shall be liable for the debts, obligations or liabilities of the Company.

Section 3.6 Representations and Warranties of Operating Member.

(a) As a material inducement for the Capital Members to contribute its Initial Capital Contribution to the Company, the Operating Member hereby represents and warrants to the Capital Members that:

(i) Both the Company and the SPE are limited liability companies duly organized, validly existing, and in good standing under the laws of the State of Delaware, and have and have had since their inception all necessary power and authority to carry on their business, to own and lease the assets which they owned and leased, and to perform all their obligations under each agreement and instrument by which they are bound;

(ii) The SPE is registered to do business in North Carolina;

(iii) Except in connection with the Company's ownership of the SPE, neither the Company nor the SPE owns, directly or indirectly, any equity interest in any other corporation, association, partnership, joint venture, business organization or limited liability company or other entity, nor has the Company or the SPE entered into any agreement, arrangement or understanding to make any such investment;

(iv) The Company has not engaged, in any material respect, in any trade or business other than owning the SPE (the "Business"). Neither the Company nor the SPE has ever conducted business under any other name other than the name of the Hawks Landing Apartments (i.e., "trading" or "doing business as").

(v) No bankruptcy or insolvency proceedings are pending or contemplated by the SPE, the Company, the Operating Member, or Manager or against the SPE, the Company, the Operating Member or Manager;

(vi) There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or, to the best of the Operating Member's knowledge, threatened against or affecting the Company, the SPE or the Property which, if adversely determined, would materially impair the Property or the Company's, SPE's or Operating Member's ability to perform the covenants or obligations required to be performed under this Agreement;

(vii) Neither the Company nor the SPE has (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by its creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of its assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of its assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension, or composition to its creditors generally.

(viii) The Company and the SPE have duly filed with the appropriate government agencies all material tax returns required to be filed. No waiver of any statute of limitations relating to taxes has been executed or given by the Company, Operating Member, Manager or the SPE that is currently in effect. All taxes required to be paid or withheld and remitted by the Company, Operating Member, Manager or the SPE (whether or not reflected on any tax return) have been fully and timely paid or withheld and remitted, and there are no levies, liens or other encumbrances relating to taxes existing, threatened or pending with respect to any asset of the Company;

(ix) The Company is not (nor has ever been) a party to any tax sharing agreement or tax indemnity agreement and the Company has not assumed the tax liability of any other person under contract. Neither the SPE nor the Company has agreed, nor is the Company or SPE required to make, any adjustment under Code Section 481(a) by reason of a change in accounting method or otherwise.

(x) Other than in connection with the Senior Mortgage Loan Documents, on the Closing Date there will be no security agreements or financing statements affecting all or any portion of the Property other than as disclosed in writing by the Operating Member to the Capital Members;

(xi) Neither the Operating Member nor the SPE is a “foreign person” within the meaning of Section 1445(f)(3) of the Code and the related Treasury Department regulations, including temporary regulations;

(xii) As of the Effective Date, Operating Member and Capital Members are the only members of the Company and the Company is the only member of the SPE;

(xiii) Since the date of the Company’s formation, it has owned no material assets other than cash and the SPE;

(xiv) Since the date of the Company’s formation, the Company has had no employees and no employee benefit plans of any kind or nature;

(xv) Reserved;

(xvi) There exists no presently pending litigation, arbitration, governmental investigation, or administrative proceeding, and no litigation, arbitration or administrative proceeding has been threatened in writing against the Company or SPE;

(xvii)The SPE has no material assets or liabilities, whether accrued, absolute or contingent, in each case, other than those related to the Property;

(xviii) All material reports, certificates, affidavits, financial statements and other data furnished in writing by or on behalf of the Operating Member or Manager and expressly delivered to the Capital Members, as from the Operating Member or Manager, and not from a third party, if any, in connection with the Property or this Agreement are true and correct in all material respects and do not omit to state any fact or circumstance necessary to make the statements contained therein not materially misleading;

(xix) The execution, delivery and performance of this Agreement is binding and enforceable against the Operating Member and Manager in accordance with the respective terms thereof and do not violate, result in a breach of or constitute a default (nor upon the giving of notice or the passage of time or both will constitute a default) under any contract or agreement of any nature to which the Operating Member or Manager is a party or by which the Operating Member or Manager or any of its property may be bound and do not violate any law, order, decree, rule or regulation to which the Operating Member or Manager is subject;

(xx) To the best of the Operating Member's knowledge, on the Closing Date, the Property and the current intended use thereof by the Company and SPE shall comply in all material respects with all applicable restrictive covenants, zoning ordinances, subdivision and building codes, flood disaster laws, health and environmental laws and regulations and all other ordinances, orders or requirements issued by any state, federal or municipal authorities having or claiming jurisdiction over the Property. On the Closing Date, the Property will constitute one or more separate tax parcels for purposes of ad valorem taxation. On the Closing Date, the Property shall not require any rights over, or restrictions against, other property in order to comply with any of the aforesaid governmental ordinances, orders or requirements except those that are in place;

(xxi) To the best of the Operating Member's knowledge, there are no conditions on, about, beneath or arising from the Property caused by the Company or SPE or to the Operating Member's knowledge, any other Person which would reasonably be expected to, now or any time in the future under any environmental law, (A) give rise to a liability, a restriction on use or activity or the imposition of a statutory lien, or (B) require any action to report, investigate, remediate, monitor or undertake other actions in response to the presence or release of hazardous substances or a violation of environmental laws;

(xxii) To the best of the Operating Member's knowledge, there is not now, nor, to Operating Member's knowledge, has there ever been, any above or underground storage tanks, asbestos containing materials, or transformers containing or contaminated with PCB's on, about or beneath the Property;

(xxiii) The utility services necessary and sufficient for the full use, occupancy, operation and disposition of the Property for its intended purposes shall be available to the Property through public rights-of-way or perpetual private easements;

(xxiv) The Property will be free from delinquent water charges, sewer rents, taxes and assessments and related liens;

(xxv) The Property will be free from material unrepaired damage caused by fire, flood, accident or other casualty;

(xxvi) No part of the Property or the improvements thereon has been taken in condemnation, eminent domain or like proceeding nor, to the best of the Operating Member's knowledge, is any such proceeding pending or threatened or contemplated;

(xxvii) Operating Member has delivered to Capital Members true, correct and complete copies of all service, management contracts, and other agreements in its possession or

under its control then currently relating to the Property, including any and all amendments thereto or modifications thereof (collectively, the "***Contracts***");

(xxviii) On the Closing Date, each Contract will constitute the legal, valid and binding obligation of the other party thereto and is enforceable against any other party thereto. No default exists, or with the passing of time or the giving of notice or both would exist, under any Contract which would, in the aggregate, have a material adverse effect on the Company or the Property;

(xxix) No Contract, other than the Senior Mortgage Loan Documents, shall provide any party with the right to obtain a lien or encumbrance upon the Property, and there are no liens, which are prior to or of equal priority with the lien of the Senior Mortgage Loan Documents against the Property other than as disclosed in writing by the Operating Member to the Capital Members prior to the Closing Date;

(xxx) The easements, covenants, conditions, restrictions and other encumbrances to title to the Property will not materially and adversely affect (A) the ability of the SPE to pay in full the Senior Mortgage Loan in a timely manner (B) the ability of the Company to pay in full all amounts due to the Capital Members hereunder, or (C) the use of the Property for the use currently being made thereof on the Closing Date, the operation of the Property as currently being operated or the value of the Property on the Closing Date;

(xxxi) Any right of any Affiliate of the Operating Member or Manager to receive any compensation, reimbursement of costs and expenses or other payments in consideration for its management services for the Property or its asset management services for the Company, other than the property management fees and expenses set forth in the Property Management Agreement, except to the extent approved by the Board of Managers or included in this Agreement or the annual Operating Budget for the Company and paid in the ordinary course of business and in accordance with the provisions of Section 7.2 hereof, shall be and remain subordinate in all respects to the Capital Members' rights under this Agreement;

(xxxii) Other than Meridian and Marc Belsky, neither the Company nor the Manager has entered into any agreement with any financial advisors, brokers, underwriters, placement agents, agents or finder in connection with the subject matter of this Agreement. The total amount owed to Meridian is $______________ and the total amount owed to Marc Belsky is $________________;

(xxxiii) The Company and SPE are and at all times during the prior five (5) year period have been, in material compliance with all applicable laws, and during such period there has not been, any notice, order or other communication from any governmental agency or instrumentality of any alleged, actual or potential violation of or failure to comply with any law by the SPE, the Company, the Operating Member or the Manager or in connection with the Business or the Company's assets, except for notices, orders or communications citing or referring to violations or failures that have been cured or alleging violations or failures that were determined not to exist.

(xxxiv) All federal, foreign, state, local, and other governmental consents, licenses, permits, franchises, approvals, notifications, numbers, and identifiers issued by governmental

authorities, grants and other authorizations (including without limitation environmental authorizations) required for the operation of the Business as currently conducted and as conducted during the prior five (5) year period have been obtained by the Company or SPE and are (to the extent currently required to be so) in full force and effect without any default or violation thereunder.

Section 3.7 Covenants of the Manager.

(a) So long as there are funds available, the Manager shall cause (i) the SPE to pay when due its portion of the principal of and the interest on the Senior Mortgage Loan in accordance with the terms of the Senior Mortgage Loan Documents, (ii) the SPE to pay its portion of all charges, fees and other sums required to be paid by the SPE as provided in the Senior Mortgage Loan Documents, in accordance with the terms of the Senior Mortgage Loan Documents, and (iii) cause the Company to pay all amounts payable to the Capital Members hereunder. So long as there are funds available, the Manager shall also cause the Company and SPE to observe, perform and discharge all obligations, covenants and agreements to be observed, performed or discharged by the Company or SPE set forth in the Senior Mortgage Loan Documents in accordance with their terms. Further, the Manager shall use good faith and commercially reasonable efforts to cause the Company and SPE to promptly and substantially perform and comply with all covenants, conditions, obligations and prohibitions required of the Company or SPE in connection with any other document or instrument affecting title to the Property, or any part thereof.

(b) Manager shall cause the SPE to comply with all insurance requirements of the Senior Mortgage Loan Documents. In the event that the Senior Mortgage Loan is satisfied and Capital Members remains a Member of the Company, the Manager shall comply with the insurance covenants that were contained in the most recently effective Senior Mortgage Loan Documents. No less than three (3) business days prior to the Closing Date, the Manager will deliver to the Capital Members certificates of insurance evidencing the required insurance.

(c) Subject to requesting and obtaining the required consent required from the Board of Managers to the extent required pursuant to Article IV below, and so long as there are funds available, the Manager shall cause the SPE to pay (or shall require that the Senior Mortgage Loan Documents require the Senior Mortgage Lender to pay), its portion of all taxes and assessments which are or may become a lien on the Property or which are assessed against or imposed upon the Property. Upon request, the Manager shall furnish a Member with evidence reasonably acceptable to such Member showing payment of such taxes and assessments no less than five (5) days prior to the applicable delinquency date therefor. Notwithstanding the foregoing, the Company and SPE may, in good faith, by appropriate proceedings and upon notice to the Capital Members, contest the validity, applicability or amount of any asserted tax or current or proposed assessment so long as (a) such contest is diligently pursued and (b) the Capital Members does not determine, based on the opinion of its counsel, that such contest would fail to suspend the obligation to pay the tax and that nonpayment of such tax or assessment may result in the sale, loss, forfeiture or diminution of the Property or any part thereof or any interest of the Capital Members therein; provided, however, that the Manager shall promptly cause the Company to pay any amount adjudged by a court of competent jurisdiction to be due, with all interest, costs and penalties thereon, promptly after such judgment becomes final; and provided further that in any event each such contest shall be concluded and the taxes, assessments, interest, costs and penalties

shall be paid prior to the date any writ or order is issued under which the Property may be sold, lost or forfeited.

(d) Subject to requesting and obtaining the required consent from the Board of Managers to the extent required pursuant to Article IV below, and so long as there are funds available, the Manager shall cause the Company or SPE to pay when due its portion of all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Property or the improvements thereon; provided, however, that, the Company or SPE shall have the right to contest in good faith any such claim or demand, so long as same is permitted under the terms of the Senior Mortgage Loan Documents, it does so diligently, by appropriate proceedings and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest. In the event the Company or SPE shall contest any such claim or demand, the Manager shall promptly notify the Members of such contest and thereafter shall, upon a Member's request, promptly cause the Company or SPE to provide a bond, cash deposit or other security reasonably satisfactory to such Member to protect the Company's and SPE's interests in the Property should the contest be unsuccessful.

Section 3.8 Representations and Warranties of Capital Members.

(a) As a material inducement for the Operating Member to contribute its Initial Capital Contribution to the Company, the Capital Members hereby represents and warrants to the Operating Member that:

(i) Each Capital Member is an "Accredited Investor" as defined by Regulation D under the Securities Act of 1933, as amended;

(ii) Each Capital Member's net worth and income are adequate to support the obligations incurred by its admission to the Company;

(iii) Each Capital Member acquired its Membership Interest in the Company for investment solely for its own account with the intention of holding such Membership Interest for investment, without any intention of participating directly or indirectly in any distribution of any portion of such Membership Interest, including an economic interest, and without the financial participation of any other Person in acquiring such Membership Interest in the Company;

(iv) None of (1) the Capital Members, (2) their Affiliates, (3) any Person with a collective direct or indirect equity interest in a Capital Member equal to or greater than 25%, (4) managers, managing members, general partners, trustees, or other Person who has the power to direct or cause the direction of the management or policies of a Capital Member, or, (5) to its knowledge, any Person that owns a beneficial interest in such Capital Member, is (i) a Person with whom U.S. Persons are restricted from doing business under regulations of Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List or Consolidated Sanctions List) or under the Executive order or a Person on the list of individuals and entities prohibited from doing business with the Department of Housing and Urban Development (each a "Prohibited Person"); (ii) no such Person is included in, owned by, controlled by, knowingly acting for or on behalf of, knowingly providing assistance, support, sponsorship or services of any kind to, or otherwise

knowingly associated with any of the Persons referred to or described in the Executive Order, or banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by OFAC; (iii) conducting any business or engaging in any transaction or dealing with any Prohibited Person; (iv) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (v) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (vi) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (vii) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes, or (F) any regulations promulgated under the foregoing statutes;

(v) No bankruptcy or insolvency proceedings are pending or contemplated by or against either Capital Member;

(vi) Each Capital Member is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code and the related Treasury Department regulations, including temporary regulations;

(vii) The execution, delivery and performance of this Agreement is binding and enforceable against the Capital Members in accordance with the respective terms thereof and, to the Capital Members' knowledge, do not violate, result in a breach of or constitute a default (nor upon the giving of notice or the passage of time or both will same constitute a default) under any contract or agreement of any nature to which the Capital Members are a party or by which the Capital Members or any of their property may be bound and, to the Capital Members' knowledge, do not violate any law, order, decree, rule or regulation to which the Capital Members are subject.

## ARTICLE IV - MANAGEMENT OF COMPANY

Section 4.1 Management. The Manager shall manage the affairs of the Company and SPE and make all decisions with regard thereto, except where the Board of Manager's approval is required under this Agreement. Without limiting the foregoing, the Manager is expressly authorized to cause the Company and/or the SPE to execute, deliver, and perform, and the Manager, on behalf of the Company and/or the SPE, is hereby authorized to (i) execute and deliver the Senior Mortgage Loan Documents to be executed in connection with the acquisition of the Property, (ii) the Property Management Agreement with Valor Residential Group LLC for the management of the Property, and (iii) carry out all matters referenced in an approved Operating Budget, Capital Budget or in any other budget approved in writing by the Board of Managers. The foregoing authorization shall not be deemed a restriction on the powers of the Manager to enter into other agreements on behalf of the Company and/or the SPE as otherwise permitted herein. Notwithstanding the foregoing, the Capital Members shall have sole authority to enforce the Property Management Agreement following a Changeover Event, including the ability to direct or replace the Property Manager, and any Property Management Agreement shall include

a provision requiring the Property Manager to accept the direction or enforcement of the Property Management Agreement by the Capital Members following a Changeover Event.

(a) No action shall be taken, sum expended, or obligation incurred by the Manager or any Member, the Company or SPE regarding the matters described below (the "***Major Decisions***") without the written approval of the Board of Managers (except to the extent the same is otherwise expressly authorized by the terms of this Agreement or expressly provided for (and not in excess of any amount set forth) in any Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers (subject to the Variance Threshold):

(i) encumbering, transferring (other than routing transfers of fixtures or personalty that is obsolete or no longer used in the operation of the Property) or granting a security interest of any nature whatsoever in all or a portion of the Company, Property or its assets, except to the extent (1) provided in an Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers, (2) the net proceeds of such transaction would satisfy in full the Required Redemption Amount, (3) such sale, lease, exchange or disposal involves (x) the sale of any personal property to the extent replaced by personal property of equal or greater value or is obsolete or (y) any easements granted to utility providers as may be necessary for the proper operation of the Property, (4) that a lease is a standard residential lease to be executed in the normal course of business, or (5) created pursuant to the Senior Mortgage Loan Documents executed in conjunction with the acquisition of the Property;

(ii) incurring indebtedness on behalf of the Company, except for (i) trade payables in an outstanding amount no greater than 2.0% of the original Senior Mortgage Loan balance, (ii) taxes and assessments, (iii) matters authorized by the terms of this Agreement, (iv) matters referenced in an approved Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers, or (v) the Senior Mortgage Loan;

(iii) making any of the following with respect to the Property not referenced in an approved Operating Budget: (A) capital or other material improvement, renovation or refurbishment, (B) removal, demolition or material alteration of the improvements or the equipment (other than routine replacement of such equipment), (C) material increase in the square footage or gross leasable area of the improvements;

(iv) making loans to, or guaranteeing the indebtedness of, any third party;

(v) binding the Company or the Property to Material Property Contracts;

(vi) entering into, modifying, or terminating any arrangement for property or asset management;

(vii) changing the zoning of the Property;

(viii) reducing or terminating (without replacing with comparable coverage) any insurance required hereunder or under the Senior Mortgage Loan Documents;

(ix) using or referencing in any way the name of, or any affiliation with, the Capital Members or any of its Affiliates in any business representation or advertising;

(x) settling any litigation, arbitration or administrative proceedings, or confessing judgment, in each case requiring payment in excess of $50,000 (unless any excess above $50,000 is funded by insurance proceeds, subject to applicable deductibles) or instituting any legal action for damages in excess of $50,000, except for counterclaims and crossclaims in matters in which the defense of the claim is funded by insurance proceeds;

(xi) filing of any petition or consenting to the filing of any petition that would subject the Company to a Bankruptcy;

(xii) entering into any transaction involving the Company on one hand and the Operating Member, Sponsor, or any Affiliate of the Operating Member on the other hand, except as specifically set out in the approved Operating Budget;

(xiii) making any material change in the method of conducting the business of the Company or making any modification to any organizational documents of the Company;

(xiv) issuing any equity in the Company or subsidiary of the Company, acquiring or creating of any subsidiary of the Company, or merging or consolidating the Company with another entity;

(xv) causing the Company to acquire any direct or indirect interest in land or other real property or interest therein other than the Property;

(xvi) amending, modifying or otherwise altering the terms or conditions of the Senior Mortgage Loan or Senior Mortgage Loan Documents;

(xvii)causing the SPE to take any action that, if taken by the Company, would have required the approval of the Capital Members;

(xviii) appointing a new Manager in replacement of the original Manager identified herein.

Notwithstanding the foregoing provisions of this Section 4.1(a) or anything in this Agreement to the contrary, except as provided in Section 4.1(e), upon the occurrence of a Changeover Event, the Capital Members shall have the authority to make and/or affect Major Decisions acting without the consent or joinder of the Operating Member and in Capital Members' sole discretion. Any termination of the Property Management Agreement, failure to renew the Property Management Agreement, or replacement property management agreement shall comply with the requirements of Section 8.3(a).

(b) Except as otherwise expressly provided in this Section 4.1, the Manager shall have the authority to execute a contract on behalf of the Company or the SPE provided that (i) such contract is a normal and customary contract in the operation of the Property and is with an unaffiliated third party; (ii) the expenditures to be made pursuant to such contract are consistent with the Operating Budget as implemented in accordance with Section 4.3 hereof; and (iii) such contract may be terminated without penalty by the Company or the SPE without cause on not more than thirty (30) days' prior written notice.

(c) If the Manager desires to take any Major Decision or take any action in respect of any matter requiring the approval of the Board of Managers as provided elsewhere in this Agreement, the Board of Managers shall be deemed to have approved such action if the Board of Mangers fail to respond to a written request for its approval given in accordance with the notice provisions set forth in Section 15.1 of this Agreement (the "***Approval Request***") within ten (10) business days after receipt by the Board of Managers of the Approval Request. The Approval Request shall include all material information known to the Manager which would be reasonably relevant to the Board of Managers' making the determination of whether to approve such action. In the case of an Approval Request sent by email, if the Capital Members Appointee does not respond to such request within five (5) business days, the Manager shall call the Capital Members Appointee (and leave a voicemail if no answer) to confirm that the Capital Members Appointee received the email Approval Request.

(d) Notwithstanding any restrictions set forth in the foregoing clauses, the Manager shall have the right to take any action as it, in its reasonable judgment, deems necessary for preservation of the life or health of any individual affected by the operation of the Company or the SPE, or preservation of the Company's or the SPE's assets if, under the circumstances, in the good faith estimation of the Manager, there is insufficient time to obtain the approval of the Board of Managers to the action and any delay materially increases the risks to life or health or the preservation of assets. The Manager shall notify the Board of Managers of each such action contemporaneously therewith or as soon as reasonably practicable thereafter.

(e) Without the prior consent of all Members, neither the Manager nor any Member shall have any authority to do any of the following acts: (i) do any act in material violation of this Agreement; (ii) possess any Company assets or SPE asset or assign the rights of the Company or the SPE in specific Company or SPE assets for other than Company or SPE purposes, or take any other action contrary to the Company's or SPE's stated purpose; (iii) permit the Company or the SPE to merge or consolidate with any other entity; (iv) amend, modify or otherwise alter the terms or conditions of this Agreement or any other organizational document of the Company or the SPE (except to reflect the addition of another Member or redemption of a Member); (v) dispose of the Property or Company or SPE assets on terms other than commercially reasonable terms; (vi) the filing on behalf of the Company or SPE (where the Company or SPE is the debtor) of any petition, or consent to the appointment of a trustee or receiver or any judgment or order, under state or federal bankruptcy laws; (vii) the taking of any willful action by the Company or SPE that has the purpose of creating a recourse event identified in any guaranty or indemnity (including, without limitation, the guaranty agreement and the environmental indemnity agreement) issued in favor of Lender or Capital Member (which, as used herein, means any recourse event, including, without limitation, fraud or misappropriation by the Company or SPE); or (viii) contract on behalf of the Company or the SPE to make any payments to any Member or its Affiliates for any services rendered that is not a normal and customary contract in the operation of the Property and on arm's length terms consistent with an agreement with an unaffiliated third party.

(f) Without the consent of the Board of Managers, neither the Manager nor any Member shall have any authority to do any of the following acts: (i) admit a person or entity as a Member except as provided in this Agreement, (ii) amend, modify or otherwise alter the terms or conditions of the Senior Mortgage Loan or Senior Mortgage Loan Document; (iii) refinance or defease the Senior Mortgage Loan or encumber all or any portion of the Property; (iv) make any

payments to any Affiliates of any Member for any services rendered that is not otherwise provided for in the Operating Budget or the Property Management Agreement, or use the name of any Member in the operation of the Property without that Member's prior written consent; or (v) incur any additional liabilities under the Senior Mortgage Loan, including under any existing draw rights of the Company or the SPE under the terms of such Senior Mortgage Loan or otherwise.

(g) The Manager shall discharge its duties in a commercially prudent manner as provided for in this Agreement. The Manager, on behalf of the Company, shall in good faith use all commercially reasonable efforts to implement all Major Decisions approved by the Board of Managers, enforce agreements entered into by the Company, and conduct the ordinary business and affairs of the Company in accordance with good industry practice and this Agreement. The Manager shall not be required to devote a particular amount of time to the Company's business, but shall devote sufficient time to perform its duties hereunder. Subject to the SPE's engagement of a Property Manager to manage the Property, engagement of various professionals and service providers (e.g., accountants and attorneys) and engagement of any third parties described in an approved Operating Budget, Capital Budget or any other budget approved in writing by the Board of Managers, the Manager shall not delegate any of its rights or powers to manage and control the business and affairs of the Company to any person without the prior written consent of the Board of Managers, except to a third party manager to undertake some or all the duties of the Manager, and any management fee due to the Manager may be paid to such third party manager by Manager.

(h) Notwithstanding anything contained in this Agreement to the contrary, the Board of Manager's vote, consent or approval shall no longer be required for any action taken by Manager, Operating Member, the Company or SPE from and after the receipt by Capital Members of the entire Required Redemption Amount. From and after such time as the vote, consent or approval of Capital Members and the Capital Members Appointee shall no longer be required, all references to vote, consent or approval by Capital Members or Capital Members Appointee or words of similar import shall refer to approval of Operating Member only.

Section 4.2 Capital Budgets and Expenditures.

(a) Implementation of Capital Budget. The Manager shall prepare and deliver to the Board of Managers for its approval a project budget for the Property prior to the Closing Date that reflects the capital expenditures associated with the Capital Expenditure Reserve. The Manager may resubmit for approval an amended Capital Budget to the Board of Managers from time to time as changes in the nature of the Property require, but in no event more than four (4) times per annum.

(b) Deviation from Operating Budget and Capital Budget. In implementing any Operating Budget and Capital Budget, and unless the consent of the Board of Managers is first obtained, the Manager shall not cause or permit the Company or the SPE to deviate from the Operating Budget or Capital Budget more than five percent (5%) in any single budgeted category (the "**Variance Threshold**"). In the event there shall be a variance in excess of the Variance Threshold between the actual or forecasted capital expenditures for a given month and the estimated results as set forth in the Operating Budget or the Capital Budget (as applicable), Manager shall also furnish to Capital Members, within ten (10) days after the expiration of such month, a written explanation concerning the variances and the steps being taken by Manager to

rectify the variances. If after a Capital Budget has been approved and substantial variations have occurred, or are anticipated by Manager, Manager shall promptly notify Capital Members and, upon Capital Members' request, shall prepare and submit to Capital Members a revised forecast of capital expenditures. Such forecast shall not constitute a replacement Capital Budget.

(c) Use of Capital Expenditure Reserve. The Manager shall prepare and deliver to the Board of Managers a written request to withdraw funds from the Capital Expenditure Reserve account. The reimbursement request shall include a line item breakout of expenses that have accrued from the previous reimbursement. Upon written consent from the Board of Managers, the Manager may withdraw the associated amount of the reimbursement. Notwithstanding the foregoing, no consent from the Board of Managers shall be required for any such expenditure that is required under the Senior Mortgage Loan Documents.

Section 4.3 Operating Budgets and Expenditures.

(a) Implementation of Operating Budgets. The Manager shall prepare and deliver to the Board of Managers for its approval budgets for the operation of the Property, prepared on an accrual basis, which budgets shall be delivered not later than thirty (30) days prior to the commencement of a particular Fiscal Year (except that the budget for the Fiscal Year in which the Closing Date occurs shall be delivered prior to the Closing Date and attached as Exhibit D). The Manager shall not implement any budget unless the same has been approved by the Senior Mortgage Lender to the extent approval by the Senior Mortgage Lender is required, and by the Board of Managers, which budget shall be approved or denied within fifteen (15) business days after the Board of Managers receives the applicable budget. If the Board or Managers denies the budget, the Board of Managers shall promptly notify the Manager in writing of its good faith reasons for denying such budget. The Manager shall implement each Operating Budget and the Manager shall be authorized, without the need for further approval by the Board of Managers, to make the specified expenditures and incur the specified obligations provided for in such Operating Budget and this Agreement (but only if the Manager acts in strict conformance with such Operating Budget in all respects with regard to, among other matters, the nature and amount of each such expenditure or obligation (subject to the to the Variance Threshold and any Necessary Expenses, each of which is permitted hereunder). The Manager may resubmit for approval an amended Operating Budget to the Board of Managers from time to time as changes in the nature of the Property require, but in no event more than four (4) times per annum.

(b) Deviation from Operating Budgets. In implementing any Operating Budget, and unless the consent of the Board of Managers is first obtained, the Manager shall not deviate from the Operating Budget more than the Variance Threshold. The foregoing notwithstanding, in the event that Necessary Expenses exceed the above referenced allowable variations, the consent of the Board of Managers shall not be required, provided that in the event there shall be substantial variances (expenses that exceed the Variance Threshold, Necessary Expense, or Operating Revenues less than ninety-five percent (95%) of projection) between the actual results of operations for any month and the estimated results of operations for such month as set forth in the Operating Budget, Manager shall also furnish to Capital Members, within ten (10) days after the expiration of such month, a written explanation concerning the variances and the steps being taken by Manager to rectify the variances. If after an Operating Budget has been approved and substantial variations have occurred, or are anticipated by Manager during the course of the Fiscal Year, Manager shall promptly notify Capital Members and, upon Capital Members 's request,

shall prepare and submit to Capital Members a revised forecast of annual revenues and expenses for the remainder of the Fiscal Year based on actual year-to-date income and expenses and Manager's forecast of revenues and expenses for the remainder of the Fiscal Year. Such forecast shall not constitute a replacement Operating Budget.

(c) Failure to Approve Operating Budgets. If any proposed Operating Budget for any calendar year has not been approved by January 1 of that year, the prior year's Operating Budget, subject to CPI increases for all expenses, shall be used by the Manager until an Operating Budget is approved by the Board of Managers for the subsequent period.

Section 4.4 Meetings of Members.

(a) Meetings. If required by the Act, an annual meeting of the Members shall be held on such date as the Manager, the Operating Member or the Capital Members shall reasonably determine. Regular monthly, quarterly or other periodic meetings may be held upon the determination of the Manager, the Operating Member or the Capital Members at any time by delivering at least five (5) business days' prior notice thereof to the other Members to discuss such matters regarding Company business as the Members may elect; provided that no Member may call a meeting more frequently than once annually without the consent of the other Members.

(b) Procedure. Each Company meeting shall be held at the principal place of business of the Company, unless the Members otherwise agree to a different location. A Member may also participate in and hold a meeting by means of a conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Attendance of a Person at a meeting (either in person or by conference telephone) shall constitute a waiver of notice of such meeting, unless such Person attends the meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 4.5 Waiver of Notice. When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member, whether before, at, or after the time stated therein, or any attendance of the Member at the meeting (other than at the beginning of the meeting to object to the holding of the meeting), shall be equivalent to the giving of such notice.

Section 4.6 Action Without Meeting. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, with notice sent to all the Members at least 30 days prior to the date on which the action is to take effect, shall be signed by the holder or holders of Membership Interests having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted. Notwithstanding the foregoing, if the consent or consents in writing is obtained from all Members, the notice of at least 30 days shall not be required.

Section 4.7 Reimbursement of Expenses. The Manager shall be reimbursed for all reasonable out-of-pocket expenses actually incurred by it directly in connection with the business and affairs of the Company (including travel expenses and the like, but not overhead expenses), except to the extent such reimbursement would be inconsistent with the Operating Budget

implemented as set forth in Section 4.3 hereof or as otherwise expressly approved by the Board of Managers. Additionally, the Capital Members shall be reimbursed for their reasonable out-of-pocket expenditures incurred for reasonable routine site inspection of the Property and, after a Changeover Event, their reasonable out-of-pocket expenses actually incurred by them directly in connection with the business and affairs of the Company (including travel expenses and the like, but not overhead expenses). Upon request, a Member shall provide reasonable supporting verification to the other Members for all expenditures for which any reimbursement is requested.

Section 4.8 Compensation of Members.

(a) Prior to a Changeover Event, except as set forth in this Agreement or in the Property Management Agreement, no compensatory payment shall be made by the Company to any Member, Sponsor, or an Affiliate of such Member for the services to the Company of such Member, an Affiliate of a Member, a Sponsor, or any member or employee of such Member without the approval of all Members. For purposes of this Agreement, any compensatory payment included in an approved Operating Budget shall be deemed an approved compensatory payment.

(b) On the Closing Date, the Operating Member or its designee shall be entitled to receive an acquisition fee equal to the product of two percent (2%) of the purchase price of the Property under the Purchase Agreement multiplied by the tenancy in common percentage that the SPE owns in the Property on the Closing Date.

(c) The Operating Member or its designee shall be entitled to receive an asset management fee equal to the product of two percent (2%) of the gross monthly income generated by the Property multiplied by the tenancy in common percentage that the SPE owns in the Property on the Closing Date (the "***Asset Management Fee***"). The Asset Management Fee shall accrue and shall be subordinate to the payment of the Initial Capital Contribution Current Return then due hereunder. Further, the payment of the Asset Management Fee shall be fully subordinate to the payment of all amounts then due under the Senior Mortgage Loan. Upon the occurrence of a Changeover Event, payment of the Asset Management Fee shall cease.

Section 4.9 Transactions with Affiliates.

(a) General. When any service or activity to be performed on behalf of the Company is performed by an Affiliate of a Member, a written contract shall be entered into and the fee payable for such service or activity shall not exceed the fee which would be payable by the Company to an unaffiliated third party of comparable standing providing the same services. In addition, the non-Affiliate Member shall have full power and authority to approve all terms and conditions of the written contract and enforce the provisions thereof for the benefit of the Company, including terminating the contract if a default occurs thereunder and otherwise pursuing all other available remedies. The conditions and restrictions contained in this Section 4.9(a) shall have no application or effect with respect to any service or activity to be performed on behalf of the Company by an Affiliate of the Capital Members following a Changeover Event. Any contract approved by the Board of Managers shall be deemed to comply with the first sentence of this Section.

(b) Termination of Agreements with Affiliates. Upon the occurrence of a Changeover Event, the Company may terminate all agreements with the Operating Member's Affiliates, and all such agreements shall contain a provision that allows for the exercise of the right of termination under this Section 4.9(b). The Capital Members may enforce this provision on behalf of the Company.

Section 4.10 Exculpation, Indemnification; Reimbursement of Expenses; Insurance.

(a) Exculpation.

(i) No Covered Person shall be liable to the Company or any Member for any loss suffered by the Company or any Member which arises out of any investment or any other action or omission of such Covered Person, unless a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has been engaged in conduct which constitutes willful or criminal malfeasance, gross negligence or fraud.

(ii) No Covered Person shall be liable for the negligence, whether of action or omission, dishonesty or bad faith of any employee selected and supervised by any Covered Person or of any broker or other agent of the Company, unless a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has committed gross negligence or willful misconduct in selecting and supervising such employee, broker or other agent.

(iii) No Person serving as liquidating trustee pursuant to Section 10.2 shall be liable to the Company or any Member for any loss suffered by the Company or any Member which arises out of any action or omission of such Person, unless a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has been engaged in conduct which constitutes willful or criminal malfeasance, gross negligence or fraud.

(iv) No Covered Person and no Person serving as liquidating trustee shall be liable to the Company or any Member with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice as to matters of law of legal counsel, or as to matters of accounting of accountants, or as to matters of valuation of investment bankers or appraisers.

(v) For purposes hereof, "***Covered Person***" shall mean the Manager, each Member, the Tax Representative, each Affiliate of the Manager or any Member, and a member, shareholder, officer, director, manager, employee, consultant or other agent of any of the foregoing.

(b) Indemnification.

(i) Each Covered Person shall be indemnified, subject to the other provisions of this Agreement, by the Company (only out of Company assets, including the proceeds of liability insurance) against any claim, demand, controversy, dispute, cost, loss, damage, expense (including reasonable attorneys' fees), judgment and/or liability incurred by or imposed upon such Covered Person in connection with any action, suit or proceeding (including any proceeding before any administrative or legislative body or agency), to which such Covered Person may be

made a party or otherwise involved or with which such Covered Person shall be threatened, by reason of such Covered Person's being at the time the cause of action arose or thereafter, the Manager, a Member or an Affiliate of the Manager or a Member, or a member, shareholder, officer, director, manager, employee, consultant or other agent thereof, or a member, shareholder, officer, director member, employee, consultant or other agent of any other organization in which the Company owns or has owned, directly or indirectly, an interest or of which the Company is or was a creditor, which other organization such Covered Person serves or has served as a member, shareholder, officer, director, manager, employee, consultant or other agent at the request of the Company (whether or not such Covered Person continues to serve in such capacity at the time such action, suit or proceeding is brought or threatened).

(ii) A Covered Person shall not be indemnified with respect to matters as to which a court or arbitral tribunal of competent jurisdiction has made a final determination (that is not subject to further appeal) that such Covered Person has been engaged in conduct which constitutes willful or criminal malfeasance, gross negligence or fraud.

(iii) In the event of settlement of any action, suit or proceeding brought or threatened, such indemnification shall apply to all matters covered by the settlement except for matters as to which the Company is advised by counsel (who may be counsel regularly retained to represent the Company) that the Person seeking indemnification, in the opinion of counsel, did not act in good faith or acted with gross negligence or a willful disregard of such Person's duties, or in breach of such Person's fiduciary obligations, or, with respect to any criminal action or proceeding, with reasonable cause to believe such Person's conduct was unlawful.

(iv) The Company shall pay the expenses incurred by a Covered Person in defending a civil or criminal action, suit or proceeding, or in opposing any claim arising in connection with any potential or threatened civil or criminal action, suit or proceeding, in advance of the final disposition of such action, suit or proceeding, upon receipt of an enforceable undertaking by such Covered Person to repay such payment if such Covered Person shall be determined to be not entitled to indemnification for such expenses pursuant to this Section 4.10.

(v) At its election, the Manager, on behalf of the Company, may cause the Company to purchase and maintain insurance, at the expense of the Company and to the extent available, for the protection of any Covered Person against any liability incurred by such Covered Person in any such capacity or arising out of his status as such, whether or not the Company has the power to indemnify such Covered Person against such liability.

(vi) The foregoing right of indemnification shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Covered Person. The rights to indemnification and advancement of expenses conferred in this Section 4.10(b) shall not be exclusive of any other right to which any Covered Person may have or hereafter acquire under any law, statute, rule, regulation, charter document, operating agreement, by-law, contract or agreement.

(c) Limitation by Law. If any Covered Person or the Company itself is subject to any law, rule or regulation which restricts the extent to which such Covered Person may be exculpated or indemnified by the Company, then the exculpation provisions set forth in Section 4.10(a) and the indemnification provisions set forth in Section 4.10(b) shall be deemed to be amended,

automatically and without further action by the Manager or the Members, to the minimum extent necessary to conform to such restrictions.

(d) Effectuation of Section. The Manager is authorized on behalf of the Company to enter into such agreements with all and any Covered Persons indemnified under this Section 4.10 as it may consider appropriate to give effect to the foregoing provisions and make them binding and enforceable against the Company by such Covered Persons.

Section 4.11 Conflicts of Interest. Subject to the other express provisions of this Agreement, each Member, Manager or Affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member or Manager the right to participate therein or to account therefore. The Company may transact business with any Member, Manager or Affiliate thereof, provided the terms of those transactions are no less favorable to the Company than those the Company could obtain from unrelated third parties or on terms approved by the Board of Managers.

Section 4.12 Confidentiality.

(a) Except as provided in Section 4.12(c), each Member agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Membership Interest in the Company or for purposes of filing such Member's tax returns) or disclose to any Person, any information or matter relating to the Company and its affairs and any information or matter related to investment (other than disclosure to such Member's directors, managers, employees, agents, advisors, or representatives responsible for matters relating to the Company, to such Member's direct and indirect owners or potential owners and the owners' or potential owners' directors, managers, employees, agents, advisors, or representatives responsible for matters relating to the owner or potential owner, or to any other Person approved in writing by all the Members (each such Person being hereinafter referred to as an "***Authorized Representative***")); provided that (i) such Member and its Authorized Representatives may make such disclosure to the extent that (w) such disclosure is necessary or desirable in connection with an initial public offering ("IPO") connected with a Member or any Affiliate of a Member, any SEC filing related to a Member or its Affiliates, or in connection with a Member's or its Affiliates marketing associated with any potential IPO, securities offering or other recapitalization or sale, (x) the information to be disclosed is publicly known at the time of proposed disclosure by such Member or Authorized Representative, (y) the information otherwise is or becomes legally known to such Member other than through disclosure by the Manager or any Affiliate, or other party that is subject to (and the Member is aware is subject to) a confidentiality agreement with, any of the foregoing entities, or (z) such Member is required by law or in response to any governmental agency request or in connection with an examination by regulatory authorities, provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed, (ii) each Member will be permitted, after written notice to the Manager, to correct any false or misleading information which becomes public concerning such Member's relationship to the Company, (iii) each Member (and each employee, representative or other agent of each Member) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Company and all materials of any kind (including opinions or other tax analyses) that are provided to the Member relating to such tax treatment or tax structure, and (iv) any information required to be disclosed in accordance with the Senior

Mortgage Loan Documents. Prior to making any disclosure required by law, each Member must, to the extent permitted by applicable law, use its reasonable best efforts to notify the Company of such disclosure. Prior to any disclosure to any Authorized Representative, each Member must use its reasonable best efforts to advise such Authorized Representative of the obligations set forth in this Section 4.12(a).

(b) The Company must use reasonable efforts to keep confidential any information relating to a Member obtained by the Company in connection with or arising out of the Company that the Member requests in writing to the Company to be kept confidential (it being understood that the identity of any Member may be disclosed to any other Member).

(c) Notwithstanding anything herein to the contrary, the Operating Member, Manager, Capital Members and their Affiliates may disclose the fact that the Capital Members has invested in and is a Member of the Company, provided that the specific terms of the investment are not disclosed.

Section 4.13 Upfront Fee, Expense Reimbursement. The Upfront Fee and Expense Reimbursement, shall be payable to the Capital Members on the Closing Date.

## ARTICLE V - ACCOUNTING AND REPORTING

Section 5.1 Fiscal Year, Accounts, Reports.

(a) The fiscal year of the Company shall be the calendar year (the "***Fiscal Year***").

(b) The Manager, at the Company's expense, shall cause to be kept proper and complete records and books of account in which shall be entered fully and accurately all transactions and other matters relating to the Company's business as are usually entered into such records and books of account kept for businesses of a like character. Notwithstanding Section 18-305(c) of the Act, the Manager shall not have the right to keep confidential from any Member any information relating to the Company, the Property or a Member's interest in the Company.

(c) The Manager shall provide financial statements and information as described in "Exhibit B" attached hereto (or such other information with respect to the Property or Sponsor which may be reasonably requested from time to time by the Capital Members or under any of the other Senior Mortgage Loan Documents) to the Members**,** all of which shall be certified to the Members as being true and correct in all material respects by the Manager or the person or entity to which they pertain, as applicable, and be in form and substance reasonably acceptable to the Board of Managers.

(d) If any of the aforementioned materials are not furnished to the Capital Members within the applicable time periods or the Capital Members finds the contents of any of the foregoing to be materially inaccurate, fraudulent or not of commercially reasonable quality, and has notified the Manager in writing of its dissatisfaction or failure to provided, as the case may be, and the Manager has failed to cure such deficiencies or failures within thirty (30) business days following notification by the Capital Members, in addition to any other rights and remedies of the Capital Members contained herein, the Capital Members shall have the right, but not the obligation, to obtain the same by means of an audit by an independent certified public accountant selected by such Member and at such Member's expense. The Manager agrees to provide all

necessary information to said accountant and to otherwise cooperate in the making of such audit, and the Manager further agrees to pay, or to reimburse the Capital Members for, any expense of such audit if the results of the audit support the Capital Members' determination that the materials furnished by the Manager were materially inaccurate, fraudulent or not of commercially reasonable quality.

(e) Each Member, at its expense, may at all reasonable times during usual business hours, but in no event more than quarterly, audit, examine, and make copies of or extracts from the books of account records, files, and bank statements of the Company. In addition, each Member, at its expense, may at all reasonable times during usual business hours, but in no event more than annually, initiate an audit of the financial statements of the Company. Such right may be exercised by any Member, or by its designated agents or employees, subject to the imposition of commercially reasonable restrictions on such agents and employees with respect to confidential information.

Section 5.2 Bank Accounts. The Manager shall open and maintain (in the name of the Company) a special bank account or accounts in a bank or savings and loan association, the deposits of which are insured, up to the applicable limits, by an agency of the United States government, in which shall be deposited all funds of the Company. Withdrawals therefrom shall be made upon the signatures of such Persons as the Manager shall designate with the approval of the Members, including one Person designated by the Capital Members. The account signatories for each bank account of the Company are set forth opposite each such account as follows:

| Account | Account Signatories |
|---|---|
| Operating Account – Property | > Moshe Weingarten<br>> Eli Meisels<br>> Adam Fletcher |
| | |
| Security Deposit Account | > Moshe Weingarten<br>> Eli Meisels<br>> Adam Fletcher |
| | |
| Operating Account – Company | > Eli Meisels<br>> Moshe Weingarten<br>> Adam Fletcher |

Section 5.3 Capital Members Designee. As used herein, the "***Capital Members Designee***" means an individual designated by Capital Members in writing. The Capital Members Designee shall at all times be a manager, member or employee of a Capital Member or one of its Affiliates. Prior to a Changeover Event, the Capital Members Designee shall not take any action related to the bank accounts, including making withdrawals.

## ARTICLE VI - CAPITAL CONTRIBUTIONS

Section 6.1 Initial Capital Contributions. Subject to Section 15.24, the Members shall make their respective Initial Capital Contributions to the Company on the Effective Date, as set forth in Schedule I.

Section 6.2 Additional Capital Contributions. No Member shall have the obligation to make any Additional Capital Contribution to the Company. However, the Capital Members may request Additional Capital Contributions from time to time to (a) avoid a material decline in the value of the assets of the Company, as determined by the Capital Members in their reasonable good faith discretion, (b) pay Uncontrollable Expenses, and (c) avoid a default under the Senior Mortgage Loan.

Section 6.3 Intentionally Omitted.

Section 6.4 Failure to Make Additional Capital Contributions. In the event that the Capital Members requests Additional Capital from the Members, as permitted in Section 6.2, and the Operating Member does not make an Additional Capital Contribution of 100% of the required capital, then the Capital Members may make a Protective Capital Contribution in the amount of any deficiency. Such Protective Capital Contribution shall receive preference in the order of distributions from the Company, including a return on such investment, as set forth in this Agreement.

Section 6.5 Return of Contributions. Except as expressly provided in this Agreement, no Member shall be entitled to (a) the return of any part of its Capital Contributions, (b) any preferred return in respect of any Capital Contribution, or (c) the fair market value of its Membership Interest in connection with a withdrawal from the Company or otherwise. Except as expressly provided in this Agreement, unrepaid Capital Contributions shall not be a liability of the Company or of any Member. Except as expressly provided in this Agreement, no Member shall be required to contribute or lend any cash or property to the Company to enable the Company to return the Capital Contribution of any Member.

Section 6.6 Balances. The Company's books and records shall contain entries indicating the type and amount of Capital Contributions made to the Company, the type of return applicable to such Capital Contribution, and the Balances thereof.

## ARTICLE VII - DISTRIBUTIONS

Section 7.1 Distribution Policy. The Company may, subject to approval of the Manager, make distributions of cash or securities to the Members at any time and from time to time, in accordance with this Agreement.

Section 7.2 Distribution Priority. Notwithstanding the frequency or amount, the aggregate of Operating Revenues, Capital Proceeds, Capital Expenditure Reserve (if permitted), and Additional Capital Contributions ("**Property Proceeds**"), shall be used to pay, on a monthly basis the items described in (a) below and the Property Proceeds shall be used to pay on a monthly basis (except for special distributions required pursuant to paragraphs (d), (e) and (f) below, or in the event of a Capital Transaction in which case Capital Proceeds shall be paid simultaneous with closing of the Capital Transaction rather than monthly), the distributions described in paragraphs (b) through (i) in the following order:

(a) to fund (i) any tax or insurance payments (or escrows therefor required by the Senior Mortgage Loan Documents); (ii) Debt Service on the Senior Mortgage Loan; (iii) Operating Expenses of the Property; and (iv) any remaining reserves or escrows required under

the Senior Mortgage Loan Documents, all in the order set forth above unless a different order is required under the Senior Mortgage Loan Documents;

(b) to pay the Capital Members any Protective Capital Contribution Preferred Return;

(c) to return to the Capital Members any Protective Capital Contribution;

(d) to pay any other amounts then due and payable to the Capital Members and not otherwise specifically noted in this list of distributions (including without limitation the Required Redemption Amount on a Required Redemption Date);

(e) if there has been a Changeover Event, to pay the Capital Members until the Required Redemption Amount is paid in full;

(f) if there has been a Full Casualty Event, to pay the Capital Members until the Required Redemption Amount (exclusive of the Redemption Premium) is paid in full;

(g) to pay the Capital Members any Initial Capital Contribution Current Return; and

(h) all remaining Property Proceeds to the Operating Member.

All distributions to the Capital Members under this Section 7.2 shall be pari passu. Notwithstanding the foregoing or anything contained in this Agreement to the contrary, Manager may, in its sole discretion, (i) use Property Proceeds or accept capital contributions from Operating Member to pay the Capital Member an amount greater than the Initial Capital Contribution Current Return, to reduce Capital Member’s Protective Capital Contribution Balance, the Initial Capital Contribution Balance, the Initial Capital Contribution Preferred Return Balance and/or to pay any other amount payable to Capital Members or payable with respect to the Property; (ii) enter into (or have SPE enter into) a refinancing or sale transaction with respect to the Property that will result in a payment to Capital Member of the entire Required Redemption Amount.

Section 7.3 Distributions In Kind. In general, the Company will use its commercially reasonable efforts to liquidate investments rather than making distributions in kind. Prior to a distribution of property (other than cash and other than in complete liquidation of the Company or a Member's Interest), the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property (that has not previously been reflected in the Capital Accounts), would be allocated among the Members if there were a taxable disposition of the property on the date of distribution. If the distribution of property (other than cash) is to a Member in complete liquidation of the Member's Interest or in liquidation of the Company, prior to such distribution, the Capital Accounts of all the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in all the Company's property (that has not previously been reflected in the Capital Accounts) would be allocated among the Members if there was a taxable disposition of all such property on the date of the liquidating distribution.

Section 7.4 Senior Mortgage Loans. Notwithstanding the repayment or defeasance of the Senior Mortgage Loan, and for so long as a Capital Member remains a member of the Company, the provisions of the Senior Mortgage Loan Documents will continue to apply and remain in full force and effect with respect to the representations, warranties, covenants and reserve account requirements contained therein.

Section 7.5 Distributions Under the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Members on account of their interests in the Company if such distribution would violate Section 18-607 of the Act or any other applicable law.

## ARTICLE VIII - CHANGEOVER EVENTS; REMEDIES

Section 8.1 Changeover Events. The occurrence of any of the following events or circumstances shall constitute a Changeover Event; provided however, that notwithstanding anything to the contrary contained herein, any event, omission or circumstance listed below for which a cure period is otherwise expressly provided in this Agreement shall not constitute a Changeover Event until the expiration of such cure period.

(a) Failure to pay the Required Redemption Amount on or before a Required Redemption Date;

(b) The Company's failure to maintain required insurance;

(c) The Operating Member's, Sponsors', or Manager's: (i) fraud, intentional misrepresentation to the Capital Members, or gross negligence in the management of the Property or (ii) liquidation or dissolution;

(d) Sponsor's or Operating Member's material breach of a material representation made in connection with Capital Members' making the Capital Members' Initial Capital Contribution;

(e) The claim by the Senior Mortgage Lender of the occurrence of an Event of Default under the Senior Mortgage Loan Documents, together with the Senior Mortgage Lender's commencement of remedial action as a result of such claimed default unless such claimed default is being diligently contested in good faith and provided that neither the Property nor any interest therein would be in any danger of sale, loss, or forfeiture as a result of such proceeding or contest;

(f) The Company (A) files a petition in bankruptcy or (B) is the subject of an involuntary petition in bankruptcy which involuntary petition (i) is not dismissed within sixty (60) days after the effective filing date thereof, and (ii) is not caused by a Capital Member;

(g) Failure to pay the Capital Members the Initial Capital Contributions Current Return by the first (1st) day of each month (regardless of whether there is sufficient available cash); provided, however, that if payment is made within 30 days of when such Initial Capital Contributions Current Return is due then such failure to pay shall not constitute a Changeover Event, but during such period the Capital Members Preferred Return Rate shall increase in accordance with Section 8.3(c).

(h) Failure to cause the Company to cease engaging in an activity, as requested by the Capital Members, in violation of Section 14.3, which fails the income and asset tests as described in the REIT Covenants;

(i) Any other breach by the Operating Member of its obligations under this Agreement or the Senior Mortgage Loan Documents that is not cured within 30 days after written notice from the Capital Members or Senior Mortgage Lender (or, if such breach cannot be cured within 30

days, Operating Member fails to commence such cure within such 30 day period and to diligently prosecute the same to completion);

(j) The death, long-term disability, or adjudication as incompetent of all Sponsors or the failure at any time of one or more Sponsors to Control the Operating Member (each or any a "Loss of Sponsor"). Operating Member acknowledges that the individual talents of Sponsors are basic and essential to the success of the development and operation of the Company. Notwithstanding the foregoing, if within thirty (30) days of the Loss of Sponsor, the Operating Member proposes a substitute person to assume Control of the Operating Member, and such person is approved by Capital Members in its sole discretion, then the Changeover Event shall not be deemed to have occurred;

(k) Sponsor's (A) conviction of a felony which, in the reasonable judgment of the Capital Members would result in a Material Adverse Effect or (B) intentional misapplication of any funds derived from the Property, including without limiting the generality of the foregoing, security deposits, insurance proceeds and condemnation awards;

(l) Operating Member's failure to complete a redemption of Capital Members' interests hereunder in a timely fashion after becoming obligated to do so pursuant to Section 16.3; or

(m) The occurrence of: (1) a material breach or default under the loan documents between Capital Member and RRAIT Holding 1 LLC or between Capital Member and Dover Holding 1 LLC beyond any applicable notice and/or cure periods; or (2) a "Changeover Event" under the terms of the operating agreement for RRAIT Holding 1 LLC, Merchant's Holding 1 LLC, or Dover Holding 1 LLC (as such term is defined under said operating agreements).

Section 8.2 Acts or Failures of Manager. For so long as the Operating Member or any of its Affiliates is the Manager, the occurrence of any act by the Manager that would constitute a Changeover Event if such act was performed by the Operating Member (after giving effect to the applicable notice and cure period), shall constitute a Changeover Event.

Section 8.3 Remedies. Upon the occurrence of any Changeover Event, in addition to any other rights or remedies available to the Capital Members at law or in equity, the Capital Members shall be entitled to exercise any one or more of the following remedies:

(a) The Capital Members may require that the SPE replace the Property Manager with Maxus Properties, Inc. or a regionally recognized, reputable property management company (provided that in each case Capital Members shall be required to comply with the terms of the Senior Mortgage Loan Documents, including obtaining Lender consent, if required, and shall comply with the Replacement Guaranty Requirements as a condition to this remedy);

(b) The Capital Members may replace the Manager of the Company and the SPE with a person or entity selected by the Capital Members, provided that Capital Members shall be required to comply with the Replacement Guaranty Requirements as a condition to this remedy;

(c) The Capital Members Preferred Return Rate will be increased by 4.0%;

(d) Distributions shall be changed as set forth in paragraph 7.2(e);

(e) To exercise control of the Company, including without limitation the making of Major Decisions, without the joinder or consent of the Operating Member as set forth in Section 4.1 hereof (subject to Section 4.1(e)); and

(f) Reserved.

## ARTICLE IX - CAPITAL ACCOUNTS; ALLOCATIONS; TAX MATTERS

Section 9.1 Capital Accounts. The Company shall establish and maintain a capital account ("***Capital Account***") for each Member in accordance with Exhibit C.

Section 9.2 Allocation of Profit and Loss. Profit and loss for each Fiscal Year shall be allocated in accordance with Exhibit C.

Section 9.3 Tax Returns. The Manager shall cause to be prepared and filed all necessary federal and state (and any required local) income tax returns for the Company, including making the elections described in Section 9.4, and shall provide all of the Members with a copy of such returns promptly after filing. Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable such income tax returns to be prepared and filed. In the event of an audit of the Company's income tax returns, the Company shall retain accountants and other professionals to participate in such audit in order to contest assertions by the auditing agent that may be materially adverse to the Members.

Section 9.4 Tax Elections. The following elections shall be made on the appropriate returns of the Company:

(a) to adopt the calendar year as the Company's Fiscal Year;

(b) to adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

(c) if there is a distribution of Company property as described in Section 734 of the Code or if there is a transfer of a Company interest as described in Section 743 of the Code, upon written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties; and

(d) to elect to amortize the organizational expenses of the Company ratably over a period of 60 months as permitted by Section 709(b) of the Code.

No election shall be made by the Company or any Member to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state laws.

Section 9.5 Tax Representative. The Manager shall be the "partnership representative" of the Company pursuant to Section 6223(a) of the Code (each such roles, the "Tax Representative"). If any state or local tax law provides for a Tax Representative, partnership representative or person having similar rights, powers, authority or obligations, the Tax Representative shall also serve in such capacity. The Tax Representative shall inform the Board of Managers and each Member of all matters relating to taxes (including any tax audits or inquiries

and administrative and judicial proceedings) that may come to its attention in its capacity as Tax Representative by giving notice thereof within ten (10) days after becoming aware thereof and, within such time, shall forward to the Board of Managers and each Member copies of all significant written communications it may receive in such capacity. The Tax Representative shall not settle any tax matter or dispute without the prior written consent of the Board of Managers and the Operating Member. Notwithstanding anything to the contrary in this Agreement, each Member (including for purposes of this Section 9.5 any Person who is or becomes a Member but who for any reason ceases to be a Member) (i) hereby covenants to treat each item of income, gain, loss, deduction, or credit attributable to the Company in a manner consistent with the treatment of such income, gain, loss deduction, or credit on the tax return of the Company or as determined in a notice of final partnership adjustment pursuant to Section 6226 of the Code, (ii) hereby agrees to indemnify and hold harmless the Company from such Member's share of any tax and any penalties, interest and additions to tax attributable to any adjustment to the income, gain, loss, deduction, or credit of the Company pursuant to Section 6226 of the Code and (iii) hereby agrees to take all other actions as the Tax Representative may reasonably direct with respect to the Member's (or, in respect of the Member, the Company's) tax liabilities, including filing an amended return for any "reviewed year" to account for all adjustments under Section 6225(a) of the Code properly allocable to the Member as provided in and otherwise contemplated by Section 6225(c) of the Code and any Treasury Regulations that may be promulgated thereunder. The provisions of this Section 9.5 shall survive the termination or dissolution of the Company or the termination of any Member's interest in the Company, any transfer of a Member's interest in the Company or withdrawal as a Member and shall remain binding on the Member.

## ARTICLE X - WITHDRAWAL; DISSOLUTION; LIQUIDATION; TERMINATION

Section 10.1 Dissolution, Liquidation, and Termination Generally. The Company shall be dissolved upon the first to occur of any of the following:

(a) The sale or disposition of all of the assets of the Company and the receipt, in cash, of all consideration therefore;

(b) The determination of the Members to dissolve the Company; and

(c) The occurrence of any event which, as a matter of law, requires that the Company be dissolved.

Section 10.2 Liquidation and Termination. Upon dissolution of the Company, the Manager shall act as liquidating trustee or may appoint one or more other Persons as liquidating trustee, unless one or more other Persons are selected in writing by the Members to act as liquidating trustee. The liquidating trustee shall proceed diligently to wind up the affairs of the Company, sell its property and assets for cash at the highest price reasonably obtainable and make final distributions as provided herein. The costs of liquidation shall be a Company expense. Until final distribution, the liquidating trustee shall continue to operate the Company properties with all of the power and authority of the Manager hereunder. The steps to be accomplished by the liquidating trustee are as follows:

(a) as promptly as possible after dissolution and again after final liquidation, the liquidating trustee shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution shall occur or the final liquidation shall be completed, as applicable;

(b) the liquidating trustee shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidating trustee may reasonably determine); and

(c) after all Capital Account adjustments for the Company's taxable year in which the liquidation occurs (including without limitation adjustments required under Regulation Section 1.704-1(b)(2)(iv)(e), relating to distributions in kind), all remaining assets of the Company shall be distributed to the Members in accordance with Section 7.2.

In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs, and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act, subject to modifications provided in Section 7.2 of this Agreement.

Section 10.3 Deficit Capital Accounts. No Member shall be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

Section 10.4 Cancellation of Certificate. On completion of the liquidation and winding up of Company, the Manager (or such other person as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State for the State of Delaware, cancel any other filings made pursuant to Article IV, and take such other actions as may be necessary to terminate the existence of the Company.

Section 10.5 Dissolution Generally.

(a) Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to this Agreement, or (ii) the resignation of a Member and the admission of an additional Member of the Company pursuant to this Agreement), to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member of the Company.

(b) Notwithstanding any other provision of this Agreement, the Bankruptcy of a Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c) Notwithstanding any other provision of this Agreement, each Member and the Manager waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of a Member, or the occurrence of an event that causes a Member to cease to be a member of the Company.

## ARTICLE XI - PURCHASE OF MEMBERSHIP INTEREST

Section 11.1 General. This Article sets forth certain provisions that are applicable if a Member (the "***Acquiring Member***") or its assignee purchases all or a portion of the entire Membership Interest of the other Member in the Company (the "***Exiting Member***"). The date on which the Acquiring Member or its assignee acquires the Membership Interest of the Exiting Member is herein called the "***Acquisition Date***". For the avoidance of doubt, this Article is intended to govern a consensual acquisition of Membership Interests between the Members and does not constitute a buy/sell right or option.

Section 11.2 Assignment of Membership Interest. Concurrently with the payment of any purchase price agreed upon between the Acquiring Member and Exiting Member, the Exiting Member shall deliver or cause to be delivered to the Acquiring Member or its assignee (1) an assignment of its Membership Interest (or the portion thereof that is being transferred, as applicable), and (2) such evidence of the due authorization and execution of such assignment (including corporate resolutions, company authorizations or partner consents, as applicable) as the Acquiring Member or its assignee may reasonably request in connection therewith. Such assignment shall represent and warrant that the Exiting Member is the owner of such Membership Interest free and clear of any liens, encumbrances, claims and rights, and that it has the free and unrestricted right and power to sell and assign such interest to the Acquiring Member or its assignee. Except as set forth above, the Exiting Member shall not make any representations or warranties of any kind or nature, express, implied or otherwise, in connection with such sale.

Section 11.3 Transfer of Management. If the Manager is the Exiting Member or an Affiliate of the Existing Member, or if the Property Manager is an Affiliate of the Exiting Member, and if the Exiting Member is transferring all of its Membership Interest or is otherwise withdrawing from or being removed as the Manager, then the Exiting Member shall reasonably cooperate (and cause its Affiliates to reasonably cooperate) with the Acquiring Member in order to effect an orderly transition of management of the Property to the Acquiring Member or its designee and minimize any disruption to the ongoing operation of the Property.

Section 11.4 Release and Indemnity.

(a) Release. Where the sale of the Membership Interest of the Exiting Member is consummated and if such sale is of the entire Membership Interest of the Exiting Member, then the Exiting Member shall be released from any liability first arising under this Agreement after the consummation of such sale, except for any liabilities of such Exiting Member under Article X and Section 9.5 of this Agreement, which liabilities shall survive any transfer of such Interest or a liquidation of the Company.

(b) Indemnity. In addition, if the sale of the Membership Interest of the Exiting Member is consummated and if the sale is of the entire Membership Interest of the Exiting Member, and except for any liabilities of and related amounts owed to the Capital Members under

Article X of this Agreement, the Company shall and hereby does, to the greatest extent permitted by applicable law, indemnify, defend and hold harmless the Exiting Member for, from and against (i) any liability, damage, cost or expense (including reasonable attorneys' fees incurred in connection with the enforcement of the foregoing indemnity) arising out of or relating to any action or proceeding commenced by any third party relating to the Company, the Property or this Agreement, and which action is based on facts or circumstances first arising on or after the Acquisition Date, and (ii) any liability actually known to both Members prior to the date on which the price payable for the Membership Interest of the Exiting Member was determined in accordance with this Agreement to the extent such liability was taken into account in the determination of such price. Such indemnity shall survive the closing of the sale of the Membership Interest of the Exiting Member.

Section 11.5 Transfer Tax. Unless the Acquiring Member and the Exiting Member agree otherwise, any transfer tax or similar taxes arising out of or in connection with the sale and transfer of the Membership Interest (other than any tax based upon the net income of either Member) and all other closing costs of the sale and purchase of the Membership Interest (if any) shall be borne by the Exiting Member; provided, however, each of the Acquiring Member and the Exiting Member shall pay its own attorneys' fees and costs in connection with such sale.

Section 11.6 Assignment by Acquiring Member. The Acquiring Member shall have the right to assign its rights to acquire the Membership Interest of the Exiting Member to a third party, which may or may not be an Affiliate of the Acquiring Member.

## ARTICLE XII - PREFERENCES; REQUIRED PAYMENTS; REDEMPTION DATE; RESERVES; CASH MANAGEMENT

Section 12.1 Voluntary Redemption. If the Operating Member elects to (a) return the Capital Members' Initial Capital Contribution Balance as described in this Section 12.1 (whether prior to or following a Changeover Event, a "***Voluntary Redemption***", and which Voluntary Redemption must be accomplished in whole and not in part), or if (b) the Redemption Date occurs on or prior to Capital Members receiving total distributions under Section 7.2 equal to the Required Redemption Amount, then the Company shall distribute to the Capital Members, in addition to any other amounts then payable to the Capital Members pursuant to this Agreement, the Required Redemption Amount. The Operating Member may elect to do a Voluntary Redemption at any time, including after the occurrence of a Changeover Event.

Section 12.2 Redemption. Following the receipt by a Capital Member of the entire Required Redemption Amount, the Capital Member shall cease to be a member of the Company without any further act. Following such distribution, the Capital Member shall have no further rights, obligations or duties pursuant to this Agreement or otherwise with respect to the Company and agrees to execute an assignment and other documents reasonably requested by the Operating Member to memorialize the redemption.

Section 12.3 Capital Expenditure Reserve. A Capital Expenditure Reserve in the total amount shown in the Capital Budget shall be established on the Closing Date. The Capital Expenditure Reserve shall be held in a separate account for payment of capital improvements at the Property, as more particularly set forth in the Capital Budget, which such account shall provide that no withdrawal shall be permitted without Board of Managers approval. The

Members agree that as of the date of this Agreement, the current amount of the required Capital Expenditure Reserve is $500,000.

Section 12.4 Extension Option. The Operating Member may request up to two (2), six (6) month extensions from the Capital Member (each, an "Extension"), with notice given no later than 90 days before the second (2nd) anniversary of the Closing Date. Upon each granted extension, the capital member shall be entitled to and shall be paid a 1% fee payable by Company at the time the extension goes into effect. Capital Member shall be entitled to reject the request for an Extension unless Company has in place or will have in place at the time the applicable Extension will go into effect, a senior loan satisfactory to Capital Member, in its sole discretion. Without limiting the Capital Member's discretion, such senior loan shall carry a balance equal to or greater than the current Regions Bank senior loan with a debt service coverage ratio of at least 1.2x, using a denominator equal to the senior loan payments as well as the Capital Member's Initial Capital Contribution Current Return. Furthermore, such senior loan shall have preapproved Capital Member, and/or its Affiliates, as replacement property managers and replacement Manager.

Section 12.5 Tax Reserve. A Tax Reserve shall be established when deemed appropriate by the Manager and funded with deposits thereafter up to a maximum amount equal to Tax Amount. The Tax Reserve shall be held in an interest-bearing account for payment to Members. The Capital Members hereby consent to a disbursement in April of each year to each Member an amount equal to a pro-rata portion of the Tax Amount. Disbursements from the Tax Reserve for any cost not set forth in the Operating Budget shall be prohibited, unless consented to in writing by Capital Members. Funds from the Tax Reserve may also be used to fund the payments required under Sections 7.2(a) through 7.2(g). The Operating Member shall provide the Capital Members with written notice including supporting documentation with respect to any shortfall in net cash flow and the amount of funds to be withdrawn from the Tax Reserve. Any payment to the Capital Members pursuant to this Section shall be considered a payment to the Capital Members under Section 7.2 (i.e. payments to the Capital Members under this Section are not in addition to the payments required under Section 7.2).

## ARTICLE XIII - RECOURSE LIABILITIES

Section 13.1 Recourse Limited to Damage. The Sponsor, jointly and severally, shall indemnify the Capital Members for losses on the Capital Members' Investment and related damages actually incurred resulting from any of the following:

(a) If the Manager fails to comply with an approved budget, operating plan or other required protocol of this Agreement;

(b) Misappropriation or conversion by the Operating Member, Sponsor, or Manager (i.e., if the Operating Member or any of its Affiliates is the Manager) (or any affiliated asset manager or affiliated property manager) of rents, security deposits, insurance and condemnation awards or other proceeds;

(c) If the Manager fails to comply with the Major Decisions provisions of this Agreement or otherwise obtain Requisite Consent when required;

(d) If Capital Member reasonably determines any material representation or warranty made to the Capital Member by Operating Member, Sponsor, or Manager is materially false or misleading as of the date on which such representation or warranty was made;

(e) Environmental Matters;

(f) The Operating Member, Sponsor, or Manager is convicted of a felony; or

(g) A Sponsor dies, retires, is deemed incompetent or is replaced without the consent of the Capital Member.

Section 13.2 Full Recourse. In addition, upon the occurrence of any of the following the Sponsor, jointly and severally, shall become fully liable for the repayment of the Required Redemption Amount (and the Capital Members' Investment shall thereupon be redeemed):

(i) Fraud, or intentional misrepresentation with respect to a material matter, by the Operating Member, Sponsor, Manager (if Operating Member or any of its Affiliates is the Manager), or an Affiliate of any of the foregoing Persons;

(ii) The occurrence of a Bankruptcy Event. A "Bankruptcy Event" shall include any of the following that occurs without the consent or cooperation of the Capital Members: (i) The Company or Sponsor voluntarily files for bankruptcy under the Bankruptcy Code; (ii) Company or Sponsor voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights; (iii) The Property or any part of the Property becomes an asset in a voluntary bankruptcy or becomes subject to any voluntary reorganization, receivership, insolvency proceeding, or other similar voluntary proceeding pursuant to any other federal or state law affecting debtor and creditor rights; (iv) An order of relief is entered against Company or Sponsor pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by, or as a result of solicitation by, the Operating Member, Sponsor or any Affiliate thereof; (v) An involuntary bankruptcy or other involuntary insolvency proceeding is commenced against Company or Sponsor but only if Company or Sponsor has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in Company or Sponsor to contribute or cause the contribution of additional capital to Company or Sponsor;

(iii) Borrower (as such term is defined under the Senior Mortgage Loan Documents) commits a material default under the Senior Mortgage Loan Documents which default remains uncured beyond the applicable cure period and which, if left uncured, could cause the Senior Mortgage Loan to be accelerated;

(iv) The Manager commits gross negligence or willful misconduct;

(v) Manager fails to cause a distribution of amounts due and payable to Capital Member in accordance with this Agreement, provided there is available cash, after payment of debt service, reserves and all operating expenses, to make such distribution; or

(vi) Operating Member willfully or intentionally fails to cooperate with Capital

Members in connection with marketing of the Property pursuant to Article XVI, or Operating Member fails to perform any payment obligation under Article XVI after it serves a DTM Purchase Notice pursuant to Section 16.3; *provided, however*, that routine management and operational activities of the Operating Member (as opposed to actions taken or omitted to be taken specifically in connection with the marketing of the Property for sale) shall not be deemed any failure to cooperate with Capital Members under this subsection (vii) so long as such management and operational activities are consistent with the operation and management activities of prudent and diligent managers of multifamily properties similar to the Property and located in the same geographical area as the Property.

For so long as the Operating Member or any of its Affiliates is the Manager, the occurrence of any action or inaction by Manager, that if taken or not taken by Operating Member would have constituted a Sponsor indemnification obligation as described above, shall constitute an indemnification obligation of Sponsor pursuant to this Article.

Section 13.3 No Recourse. Notwithstanding anything in this Article XIII to the contrary, Sponsor shall have no liability if the event giving rise to the liability under this Article XIII was the result of the act or omission of a Capital Member, any member of the Board of Managers appointed by the Capital Members, any Manager or Property Manager appointed by the Capital Members following a Changeover Event, or any officer, director, employee, member, manager, owner, or representative of any of the foregoing.

## ARTICLE XIV - REIT COVENANTS

Section 14.1 The Capital Members will be provided with any information with respect to any investment, its operations, its income and its assets reasonably requested in writing by the Capital Members for the purposes of verifying whether the Investment's income and assets are treated as qualifying for purposes of the income and asset tests applicable to real estate investment trusts in Section 856(c) of the Code.

Section 14.2 The Manager will provide the Capital Members with a completed property services questionnaire prior to the funding of the investment. Additionally, a completed property services questionnaire will also be required on an annual basis and delivered no later than January 31st of each year. If, after providing the completed property services questionnaire to the Capital Members, the Manager (or any of its affiliates) plans to provide any additional service at the Property that is not listed or described on the most recently completed property services questionnaire, the Manager will notify the Capital Members in writing at least 30 days prior to the commencement of the provision of such service and will not provide such service if the Capital Members notifies the Manager that such service could reasonably be expected to cause the Investment to derive income that would not be qualifying income for the income tests applicable to real estate investment trusts in Section 856 of the Code.

Section 14.3 If the Capital Members otherwise notifies the Manager that the Company has recognized any income or acquired any assets that would cause the Company to fail to satisfy the income and asset tests applicable to real estate investment trusts in Section 856(c) of the Code, the Manager shall cause the Company to cease engaging in the activity that generates such income or dispose of such asset within 15 days of the receipt of written notice from the Capital Members.

## ARTICLE XV - MISCELLANEOUS PROVISIONS

Section 15.1 Notices. All notices, demands, requests or other communications that may be or are required to be given, served or sent by any party to another party pursuant to this Agreement shall be in writing and shall be mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or transmitted by hand delivery, telegram, facsimile transmission or electronic transmission addressed as set forth on the signature pages hereof. Each party may designate by notice in writing a new address to which any notice, demand, request or communication may thereafter be so given, served or sent. Each notice, demand, request or communication that is mailed, delivered or transmitted in the manner described above shall be deemed sufficiently given, served, sent and received for all purposes at such time as it is delivered to the addressee with the return receipt, the delivery receipt, the affidavit of messenger or (with respect to a facsimile or electronic transmission) the answer back being deemed conclusive evidence of such delivery or at such time as delivery is refused by the addressee upon presentation. Any notice provided to a member of the Board of Managers shall be given to the address of the Member that appointed such member of the Board of Managers.

Section 15.2 Approvals. All consents, approvals and other matters of similar import required pursuant to the terms of this Agreement shall be in effect only if in writing signed or sent by electronic transmission (*e.g.*, via email) by the party sought to be bound. Whenever the consent or approval of the Capital Members is required, such consent or approval shall be effective and binding on the Capital Members if given by the Capital Members that own more than fifty percent (50%) of the Capital Member Percentage Interest.

Section 15.3 Governing Law. This Agreement and the obligations of the Members hereunder shall be construed and enforced in accordance with the laws of the State of North Carolina, excluding any conflicts of law rule or principle which might refer such construction to the laws of another state or country. Each Member submits to the jurisdiction of the state and federal courts located in Hickory, North Carolina, which courts shall be entitled to enforce all awards granted.

Section 15.4 Entireties; Amendments. This Agreement and its exhibits constitute the entire agreement between the Members relative to the formation of the Company. This Agreement shall be amended only upon the written consent of all Members. Notwithstanding the forgoing, for so long as the Senior Mortgage Loan Documents are in place, this Agreement shall not be amended or modified in any manner, without the written consent of the Senior Mortgage Lender if such amendment or modification would violate the Senior Mortgage Loan Documents.

Section 15.5 Waiver. No consent or waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation hereunder. Failure on the part of any Member to complain of any act or to declare any other Member in default, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

Section 15.6 Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, and such invalidity

or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

Section 15.7 Ownership of Property and Right of Partition. A Member's interest in the Company shall be personal property for all purposes. No Member shall have any right to partition the property owned by the Company. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member and the Manager hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. No Member shall have any interest in any specific assets of the Company, and no Member shall have the status of a creditor with respect to any distribution pursuant to Article VII hereof.

Section 15.8 Captions, References and Construction. Pronouns, wherever used herein, and of whatever gender, shall include natural persons and corporations and associations of every kind and character, and the singular shall include the plural wherever and as often as may be appropriate. Article and section headings are for convenience of reference and shall not affect the construction or interpretation of this Agreement. Whenever the terms "hereof", "hereby", "herein", or words of similar import are used in this Agreement, they shall be construed as referring to this Agreement in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary. Whenever the word "including" is used herein, it shall be construed to mean including without limitation. Any reference to a particular "Article," "Section," "Schedules" or "Exhibit" herein shall be construed as referring to the indicated article, section or exhibit of this Agreement unless the context indicates to the contrary. Each party hereto acknowledges participating in the drafting of this Agreement and agrees that this Agreement shall not be construed more stringently against one party than the other.

Section 15.9 Involvement of Members in Certain Proceedings. Should any Member become involved in legal proceedings unrelated to the Company's business in which the Company is required to provide books, records, an accounting, or other information, then such Member shall indemnify the Company from all expenses incurred in conjunction therewith.

Section 15.10 Interest. No amount charged as interest on loans hereunder shall exceed the maximum rate from time to time allowed by applicable law.

Section 15.11 Counterparts. This Agreement may be executed in multiple counterparts, with signature pages signed by each party affixed to constitute a fully executed instrument.

Section 15.12 General Indemnification. The Operating Member shall indemnify, defend and hold harmless the Company and the Capital Members from any loss, claim, damage or liability relating to any brokerage commissions or finder's fees claimed by any broker or other party in connection with the transactions which are the subject of this Agreement, and any claim

arising out of any conduct of the Operating Member accruing prior to the date of this Agreement (excluding, however, any of the foregoing to the extent caused solely by the Capital Members).

Section 15.13 Publicity. Upon the acquisition of the Property, the Capital Members may issue press releases, advertisements and other promotional materials describing in general terms or in detail as to its participation in such transaction. All references to the Capital Members or its Affiliates in any press release, advertisement or promotional material issued by the Operating Member must be approved in advance of issuance by the Capital Members.

Section 15.14 Time of the Essence; Business Day. Time shall be of the essence as to all deadlines and time permits set forth in this Agreement. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or national bank holiday. Any time period provided for in this Agreement that expires on a Saturday, Sunday or national bank holiday shall extend to the next full business day. The term "business day" used in this Agreement shall mean any day other than a Saturday, Sunday or national bank holiday. The term "day" used in this Agreement shall mean any calendar day including a Saturday, Sunday or national bank holiday unless otherwise specified.

Section 15.15 Estoppel Certificate. Each Member agrees to give the other member or any proposed permitted transferee of such Member, on not less than ten (10) days' written request, a certificate, binding upon the issuing Member and its successors and assigns, stating (1) whether or not, to its then current knowledge, the transferring Member is then in default under this Agreement and whether an event has occurred which, with the passage of time or giving of notice or both, would constitute such a default (and stating with particularity the nature of any claimed defaults or potential defaults), and (2) that this Agreement is in full force and effect and has not been amended, or if amended, the date of each amendment.

Section 15.16 Right of Offset. Notwithstanding any other provision of this Agreement, in the event that a Member ("***Debtor Member***") or one of its Affiliates owes the Company or any other Member (the "***Creditor Member***") any sums, arising out of or related directly or indirectly to the matters which are the subject of this Agreement or Property, the Company or the Creditor Member, as the case may be, shall be entitled to withhold the distributions and payments that would otherwise be paid to such Debtor Member pursuant to this Agreement or any contractual arrangement with the Company and use the amount so withheld to pay to the Company or the Creditor Member, as appropriate, the sums owed to it by the Debtor Member or such Affiliate of the Debtor Member. For all purposes of this Agreement, any such amounts that are so withheld from the distributions or payments to be made to the Debtor Member under this Agreement shall be deemed to have been distributed or paid to the Debtor Member and then paid by such Debtor Member or its Affiliate to the Company or the Creditor Member, as appropriate. To the extent applicable, each Member hereby waives any all defenses of a guarantor, surety and accommodation maker, to the fullest extent possible, to the extent such defenses pertain to the exercise by the Company or any other Member of the offset rights set forth in this Section 15.16.

Section 15.17 Waiver of Certain Defenses. THE PARTIES HERETO ACKNOWLEDGE THAT THEY WERE REPRESENTED BY COMPETENT COUNSEL IN

CONNECTION WITH THE NEGOTIATION, DRAFTING AND EXECUTION OF THIS AGREEMENT. THE CAPITAL MEMBERS SHALL NOT BE SUBJECT TO ANY LIMITATION WHATSOEVER IN THE EXERCISE OF ANY RIGHTS OR REMEDIES AVAILABLE TO IT UNDER THIS AGREEMENT OR UNDER ANY OTHER DOCUMENTS EVIDENCING OR RELATING TO THE EQUITY INVESTMENT DESCRIBED HEREIN BY VIRTUE OF THE EXTENSION OF A MORTGAGE LOAN SECURED BY THE PROPERTY BY IT, OR ANY PARENT, SUBSIDIARY, OR AFFILIATE OF THE CAPITAL MEMBERS, AND THE OPERATING MEMBER HEREBY IRREVOCABLY WAIVES THE RIGHT TO RAISE ANY DEFENSE OR TAKE ANY ACTION ON THE BASIS OF THE FOREGOING WITH RESPECT TO THE CAPITAL MEMBERS' EXERCISE OF ANY SUCH RIGHTS OR REMEDIES.

Section 15.18 Waiver of Jury Trial. SUBJECT TO SECTION 15.19, EACH PARTY HERETO, TO THE FULLEST EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE PROPERTY OR ANY CONDUCT, ACT OR OMISSION OF ANY PARTY HERETO, OR ANY RESPECTIVE DIRECTOR, OFFICER, PARTNER, MEMBER, EMPLOYEE, AGENT OR ATTORNEY, OR ANY OTHER PERSONS AFFILIATED WITH SUCH PARTY, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Section 15.19 Alternate Dispute Resolution. If a dispute, controversy or claim (whether based upon contract, tort, statute, common law or otherwise) (collectively a "***Dispute***") arises from or relates directly or indirectly to the subject matter hereof, and if the Dispute cannot be settled through direct discussions, the parties shall first endeavor to resolve the Dispute by participating in a mediation administered by the American Arbitration Association (the "***AAA***") under its Commercial Mediation Rules before resorting to arbitration. Thereafter, any unresolved Dispute shall be settled by binding arbitration administered by the AAA in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator, after the review rights set forth below have been exhausted, may be entered in any court having jurisdiction. The arbitration proceedings shall be conducted in Hickory, North Carolina on an expedited basis before a neutral arbitrator (or multiple arbitrators if called for by the Commercial Arbitration Rules). Each arbitrator shall be an attorney with excellent academic and professional credentials, who (i) is a member of the Bar of any state in the United States, (ii) has been actively engaged in the practice of law for at least ten (10) years, and (iii) specializes in commercial transactions, with substantial experience in the subject matter of this Agreement. Any attorney who serves as an arbitrator shall be compensated at a rate equal to his or her current regular hourly billing rate. Upon the request of either party, the arbitrator's award shall include findings of fact and conclusions of law provided that such findings may be in summary form. Either party may seek review of the arbitrator's award before an arbitration review panel comprised of three (3) arbitrators qualified in the same manner as the initial arbitrator(s) (as set forth above) by submitting a written request to the AAA. The right of review shall be deemed waived unless requested in writing within ten (10) days of the receipt of the initial arbitrator's award. The arbitration review panel shall be entitled to review all findings of fact and conclusions of law in whatever manner it deems appropriate and may modify the award of the initial arbitrator(s) in its

discretion. The prevailing party in any arbitration proceeding shall be entitled to an award of all reasonable out-of-pocket costs and expenses (including attorneys' and arbitrators' fees) related to the entire arbitration proceeding (including review if applicable). Upon request of either party, the arbitrator(s) may require that the subject arbitration proceedings be kept confidential and no party shall disclose or permit the disclosure of any information produced or disclosed in the arbitration proceedings until the award is final. A party shall not be prevented from seeking temporary injunctive relief before a court of competent jurisdiction in an emergency situation, but responsibility for resolution of the Dispute shall be appropriately transferred to the arbitrator(s) upon appointment in accordance with the provisions hereof.

Section 15.20 SPE Provisions. The Company and its Members (to the extent governed thereby) shall comply, and shall cause the SPE to comply, with the SPE requirements set forth in Section 5.22 of the Senior Mortgage Loan Documents. In the event that the Senior Mortgage Loan is satisfied, the Company and its Members shall continue to comply with such SPE requirements until Capital Members is no longer a Member of the Company. Any action taken by the Operating Member or any Affiliate thereof on behalf of the SPE, which if taken by the Operating Member or Manager hereunder would constitute a Changeover Event, recourse event under Sections 13.1 or 13.2 hereof, or otherwise constitute a breach hereunder shall also constitute a Changeover Event, recourse event, or breach hereunder, as the case may be, and shall entitle the Capital Members to exercise its remedies therefor.

Section 15.21 Third Parties. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member. Nothing in this Agreement shall be deemed to create any right in any Person not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person.

Section 15.22 Casualty and Condemnation. In a case where a Lender exercises its right to apply proceeds from a casualty or condemnation event (a "Full Casualty Event") to pay down principal of the Senior Mortgage Loan, any excess proceeds from that event will be used to pay to the Capital Members the Required Redemption Amount exclusive of the Redemption Premium. In cases where the Lender allows the Company to apply casualty insurance proceeds to restore the Property subject to an approval/draw (or similar) process, Operating Member will obtain Capital Members' approval (not to be unreasonably withheld or delayed) for any plans, specifications, construction contracts, and draw requests in a manner that does not unreasonably burden or impede Operating Member's actions to restore the Property.

Section 15.23 Expenses. Sponsor shall pay Capital Members and its Affiliates, upon demand and whether or not the Capital Members' Initial Capital Contribution occurs, all out-of-pocket expenses and fees (including reasonable attorneys' fees) incurred by Capital Members and/or its Affiliates in connection with the matters and transactions contemplated hereby to the extent such expenses and fees exceed any deposit previously paid by Operating Member.

Section 15.24 Material Adverse Change. In addition to any other conditions set forth herein, Capital Members' obligation to make the Capital Members' Initial Capital Contribution is dependent upon the absence of any of the following: (a) failure of SPE to acquire the Property; (b) any materially adverse change in the condition, financial or otherwise, of the

Property between the Effective Date and the Closing Date; (c) any spill or release of hazardous materials at the Property after the effective date of the Property's final Phase I environmental assessment shall have occurred that is material and has not been fully remediated in accordance with all applicable laws to the Capital Member's reasonable satisfaction; (d) any material violation of any laws, ordinances, orders, restrictions, regulations or requirements applicable with respect to the Property, or the use thereof and first arises after the Effective Date, unless such violation is corrected on or before the Closing Date; (e) any unresolved title objections regarding the Property; (d) any development occurring which could, in Capital Members' sole and absolute opinion, materially and adversely affect the transactions contemplated hereby, including, without limitation, any development in the financial condition or prospects of the Property, Operating Member, Sponsor, or in the economy or capital markets. Capital Members agrees to use best efforts to inform the Sponsor immediately upon its identification of the existence of any of the conditions identified in this Section 15.24. Sponsor agrees to use best efforts to inform the Capital Members immediately upon its identification of the existence of any of the conditions identified in this Section.

## ARTICLE XVI - DRAG TO MARKET

Section 16.1 Capital Members' Right to Market. At any time following the second anniversary of the Closing Date, the Capital Members may elect to cause the Company to sell all or substantially all of the Property. The Capital Members shall give written notice (the **"DTM Notice"**) to the Operating Member of the Capital Members' desire to pursue such a sale. The Capital Members' right to market the property shall be conditioned upon there not being in existence any offer or proposal to purchase the property from any third party at the time the DTM Notice is given.

Section 16.2 Operating Member's Rights upon service of DTM Notice. Capital Members shall not commence marketing of the Property (including that Capital Members shall not commit the Company to any listing agreement) until the earlier of (i) the thirtieth (30th) day after Capital Members' service of the DTM Notice, or (ii) the date upon which Operating Member advises Capital Members in writing that Operating Member permits the Company to proceed to a third party sale (the **"DTM Sale Notice"**). Within such thirty- (30-) day period, the Operating Member, at its option, may advise the Capital Members in writing that Operating Member agrees to pay the Capital Members its Required Redemption Amount (the **"DTM Purchase Notice"**).

Section 16.3 DTM Purchase. If the Operating Member serves its DTM Purchase Notice, then the Operating Member shall become obligated to pay the Capital Members its Required Redemption Amount in accordance with the procedures set out in Section 12.1, and shall complete such redemption within ninety (90) days. Operating Member's failure to timely complete any such redemption after serving a DTM Purchase Notice shall be a material default hereunder and shall constitute a Changeover Event. Capital Members and the Operating Member shall close the sale at a time, place and date mutually agreeable to the Capital Members and the Operating Member within the sixty (60) day period referred to above.

Section 16.4 No DTM Purchase. If the Operating Member serves a DTM Sale Notice within the thirty day period referred to in Section 16.2, or if Operating Member serves neither a DTM Purchase Notice nor a DTM Sale Notice within such thirty (30) day period, then

the Capital Members shall be entitled to and is hereby vested with all power and authority (including a power of attorney, coupled with an interest) to cause the Company to sell the Property for cash to any third party at commercially reasonable terms. In any such transaction, the proceeds will be paid first to the Capital Members up to its Required Redemption Amount plus any other amounts owed to Capital Member under this Agreement and the balance to the Operating Member in accordance with Section 7.2(h).

[The remainder of this page is intentionally left blank.]

**SIGNATURE PAGE TO**
**LIMITED LIABILITY COMPANY AGREEMENT**

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be signed as of the date first above written.

**MANAGER:**

By: Hawks PVO LLC
a Delaware limited liability company

By:______________________________
Name: Moshe Weingarten
Title: Authorized Signatory

Notice Address:

c/o Valor Residential Group LLC
3 Alpine Court
Suite 200
Chestnut Ridge, NY 10977 Attention: Moshe Weingarten
Email: max@valorresidential.com

With a copy to:

Lubin Law Group LLC
9 Belvedere Lane, Suite 101
Lakewood, NJ 08701
Attention: Michael E. Lubin, Esq.
Email: mlubin@mlubinlaw.com

**OPERATING MEMBER:**

**HAWKS PVO LLC,**
a Delaware limited liability company

By:________________________________
Name: Moshe Weingarten
Title: Authorized Signatory

Notice Address:

Hawks PVO LLC
c/o Valor Residential Group LLC
3 Alpine Court
Suite 200
Chestnut Ridge, NY 10977 Attention: Moshe Weingarten
Email: max@valorresidential.com __________________

with a copy to:

Lubin Law Group LLC
9 Belvedere Lane, Suite 101
Lakewood, NJ 08701
Attention: Michael E. Lubin, Esq.
Email: mlubin@mlubinlaw.com

**CAPITAL MEMBERS:**

**MAXMEZ NC, LLC**

By:__________________________________
Name: Adam Fletcher
Title: Manager

Notice Address:

MaxMez NC, LLC
104 Armour Rd
N Kansas City, Missouri 64116
Attention: Adam Fletcher
E-Mail: afletcher@maxusprop.com

**SPONSORS:**

Each of the following individuals, acting in their capacity as Sponsor, hereby acknowledges its agreement to be bound by the provisions set forth in Article XIII of this Agreement, as of the date first above written.

________________________________
Moshe (a/k/a Max) Weingarten

Notice Address of Sponsor:

____________________

____________________

________________________________
Eli Meisels

Notice Address of Sponsor:

____________________

____________________

**Schedule I**
**Schedule of Members and Membership Interest**

| *Members* | *Initial Capital Contribution* | *Operating Member Percentage Interests* | *Capital Member Percentage Interests* |
|---|---|---|---|
| *Hawks PVO LLC* | *$__________* | *100.000%* | *0.000%* |
| *MaxMez NC, LLC* | *$2,341,572.92* | *0.000%* | *100.000%* |
| *Total* | *$___________* | *100.000%* | *100.000%* |

**EXHIBIT A**

Land Description

# EXHIBIT B

Reporting Requirements

## I. Monthly Reporting

Manager shall prepare and deliver to the Members within ten (10) days after the end of each month (in Excel format, wherever possible and applicable):

(i) Budget Comparison[1], monthly and YTD
(ii) Rent Roll, as of the last day of the month
(iii) Market Survey
(iv) Income Statements, including trailing 12 months and YTD
(v) Cash Flow Statements, monthly and YTD
(vi) Balance Sheet, including monthly comparison
(vii) Check Register
(viii) Security Deposit Activity
(ix) Bank Statements and Reconciliations
(x) Reserve Accounts Summary, including evidence of withdrawals from reserve accounts
(xi) Base Management Fee Calculation
(xii) Asset Management Fee Calculation
(xiii) Distribution Calculation

(1) Budget comparison shall include: (i) a comparison of monthly line item actual income and expenses with the monthly line item income and expenses projected in the Operating Budget; and (ii) a comparison of the actual line item capital expenditures with the line item capital expenditures projected in the Capital Budget.

## II. Quarterly Reporting

Manager shall prepare and deliver to the Members within ten (10) days after the end of each quarter (in Excel format, wherever possible and applicable):

(i) Trial Balance, including mapping of the accounts to the financial statements
(ii) General Ledger, with description and balance detail
(iii) Payable Aging Summary
(iv) Receivable Aging Summary
(v) Prepaids and Accruals (for partners using Cash Basis)
(vi) Fixed Asset Additions and Depreciation Schedule
(vii) Bank Statements and Reconciliations
(viii) Senior Mortgage Loan Statement

## III. Periodic Reporting

1. Insurance, pursuant to Section 3.7(b) hereof
2. Real Estate Tax Bills, pursuant to Section 3.7(c) hereof
3. Capital Budget, pursuant to Section 4.2 hereof
4. Operating Budget, pursuant to Section 4.3 hereof
5. Tax Returns, pursuant to Section 9.3 hereof
6. Annual Property Services Survey, pursuant to Section 14.2 hereof

## IV. Additional Requirements

Manager shall furnish such information as requested by the Capital Members with respect to the Property, Company or Sponsor, as is necessary for the Capital Members to determine its qualification as a REIT pursuant to Article XIV and its compliance with any other requirements for qualifying as a REIT. Manager shall cooperate in a reasonable manner at the request of the Capital Members to work in good faith with any designated accountants or auditors of the Capital Members or its Affiliates so that the Capital Members or its Affiliate is able to comply with its public reporting, attestation, certification and other requirements under the Securities Exchange Act of 1934, as amended, applicable to such entity, and to work in good faith with the designated accountants or auditors of the Capital Members or any of its Affiliates for purposes of testing internal controls and procedures of the Capital Members or its Affiliates.

# EXHIBIT C

## Capital Accounts and Tax Allocations

**I. Allocation Definitions.** Capitalized terms and phrases used in this Exhibit C have the following meanings:

"***Adjusted Capital Account Deficit***" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences in Regulations sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) debit to such Capital Account the items described in Regulations sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"***Company Minimum Gain***" has the meaning as the term "partnership minimum gain" set forth in Regulations section 1.704-2(b)(2) and 1.704-2(d).

"***Depreciation***" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"***Full Capital Event***" means the sale or similar transaction of or involving the Property (including a full condemnation or full casualty loss), liquidation of the Company, or redemption of the Capital Members.

"***Gross Asset Value***" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value (taking Code section 7701(g) into account) of such asset on the date of contribution, as determined by the Manager;

(ii) the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values as determined by the Manager as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution or in exchange for the performance of services to or for the benefit of the Company; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; and (C) the liquidation of the Company within the meaning of Regulations section 1.704-1(b)(2)(ii)(g), provided that an adjustment described in clauses (A) and (B) of this paragraph shall be made only if the Manager reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii) the Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code section 7701(g) into account) of such asset on the date of distribution as determined by the Manager; and

(iv) the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code section 734(b) or Code section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

*"**Member Nonrecourse Debt**"* has the same meaning as the term "partner nonrecourse debt" in Regulations section 1.704-2(b)(4).

*"**Member Nonrecourse Debt Minimum Gain**"* means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations section 1.704-2(i)(3).

*"**Member Nonrecourse Deductions**"* has the same meaning as the term "partner nonrecourse deductions" in Regulations sections 1.704-2(i)(1) and 1.704-2(i)(2).

*"**Nonrecourse Deductions**"* has the meaning set forth in Regulations section 1.704 2(b)(1).

*"**Nonrecourse Liability**"* has the meaning set forth in Regulations section 1.704-2(b)(3).

*"**Preferred Distributions**"* means the total distribution received by the Capital Members of Initial Capital Contribution Current Return, Initial Capital Contribution Preferred Return, Protective Capital Contribution Preferred Return, and/or Redemption Premium.

*"**Profits**"* and *"**Losses**"* means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for the Fiscal Year, determined in accordance with Code Section 703(a)

(for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition will be added to the taxable income or loss;

(ii) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition will be subtracted from the taxable income or loss;

(iii) In the event the Gross Asset Value of any Company asset is adjusted pursuant to (ii) or (iii) of the definition of Gross Asset Value, the amount of the adjustment will be treated as an item of gain (if the adjustment increases the Gross Asset Value of the Company asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the Company asset) from the disposition of the item and will be taken into account for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income purposes will be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation for the Fiscal Year, computed in accordance with the definition of Depreciation;

(vi) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member’s interest in the Company, the amount of the adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) from the disposition of a Company asset and will be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provisions of this definition, any items that are specially allocated pursuant to Section IV hereof will not be taken into account in computing Profits or Losses. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section IV of this Exhibit C will be determined by applying rules analogous to those set forth in clauses (i) through (vi) above.

*“**Unallocated Preferred Distributions**”* means the Preferred Distributions less all amounts previously allocated under Section III(a)(iv).

**II. Capital Accounts.** The Company shall maintain a separate Capital Account for each Member. Each Member’s Capital Account shall be maintained in accordance Section 704(b)

and Regulations Section 1.704-1(b)(2)(iv). The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including without limitation debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Members) are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations section 1.704-1(b).

**III. Profits and Losses.** After giving effect to the special allocations set forth in Sections IV and V of this Exhibit C, Profits and Losses for any Fiscal Year shall be allocated to the to the Members in accordance with the following:

(a) Profit shall be allocated to the Members in the following order of priority:

(i) To the extent Losses have been allocated pursuant to Section III(b)(iii) and not previously offset by allocations pursuant to this Section III(a)(i), to the Members to whom such Losses have been allocated in the same ratio, in reverse order, and to the extent of such allocations of Loss pursuant to Section III(b)(iii) until the allocations pursuant to this Section III(a)(i) fully offset such losses;

(ii) To the extent Losses have been allocated pursuant to Section III(b)(ii) and not previously offset by allocations pursuant to this Section III(a)(ii), to the Members to whom such Losses have been allocated in the same ratio, in reverse order, and to the extent of such allocations of loss pursuant to Section III(b)(ii) until the allocations pursuant to this Section III(a)(ii) fully offset such Losses;

(iii) To the extent Losses have been allocated pursuant to Section III(b)(i) and not previously offset by allocations pursuant to this Section III(a)(iii), to the Members to whom such Losses have been allocated in the same ratio, in reverse order, and to the extent of such allocations of Loss pursuant to Section III(b)(i) until the allocations pursuant to this Section III(a)(iii) fully offset such Losses;

(iv) To the Capital Members in an amount equal to the Unallocated Preferred Distributions; and

(v) To the Operating Member.

(b) Losses shall be allocated to the Members in the following order of priority:

(i) To the Operating Member, until the Operating Member's Capital Account has been reduced to zero;

(ii) To the Capital Members, prorata in accordance with their Capital Accounts, until the Capital Members' Capital Accounts have been reduced to zero; and

(iii) To the Operating Members.

**IV. Special Allocations.** The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Regulations section 1.704-2(f), notwithstanding any other provision of this Exhibit C, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations sections 1.704-2(f)(6) and 1.704-2(j)(2). This subparagraph (a) is intended to comply with the minimum gain chargeback requirement in Regulations section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Except as otherwise provided in Regulations section 1.704-2(i)(4), notwithstanding any other provision of this Exhibit C, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such allocation Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Regulations section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations sections 1.704-2(i)(4) and 1.704-2(j)(2). This subparagraph (b) is intended to comply with the minimum gain chargeback requirement in Regulations section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this subparagraph (c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Exhibit C have been tentatively made as if this subparagraph (c) were not in the Agreement.

(d) Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Member

is deemed obligated to restore pursuant to the penultimate sentences of Regulations sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this subparagraph (d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Exhibit C have been made as if subparagraph (c) above and this subparagraph (d) were not in the Agreement.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Operating Members.

(f) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations section 1.704-2(i)(1).

(g) Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code section 734(b) or Code section 743(b) is required, pursuant to Regulations section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations section 1.704-1(b)(2)(iv)(m)(4) applies.

**V. Curative Allocations.** The allocations set forth in Sections IV(a) through IV(g) of this Exhibit C (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section V. Therefore, notwithstanding any other provision of this Exhibit C (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections III, and IV(a) of this Exhibit C.

**VI. Other Allocation Rules.**

(a) Profits, Losses, and any other items of income, gain, loss, or deduction will be allocated to the Members pursuant to this Exhibit C as of the last day of each taxable year; provided, that Profits, Losses, and such other items will also be allocated at such times as the Gross Asset Values of any Company assets are adjusted pursuant to clause (ii) of the definition of "Gross Asset Value."

(b) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any other items will be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(c) The Members are aware of the income tax consequences of the allocations made pursuant to the provisions of this Exhibit C and hereby agree to be bound by the provisions of this Exhibit C in reporting their shares of Company income and loss for income tax purposes.

(d) The "excess nonrecourse liabilities" of the Company (within the meaning of Regulations Section 1.752-3(a)(3)) shall be allocated among the Members in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated.

(e) As between a Member who has transferred all or part of his or her Membership Interest and his or her transferee, all items of income, gain, deduction and loss, for any year shall be apportioned on the basis of the number of days in each such year that each was the holder of such interest (making any adjustments necessary to comply with the provisions of Section 706(d)(2) of the Code), without regard to the results of the Company's operations during the period before and after the date of such transfer, provided that if both the transferor and transferee consent thereto a special closing of the books shall be had as of the effective date of such transfer and the apportionment of items of income and gain, and deduction and loss, shall be made on the basis of actual operating results.

**VII. Tax Allocations: Code Section 704(c).** In accordance with Code section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) of the definition of Gross Asset Value). In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Manager. Allocations pursuant to this Section VII are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

# **EXHIBIT D**

Operating Budget

EXHIBIT E

Capital Budget

# EXHIBIT G

Intervenor Order

STATE OF NORTH CAROLINA

CATAWBA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CVS000955-170

DOVER SUB 1 LLC; RRAIT SUB 1 LLC; MERCHANT'S SUB 1 LLC; and HAWKS LANDING OWNER, LLC,

Plaintiffs,

v.

HAWKS NOTE PURCHASE, LLC,

Defendant.

MAXMEZ NC, LLC,

Intervenor-Plaintiff,

and

MERCHANT'S WALK APARTMENTS, LLC and HAWKS PVO LLC,

Intervention-Defendants,

and

HAWKS PVO HOLDING LLC and MERCHANT'S HOLDING 1 LLC,

Nominal Defendants.

**ORDER DENYING EMERGENCY MOTION TO INTERVENE AND STAYING THE LITIGATION**

1. **THIS MATTER** is before the Court following the 27 October 2025 filing of the *Emergency Motion to Intervene* (the Motion). (ECF No. 6 [Mot.].)

## I. PROCEDURAL BACKGROUND

2. The Motion requests that the Court enter an order allowing Potential Intervenor MaxMez NC LLC (MaxMez) to intervene as Plaintiffs and to file their Intervenor Complaint in the above-captioned case. (Mot. 16). In subsequent rounds of briefing, MaxMez has detailed three bases for its contention that it should be

allowed to intervene as Plaintiffs in the present action: (1) that various "Changeover Events" (the Changeover Events) under the relevant LLC Agreements have occurred, which events give MaxMez the right, as the Capital Member of various Plaintiff entities (the Plaintiff Entities), to step in as manager of said entities, which right MaxMez has exercised; (2) that MaxMez is now the manager of the Plaintiff Entities under the Tenancy In Common Agreement (the TIC Agreement) between said entities; and (3) that, under the relevant LLC Agreements, MaxMez's consent was needed to start litigation, which consent was neither sought nor granted. (MaxMez NC, LLC's Post-Hearing Br. Reg. the Jt. Rec. Supp. and Res Judicata Issues 2–3, ECF No. 144 [MaxMez Post-Hearing Brief].)

3. After a round of briefing, the Court held a hearing to discuss the Motion on 14 January 2026. (*See* ECF No. 115.)

4. Throughout the briefing and hearing process, Plaintiffs raised several objections to the requested relief including that said relief had already been ruled on at an arbitration between these parties and was thus barred, that the request to intervene was untimely, and that the request should have been made at arbitration. (Pl.'s Resp. in Opp. to Non-Party MaxMez, NC, LLC's Mot. to Intervene 15 – 23, ECF No. 110 [Pl.'s Resp.].)

5. At the 14 January Hearing, the issue of whether the relief requested by MaxMez was barred by the *res judicata* effects of prior arbitration awards in the

current dispute was prevalent. In order to gain clarity on the *res judicata* effects of the prior arbitration awards, the Court instructed the parties to supplement the record with several arbitration-related filings.

6. In connection with the newly-filed materials, the Court allowed the parties to file new briefing on the *res judicata* issues. (*See* Ord. Granting MaxMez NC, LLC's Mot. for Leave to File Post-Hearing Brs., ECF No. 137.)

7. In the second round of briefing, Plaintiffs further detailed their contention that the relief requested was already ruled on at arbitration and that therefore, said relief could no longer be sought. (Pl.'s Post-Hearing Br. Reg. Supp. Rec. and Res Judicata 5–13, ECF No. 148 [Pl.'s Post-Hearing Brief].) Defendants, for their part argued that the issue of forward-facing control of the Plaintiff Entities had not actually been reached at arbitration and that, in any case, the issue of whether control had been transferred by virtue of the TIC Agreement or because MaxMez had not been consulted on the "Major Decision" of starting this litigation had never been addressed. (MaxMez Post-Hearing Brief 6–10, 11.)

8. After a second round of briefing related to the *res judicata* issues, the Court then held a second hearing on the Motion on 1 May 2026. (*See* ECF No. 153.)

9. The Motion is now ripe for resolution.

## II. ANALYSIS

10. After considering the briefing and all arguments made at hearing on the present matter, the Court finds that the Motion should be denied. More Specifically, the Court finds that each source of relief requested presents an issue that should be

decided at arbitration. In this section, the Court will therefore walk through each source of relief requested and explain why the proper venue for the resolution of the presented issues is at arbitration and not before this Court.

**a. Control through the "Changeover Events" Provision of the LLC Agreements**

11. First, the Court notes that it is skeptical of MaxMez's contention that the issue of whether it controls the Plaintiff Entities by virtue of the occurrence of select Changeover Events as detailed in the LLC Agreements was not decided at arbitration. First, as noted in the Interim Arbitration Award, MaxMez, in its prehearing brief, requested that the Arbitrator confirm MaxMez's control of Plaintiff Entities because of the Changeover Events that had occurred. (Oct. 20, 2025, AAA Interim Award 14, ECF No. 111, Ex. G [Oct. 20, 2025 Award].) Second, the Arbitrator addressed the issue of control through Changeover Events by stating that he "denies Claimant's request." (Oct. 20, 2025 Award 14.) If this explicit denial of the relief requested by way of Changeover Events were not enough, the arbitrator went on to explicitly deny all relief "not expressly granted" in the Interim Arbitration Award. (Oct. 20, 2025 Award 17.) Thus, it appears to the Court that the issue was before at the arbitrator and that he explicitly denied the requested relief. The arbitrator's decision to deny the requested relief is significant, because arbitral awards are typically binding on courts. *See Rodgers Builders, Inc. v. McQueen,* 76 N.C. App. 16, 22 (1985) (stating that arbitration awards can only be vacated on very limited grounds.). It therefore seems likely to the Court that it cannot properly grant control to MaxMez by virtue of the Changeover Events because a binding decision on that

issue between these parties has already been made. The Court further notes that the arbitration agreement between the parties provided for the right of appeal from a decision of the arbitrator to an appellate panel, a right exercised by MaxMez's opponents. (*See* Appellate Opinion and Interim Award, ECF No. 152.2.)

12. Additionally, though MaxMez, asserts that, even if the arbitrator did deny their request to be made the managers of Plaintiff Entities at arbitration, there have since been intervening events that warrant reconsideration of that decision, (MaxMez Post-Hearing Brief 11), the Court does not find good cause to grant control to MaxMez on that basis. The Court does not agree with MaxMez's contention that MaxMez's actions in declaring itself the manager of the relevant Plaintiff Entities amounts to a change of the underlying circumstances upon which the arbitrator's award was based. (MaxMez Post-Hearing Brief 11). It would be improper to allow MaxMez to essentially negate an arbitral award by acting unilaterally to change the underlying facts upon which that award was based. If it were otherwise, litigants at arbitration could invalidate arbitral awards that prejudice them on a whim, thus jeopardizing the finality that parties to any arbitration count on from binding arbitral awards.

13. Furthermore, even if Maxmez is correct that the arbitrator did not already rule on the issue of control through Changeover Events, this Court is still an improper venue at which to raise the issue. Raising this issue before the Court is improper because the same LLC Agreements that give MaxMez a right to manage the Plaintiff Entities when Changeover Events occur also contain an Arbitration Provision which states in relevant part:

> If a dispute, controversy or claim (whether based upon contract, tort, statute, common law or otherwise) (collectively a "Dispute") arises from or relates directly or indirectly to the subject matter hereof, and if the Dispute cannot be settled through direct discussions, the parties shall first endeavor to resolve the Dispute by participating in a mediation administered by the American Arbitration Association (the "AAA") under its Commercial Mediation Rules before resorting to arbitration. Thereafter, any unresolved Dispute shall be settled by binding arbitration administered by the AAA in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator, after the review rights set forth below have been exhausted, may be entered in any court having jurisdiction.

(*See e.g.* Limited Liability Company Agreement of Hawks PVO Holding LLC § 15.19, ECF No. 6, Ex. 8 [Hawks PVO LLC Agreement].) As stated in the above language, parties to any dispute that arises out of the rights and provisions of the LLC Agreements need to exhaust their review rights at arbitration before they can seek review from a court. Because the Changeover Event provisions and the rights that arise therefrom are contained in the LLC Agreements, any dispute regarding such rights and provisions falls under the Arbitration Provision of the LLC Agreements. Therefore, if MaxMez is correct in arguing that the issue of control by way of Changeover Events was not brought at arbitration, then it has not exhausted its rights of review at that stage and cannot ask this Court to weigh in until it has done so.

14. Ultimately, whether intervention based on the occurrence of Changeover Events is barred because of a prior binding decision or because MaxMez has not

exhausted its review rights as to that issue at arbitration, it would be improper for this Court to grant that relief.

**b. Control through the TIC Agreement**

15. MaxMez's reliance on the TIC Agreement to claim that it has control over the Plaintiff Entities is similarly misplaced. First, as Plaintiffs raised in briefing and in the hearings on this matter, MaxMez is not a party to the TIC Agreement and thus, may not be able to enforce its rights under said agreement. (*See* Tenancy in Common Agreement 1, ECF No. 6, Ex. 3 [TIC Agreement]; Pl.'s Post-Hearing Brief 4 – 5); *Big League Analysis, LLC v. Office of the Comm'r of Baseball*, 2016 NCBC LEXIS 68, at **17–18 (N.C. Super. Ct. Aug. 29, 2016) (holding that non-parties can only enforce contractual rights in "appropriate circumstances.")

16. Second, and most importantly, even if the present case presents an "appropriate circumstance" in which to allow a non-party to enforce contractual rights, this Court is still not the proper venue at which to decide whether MaxMez controls the Plaintiff Entities by means of the TIC Agreement. The TIC Agreement, like the LLC Agreements, contains a clause requiring that all disputes pertaining to the rights given in the TIC Agreement that cannot be resolved by a Rav be resolved at arbitration. (TIC Agreement ¶ 13.) Thus, if MaxMez's right to control the Plaintiff Entities stems from the TIC Agreement, then any dispute over the application of that right must be settled at arbitration, not before this Court.

**c. Control through the "Major Decisions" Provision of the LLC Agreements**

17. MaxMez's final alleged source of its control over the Plaintiff Entities stems from its right, under the LLC Agreements to be consulted about and to consent to any "major decisions" made by the relevant entities. (MaxMez Post-Hearing Brief 2–3; Hawks PVO LLC Agreement § 4.1(a).) Much like MaxMez's argument that it controls Plaintiff Entities because of the occurrence of relevant Changeover Events as defined in the LLC Agreements, this contention rests on rights detailed in the LLC Agreements which contain mandatory arbitration provisions. (MaxMez Post-Hearing Brief 2–3; Hawks PVO LLC Agreement § 15.19.) Thus, as per the contention that MaxMez has control over the Plaintiff Entities through the occurrence of Changeover Events, MaxMez needs to exhaust its right of review at arbitration before it can ask a court to award it control of Plaintiffs because of the Major Decisions Provision of the LLC Agreements. Therefore, it would be improper for this Court to grant the requested relief based on the "Major Decisions" provision of the LLC Agreements.

**III. CONCLUSION**

18. **THEREFORE**, the Motion is hereby **DENIED**. The Court determines that this is not the proper venue in which to grant the relief sought.

19. Further, because the Court has determined that the request contained in the Motion needs to be addressed at arbitration, the current litigation is hereby **STAYED** to allow Potential Intervenor MaxMez time to file an arbitration demand requesting the relief asked for in the Motion. The present stay will last up and through 11 June 2026. Therefore, all current deadlines and hearings in the above-

captioned case, including the Hearing on Plaintiffs' Motion to Modify Orders Releasing Funds and the deadline for the Catawba County Clerk of Court to release the funds held in the Clerk's possession to Defendant Hawks Note Purchase, LLC are hereby stayed. Upon the lifting of the stay set forth in this Order, the Court will issue a scheduling order setting any new deadlines that may be required.[1]

20. The Court further requests that MaxMez file documentation with this Court of any demand requesting control over Plaintiff Entities that it makes at arbitration. Upon receipt of said documentation, the Court may extend the present stay to allow the control issue to be fully resolved at arbitration before moving on with the litigation in the above-captioned case.

21. Additionally, the Court concludes that MaxMez has a substantial right to have this matter considered and that, as a result, there is no just reason to delay an appeal of the Court's ruling if desired by MaxMez. Based on the above, the Court further concludes that it would be inefficient and potentially wasteful for the parties and the Court to proceed to trial at this time on the remaining claims prior to the resolution of an appeal of the denial of the Motion.

22. Therefore, the Court concludes that there is no just reason to delay an appeal of the Court's denial of the Motion and that the Court therefore certifies its ruling denying the Motion as a final judgment as to the matters considered herein under Rule 54(b).

---

[1] The Court notes that the deadline for the Catawba County Clerk of Court to release the funds held in its possession has already been stayed indefinitely. That indefinite stay will be unaffected by the lifting of the 30-day stay of the entire case entered in this Order unless otherwise ordered by this Court.

**SO ORDERED**, this the 12th day of May, 2026.

/s/ Michael L. Robinson

Michael L. Robinson
Chief Business Court Judge