**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>Hawks Landing Owner LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31122 (LTB) |
| In re:<br><br>Merchant's Sub 1 LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31123 (LTB) |

**MOTION FOR ENTRY OF AN ORDER (I) CONFIRMING THE AUTOMATIC STAY DOES NOT APPLY TO THE RELEASE OF FUNDS ON DEPOSIT IN CATAWBA COUNTY AND (II) LIFTING THE AUTOMATIC STAY TO PERMIT PENDING STATE COURT LITIGATION TO PROCEED**

NOW COMES Hawks Note Purchase, LLC ("Hawks Note"), pursuant to Section 362(d) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure, and moves the Court for an entry of an order (1) confirming that the automatic stay triggered by these actions did not stay the order of the North Carolina Business Court requiring Hawks Landing Owner LLC and Merchant's Sub 1 LLC (collectively, "Debtors"), along with two other entities, to post a bond in support of their claims; and (2) lifting the automatic stay to allow the North Carolina Business Court litigation to proceed. *See Dover Sub 1 LLC, et al. v. Hawks Note Purchase, LLC*, Catawba County Superior Court, Business Court Division, Case No. 25CVS000955-170 (the "Business Court Litigation").

In support of its Motion, Hawks Note respectfully states as follows:

## INTRODUCTION

Debtors have spent the last 17 months trying to prevent their lender, Hawks Note, from being paid back the approximately $22 million Debtors owe on their loan—funds currently being held by a clerk of court in Catawba County, North Carolina. The North Carolina Business Court finally ordered the funds released this past March. Debtors tried everything to block that release, filing motion after motion, an appeal, and even a petition for extraordinary relief from the Supreme Court of North Carolina. Nothing worked. They had one last chance on August 17, 2026. All they had to do was post a bond in Catawba County. Instead, they filed these bankruptcy actions, hoping to buy more time.

That gambit should fail. Hawks Note's funds are only on deposit as a pre-judgment attachment for *Debtors' own claims*, which are not stayed by these bankruptcy filings. More broadly, the Business Court Litigation is almost complete, and should be allowed to move forward notwithstanding the bankruptcies. Hawks Note now files this motion seeking an order confirming that the appeal bond order was never stayed and expressly allowing the Business Court Litigation to move forward in its entirety.

## STATEMENT OF THE FACTS

Neither half of the relief sought in this motion is overly fact-dependent. Debtors' own claims were never stayed, so any orders relating to the pre-judgment attachment supporting those claims were not stayed either. And after almost 18 months of litigation, it would be more efficient to allow the Business Court Litigation to proceed and finally resolve the parties' claims against each other. Recognizing, however, that much has happened over those 18 months, Hawks Note will first provide a summary of the underlying facts and the course of the Business Court Litigation.

## I. Creation and Purpose of Plaintiff Entities.

Debtors Hawks Landing Owner LLC and Merchant's Sub 1 LLC, along with RRAIT Sub 1 LLC and Dover Sub 1 LLC (collectively, "Plaintiffs") were created in or about June 2022. At that time, Eliezer Meisels and Moshe ("Max") Weingarten acted as the indirect operating members of Plaintiffs, effectively overseeing and managing the entities. *See* Doc. No. 17-1, at 26-27, 33-34 ("The Member hereby appoints Moshe Weingarten and Eliezer Meisels as the initial Authorized Signatories," which were "empowered and directed in the name and on behalf of the Company to execute and deliver any and all specified agreements, certificates, or any other documents on behalf of the Company"). Even today, Mr. Meisels and Mr. Weingarten still purport to direct Plaintiffs. Mr. Weingarten, for instance, purported to authorize the instant bankruptcy cases and signed the Debtors' petitions as the "Authorized Signatory." Doc. No. 1. Similarly, Mr. Meisels filed a declaration in the Business Court Litigation just over four months ago, declaring that he was a "Member in, and representative agent for Plaintiff entities." **Exhibit A**, Eliezer Meisels Declaration, at ¶ 3.

Plaintiffs were formed as single-purpose entities, created for the "sole purpose" of acquiring, developing, maintaining, and selling the Hawks Landing Apartment Complex in Hickory, North Carolina (the "Hawks Landing property"). *See* DE 17-1, at 27-28, 30-31, 34-35, and 37-38; **Exhibit B**, Loan Agreement, at 35-37. As such, Plaintiffs' sole asset was the Hawks Landing property. Once the asset was disposed of, Plaintiffs' only purpose was supposed to have been fulfilled.

## II. Plaintiffs' Acquisition, Control, and Management of the Hawks Landing Property.

On or about June 16, 2022, Plaintiffs and non-party Regions Bank ("Regions") entered into a Loan Agreement (the "Loan Agreement"), pursuant to which Regions agreed to loan Plaintiffs

the principal amount of Nineteen Million Seven Hundred Thousand and 00/100 Dollars ($19,700,000.00) (the "Loan"). Ex. B, at 3. Plaintiffs then used the Loan to purchase the Hawks Landing property. Under the terms of the Loan Agreement, Plaintiffs were obligated to make monthly payments calculated pursuant to the terms of the Loan Agreement and then pay the balance of the Loan along with any other fees on the Maturity Date, June 15, 2024. *Id.*, at 10, Section 1.1.

Once Plaintiffs purchased the Hawks Landing property, they entered into a Management Agreement with Valor Residential Group, LLC ("Valor"), one of the alleged unsecured creditors identified in their bankruptcy filings. **Exhibit C**, Management Agreement; Doc. No. 1, at 7-8. Valor is equally owned by Mr. Meisels and Mr. Weingarten; Mr. Meisels is the CEO, and Mr. Weingarten is the President. **Exhibit D**, Eliezer Meisels Deposition, October 21, 2025[1], at 21:15-24. Under the Management Agreement, Plaintiffs employed Valor to "act as the sole and exclusive managing agent" of the Hawks Landing property. Ex. C, at 1. Mr. Weingarten signed the Management Agreement on behalf of *all* parties to the agreement: Debtors, their co-Plaintiffs, and Valor. *Id.*, at 12-13.

Plaintiffs owned and, through Valor, managed the Hawks Landing property for approximately two years. However, "[d]espite [their] best efforts from January through May 2024," Plaintiffs say they were unable to pay off the Loan and defaulted on the Loan Agreement. **Exhibit E**, Revised First Amended Complaint, at ¶ 40. Regions, through a substitute trustee, instituted foreclosure proceedings on the Hawks Landing property in December 2024. **Exhibit F,** Notice of Hearing Prior to Foreclosure Sale, December 18, 2024.

[1] All pleadings and transcripts attached hereto as exhibits are all docket entries in the Business Court Litigation.

Hawks Note was formed in February 2025 by Maxus Realty Trust, Inc. and some of its investors. **Exhibit G**, Hawks Note's Amended Counterclaim, at pg. 32, ¶ 27. Maxus, through its affiliates MaxMez NC LLC, had made debt and equity investments in the Hawks Landing property. *See* Doc. 17 (providing background on MaxMez's investments and control rights); *see also* Ex. G, at pg. 30, ¶¶ 13-14. Maxus formed Hawks Note to purchase the Loan and protect its investment. Ex. G, at pg. 32, ¶ 27.

On February 14, 2025, Hawks Note entered into a Sale and Assignment Agreement with Regions (the "Loan Assignment"), pursuant to which all of Regions' rights under the Loan Agreement, the Note, along with the corresponding Deed of Trust and Assignment of Rents, were assigned to and assumed by Hawks Note. **Exhibit H**, Sale and Assignment Agreement, February 14, 2025.

**III. The Business Court Litigation.**

Plaintiffs initiated the Business Court Litigation in Catawba County Superior Court on March 24, 2025 in order to obtain a payoff statement from Hawks Note that would facilitate the sale of the Hawks Landing property to a new owner. In their Verified Complaint, signed by Mr. Meisels, Plaintiffs alleged two causes of action: (1) injunctive relief and (2) declaratory judgment. **Exhibit I**, First Verified Complaint. They later amended their complaint to include four additional claims: (3) Breach of Good Faith and Fair Dealing, (4) *Per Se* Violations of N.C. Gen. Stat. §45.36.7(d) and (j); (5) Predatory Lending, and (6) Abuse of Process and/or Malicious Prosecution (collectively, "Plaintiffs' Claims"). Ex E, Revised First Amended Complaint.

Plaintiffs first sought a temporary restraining order. During the hearing (the "TRO Hearing"), Plaintiffs' counsel admitted that Hawks Note was owed the principal and some interest due under the Loan Agreement, but with a difference of opinion as to certain fees and costs totaling

a couple hundred thousand dollars. **Exhibit J**, March 26, 2025 Hearing Transcript Excerpt, at 34:11-12, 36:7-11, 37:9-12. Plaintiffs' counsel suggested that the court hold the disputed funds in escrow until the conclusion of the Business Court Litigation. *Id.*, at 37:9-12. At the conclusion of the TRO Hearing, the Court orally instructed Hawks Note to provide Plaintiffs with a payoff statement. *Id.*, at 74:4-12. No written TRO was ever entered. **Exhibit K**, April 7, 2025 Hearing Transcript Excerpt, at 3:7-15.

Following the TRO hearing, Hawks Note sent Plaintiffs a payoff statement on four separate occasions. However, at the April 7 preliminary injunction hearing (the "PI Hearing"), Plaintiffs represented to the court that the four payoff statements that Hawks Note provided were all unusable and that the sale of the Hawks Landing property could not move forward without court intervention. *See*, Ex. K, at 7:23-8:25, 15:8-23:14. The Court granted the preliminary injunction, directing Plaintiffs to deposit the sum calculated by Hawks Note as due under the Loan with the trial court upon sale of the Hawks Landing property. **Exhibit L**, April 7, 2025 Preliminary Injunction (the "Injunction"). Hawks Note asked that the undisputed principal amount of the Loan be disbursed to Hawks Note, leaving only the disputed portion on deposit. Ex. K, at 94:8-25. Plaintiffs' counsel objected, saying they had no idea what their damages would be and that the court needed to hold all of Hawks Note's money to satisfy a potential monetary judgment. Ex. K, at 95:2-15. In the written ruling, the court ordered that *all* of Hawks Note's proceeds be deposited with the Catawba County Clerk's Office pending the resolution of the matter. Ex. L. The Injunction was silent as to what bond, if any, Plaintiffs would need to post.

Plaintiffs sold the Hawks Landing property—their only asset—on April 8, 2025 (the "Sale"). Plaintiffs deposited $21,894,377.07 due under the Loan (the "Deposited Funds") on April 11, 2025. As of that moment, as remains true today, Plaintiffs "are all single-purpose entities,

lacking any assets." *See* **Exhibit M**, Plaintiffs' Corrected Brief in Support of Motion to Modify Orders Releasing Funds to Defendant, at 11; *see also* **Exhibit N**, Plaintiffs' Motion for Reconsideration, at 3 ("Plaintiffs in this case are all single purpose entities (SPEs), with no assets of any kind other than *the claims* asserted against Defendant HNP, herein." (emphasis added)).

In the following months, Hawks Note repeatedly asserted that the Deposited Funds were its property; that they were being held as a pre-judgment attachment; and that North Carolina law required that Plaintiffs post a bond to secure the attachment of Hawks Note's property. *See* **Exhibit O,** Hawks Note Purchase LLC's Motion to Dissolve Preliminary Injunction, at ¶¶ 37, 44; **Exhibit P**, Hawks Note Purchase LLC's Brief in Support of Renewed Motion to Dissolve Preliminary Injunction, at 21.

At first, Plaintiffs acknowledged reality: that the Deposited Funds belong to Hawks Note, with the Court holding Hawks Note's money for the purpose of satisfying a judgment in the event "Plaintiffs prevail on their claims against" Hawks Note. **Exhibit Q**, Plaintiffs' Brief in Support of Motion to Stay Order Denying Modification Motion, at 13; *see also Id.*, at 16 (the disbursement of the Disputed Funds "will effectively deprive Plaintiffs of any meaningful ability to enforce any judgment that it obtains against Defendant").

The Business Court ultimately agreed with Hawks Note on January 28, 2026. Upon Hawks Note's Motion to Dissolve the Injunction, the trial court converted the preliminary injunction into a pre-judgment attachment. **Exhibit R**, Order Denying in Part and Granting in Part Defendant/Counterclaim Plaintiff Hawks Note Purchase, LLC's Renewed Motion to Dissolve Preliminary Injunction (the "Attachment Order"). "[T]he purpose for which it was originally ordered," the Court reasoned, "no longer exist[ed] and the continuation of holding the funds on deposit or at least the vast majority of them, is for the purpose of allegedly protecting them by

dissipation by Defendant so that Plaintiffs may have a corpus from which to satisfy the judgment that Plaintiffs contend they will obtain on the merits of their claims." *Id*., at ¶ 3. To satisfy the prejudgment-attachment statutes, the Court required Plaintiffs to file an affidavit with the information outlined in N.C. Gen. Stat. § 1-440.11 and to post a bond under N.C. Gen. Stat. § 1-440.10. The trial court set the bond for $1,626,782.20, giving Plaintiffs until February 27, 2026 to post the bond and file the affidavit. **Exhibit S**, Order Setting Bond Amount (the "Initial Bond Order").

On February 26, 2026, Plaintiffs filed a Motion for 3-Business Day Extension to Post Bond, asking for an order extending their deadline to close of business on March 3, 2026. **Exhibit T**, Plaintiffs' Motion for 3-Day Extension to Post Bond, at 2. The trial court did not rule on the motion one way or the other before March 3, giving Plaintiffs a de facto extension *See* **Exhibit U,** Order Directing the Catawba County Clerk of Court to Release the Funds Held in the Clerk's Custody (the "First Release Order"). When Plaintiffs failed to post the bond or file the affidavit by their own extended deadline, the Court ordered that the funds be released to Hawks Note. *Id*., at ¶ 18. The Court specified that these were funds that "Hawks Note would otherwise be entitled to without the necessary protection of a bond." *Id*., at ¶ 16.

Plaintiffs then filed a Motion Seeking Reconsideration of the First Release Order. **Exhibit V**, Plaintiffs' Motion for Reconsideration of Court's March 5, 2026 Order ("Motion to Reconsider"). The trial court denied the motion and again ordered that the Deposited Funds be released to Hawks Note. **Exhibit W,** Order Denying Plaintiffs' Motion for Reconsideration of Court's March 5, 2026 Order ("Second Release Order").

Plaintiffs then moved to modify the Initial Bond Order, the First Release Order, and the Second Release Order. **Exhibit X**, Plaintiffs' Motion to Modify Orders Releasing Funds to

Defendant. Among other things, Plaintiffs argued for the first time that a little more than $1 million of the Deposited Funds were "Plaintiffs' money" because "Defendant's payoff is less than the amount currently held by the clerk." Ex. M, at 18. Plaintiffs supported their claim to the $1 million solely with a declaration of Eliezer Meisels, Member and Representative Agent of Plaintiffs. Ex. A, at ¶¶ 3, 27. Even still, Plaintiffs admitted again that the rest of the Deposited Funds belong to Hawks Note (the "Hawks Note Funds"). Ex. M, at 9 ("The amount deposited represented the $20,846,520.92 payoff to HNP.").

Hawks Note proposed a path forward: the court could retain on deposit the $1 million of Hawks Note's money that Plaintiffs claimed was theirs, secured by a modest bond, and release the rest to Hawks Note. The Business Court agreed, ordering that $1,025,277.88 (the "Plaintiffs' Claimed Funds") could remain in the court's possession if Plaintiffs posted a $100,000 bond. **Exhibit Y**, Order on Plaintiffs' Motion to Modify Orders Releasing Funds to Defendant (the "Third Release Order"), at 15-16. Plaintiffs had not proven that the Plaintiffs' Claimed Funds belonged to them, the Court held, but Hawks Note's proposal would adequately secure Plaintiffs at the high-water mark of their claims. *Id.*, at ¶¶ 7, 14-16, 37.

Thus, for the third time in as many months, the Business Court once again ordered that the bulk of the Deposited Funds be released to Hawks Note. *Id*.

Plaintiffs posted the bond securing the Plaintiff's Claimed Funds on June 26, 2026. The remaining portion of the Deposited Funds ($20,868,099.19) (the "Hawks Note Funds") were set to be released on July 14, 2026 "without condition." *Id.*, at ¶ 16(c).

Plaintiffs refused to comply, instead filing a Notice of Appeal and asking the Business Court to stay *all* trial court proceedings pending resolution of their appeal. **Exhibit Z**, Plaintiffs' Notice of Appeal; **Exhibit AA**, Plaintiffs' Motion to Stay. The trial court allowed a stay, but only

as to the release of the Hawks Note Funds. **Exhibit BB**, Order Granting in Part Plaintiffs' Motion to Stay.

The stay order was silent as to what bond Plaintiffs needed to post as security. Hawks Note then filed an Emergency Motion to Set Bond on July 23, 2026. **Exhibit CC**, Hawk Note Purchase LLC's Emergency Motion to Set Bond and Request for Expedited Briefing and Decision. Hawks Note argued that, by obtaining a stay of the Release Orders, Plaintiffs have interfered "with Hawks Note's interest in its property" and it was "only equitable to require security to protect against that interference." **Exhibit DD**, Hawk Note Purchase Brief in Support of Emergency Motion to Set Bond and Request for Expedited Briefing and Decision, at 16-17. More specifically, Hawks Note argued that allowing a stay of the Release Orders during the pendency of Plaintiffs' appeal—without requiring Plaintiffs to post a bond—would place Plaintiffs in a better position than they would have occupied had any of their Motions to Reconsider actually been granted. *See Id.*, at 15.

In their Reply, Plaintiffs consented to the posting of a bond "subject to one essentially and fundamentally equitable condition: once Plaintiffs incur the substantial expense of obtaining and posting the bond, the Deposited Funds should remain in the custody and control of the Clerk until the parties' competing claims have been finally adjudicated on the merits." **Exhibit EE**, Plaintiffs' Brief in Response to Hawks Note Purchase LLC's Emergency Motion for Bond, at 2-3. However, they proposed a bond that was approximately 50% *less* than the court had ordered months earlier in the Initial Bond Order. *Id.*, at 10.

In its Order on Hawks Note's Motion to Set Bond, the Business Court rejected Plaintiffs' request for a smaller bond, directing them to post a bond in the amount of $1,957,599.24 no later than August 17, 2026 to stay the release of the Hawks Note Funds. **Exhibit FF**, Order Granting in Part Defendant Hawks Note Purchase, LLC's Emergency Motion to Set Bond (the "July 26 Bond

Order”). The Business Court also rejected Plaintiffs’ request that Hawks Note’s Funds be held through the conclusion of the Business Court Litigation:

> In making this request, the Plaintiffs are essentially attempting to secure the benefits of a prejudgment attachment without having timely filed the bond as previously ordered by this Court. What is more, Plaintiffs fundamentally misunderstand the reason for the needed increase in bond amount. The funds may be “secure in the custody of the Clerk” as Plaintiffs claim, (See Resp. Br. 1.), but the fact that the funds are protected from dissipation or removal by an outside party does not change the fact that, if it is determined that Hawks Note is entitled to the Deposited Funds, every day that it does not possess the funds it is further prejudiced by its inability to earn interest on the funds or dispose of them as it pleases. It is this exact prejudice against which a bond protects, and the increased length of time over which Defendants experience this prejudice is the exact reason for the increased bond length ordered herein.

*Id.*, at ¶ 16.

On August 15, two days before Plaintiffs’ deadline to post a bond, Mr. Weingarten sent an offer to Hawks Note’s Manager Dave Johnson: If Hawks Note would consent to the disbursement of $1.8 million to Plaintiffs, Plaintiffs would consent to Hawks Note taking the rest of the Deposited Funds, with the parties dismissing their claims against each other. **Exhibit GG**, August 15, 2026 Email from Max Weingarten to Dave Johnson, Subject: Re: [External] RE: Final Demand - 2025 Tax Returns - MaxMez NC LLC, at 5-6. If Hawks Note refused, however, the offer was “off the table and we continue this fight for another 2 years.” *Id.* at 6. Mr. Johnson did not consent to Plaintiffs’ demand. Plaintiffs then missed their deadline to post the bond.

Instead, Debtors filed their petitions for Chapter 11 Bankruptcy (the “Petitions”). Mr. Weingarten purported to authorize and sign those Petitions on behalf of Debtors.[2] Debtors think

[2] MaxMez has filed a motion to dismiss these cases on the grounds that the Debtors lacked authorization to file bankruptcy and that Mr. Weingarten’s purported authorization was invalid and not legally sufficient. *See* Doc. No. 17.

they have stayed the Business Court Litigation, halting Catawba County's Clerk from releasing the Hawks Note Funds pending further instruction from the court and keeping Hawks Note from recovering its own property for the fifth time while ignoring the statutes and various court orders requiring Plaintiffs to post a bond. *See* Ex. GG, at 2 (Eliezer Meisels to Dave Johnson: "Never gonna post a bond as long as you live."); *see also Id.*, at 4 (Eliezer Meisels to Dave Johnson: "you and your investors can get that money tomorrow instead of dealing with this in BK indefinitely WITHOUT a bond."); *Id.*, at 1: (Joshua Kahane (Debtors' counsel) to Dave Johnson: "I am enthusiastic about the HNP case, especially in seeing how your BKTCY counsel will explain to you that the money is being held for the life of the litigation.").

As shown below, Debtors' assumptions are incorrect.

## ARGUMENT

### I. Debtors' Bankruptcy Filing Did Not Stay the Orders Requiring Debtors to Post a Bond to Secure the Pre-Judgment Attachment.

The automatic stay arising under Section 362 of the Bankruptcy Code gives "the bankruptcy court an opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations." *Robbins v. Robbins* (*In re Robbins*), 964 F.2d 342, 345 (4th Cir. 1992), *as amended* (May 27, 1992). The provision is meant to "protect[] the debtor's interests by imposing an automatic stay on efforts to collect prepetition debts outside the bankruptcy forum." *City of Chicago, Illinois v. Fulton*, 592 U.S. 154, 156 (2021).

#### ***A. The Stay Doesn't Apply To the Debtors' Claims.***

Critically, the stay's "coverage extends only to claims *against* the debtor that arose prior to the filing of its petition." *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200 (4th Cir. 1988) (emphasis added). It does *not* apply to claims made by debtors against creditors, meaning that a debtor's

claim against a creditor is *not* subject to the automatic stay. *See Synovus Bank v. Karp*, No. 1:10CV172, 2014 WL 221209, at *7 (W.D.N.C. Jan. 21, 2014), *aff'd in part sub nom. Synovus Bank v. Tracy*, 603 F. App'x 121 (4th Cir. 2015) (citing *In re Atlas IT Exp., LLC*, 491 B.R. 192, 195 (B.A.P. 1st Cir. 2013).

The July 2026 Bond Order relates solely to Debtors' and co-Plaintiffs' claims against Hawks Note, not Hawks Note's counterclaims *against* Plaintiffs. As the order recognizes, the bond serves two purposes: (1) it secures the Deposited Funds being held as a pre-judgment attachment; and (2) it secures the stay arising from Plaintiffs' appeal. July 2026 Bond Order, at ¶ 14. Neither of these purposes has anything to do with Hawks Note's counterclaims against Plaintiffs. Suppose, for instance, Hawks Note had dismissed its counterclaims earlier in the summer. Hawks Note's funds would still have been on deposit. Plaintiffs would still have been ordered to post a bond. And Plaintiffs would still have filed everything they could think of to prevent Hawks Note from getting its funds back.

Hawks Note acknowledges Plaintiffs maintain an asserted interest—though poorly supported by any evidence—in the $1,025,277.88 currently on deposit and secured by Plaintiffs' $100,000 bond. The Business Court has not ordered that those funds be released, nor has Hawks Note asked for those funds to be released at this stage. To be clear, Hawks Note simply seeks to have its own undisputed funds—the $20,868,099.19—released now that Plaintiffs have failed to post the ordered bond.

***B. The Deposited Funds are Not Estate Property.***

Debtors cannot sidestep this analysis by arguing that the undisputed funds are property of the estate. Property of the estate is "comprised of the property listed in 11 U.S.C. § 541(a), including 'all legal or equitable interests of the debtor in property as of the commencement of the

case.'" *In re FCX, Inc.*, 853 F.2d 1149, 1153 (4th Cir. 1988) (quoting 11 U.S.C. § 541(a)(1)). However, an "estate under § 541(a) succeeds only to those interests that the debtor had in property prior to commencement of the bankruptcy case." *Id.*; *see also Am. Bankers Ins. Co. of Fla. v. Maness*, 101 F.3d 358, 364 (4th Cir. 1996) ("Congress stated that § 541 'is not intended to expand the debtor's rights against others more than they exist at the commencement of the case.'" (citation omitted)).

"[N]either § 541(a), nor any other Bankruptcy Code provision, answers the threshold questions of whether a debtor has an interest in a particular item of property and, if so, what the nature of that interest is." *In re FCX, Inc.*, 853 F.2d at 1153. To make that determination, a court must look to non-bankruptcy law. *i.e.*, federal or state law. *Id.*; *see also Maness*, 101 F.3d at 363 ("To summarize then, while federal law creates the bankruptcy estate, . . . state law, absent a countervailing federal interest, determines whether a given property falls within this federal framework.").

Hawks Note's Funds never became part of the bankruptcy estate because they were never Debtors' property in the first place. They were Hawks Note's property, held by the state court via pre-judgment attachment.

Pre-judgment attachment statutes enable "an individual to enlist the aid of the State to deprive another of his or her property." *Connecticut v. Doehr*, 501 U.S. 1, 9 (1991). They have a deep-rooted history, having been derived from the "Custom of London, under which a creditor might attach money or goods of the defendant either in the plaintiff's own hands or in the custody of a third person, by proceedings in the mayor's court or in the sheriff's court." *Id.,* at 16 (internal citation and quotation marks omitted). This deprivation of property is premised "on one ultimate factual contingency—the award of damages to the plaintiff which the defendant may not be able

to satisfy." *Id.*, at 11; *see also Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 613–14 (1974) (An attachment is "designed to create a lien for the creditor at the outset of the litigation." (citing *McInnes v. McKay*, 127 Me. 110, 141 A. 699, 702 (1928), *aff'd*, 279 U.S. 820 (1929)).

Like many states, North Carolina has enacted pre-judgment attachment statutes. N.C. Gen. Stat. § 1–440 et seq. In North Carolina, an attachment is "a preliminary execution against property, and is intended to bring property of a defendant within the legal custody of the court in order that it may subsequently be applied to the satisfaction of any judgment for money which may be rendered against the defendant in the principal action." N.C. Gen. Stat. § 1-440.1(a). The property subject to an attachment is "[a]ll of a *defendant's* property within" the state. N.C. Gen. Stat. § 1-440.4 (emphasis added), and it is to remain the property of the attached party until the attachment is perfected through a judgment. *See Ivester v. Miller*, 398 B.R. 408, 419 (M.D.N.C. 2008) (citing N.C. Gen. Stat. § 1-440.33(b)).

Debtors have already acknowledged that the Hawks Note Funds are the property of Hawks Note. The only reason Debtors want the clerk to withhold the Hawks Note Funds from Hawks Note is so that there is money available to satisfy any judgment that may be entered in their favor. *See* Ex. M, at 17 ("[R]eleasing all of the funds held by the Clerk to Defendant without the imposition of protective conditions . . . fails to take into consideration the risk that . . . Plaintiffs will have no meaningful recourse if Defendant, as it has every incentive to do, simply transfers the funds to another entity so as to place them beyond Plaintiffs' reach in the event that Plaintiff prevails in the underlying civil action.").

Nor can Debtors argue that the mere possibility that they could someday recover on their claims gives them a legal or equitable interest in the unsecured Hawks Note Funds. If that were true, then *every* debtor with pending legal claims could claim a legal or equitable interest in *all*

property of the defendants in those cases, whether that property has been attached or not. Having ignored their obligation to post the ordered bond, Debtors have no greater claim to the Hawks Note Funds than they do to *any other* property of Hawks Note—zero.

Here, the trial court has already determined that the undisputed funds are the property of Hawks Note. The court has also decided the terms on which the Debtors and their co-Plaintiffs may stay the release of the Hawks Note Funds to Hawks Note. July 26 Bond Order, at 7. There is nothing this Court could do with the bankruptcy estate that would change those facts.

***C. Hawks Note is Prejudiced By the Continued Attachment of its Property.***

Absent direction from this Court, the Clerk and Business Court are unlikely to act with respect to any portion of the Deposited Funds. In that time, Hawks Note will continue to suffer prejudice.

As was explained by the Business Court, the best way to "minimize the potential for this prejudice" was to disburse the Hawks Note Funds to Hawks Note. July 2026 Bond Order, at ¶ 16. With that order stayed by the Business Court itself, Hawks Note could only be protected by the posting of a bond:

> the fact that the funds are protected from dissipation or removal by an outside party does not change the fact that, if it is determined that Hawks Note is entitled to the Deposited Funds, every day that it does not possess the funds it is further prejudiced by its inability to earn interest on the funds or dispose of them as it pleases. It is this exact prejudice against which a bond protects, and the increased length of time over which Defendants experience this prejudice is the exact reason for the increased bond length ordered herein.

July 2026 Bond Order, at ¶ 16.

In contrast, Debtors have no perfected interest in the Deposited Funds or the Hawks Note Funds, but they only wish for the money to remain with the Court pending a final judgment in their favor. This, also explained by the state court, "does not justify the continued holding by the Court

of funds that Hawks Note would otherwise be entitled to without the necessary protection of a bond." First Release Order, at ¶ 16.

To be sure, Hawks Note could make these arguments directly to the Business Court. But the practical reality is that the Business Court will not want to move forward with releasing the funds without authorization from this Court. Hawks Note now asks for entry of just such an order, recognizing that the bankruptcy automatic stay did not relieve Debtors of their obligation to comply with the July 2026 Bond Order and that the Business Court may conduct further proceedings to issue consequences for Plaintiffs' failure to comply with the court's order, including ordering the release of the Hawks Note Funds.

## II. This Court Should, in Its Discretion, Lift the Automatic Stay to Allow the Business Court Litigation to Proceed in State Court.

Bankruptcy courts are given broad discretion "to lift the automatic stay to permit enforcement of rights against property of the estate." *Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir. 1994) (citing 11 U.S.C. § 362(d)). "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay – (1) for cause." 11 U.S.C. § 362(d)(1).

As "the Bankruptcy Code provides no definition of what constitutes 'cause,' the courts must determine when discretionary relief is appropriate on a case-by-case basis." *Claughton*, 33 at 5 (citing *In re Robbins*, 964 F.2d at 345. Still, the "term is not unmoored." *Herlihy v. DBMP, LLC*, 167 F.4th 142, 149 (4th Cir. 2026). The Fourth Circuit has "provided a standard to apply the term, drawing limitations from context." *Id.* Since the automatic stay "is designed to give the bankruptcy court the ability 'to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations'—which

imitates a fundamental function of bankruptcy—removal of such a stay must, at bottom, address what the stay provided." *Id*. (quoting *In re Robbins*, 964 F.2d at 345). For this reason, "when considering a motion to lift an automatic stay, '[t]he court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied.'" *Id*. (*In re Robbins*, 964 F.2d at 345).

To assist in this analysis and determine whether there is "cause" to lift the stay, the Fourth Circuit has provided three factors that lower courts can consider:

> (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary;
>
> (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and
>
> (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*In re Robbins*, 964 F.2d at 345 (the "*In re Robbins* factors"). These factors are meant to weigh, "on one side, the efficiencies in resolving the matter sought to be released from the stay in another court, assessing whether that court could handle the matter more efficiently and thereby provide judicial economy to the bankruptcy court, and, on the other side, whether the estate can still be protected for the benefit of creditors." *Id*. When considering the *In re Robbins* factors, the "court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *In re Robbins*, 964 F.2d at 345.

Each of the *Robbins* factors support Hawks Note's request for a modification of the automatic stay.

***A. The Claims Pending in the Business Court Involving Only North Carolina Law and Do Not Require the Bankruptcy Court's Expertise.***

Plaintiffs' Claims and Hawks Note's counterclaims are *all* governed by state law. Given the relative familiarity of the Business Court with both the procedural history and with issues of North Carolina law that will govern the resolution of the parties' claims, the first factor favors allowing the state court to resolve the Business Court Litigation.

***B. Terminating or Modifying the Stay Will Promote Judicial Economy as the Business Court Litigation Was Nearing Finality When Debtors Filed Their Petitions and Hawks Note's Property Was in the Process of Being Secured.***

The Business Court Litigation was nearing the end when Debtors filed their Chapter 11 Petitions on August 17. At that point, the Business Court Litigation had been progressing in state court for almost 18 months. *See* Ex. I, First Verified Complaint. Discovery was scheduled to close on September 8, and the parties then had until October 8 to file dispositive motions. **Exhibit HH**, Order Granting in Part Plaintiffs' Emergency Motion to Compel Defendant's Discovery, Granting in Part Plaintiffs' Motion for Sanctions, and Setting Discovery and Post-Discovery Deadlines, at ¶ 26. In fact, less than one month before they filed their Petitions, Debtors represented that, "[o]ther than selecting a trial date consistent with the Court's calendar, there are no known procedural impediments to trying this case before the end of 2026." Ex. DD, at 9. By Debtors' admission, this matter could have been resolved entirely within three months.

With the matter near its end, lifting the stay in its entirety as to the Business Court Litigation would promote judicial economy. *See In re Lee*, 461 F. App'x 227, 232 (4th Cir. 2012) (finding that lifting the stay promoted judicial economy since the underlying dispute "had been ongoing for over two years and was near finality" when the debtor filed for bankruptcy).

That is all the more true in this case, where the state court has issued several orders severely curtailing the scope of Plaintiffs' discovery as sanctions for their litigation conduct. *See* **Exhibit**

**II,** Order Granting in Part and Denying in Part Hawks Note Purchase LLC's Motion for Sanctions; **Exhibit JJ**, Order Denying in Part and Granting in Part Defendant Hawks Note Purchase, LLC's Motion to Exclude Plaintiffs' Experts. The Business Court is well-situated to guide discovery—and the rest of the case—to its conclusion.

### *C. Debtors' Bankruptcy Estate Can Be Properly Protected by a Requirement That, At the Conclusion of the Business Court Litigation, Hawks Note Could Seek Enforcement of a Judgment Through the Bankruptcy Court.*

Resolution of the Business Court Litigation in the state court forum will not prejudice the Debtors' bankruptcy estate (assuming, in the first instance these Debtors are permitted to remain in bankruptcy). If Hawks Note succeeds on its counterclaims against Plaintiffs, this Court could require Hawks Note to seek enforcement of that judgment here. And if Debtors succeed in their claims against Hawks Note, then the value of the estate will increase. Either way, the claims should move forward now, and in the forum best suited to resolve them.

Again, there is no prejudice to Debtors caused by moving forward with all parties' claims in Business Court. Actually, Debtors are already more protected than most plaintiffs. After all, they have already posted a bond to secure the high-water mark of the funds they believe are theirs—the $1,023,622.40. *See* Ex. M, at 13-14; **Exhibit KK**, Plaintiffs' Notice of Posting Bond. In that sense, Debtors are already better off than most plaintiffs, since "[a]ggrieved parties regularly litigate claims successfully and receive money damages without first obtaining a prejudgment attachment." First Release Order, at ¶ 16.

## CONCLUSION

For the reasons set forth herein, Hawks Note Purchase, LLC respectfully requests that its Motion for Entry of an Order (I) Confirming the Automatic Stay Does Not Apply to the Release

of Funds on Deposit In Catawba County and (II) Lifting the Automatic Stay to Permit Pending State Court Litigation to Proceed be granted.

This the 2nd day of September, 2026.

*/s/ Brian R. Anderson*
Brian R. Anderson
N.C. State Bar No. 37989
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
Greensboro, NC 27401
(336) 378-5205; phone
(336) 378-5400 fax
Branderson@foxrothschild.com
*Counsel for Hawks Note Purchase LLC*

## INDEX OF EXHIBITS

| Exhibit | Description of Exhibit |
|---|---|
| **A** | Declaration of Eliezer Meisels, April 17, 2026 ("Eliezer Meisels Declaration") |
| **B** | Loan Agreement, by and between Plaintiffs and Regions Bank, Dated June 16, 2022 ("Loan Agreement") |
| **C** | Management Agreement, by and between Plaintiffs and Valor Residential Group LLC, June 15, 2022 ("Management Agreement") |
| **D** | Eliezer Meisels Fact Witness Deposition, Transcript Excerpt, Oct. 21, 2025 |
| **E** | Plaintiffs' Revised First Amended Complaint for Emergency TRO, Preliminary and Permanent Mandatory Injunction, Declaratory Judgment, Breach of Duty of Good Faith and Fair Dealing, Per Se Violations of N.C.G.S.A. § 45-36.7(D) and N.C.G.S.A. § 45-36.7(J), Predatory Lending, Abuse of Process and/or Malicious Prosecution, and Damages, October 10, 2025 ("Revised First Amended Complaint") |
| **F** | *In the Matter of: The Foreclosure of the Deed of Trust Executed by DOVER SUB 1 LLC, RRAIT SUB 1 LLC, MERCHANT'S SUB 1 LLC, and HAWKS LANDING OWNER LLC recorded in Book 03752, Page 0589, Catawba County* Registry, Catawba County Superior Court Division, 24 SP 463, Notice of Hearing Prior to Foreclosure Sale, December 18, 2024 ("Notice of Hearing Prior to Foreclosure Sale") |
| **G** | Defendant Hawks Note Purchase LLCs Amended Answer and Amended Verified Counterclaims, April 25, 2025 ("Hawks Note Amended Counterclaim") |
| **H** | Sale and Assignment Agreement, February 14, 2025 ("Loan Assignment") |
| **I** | Verified Complaint for Emergency TRO, Preliminary and Permanent Mandatory Injunction, Declaratory Judgment and Damages in the Business Court Litigation, March 24, 2025 ("First Verified Complaint"), |
| **J** | March 26, 2025 Hearing Transcript Excerpt |
| **K** | Apri 7, 2025 Hearing Transcript Excerpt |
| **L** | April 7, 2025 Preliminary Injunction ("Injunction") |

| | |
|---|---|
| **M** | Plaintiffs' Corrected Brief in Support of Motion to Modify Orders Releasing Funds to Defendant, April 30, 2026 |
| **N** | Plaintiffs' Motion for Reconsideration, March 11, 2026 |
| **O** | Hawks Note Purchase LLC's Motion to Dissolve Preliminary Injunction, September 24, 2025 |
| **P** | Hawks Note Purchase LLC's Brief in Support of Renewed Motion to Dissolve Preliminary Injunction, December 18, 2025 |
| **Q** | Plaintiffs' Brief in Support of Motion to Stay Order Denying Modification Motion, July 9, 2026 |
| **R** | Order Denying in Part and Granting in Part Defendant/Counterclaim Plaintiff Hawks Note Purchase, LLC's Renewed Motion to Dissolve Preliminary Injunction, January 27, 2026 ("Attachment Order") |
| **S** | Order Setting Bond Amount, February 13, 2026 ( "Initial Bond Order"). |
| **T** | Plaintiffs' Motion for 3-Day Extension to Post Bond, February 26, 2026 |
| **U** | Order Directing the Catawba County Clerk of Court to Release the Funds Held in the Clerk's Custody, March 5, 2026 ("First Release Order") |
| **V** | Plaintiffs' Motion for Reconsideration of Court's March 5, 2026 Order, March 11, 2026 |
| **W** | Order Denying Plaintiffs' Motion for Reconsideration of Court's March 5, 2026 Order, April 2, 2026 ("Second Release Order") |
| **X** | Plaintiffs' Motion to Modify Orders Releasing Funds to Defendant, April 17, 2026 |
| **Y** | Order on Plaintiffs' Motion to Modify Orders Releasing Funds to Defendant, June 11, 2026 ("Third Release Order") |
| **Z** | Plaintiffs' Notice of Appeal, July 9, 2026 |
| **AA** | Plaintiffs' Motion to Stay, July 9, 2026 |
| **BB** | Order Granting in Part Plaintiffs' Motion to Stay, July 20, 2026 |
| **CC** | Hawk Note Purchase LLC's Emergency Motion to Set Bond and Request for Expedited Briefing and Decision in the Business Court Litigation, July 23, 2026 |

| | |
|---|---|
| **DD** | Hawk Note Purchase LLC's Brief in Support of Emergency Motion to Set Bond and Request for Expedited Briefing and Decision, July 23, 2026 |
| **EE** | Plaintiffs' Brief in Response to Hawks Note Purchase LLC's Emergency Motion for Bond, July 27, 2026 |
| **FF** | Order Granting in Part Defendant Hawks Note Purchase, LLC's Emergency Motion to Set Bond, July 29, 2026 ("July 2026 Bond Order") |
| **GG** | August 15-31, 2026 Email from Max Weingarten to Dave Johnson, Subject: Re: [External] RE: Final Demand - 2025 Tax Returns - MaxMez NC LLC |
| **HH** | Order Granting in Part Plaintiffs' Emergency Motion to Compel Defendant's Discovery, Granting in Part Plaintiffs' Motion for Sanctions, and Setting Discovery and Post-Discovery Deadlines, July 16, 2026 |
| **II** | Order Granting in Part and Denying in Part Hawks Note Purchase LLC's Motion for Sanctions, November 17, 2025 |
| **JJ** | Order Denying in Part and Granting in Part Defendant Hawks Note Purchase, LLC's Motion to Exclude Plaintiffs' Experts, July 13, 2026 |
| **KK** | Plaintiffs' Notice of Posting Bond, June 26, 2026 |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>Hawks Landing Owner LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31122 (LTB) |
| In re:<br><br>Merchant's Sub 1 LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-31123 (LTB) |

**CERTIFICATE OF SERVICE**

I hereby certify that I have, this date, served or caused to be served a copy of the foregoing Motion for Entry of an Order (I) Confirming the Automatic Stay Does Not Apply to the Release of Funds on Deposit In Catawba County and (II) Lifting the Automatic Stay to Permit Pending State Court Litigation to Proceed by electronic mail using the Court's CM/ECF electronic service and/or first-class Mail, postage prepaid, on the following parties as addressed below:

Merchant's Sub 1, LLC
3 Alpine Court, Ste 200
Chestnut Ridge, NY 10977
*Debtor (via First-class mail)*

Hawks Landing Owner LLC
3 Alpine Court, Ste 200
Chestnut Ridge, NY 10977
*Debtor (via First-class mail)*

U.S. Bankruptcy Administrator Office
401 W. Trade Street
Suite 2400
Charlotte, NC 28202

Jason L. Hendren
Rebecca Redwine Grow
Lydia C. Carpenter
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
*Debtor's counsel*

S. Joshua Kahane
Glankler Brown, PLLC
6000 Poplar Avenue, Ste 400
Memphis, Tennessee 38119
jkahane@Glankler.com
*Debtor's counsel*

Jarret P. Hitchings
Bryan Cave Leighton Paisner LLP
301 South College Street, Suite 2150
Charlotte, North Carolina 28202
Email: jarret.hitchings@bclplaw.com
*Counsel for MaxMez NC, LLC*

All parties that have filed a Notice of Appearance in the case

This, the 2nd day of September, 2026.

*/s/ Brian R. Anderson*
Brian R. Anderson
N.C. State Bar No. 37989
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
Greensboro, NC 27401
(336) 378-5205; phone
(336) 378-5400 fax
Branderson@foxrothschild.com

*Counsel for Hawks Note Purchase LLC*